**No. 26-1992**

# United States Court of Appeals for the Federal Circuit

UCB, INC., UCB BIOPHARMA SRL, HANANJA EHF,
UNIVERSITY OF ICELAND

*Plaintiffs-Appellees*,

v.

CIPLA LIMITED, CIPLA USA INC.,

*Defendants-Appellants*,

*On Appeal from the United States District Court for the District of Delaware, No. 1:21-cv-01229-JLH*

**BRIEF OF PLAINTIFFS-APPELLEES**


Eric R. Sonnenschein
Kaveh Saba
Larissa Davis
Allyson Corigliano
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000

August 14, 2026

Alexa Hansen
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-7035

*Counsel for Plaintiffs-Appellees*

## PATENT CLAIMS AT ISSUE

## U.S. Patent No. 8,217,033

**Claim 13**. Claim 13 depends from claim 10, which in turn depends from a series of other claims, including independent claim 1.

1. A liquid pharmaceutical composition formulated for intranasal administration, comprising: (i) midazolam or a pharmaceutically [acceptable] salt thereof; and (ii) a methoxy-polyethylene glycol selected from the group consisting of methoxy-polyethylene glycol 350 and methoxy-polyethylene glycol 550.

> [2] The pharmaceutical composition of claim 1, further comprising propylene glycol.
>
> [3] The pharmaceutical composition of claim 2, further comprising water.
>
> [5] The pharmaceutical composition of claim 3, wherein the methoxy-polyethylene glycol is methoxy-polyethylene glycol 350.
>
> [7] The pharmaceutical composition of claim 5, further comprising polyethylene glycol.
>
> [10] The pharmaceutical composition of claim 7, wherein the polyethylene glycol is polyethylene glycol 400.

13. The pharmaceutical composition of claim 10, wherein the midazolam is present in a concentration from 0.001% (w/v) to 20% (w/v).

## U.S. Patent No. 8,809,322

**Claim 10.** Claim 10 depends from independent claim 1.

1. A liquid pharmaceutical composition formulated for intranasal administration comprising:

   (a) a therapeutically effective amount of a therapeutic agent selected from midazolam, a pharmaceutically acceptable salt thereof or combinations thereof; and

(b) a methoxy-polyethylene glycol [mPEG] of Formula I

$$H_3C—O—(CH_2CH_2O)_n—H$$

wherein n is a number in the range of 2 to 12.

10. The pharmaceutical composition of claim 1 wherein the therapeutic agent is midazolam.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1992

**Short Case Caption** UCB, Inc. v. Cipla Limited

**Filing Party/Entity** UCB Inc., UCB BioPharma SRL, Hananja EHF, and the University of Iceland

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/14/2026

Signature: /s/ Alexa Hansen

Name: Alexa Hansen

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| UCB Inc. | | All of the issued and outstanding shares of UCB, Inc. are held indirectly by UCB SA, through UCB Holdings, Inc. |
| UCB BioPharma SRL | | All of the issued and outstanding shares of UCB Biopharma SRL are held indirectly by UCB SA, through UCB Pharma SA and UCB Manufacturing, Inc., the latter being held directly by UCB, Inc. |
| Hananja EHF | | Hananja EHF is a private corporation with no parent corporation. No publicly held corporation owns 10% or more of the tock of Hananja EHF. |
| University of Iceland | | University of Iceland is a public university with no parent corporation and no publicly held stock. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| George F. Pappas (Covington & Burling LLP) | Charles Hall (no longer attorney at Covington & Burling LLP) | Jack B. Blumenfeld (Morris, Nichols, Arsht & Tunnell LLP) |
| Melissa Keech (no longer attorney at Covington & Burling LLP) | Yiye Fu (Covington & Burling LLP) | Megan E. Dellinger (Morris, Nichols, Arsht & Tunnell LLP) |
| John Y. Veiszlemlein (Covington & Burling LLP) | David S. Denuyl (no longer attorney at Covington & Burling LLP) | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

PATENT CLAIMS AT ISSUE

CERTIFICATE OF INTEREST

TABLE OF AUTHORITIES .......... v

TABLE OF ABBREVIATIONS .......... viii

STATEMENT OF RELATED CASES .......... x

INTRODUCTION .......... 1

COUNTERSTATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 4

A. Nayzilam and the Asserted Claims .......... 4
B. The Patents-in-Suit .......... 6
C. Proceedings Below .......... 7

SUMMARY OF THE ARGUMENT .......... 12

STANDARD OF REVIEW .......... 15

ARGUMENT .......... 17

I. The District Court Correctly Held that the Asserted Claims Were Not Obvious .......... 17

A. Cipla fails to demonstrate clear error in the district court's factual findings .......... 18

1. The district court correctly found no motivation to modify the Wermeling Formulation .......... 18

a) There was no motivation to reduce the viscosity of the Wermeling Formulation .......... 19
b) There was no motivation to use MPEG in an intranasal formulation .......... 24

c) Cipla's asserted "structural similarity" argument does not establish motivation to use mPEG.........27

2. The district court correctly found no reasonable expectation of success in using mPEG in an intranasal midazolam formulation.........30

a) The district court's findings of lack of reasonable expectation of success were amply supported by the record.........31
b) Cipla does not establish the district court clearly erred in finding no reasonable expectation of success.........34

(1) Rehashing evidence rejected by the district court does not establish clear error.........34
(2) Cipla's structural similarity arguments fail.........35
(3) Cipla has not shown a reasonable expectation of lowering viscosity sufficient to use the Wermeling Formulation with an unmodified device.........41
(4) Routine testing does not establish reasonable expectation of success.........44

3. The district court properly considered the scope and content of the prior art from the standpoint of the POSA.........45

a) The court made detailed findings about the POSA's knowledge.........45
b) The district court correctly interpreted the prior art in view of the POSA's knowledge.........46

(1) Wermeling '359.........46
(2) Carbowax.........47
(3) Cipla's other prior art.........49

c) The district court did not ignore record evidence ........ 50

4. The district court correctly found objective indicia do not support obviousness ........ 52

5. The district court correctly declined to treat the inventor's work as supporting obviousness ........ 54

B. The district court properly applied the law of obviousness ........ 59

1. The district court properly found the claims non-obvious based on its factual findings ........ 59

2. The district court did not commit legal error in reaching its conclusions of lack of motivation and reasonable expectation of success ........ 59

a) *KSR's* simple substitution framework is inapplicable ........ 60

b) *KSR*'s "obvious to try" framework is also inapplicable ........ 61

C. The district court properly viewed the prior art as a whole from the viewpoint of the POSA ........ 64

1. The district court considered the prior art holistically and did not require an "explicit" motivation ........ 64

2. The district court held Cipla to the reasonable expectation of success standard, not "absolute predictability" ........ 67

3. The district court did not improperly go "beyond the scope of the claims" in its motivation and reasonable expectation of success analysis ........ 68

D. Affirmance is compelled by the record ........ 74

II. Cipla Has Waived Its Anticipation Theory .................................... 74

CONCLUSION ........................................................................................ 75

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) .................................................. 71, 72

*Allergan, Inc. v. Sandoz, Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) .................................................. *passim*

*Almirall LLC v. Amneal Pharms. LLC*,
28 F.4th 265 (Fed. Cir. 2022)...................................................... 38, 39

*Anacor Pharms., Inc. v. Iancu*,
889 F.3d 1372 (Fed. Cir. 2018) ............................................. 28, 36, 37

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985) ..................................................................... *passim*

*Bayer Pharma AG v. Watson Laboratories, Inc.*,
874 F.3d 1316 (Fed. Cir. 2017) .................................................. 21, 22

*Biogen Int'l GMBH v. Mylan Pharms. Inc.*,
18 F.4th 1333 (Fed. Cir. 2021)........................................................... 14

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) .......................................................... 22

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ............................................. 45, 54, 68

*In re Dillon*,
929 F.2d 688 (Fed. Cir. 1990) .................................................... 28, 38

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
8 F.4th 1331 (Fed. Cir. 2021)............................................................ 30

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*,
918 F.3d 928 (Fed. Cir. 2019) .......... 15, 34

*Gen. Elec. Co. v. Wilkins*,
750 F.3d 1324 (Fed. Cir. 2014) .......... 51

*Glaxo Grp. Ltd. v. Apotex, Inc.*,
376 F.3d 1339 (Fed. Cir. 2004) .......... 17

*Grünenthal GmbH v. Alkem Lab'ys Ltd.*,
919 F.3d 1333 (Fed. Cir. 2019) .......... 36

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) .......... 70

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
141 F.4th 1367 (Fed. Cir. 2025) .......... 70

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......... *passim*

*In re Merck & Co.*,
800 F.2d 1091 (Fed. Cir. 1986) .......... 37

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) .......... 17, 39

*Millennium Pharms., Inc. v. Sandoz Inc.*,
862 F.3d 1356 (Fed. Cir. 2017) .......... 61

*MySpace, Inc. v. GraphOn Corp.*,
672 F.3d 1250 (Fed. Cir. 2012) .......... 51

*Neptune Generics, LLC v. Eli Lilly & Co.*,
921 F.3d 1372 (Fed. Cir. 2019) .......... 55

*Novartis Pharms. Corp. v. Watson Lab'ys Inc.*,
611 F. App'x 988 (Fed. Cir. 2015) .......... 16, 17

*In re Omeprazole Patent Litigation*,
483 F.3d 1364 (Fed. Cir. 2007) .......... 56, 57

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) .......... 58

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) .......... 55

*PAR Pharm., Inc. v. TWi Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) .......... 63

*In re Payne*,
606 F.2d 303 (C.C.P.A. 1979) .......... 38

*Pfizer Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .......... *passim*

*Pfizer Inc. v. Watson Pharms., Inc.*,
920 F. Supp. 2d 552 (D. Del. 2013) .......... 36

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) .......... 13, 36, 74

*Richardson-Vicks Inc. v. Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997) .......... 38

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) .......... 19, 74

*UCB, Inc. v. Accord Healthcare, Inc.*,
890 F.3d 1313 (Fed. Cir. 2018) .......... 16

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
74 F.4th 1360 (Fed. Cir. 2023) .......... 71

*Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*,
955 F.3d 25 (Fed. Cir. 2020) .......... 37

# TABLE OF ABBREVIATIONS

| Term/Abbreviation | Definition |
|---|---|
| ’033 Patent | U.S. Patent No. 8,217,033 (Appx93-107) |
| ’322 Patent | U.S. Patent No. 8,809,322 (Appx78-92) |
| asserted claims | Claim 13 of the ’033 Patent and Claim 10 of the ’322 Patent |
| Bechgaard ’608 | U.S. Patent No. 5,693,608 (Appx14849-14883) |
| Carbowax | Dow Chemical Co., CARBOWAX and CARBOWAX SENTRY Polyethylene Glycols and Methoxypolyethylene Glycols, PEGS & MPEGS (March 2006) (Appx14739-14798) |
| Cipla or Appellants | Cipla Limited and Cipla USA Inc. |
| Cipla Br. | Cipla’s Defendant-Appellant Brief |
| Handbook of Pharmaceutical Excipients | Rowe, R.C. et al., *The Handbook of Pharmaceutical Excipients* (2006) (Appx17244-17285) |
| IID 2006 | FDA’s Inactive Ingredient Database (in FDA-approved drugs) (October 2006) (Appx18327-18542) |
| ITI | Intranasal Therapeutics, Inc. |
| Knoester Formulation | The intranasal formulation in Knoester 2002 (Appx17479-17485) and Knoester 2002b (Appx17286-17298). |
| Merkus ’893 | Int’l Patent Publication No. WO 2005/067893 (Appx14934-14960) |
| mPEG | Methoxy-Polyethylene Glycol |
| patents-in-suit | The ’033 Patent and the ’322 Patent |
| PEG | Polyethylene Glycol |
| Appellees | Hananja Ehf, University of Iceland, UCB Inc., and UCB Biopharma SRL |
| POSA | Person of Ordinary Skill in the Art |

| **Term/Abbreviation** | **Definition** |
|---|---|
| Tracy ’672 | U.S. Patent Publication No. 2004/0247672 (Appx14884-14930) |
| USP 2006 | UNITED STATES PHARMACOPEIA 2006 (Appx14837-14848) |
| Wermeling 2006 | Wermeling, D.P., *Pharmacokinetics and Pharmacodynamics or a New Intranasal Midazolam Formulation in Healthy Volunteers* (2006) (Appx14799-14804) |
| Wermeling ’359 | U.S. Patent Publication No. 2004/0176359 (Appx14721-14738) |
| Wermeling Formulation | The intranasal formulation in ¶¶ [0061]/[0085] of Wermeling ’359 |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, appellees state as follows:

1. There have been no previous appeals in this case.

2. U.S. Patent Nos. 8,217,033 and 8,809,322 have been asserted in two actions relating to generic midazolam products from other generic manufacturers in the United States District Court for the District of Delaware, *UCB, Inc. et al. v. Hikma Pharms. USA Inc.*, No. 25-cv-00382 (JLH) (D. Del.) and *UCB, Inc. et al. v. Rubicon Research Ltd.*, No. 26-cv-00427 (JLH) (D. Del.), which may be directly affected by this Court's decision in the pending case.

## INTRODUCTION

Cipla's appeal asks this Court to do what appellate courts may not: reweigh evidence, disregard credibility findings, and convert factual disagreements into legal error. After a four-day bench trial, the district court issued detailed findings and held that Cipla failed to prove by clear and convincing evidence that the asserted claims were obvious over Wermeling '359 and Carbowax. Appx1-48. Those findings turned on classic fact questions—what the prior art taught, how the POSA would have understood it, whether there was motivation to combine, and whether success would have been reasonably expected. Cipla's burden on appeal is therefore a heavy one.

Cipla does not meet that burden. Its opening brief recasts the case as a simple substitution of one purportedly familiar excipient for another. But the district court found, based on credited expert testimony and documentary evidence, that even if the Wermeling Formulation required viscosity reduction (which the court found was not proven), that mPEG was not "familiar" in the intranasal space—having never been used, marketed, or suggested for intranasal formulations before the priority date, and that PEG and mPEG were not known substitutes in intranasal

formulations. Appx32-39. Nor, as the court found, would the POSA have reasonably expected that mPEG would permit a suitable intranasal formulation. *Id.* Those findings were not only plausible; they were well supported.

Contrary to Cipla's assertions, the district court did not impose an unduly rigid obviousness test. The court considered the prior art as a whole and from the perspective of the POSA. It found Cipla's proposed combination depended on hindsight—the record supplied no reason why the POSA would have selected mPEG, and no basis to reasonably expect that doing so would yield a successful intranasal pharmaceutical composition. Appx45-47. Cipla's contrary arguments largely repeat the evidence the district court considered and rejected.

Cipla abandoned any anticipation challenge and its obviousness appeal fails because it cannot show clear error in the factual findings. The judgment should be affirmed.

## COUNTERSTATEMENT OF THE ISSUES

1. On Cipla's obviousness allegation:

   a. Whether the district court correctly held that Cipla failed to prove by clear and convincing evidence the necessary factual predicates of its contention that the asserted claims were obvious over Wermeling '359 in combination with the Carbowax brochure.

   b. Whether the district court properly applied the law in concluding that the claims were not obvious, where the record established, and the district court found, that the POSA would not have been motivated to combine the prior art to arrive at the claimed invention, nor reasonably expected success in doing so.

2. On Cipla's anticipation allegation, whether Cipla has waived the contention that Wermeling '359 anticipates the asserted claims by failing to argue anticipation in its opening brief.

## STATEMENT OF THE CASE

### A. Nayzilam and the Asserted Claims

This Hatch-Waxman patent appeal concerns the epilepsy drug Nayzilam. Nayzilam is an advance in the treatment of acute repetitive seizures ("ARS"), a life-threatening condition in which epilepsy patients experience multiple seizures over a short time period. Appx5-6, Appx8 (FOF7-8, 16-18, 31).

Nayzilam is the first FDA-approved intranasal formulation for the treatment of ARS. Appx9 (FOF38). Prior to Nayzilam, the only FDA-approved treatment for ARS was Diastat, a rectally-delivered medication that was of limited use due to its inconvenient and intrusive route of administration. Appx7 (FOF25-27); Appx40 (FOF249); Appx42 (FOF253-254). Despite decades of research, prior to Nayzilam, there were no intranasal formulations FDA-approved for ARS in the United States. Appx7-8 (FOF28); Appx42 (FOF254).

As an intranasal formulation, Nayzilam provides patients with a safe, effective, and convenient medication that patients or their caretakers can quickly administer at home to stop serial seizures. Appx40 (FOF249); Appx42 (FOF254). Because of this, Nayzilam has been heralded as a "game changer" by one industry expert (Appx42-43

(FOF255)), and an "advance" by Cipla's clinical expert, Dr. Privitera. Appx5724-5725 (Privitera Tr. 834-835).

Nayzilam is an embodiment of the asserted claims, which cover pharmaceutical compositions for intranasal administration comprising the active ingredient midazolam (a benzodiazepine) and an excipient called mPEG. Appx10 (FOF48, 50). Asserted claim 13 of the '033 Patent requires the unique combination of midazolam, mPEG-350 (a particular grade of mPEG), PEG-400, propylene glycol, and water. Appx11-12 (FOF57-63). Asserted claim 10 of the '322 Patent requires the use of the midazolam base with mPEG. Appx13 (FOF65-67).

Although mPEG existed for 60 years before the January 2007 priority date, it had not once previously been used in any intranasal formulation. Appx17 (FOF101); Appx23 (FOF137); Appx33 (FOF204-205). The novel use of mPEG in Nayzilam, and the asserted claims, allowed large amounts of midazolam, a poorly water soluble drug, to be readily dissolved in the small volume of liquid necessary to administer to the nasal cavity, while simultaneously improving the formulation's sprayability to facilitate drug delivery across the nasal membrane. Appx10-11 (FOF53-54); Appx15 (FOF80-81); Appx19 (FOF109). The use

of mPEG, and in particular mPEG-350, was key to Nayzilam's success in treating ARS patients intranasally, when, after decades of research, numerous other formulations using known intranasal excipients—including Cipla's expert Dr. Wermeling's formulation—were unable to do so. Appx17-19 (FOF101-108); Appx42 (FOF254).

### B. The Patents-in-Suit

The patents-in-suit—the '033 and '322 Patents—are directed to liquid pharmaceutical compositions formulated for intranasal administration comprising midazolam and at least mPEG. They share substantively identical specifications and the same January 19, 2007 priority date. Appx78-92; Appx93-107; Appx9 (FOF45); Appx10 (FOF49). The named inventor is Dr. Sveinbjörn Gizurarson.

The shared specification discloses that the inclusion of alkoxy-polyethylene glycols—specifically mPEG—in intranasal formulations provide several advantages: the therapeutic agent can be solubilized, but the resulting formulations are less viscous and cause less irritation to mucosal membranes. Appx83 ('322 Patent, 3:29-51); Appx98 ('033 Patent, 3:29-51). The lower viscosity formulations produce a spray pattern

optimized for delivering the therapeutic agent to the nasal membrane and minimize undesirable aftertaste. *Id.*

### C. Proceedings Below

In 2021, Cipla filed an ANDA seeking FDA approval to sell a generic version of Nayzilam. Appx13 (FOF68-69). In the district court, Cipla stipulated to infringement of the asserted claims but contended the claims were invalid as anticipated and obvious. Appx2; Appx14 (FOF74).

The district court held a four-day bench trial in October 2023. On anticipation, Cipla argued the asserted claims were anticipated by a United States Patent Application called Wermeling '359. Appx44. Wermeling '359 discloses intranasal formulations, including an exemplary formulation the parties called the "Wermeling Formulation" comprising 25 mg midazolam base, 0.18 mL PEG-400, 0.1 mg butylated hydroxytoluene, 1 mg saccharin powder, and q.s. to 1 mL propylene glycol. Appx18 (FOF106).

Cipla also argued the claims were obvious based on the combination of Wermeling '359 with Carbowax, a Dow Chemical marketing brochure. Appx45. Cipla contended that the POSA would have been motivated to use mPEG-350, mentioned in Carbowax, to reduce viscosity or improve

tolerability of the Wermeling Formulation, with a reasonable expectation of success. *Id.*

Appellees disputed Cipla's contentions, and presented extensive evidence of validity, including detailed rebuttal testimony from expert Dr. Hugh Smyth, a pharmaceutical sciences professor with decades of experience in intranasal drug delivery. On nonobviousness, Dr. Smyth testified that the POSA would not have been motivated to combine Wermeling '359 with Carbowax, and would not have reasonably expected success in doing so, because, among other reasons:

- mPEG was not a known excipient for intranasal formulations before the 2007 priority date and had never been used or suggested for intranasal use, despite being commercially available since the 1940s. Appx33 (FOF204-207); Appx5466-5473 (Smyth Tr. 615-22).

- Before 2007, the POSA would not have known how mPEG would affect solubility, viscosity, sprayability, permeability, stability, tolerability, permeability or safety in an intranasal midazolam formulation. Appx33-35 (FOF209-218); Appx5476-5501 (Smyth Tr. 625-50).

- The FDA determined that mPEG's prior topical use was "not relevant" to intranasal safety, classifying mPEG as a "novel excipient" requiring two-week toxicity studies in two species before clinical trials could proceed. Appx35 (FOF222); Appx5482-5486 (Smyth Tr. 631-35).

- Wermeling '359 did not suggest its formulation's viscosity was problematic, and the Wermeling Formulation was reported to be "well tolerated" in healthy volunteers—giving no reason to

reformulate. Appx36-38 (FOF227-228, 233); Appx5490-5501 (Smyth Tr. 639-50).

- PEG and mPEG were not interchangeable in the art—they have different chemical structures, different properties, different CAS numbers, and different pharmaceutical uses. Appx38-39 (FOF238-244); Appx5445-5458 (Smyth Tr. 594-607).

Appellees also introduced objective evidence of non-obviousness, including:

- **Long-felt need/failure of others**: The industry recognized a need for an intranasal ARS rescue treatment since the 1980s. Despite decades of effort by multiple researchers, none achieved FDA approval before Nayzilam in 2019. Appx40, Appx42 (FOF247-248, 254); Appx5236-5252 (Klein Tr. 425-41).

- **Industry praise**: A past American Epilepsy Society president described Nayzilam as a "game changer," and Cipla publicly praised Nayzilam before this litigation. Appx42-43 (FOF255); Appx5291-5293 (Klein Tr. 480-82).

- **Licensing**: Four companies licensed the patents-in-suit as of 2019. Appx43-44 (FOF257); Appx5508-5514 (Smyth Tr. 657-63).

- **Cipla's failed design-around**: Cipla spent three years testing numerous formulations using at least 25 excipients to develop an mPEG-free formulation but ultimately did not seek FDA approval for any formulation without mPEG. Appx43 (FOF256); Appx5518-5530 (Smyth Tr. 667-79).

Appellees presented evidence of a nexus between these objective indicia and the asserted claims, as Nayzilam is an undisputed embodiment of those claims. Appx10 (FOF48).

Following trial and post-trial briefing, the district court issued detailed findings of fact and conclusions of law, concluding that Cipla failed to prove invalidity by clear and convincing evidence. Appx1-48.

On anticipation, the court rejected Cipla's contention that Wermeling '359 discloses each element of the asserted claims. Appx44-45. Cipla does not challenge that ruling on appeal.

On obviousness, the court found that Cipla failed to prove the claims obvious over Wermeling '359 combined with Carbowax, rejecting Cipla's combination on multiple grounds:

- **No motivation to select mPEG for intranasal use:** mPEG had never been used or suggested for intranasal use; Carbowax described its pharmaceutical use only as a "chemical intermediate," not for intranasal use. Appx32-33, Appx36 (FOF203-207, 224-226).
- **No motivation to reduce viscosity:** Neither Wermeling '359 nor any other prior art suggested that the viscosity of the Wermeling Formulation was problematic; indeed, Wermeling '359's only viscosity-related agents mentioned were viscosity increasing agents. Appx36-37 (FOF227-228).
- **No motivation to improve tolerability:** the Wermeling Formulation was "well tolerated" in healthy volunteers. Appx37-38 (FOF233).
- **No reasonable expectation of success for using mPEG:** Before 2007, nothing was known about mPEG's safety, stability, tolerability, solubilizing ability for midazolam, sprayability, or permeability intranasally. The FDA classified mPEG as a "novel excipient" requiring toxicity studies before clinical trials. Appx33-36 (FOF209-218, 222); Appx46-47.

- **PEG and mPEG not interchangeable:** The compounds were not known substitutes in the intranasal formulation art as of the priority date. Appx38-39 (FOF238-245).

The court considered the full landscape of prior art references asserted by Cipla, finding that none suggested mPEG for intranasal use. Appx17-29 (FOF101-186); Appx45-46.

The court considered such evidence from the standpoint of the POSA, finding that intranasal formulation was complex and multivariate, and that the POSA would have understood that just because one excipient (PEG) had been used topically and intranasally did not mean that all compounds that had been used topically could be used intranasally. Appx15-17, Appx35 (FOF78-100, 220-222). The court rejected Cipla's assertion that limited topical use of mPEG informed its suitability for intranasal use, finding that the POSA would have understood the skin and nasal mucosa are different tissues with different safety requirements (Appx35 (FOF220)); intranasal formulations involve unique development considerations (Appx35 (FOF221)); and the FDA confirmed this distinction by determining that mPEG's prior topical use was "not relevant" to intranasal use (Appx35-36 (FOF222-223)).

In making its findings, the district court "considered all of the evidence in the trial record," Appx4 (FOFn.3), including objective indicia, which the court concluded "doesn't help Cipla meet its burden to prove by clear and convincing evidence that the asserted claims are obvious." Appx47.

The court found Appellees' formulation expert Dr. Smyth "particularly credible":

> Given Dr. Smyth's extensive experience in drug formulation, including development of intranasal formulations specifically, the internal consistency of his testimony, the consistency of his testimony with other evidence in the record, and his demeanor testifying at trial, the Court finds Dr. Smyth's testimony particularly credible. To the extent that Dr. Smyth's testimony conflicts with the testimony of other testifying experts, the Court credits Dr. Smyth's testimony.

Appx14 (FOFn.6). The court entered final judgment in favor of Appellees. This appeal followed.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's judgment that the asserted claims are not invalid. The district court heard extensive fact and expert testimony, made detailed credibility findings, and issued carefully reasoned findings of fact and conclusions of law. On appeal,

Cipla does not challenge the district court's rejection of its anticipation theory; only obviousness. But Cipla's arguments fall far short there too.

Under governing law, Cipla was required to demonstrate by clear and convincing evidence that the POSA would have (1) been motivated to combine the teachings of the prior art references to achieve the claimed invention, and (2) had a reasonable expectation of success in doing so. *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). The district court found that Cipla failed on both elements. It rejected Cipla's contention that the POSA would have been motivated to modify the Wermeling Formulation (as described in Wermeling '359) to reduce its viscosity using mPEG-350 (as described in Carbowax), and found no reasonable expectation of success in doing so. These findings were amply supported by the documentary evidence and credited expert testimony establishing that even if there was a suggestion that the Wermeling Formulation needed to have a reduced viscosity (which there was not), mPEG was not a known excipient for intranasal formulations—having never been used or suggested for use before the 2007 priority date despite being commercially available since the 1940s; was not interchangeable with PEG; and that the POSA would not have known

and could not have predicted how mPEG would impact the numerous functional characteristics that must be accounted for in a successful intranasal formulation.

Cipla now must demonstrate clear error in these findings—a heavy burden it has not met. The clear-error standard "requires courts to exercise deference when reviewing findings of fact, unless there is a 'definite and firm conviction that a mistake has been made.'" *Biogen Int'l GMBH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1341 (Fed. Cir. 2021); *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985); *Allergan, Inc. v. Sandoz, Inc.*, 796 F.3d 1293, 1303 (Fed. Cir. 2015) (hereinafter "*Allergan II*"). But Cipla fails even to engage with that standard. Cipla never once uses "clear error," "clearly erroneous," or "definite and firm conviction" outside its perfunctory recitation in the standard-of-review section—let alone applies that standard to demonstrate any specific factual finding is clearly erroneous. *See generally* Cipla Br. 1-65. Instead, Cipla rehashes the same evidence the district court weighed and rejected, as if pointing to that evidence alone mandates reversal. It does not. Under the applicable standard, this Court does "not ask whether evidence could have supported the opposing view, only whether the

district court clearly erred." *Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 936-37 (Fed. Cir. 2019). And "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573-74. Here, the district court's findings are, at the very least, "plausible"—and Cipla has not come close to showing otherwise.

Cipla's remaining efforts at obtaining reversal—mischaracterizing the district court's opinion, improperly labeling questions of fact as legal ones, and misapplying the law of obviousness—are equally unavailing. The district court properly applied the law, and its judgment should be affirmed.

## STANDARD OF REVIEW

Although this Court reviews the ultimate conclusion of obviousness *de novo*, it reviews underlying factual findings for clear error. *Allergan II*, 796 F.3d at 1303-04. The scope and content of the prior art, the POSA's interpretation of the prior art, motivation to combine, reasonable expectation of success, and objective indicia are all questions of fact. *Id.*

The clear error standard demands that the Court defer to the district court's factual findings unless "[it is] left with a definite and firm conviction that a mistake has been made." *Id.* at 1303; *Anderson*, 470 U.S. at 573-74. "The burden of overcoming the district court's factual findings is, as it should be, a heavy one." *Novartis Pharms. Corp. v. Watson Lab'ys Inc.*, 611 F. App'x 988, 994 (Fed. Cir. 2015) (citations omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573-74. This Court cannot "reweigh evidence, make credibility findings, or find facts" on appeal. *UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1326 (Fed. Cir. 2018).

## ARGUMENT

### I. The District Court Correctly Held that the Asserted Claims Were Not Obvious

The district court rejected Cipla's obviousness challenge, finding Cipla failed to prove by clear and convincing evidence that the asserted claims were obvious over the combination of Wermeling '359 and Carbowax. Cipla now faces a heavy burden on appeal. *First*, Cipla must overcome the presumption of validity, which requires proof of invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). *Second*, Cipla's task is further complicated because these prior art references were before the Examiner during prosecution of the patents-in-suit. *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004); Appx94-95 ('033 Patent, References Cited); Appx5552 (Smyth Tr. 701). *Third*, Cipla must demonstrate the district court's underlying factual findings were clearly erroneous—"a heavy" burden that requires this Court be "left with [a] definite and firm conviction that a mistake has been made." *Novartis*, 611 F. App'x at 994; *Allergan II*, 796 F.3d at 1303; *Anderson*, 470 U.S. at 573-74.

As discussed below, Cipla comes nowhere close to meeting this burden. The district court issued a thorough, carefully-reasoned opinion

replete with factual findings grounded in the record, and Cipla cannot establish clear error in any of them. With those factual findings as the predicate, application of the law of obviousness is straightforward: the asserted claims were not obvious, and this Court should affirm the judgment below.

### A. Cipla fails to demonstrate clear error in the district court's factual findings

Cipla contends that the POSA would have been motivated to modify the exemplary Wermeling Formulation described in Wermeling '359 to reduce its viscosity using mPEG, mentioned in Carbowax, with a reasonable expectation of success. Cipla Br. 40-41. The district court rejected Cipla's assertions in detailed findings that were amply supported by the record, including credited expert testimony from Dr. Smyth. Appx1-48. Those findings were clearly *correct*—not clearly erroneous.

#### 1. The district court correctly found no motivation to modify the Wermeling Formulation

At trial, Cipla advanced two theories as to what would have motivated the POSA to modify the Wermeling Formulation using

mPEG,[1] but on appeal asserts only one: to reduce the viscosity. Cipla Br. 46, 59-60. The district court correctly rejected this theory, finding the POSA (1) would not have been motivated to reduce the viscosity of the Wermeling Formulation; and (2) even if so motivated, would not have selected mPEG as the means of doing so. Cipla fails to demonstrate clear error in either finding.

**a) There was no motivation to reduce the viscosity of the Wermeling Formulation**

The district court correctly found that the POSA would not have been motivated to reduce the viscosity of the Wermeling Formulation. As the court observed, "Wermeling '359 did not suggest that the viscosity of the Wermeling Formulation (or any other formulation) was too high." Appx36 (FOF227). Wermeling '359's only discussion of viscosity-affecting agents involves viscosity *increasing* agents "to promote nasal absorption" (*id.*)—pointing in the opposite direction from what Cipla's purported motivation theory requires.

---

[1] Cipla also lost below on its theory that the POSA would have been motivated to substitute propylene glycol with mPEG and water to improve tolerability. Appx21 (FOF127); Appx37-38 (FOF233). Cipla has abandoned that theory on appeal and therefore waived it. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

Cipla argued below that the POSA would have been interested in reducing viscosity so that the Wermeling Formulation could be delivered through a standard, unmodified nasal spraying device. But the district court found that "Wermeling '359 did not state that the use of a modified device was problematic." Appx36-37 (FOF228). Nor, critically, did Wermeling '359's own author treat the modified device as a problem to be solved: Dr. Wermeling—who served as Cipla's paid expert at trial—"did not attempt to reformulate the Wermeling Formulation to be delivered through an unmodified device" at any point before the priority date. *Id.* It was not until after this litigation began that Dr. Wermeling suggested, while testifying for Cipla, that the formulation's viscosity should be reduced. *Id.* Given such timing, the district court did not err in discounting his testimony as hindsight reconstruction. *Id.*; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (warning against "hindsight bias").

Cipla argues "there was strong evidence" the POSA would have been motivated to reduce the Wermeling Formulation's viscosity. Cipla Br. 47. But pointing to evidence the district court already weighed and rejected does not establish clear error. The clear-error standard is not

satisfied by showing the record could have supported a different finding; Cipla must show that the district court's findings were not "plausible" in light of the record as a whole, and leave this Court with a "definite and firm conviction" that a mistake was made. *Anderson,* 470 U.S. at 573-74; *Allergan II*, 796 F.3d at 1303. Cipla has not made that showing. The district court's finding here was amply plausible: Wermeling '359 did not suggest the formulation's viscosity was too high (Appx36 (FOF227)); Dr. Smyth testified, and the district court credited, that the POSA would not have been motivated to reduce it (Appx4, Appx36-38 (FOFn.3, 227-228, 233)); and Dr. Wermeling himself took no steps to do so before the priority date (Appx36-37 (FOF228)). That readily supports a lack-of-motivation finding under clear-error review.

Cipla cites *Bayer Pharma AG v. Watson Laboratories, Inc.*, 874 F.3d 1316, 1325-26 (Fed. Cir. 2017) to suggest there need not be a "known problem" for there to be a motivation to modify a formulation. Cipla Br. 60. But *Bayer* is inapposite. In *Bayer*, the prior art itself provided the motivation by expressly disclosing the advantageous combination. The absence of a problem with mannitol alone was immaterial precisely because the art affirmatively taught the combination. *Bayer*, 847 F.3d at

1325-26. Here, no reference affirmatively taught using mPEG in an intranasal formulation, nothing identified the Wermeling Formulation as having a viscosity problem that needed to be solved (Appx36-37 (FOF227-228)), and the Wermeling Formulation was reported to be "well tolerated" in healthy volunteers (Appx36-38 (FOF227, 233)).

Cipla also cites *Bayer* in arguing that the motivation inquiry is "not limited to what already has or could gain FDA approval" (Cipla Br. 53 (citing *Bayer*, 847 F.3d at 1326)), but that observation is inapposite because the district court here did not base its finding on FDA approval requirements. It found that nothing in the prior art suggested mPEG for intranasal use and that mPEG's suitability for any intranasal formulation was unknown—findings grounded in the absence of information in the prior art, not the absence of FDA approval. Appx45-46.

Cipla relies on Dr. Wermeling's testimony but fails to grapple with the district court's credibility determination. Cipla Br. 59-60. District courts have "wide discretion to weigh expert credibility," and "[t]his court defers to such credibility determinations." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 929 (Fed. Cir. 2012). Here, the district

court found Dr. Smyth "particularly credible" based on his extensive intranasal formulation experience, the internal consistency of his testimony, its consistency with other record evidence, and his trial demeanor—and expressly credited his testimony over Dr. Wermeling's on every point of conflict. Appx14 (FOFn.6). Nowhere does Cipla argue, let alone establish, that the district court erred in that credibility determination or explain why the court was clearly wrong to credit Dr. Smyth over Dr. Wermeling. *See generally* Cipla Br. 1-65.

Finally, Cipla's remaining evidence—including snippets of testimony from fact witness Dr. Raouf Ghaderi (Cipla Br. 13, 17, 47, 59)—does not show that the Wermeling Formulation's viscosity was a problem requiring correction. Dr. Ghaderi testified that "you need to have a certain level of viscosity, but not too much." Appx5123-5124 (Ghaderi Tr. 312-13). But nothing in Wermeling '359 or elsewhere in the prior art indicated that the Wermeling Formulation's viscosity was "too much." Appx36 (FOF227). Indeed, Dr. Ghaderi's own testimony acknowledged the countervailing consideration: a formulation with too low a viscosity will "run[] down from the nose," rendering it unsuitable for intranasal use. Appx5123-5124 (Ghaderi Tr. 312-13); *see also* Appx16 (FOF88). Dr.

Ghaderi's testimony supports the district court's finding that the POSA would not have wanted to reduce viscosity in the Wermeling Formulation.

#### b) There was no motivation to use MPEG in an intranasal formulation

The district court also found that:

> [e]ven if the Court thought Cipla had proven that the POSA would have been motivated to modify the Wermeling Formulation in the ways that Cipla says (and the Court does not think that has been proven), the Court is wholly unpersuaded that mPEG (as described in Carbowax) would have been an obvious choice, given that its suitability for any nasal formulation was unknown[.]

Appx46. That finding was not clearly erroneous. The record established, and the district court found, that:

- mPEG had never been used in an intranasal formulation before the 2007 priority date, despite being commercially available since the 1940s. Appx33 (FOF204-205).

- mPEG had never been marketed for use in an intranasal formulation. Appx33 (FOF206).

- No prior art reference suggested the use of mPEG in intranasal formulations (Appx33 (FOF207)), including the full landscape of prior art asserted by Cipla. Appx17-19 (FOF101-108).

- Despite decades of research into intranasal midazolam formulations dating from the 1980s, "none of this literature or the attempted formulations used or suggested the inclusion of mPEG." Appx17 (FOF101).

- Carbowax described numerous pharmaceutical uses for PEG in liquid medications including nose and ear drops, but disclosed mPEG only as a "chemical intermediate," not for intranasal or even pharmaceutical excipient use. Appx23 (FOF140-141, 143).

- Tracy '672—directed to injectable sustained-release compositions—listed mPEG as one of dozens of potential viscosity reducing agents, and "a POSA would not understand Tracy '672 to disclose or suggest the use of mPEG for an intranasal formulation." Appx27-28, Appx33 (FOF173-177, 207).

- Even Cipla—before this litigation—described mPEG as a "novel" and "special" excipient. Appx33 (FOF208).

Nothing in the prior art, individually or collectively, suggested mPEG for intranasal administration. The POSA surveying the landscape of intranasal midazolam formulations in 2007 would not have contemplated mPEG—much less been motivated to use it. It was certainly not clear error for the district court to so find.

The district court's findings were further bolstered by its determination that the POSA would not have known—and could not have predicted—how mPEG would perform across the multiple parameters critical to intranasal pharmaceutical formulation. Specifically, the court found that the POSA would not have known:

- how well mPEG could solubilize midazolam. Appx34 (FOF215).

- how mPEG would affect an intranasal formulation's sprayability or spray plume. Appx34 (FOF216).

- how mPEG would affect permeability of midazolam through the nasal mucosa. Appx34 (FOF217).

- how mPEG would affect the stability an intranasal midazolam formulation. Appx35 (FOF218).

- whether mPEG was safe or tolerable for use in an intranasal formulation. Appx33 (FOF209-10).

- whether mPEG would affect the nasal cilia—a critical safety consideration because damage to cilia impairs the patient's immune system. Appx34 (FOF211).

- any pharmacokinetic data for an intranasal formulation comprising mPEG-350. Appx34 (FOF212).

The district court did not clearly err in finding the POSA would not have selected an excipient whose effects on every relevant intranasal formulation functional characteristic were unknown. Appx33-35 (FOF209-218). This conclusion was reinforced by the unique challenges of intranasal formulation, as the court found: the nasal cavity retains only 100-200 μL of liquid (requiring highly concentrated formulations) (Appx15 (FOF80-81)); the mucociliary clearance mechanism rapidly removes foreign substances (Appx15-16 (FOF86-87)); excipients can

interact in complex ways affecting sprayability (Appx16 (FOF92)); and there are different safety requirements for intranasal formulations than for topical products because "the skin and nasal mucosa are different tissues" (Appx35 (FOF220)). The POSA confronting this comprehensive uncertainty would not have selected mPEG—she would have chosen from excipients with more established intranasal track records. It was not clear error for the district court to find that the POSA would not have been motivated to use mPEG in an intranasal formulation.

#### c) Cipla's asserted "structural similarity" argument does not establish motivation to use mPEG

Largely ignoring the evidence above, Cipla argues that there was motivation to use mPEG because PEG and mPEG are "structurally similar." Cipla Br. 29-32, 42-44, 49. This argument is unavailing for multiple reasons.

*First*, it is based on the premise that the POSA would have viewed PEG and mPEG as interchangeable and therefore understood mPEG to be suitable for intranasal use. But the district court found the opposite: notwithstanding some backbone overlap, these excipients have different chemical structures, different physical and chemical properties, different

CAS Registry Numbers, and different uses—including, critically, that PEG had been used in intranasal formulations while mPEG had not—and ultimately that "PEG and mPEG were not known to be interchangeable in the art as of the priority date." Appx30-31, Appx38 (FOF192-196, 238-239). None of these findings were clearly erroneous. Cipla merely rehashes its trial evidence without demonstrating that the district court's findings on the differences were implausible in view of the record as a whole. Cipla Br. 29-40.

*Second*, Cipla cites no evidence that structural similarity between mPEG and PEG by itself would have motivated the substitution of mPEG for PEG in an intranasal formulation. Similarity in structure does not necessarily predict similarity in properties. *See Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1385 (Fed. Cir. 2018) ("[O]ur cases recognize that the chemical arts are unpredictable and that similar structures do not always result in similar properties."). Cipla identifies nothing establishing that those of ordinary skill in the art understood structural overlap with PEG to translate into an understanding of mPEG's intranasal functional characteristics, let alone in a manner that would motivate selection of mPEG. *See In re Dillon*, 929 F.2d 688, 692-93 (Fed.

Cir. 1990) ("the prior art [must] give[] reason or motivation to make the claimed compositions" beyond "structural similarity" alone). Furthermore, Cipla's structural-similarity argument proves too much: mPEG was commercially available since the 1940s, and its structure was known—yet not a single intranasal formulator, over more than sixty years, used or suggested mPEG. Appx33 (FOF204-205); Appx17 (FOF101). Surely, if structural similarity to PEG were sufficient to motivate intranasal use for mPEG, someone would have tried it during the preceding six decades.

*Third*, Cipla's structural-similarity theory is internally inconsistent with its viscosity theory. On one hand, Cipla contends that PEG and mPEG are so structurally similar that the POSA would expect them to have "similar properties" and would view them as "interchangeable." Cipla Br. 29-32. On the other hand, Cipla contends that the viscosity difference between PEG-400 and mPEG-350 is sufficiently meaningful to specifically motivate the POSA to select mPEG to replace PEG-400. Cipla Br. 46-48. Cipla cannot have it both ways. If structural similarity predicts similar properties, the POSA would not expect a meaningful viscosity difference when admixed into a midazolam

formulation—and therefore would have no reason to attempt the substitution under Cipla's theory. If the viscosity difference is meaningful enough to motivate the substitution of mPEG for PEG, then the compounds do not have "similar properties," and the interchangeability premise collapses. Either way, Cipla's arguments undermine each other, and structural similarity lends no support to Cipla's contention that the POSA would have been motivated to select mPEG for use in an intranasal midazolam formulation.

#### 2. The district court correctly found no reasonable expectation of success in using mPEG in an intranasal midazolam formulation

Independent of its extensive motivation findings, the district court also found that the POSA would not have reasonably expected success in using mPEG in any intranasal midazolam formulation, let alone the Wermeling Formulation. Appx32-39 (FOF203-245); Appx46-47. Like motivation, reasonable expectation of success is a factual finding reviewed for clear error—and a separate requirement Cipla must prove by clear and convincing evidence. *See Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021) (noting "clear distinction" between motivation and reasonable expectation of success). The district

court did not clearly err in finding that Cipla failed to prove this requirement by clear and convincing evidence.

#### a) The district court's findings of lack of reasonable expectation of success were amply supported by the record

The district court's lack of reasonable expectation finding was based on numerous subsidiary findings well-supported by the record.

*First*, the prior art was silent on critical parameters relevant to how mPEG would perform in any intranasal formulation. As detailed above in Part I.A.1.b), the district court found the POSA as of the January 2007 priority date would not have known how mPEG would affect any of the characteristics necessary for a successful intranasal pharmaceutical formulation—including safety, nasal cilia function, solubility, sprayability, permeability, stability, tolerability, or pharmacokinetics. Appx15, Appx17, Appx33-35 (FOF78, 95-99, 209-218).

*Second,* intranasal formulation development is complex. As the district court found, the POSA would have understood that intranasal formulation development is not a matter of optimizing a single variable in isolation, but balancing multiple interacting variables simultaneously, including solubility, stability, pH, drug absorption, viscosity,

sprayability, safety, and tolerability. Appx15 (FOF78). The POSA would have recognized these variables must be balanced through selection of excipients and devices (Appx17 (FOF99)), and that "[i]n formulations comprising multiple excipients, the excipients can interact in complex ways." Appx16 (FOF92).[2] These complexities would have compounded the unknowns in working with mPEG in an intranasal formulation.

*Third*, intranasal administration is unique, presenting challenges that prevent mere repurposing of excipients previously used in topical formulations. The skin and nasal mucosa are different tissues with different safety requirements (Appx35 (FOF220-221)), and intranasal formulations pose considerations absent from topical use, including severe volume constraints (the nasal cavity retains only 100-200 µL of liquid, requiring highly concentrated formulations) (Appx15 (FOF80-81)); the effect of excipients on nasal cilia (damage to which impairs a patient's immune system) (Appx17 (FOF96)); the mucociliary clearance

[2] The court's sprayability findings illustrate this multivariate point. Efficacy requires understanding how chosen excipients affect midazolam's solubility, viscosity, sprayability, and permeability through the nasal mucosa (Appx34 (FOF214); Appx5427-5435 (Smyth Tr. 576-84)), and sprayability itself depends on viscosity, surface tension, excipient choice, and the spraying device—not viscosity alone. Appx16 (FOF91). Indeed, the court found that lowering viscosity does not always improve sprayability—for example, ethanol has a lower viscosity than water but does not spray better (Appx16 (FOF93)).

mechanism that rapidly removes foreign substances and affects drug absorption (Appx15-16 (FOF86-87)); and the need for permeability through the nasal mucosa to achieve systemic drug absorption (Appx15 (FOF85)). The FDA itself confirmed this distinction, determining that mPEG's prior topical use was "not relevant" to intranasal use and classifying mPEG as a "novel excipient" requiring "two-week toxicity studies of mPEG in two species before intranasal formulations comprising mPEG could progress to clinical trials." Appx35 (FOF222). In the case of the claimed invention, shortly after the priority date, a scientist discussed potential mPEG safety concerns, noting "no published toxicity data for intranasal use of mPEG" and expressing "particular concerns regarding the 'exposure of the nasal mucosa surface' to mPEG and potential toxicity from enzymatic conversion of mPEG to other compounds." Appx35-36 (FOF223).

These subsidiary findings, taken together, provide overwhelming support for the district court's finding that the POSA would not have reasonably expected success in using mPEG in an intranasal formulation, including the Wermeling Formulation. *See* Appx46-47.

**b) Cipla does not establish the district court clearly erred in finding no reasonable expectation of success**

**(1) Rehashing evidence rejected by the district court does not establish clear error**

As with motivation, Cipla largely rehashes evidence the district court rejected when arguing that the POSA would have reasonably expected success using mPEG in the Wermeling Formulation. *See, e.g.*, Cipla Br. 29-51. Doing so does not establish clear error. *See Forest*, 918 F.3d at 936-37 (this Court does "not ask whether evidence could have supported the opposing view, only whether the district court clearly erred").

For instance, Cipla argues that mPEG's sparse topical use—in a vaginal lubricant, two bars of soap, and a single FDA-approved topical gel—would have supported a reasonable expectation of success in using mPEG intranasally, because PEG was also used topically. Cipla Br. 35-36. Indeed, Cipla asserts, repeatedly, that the district court ignored the fact that both PEG and mPEG were "pharmaceutical excipients." *See id.* at 11, 30, 36. But the district court declined Cipla's invitation to ascribe similar characteristics to different compounds based on the mere fact that both had been used in topical formulations. Just because one

excipient had been used topically and intranasally (and thus was in a "pharmaceutical") did not mean that all excipients that had been used topically were "pharmaceutical excipients" that could be used intranasally. The court amply supported its rejection of Cipla's assertion, finding that topical use did not mandate intranasal suitability for several independent reasons: the skin and nasal mucosa are different tissues with different safety requirements (Appx35 (FOF220)); intranasal formulations involve unique development considerations noted above (Appx35 (FOF221)); and the FDA confirmed that mPEG's prior topical use was "not relevant" to intranasal use. Appx35-36 (FOF222-23). These findings were well supported by credited expert testimony (Appx14 (FOFn.6)) and documentary evidence (Appx35 (FOF222)) and certainly are not "implausible" as to be clearly erroneous.

#### (2) Cipla's structural similarity arguments fail

As with motivation, Cipla also argues "structural similarity" to contend that the district court should have found a reasonable expectation of success. Cipla Br. 29-32, 42-44, 49. Cipla emphasizes Dr. Wermeling's testimony that PEG and mPEG are "about 99 percent homologous" at the polymer backbone level (*id. at* 30), but the district

court heard that testimony and was unpersuaded. The court credited Dr. Smyth's "particularly credible" testimony (Appx14 (FOFn.6)) that notwithstanding backbone similarity, PEG and mPEG have different chemical structures, properties, and pharmaceutical uses, and were not known to be interchangeable in the art of intranasal formulation. Appx38 (FOF238-240). Backbone homology percentage says nothing about how a compound will affect the nasal mucosa, whether it will be safe for repeated intranasal exposure, or whether it will maintain formulation stability—the very characteristics the district court found to be unknown. *See Anacor*, 889 F.3d at 1385. Cipla's disagreement with how the court weighed this evidence is not clear error.

Moreover, even accepting *arguendo* that PEG and mPEG were "structurally similar," Cipla has pointed to no clear and convincing evidence that structural similarity translates into a reasonable expectation of developing a successful intranasal formulation. Indeed, structural similarity does not supply a reasonable expectation of success where the relevant properties remain unpredictable. *See, e.g.*, *Procter*, 566 F.3d at 996-97; *Grünenthal GmbH v. Alkem Lab'ys Ltd.*, 919 F.3d 1333, 1341-44 (Fed. Cir. 2019); *Pfizer Inc. v. Watson Pharms., Inc.*, 920

F. Supp. 2d 552, 560-61 (D. Del. 2013). Here, the district court found, based on ample evidence, that the POSA would not have reasonably predicted how mPEG would affect solubility, sprayability, permeability, stability, safety, tolerability, or cilia function intranasally. Appx33-35 (FOF209-218); Appx46-47. Cipla has pointed to nothing in the record that the mere incantation of "structural similarity" would have informed the POSA how mPEG would affect the nasal mucosa, whether it would be safe for repeated intranasal exposure, or whether it would provide a stable formulation. Appx33-35 (FOF209-218).

Cipla's case cites are unavailing, as each depended on demonstrated functional similarity—not bare structural resemblance—in the relevant application. Cipla Br. 29-32, 42-44, 49. Each court anchored its obviousness finding to shared therapeutic activity or properties providing independent, functional grounds for expecting success: shared antifungal potency in *Anacor*, 889 F.3d at 1383-85; shared psychotropic activity in *In re Merck & Co.*, 800 F.2d 1091, 1096-97 (Fed. Cir. 1986); shared opioid-receptor antagonism with demonstrated stability profiles in *Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*, 955 F.3d 25, 32-33 (Fed. Cir. 2020); shared pesticidal

activity among the classes of related compounds in *In re Payne*, 606 F.2d 303, 313-14 (C.C.P.A. 1979); shared analgesic effect and known interchangeability in *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1480-84 (Fed. Cir. 1997); and shared water scavenging properties and demonstrated "practical" equivalency in *In re Dillon*, 929 F.2d at 692-95.

The one cited case involving an excipient substitution—*Almirall LLC v. Amneal Pharms. LLC*, 28 F.4th 265 (Fed. Cir. 2022)—depended not on structural similarity alone but on established functional interchangeability in the context of the same type of formulation. There, the prior art taught that the gelling agents "were recognized to be interchangeable and equivalent gelling agents that could be used in topical formulations containing dapsone" (*id.* at 275), had been "successfully used for other similar topical formulations" (*id.* at 276), could be used "in the same concentration range" in similar topical formulations (*id.* at 275), had been taught in "overlapping concentrations" (*id.* at 276), and were "predictable design choices" for "topical dapsone formulations." *Id.* at 274.[3]

[3] Moreover, *Almirall* involved a much lower burden than Cipla faces—on standard of review *and* burden of proof. In *Almirall*, the Federal Circuit reviewed an IPR decision under the substantial-evidence standard, (continued...)

Here, by contrast, mPEG was not recognized as interchangeable with PEG for any purpose (Appx38 (FOF238)); was not known for use in intranasal formulations—much less intranasal midazolam formulations (Appx33 (FOF204-207)); and had no demonstrated functional performance in the relevant context of intranasal formulations (Appx33-35 (FOF209-218)). The missing element in every analogy Cipla draws is precisely the element that each cited court treated as essential: demonstrated *functional* performance in the application relevant to the claimed formulation. Without it, structural similarity alone does not establish a reasonable expectation of success.

Cipla's reliance on *Pfizer* is equally unavailing. 480 F.3d 1348; Cipla Br. 52-53. In *Pfizer*, the besylate addition salt formation's relevant functional properties—excellent pharmacokinetic properties, near-optimal solubility and improved active ingredient stability—were *affirmatively known* from the prior art, and the court found that the POSA would have expected success based on those "known chemical

which is less deferential than the clear-error standard applicable here. *See Almirall*, 28 F.4th at 271. And the petitioner bore only a preponderance-of-the-evidence burden to establish invalidity before the PTAB (*id.*)—not the heightened clear-and-convincing-evidence standard that applies to Cipla's invalidity challenge. *Microsoft*, 564 U.S. at 95.

characteristics." *Id.* at 1363. Here, by contrast, the relevant functional properties of mPEG for its role in an intranasal formulation were entirely unknown. Appx33-35 (FOF209-218). The *Pfizer* analogy breaks down at the point that matters: *Pfizer* involved making a compound whose relevant functional properties were established; this case involves using a compound whose relevant properties in an intranasal formulation were a blank slate. Moreover, while the *Pfizer* court found it "unimportant, if not actually irrelevant" that a besylate salt had not been used to treat the claimed indication specifically, that was because the utility of besylate salt for improving the stability, solubility, and physiochemical characteristics of other active ingredients was generally known. 480 F.3d at 1363. Here, mPEG's suitability for intranasal administration with any particular compound, much less for the intranasal midazolam formulations required by the claims, was not known to be generally applicable, a point the FDA confirmed by classifying it as a "novel excipient" for an intranasal formulation, requiring species-level toxicity testing. Appx35 (FOF222).

#### (3) Cipla has not shown a reasonable expectation of lowering viscosity sufficient to use the Wermeling Formulation with an unmodified device

The district court also found the POSA would "have expected that substituting mPEG into the Wermeling Formulation would not markedly lower viscosity;" that "[t]he POSA would not have expected that adding mPEG to the Wermeling Formulation would result in a viscosity compatible with standard commercial devices;" and that "the POSA would have expected that non-aqueous formulations comprising mPEG [including the Wermeling Formulation] would still require device modification." Appx37 (FOF230-231). Cipla cannot demonstrate clear error in these findings.

Cipla alleges that the district court "ignored" that the Wermeling Formulation contained PEG-400, which Cipla contends is "nearly twice as viscous as mPEG-350," and notes Carbowax's teaching that intermediate viscosities may be obtained by blending different Carbowax products. Cipla Br. 12-13, 17, 47-48. But the court did not "ignore" the viscosity comparison between mPEG-350 and PEG-400 or the Carbowax blending teaching—it considered and rejected these arguments in a

finding squarely supported by Dr. Smyth's credited testimony. Appx37 (FOF231).

On the PEG-400 comparison, Cipla overlooks that the Wermeling Formulation is not composed primarily of PEG-400—it is composed of roughly 80% propylene glycol by weight. Appx21 (FOF125). The relevant viscosity comparison for predicting the effect of substituting mPEG-350 is therefore not mPEG-350 versus PEG-400 in isolation, but how the addition of mPEG-350 would change the viscosity of the Wermeling Formulation in light of the other excipients. As the district court found based on Dr. Smyth's credited testimony, mPEG-350's viscosity is "similar to propylene glycol"—the very component that constitutes the majority of the Wermeling Formulation's solvent system—"which fall within the 'higher viscosity' formulations discussed in Wermeling '359." Appx37 (FOF231); Appx5492, Appx5498 (Smyth Tr. 641, 647). Substituting mPEG-350 for a fraction of PEG-400 in an 80%-propylene-glycol formulation would not dramatically alter the formulation's viscosity, and the court was entitled to credit Dr. Smyth's testimony that the resulting formulation would likely not have had "markedly different" viscosity. *Id.*

On blending, Cipla invokes a passage from Carbowax stating that "intermediate viscosities may be obtained by blending two different CARBOWAX Products" to achieve "the proper blend of PEGs and MPEGs to obtain the desired viscosity at any temperature." Cipla Br. 47-48; Appx14745. But this tells the POSA nothing about whether the substitution Cipla proposes—adding mPEG-350 to the Wermeling Formulation, while keeping the remaining ingredients—would achieve a viscosity compatible with an unmodified device, let alone how to achieve that viscosity. Cipla Br. 46-47. The Wermeling Formulation appears to require a specific viscosity level to transition from a modified device to a standard commercial device, but neither Carbowax nor any other prior art disclosed what that threshold level was, how close the Wermeling Formulation's current viscosity was to it, or whether adding mPEG-350 would get it there. Appx36-37 (FOF228); Appx5492 (Smyth Tr. 641) (Wermeling '359 does not "specify what level of viscosity constitutes higher viscosity compositions that require device modification" and does not "specify what level of viscosity constitutes a low enough viscosity such that it would not require device modification"). Carbowax's blending statement therefore would not have helped the POSA determine whether

mPEG-350 would make the Wermeling Formulation usable with an unmodified device.

Regardless, as discussed in Part I.A.1.c) and Part I.A.2.b)(2) above, Cipla cannot credibly contend the POSA would have reasonably expected the viscosity of the Wermeling Formulation with mPEG to be substantially different than it was with PEG given Cipla's structural similarity argument. If, as Cipla insists, PEG and mPEG are so structurally similar that the POSA would expect them to have "similar properties" and be "interchangeable" (*see* Cipla Br. 28-38), the POSA would also have expected mPEG-350 to result in a formulation with a similar viscosity as the Wermeling Formulation (with just PEG-400)—not a markedly lower one. Cipla cannot simultaneously argue that the POSA would have concluded that excipients are interchangeable yet also markedly different such that substituting mPEG would enable use of the Wermeling Formulation in an unmodified device.

**(4) Routine testing does not establish reasonable expectation of success**

Cipla also argues that safety and suitability testing for intranasal use would have been "routine." Cipla Br. 50, 57, 63. But that does not mean the POSA would have expected the testing to yield a positive result.

A reasonable expectation of success requires more than the ability to run an experiment—it requires a basis to expect the experiment will succeed. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1070-71 (Fed. Cir. 2012). As discussed above, the prior art provided no such basis here. *See supra* Part I.A.2.

#### 3. The district court properly considered the scope and content of the prior art from the standpoint of the POSA

Cipla also contends the court failed to view the prior from the "viewpoint of a POSA." Cipla Br. 51 (header). Cipla is mistaken. The court made detailed findings regarding the scope and content of the prior art from the standpoint of the POSA—findings that are reviewed for clear error. *See Allergan II*, 796 F.3d at 1303-04.

##### a) The court made detailed findings about the POSA's knowledge

The district court made detailed findings about the POSA's knowledge and applied that perspective throughout its analysis. *See, e.g.*, Appx14-17 (FOF75-100) (POSA's knowledge about intranasal formulation development); Appx20 (FOF119) (POSA's level of education and experience); Appx32-39 (FOF203-245) (applying POSA's perspective to the prior art). Findings about the POSA's knowledge included:

- What works safely on skin does not necessarily work on the nasal mucosa, and one could not extrapolate from mPEG's sparse topical use to determine intranasal suitability. Appx35 (FOF220-222).

- Intranasal formulation development is complex and involves balancing interacting variables rather than optimizing a single property. *See supra* Part I.A.2.a); Appx15, Appx16-17 (FOF78, 91-93, 99); Appx34 (FOF214).

- PEG and mPEG were not interchangeable—they have different chemical structures (PEG is a polyhydroxy alcohol; mPEG is not), different synthesis methods, different CAS Registry Numbers, different physical and chemical properties, and different pharmaceutical uses. Appx30-31, Appx38-39 (FOF193-196, 238-242). Every pharmaceutical compendium in evidence recognized them as distinct substances. Appx28-29, Appx38 (FOF179, 182, 184-185, 238).

#### b) The district court correctly interpreted the prior art in view of the POSA's knowledge

Applying such knowledge, the court also properly interpreted the prior art.

##### (1) Wermeling '359

The district court carefully considered Wermeling '359 and found it does not render the claims obvious. Appx21-22; Appx45-47. As the court found, Wermeling '359 does not mention mPEG by name or structure and does not discuss the use of PEG derivatives in an intranasal midazolam formulation. Appx22 (FOF129-130). Its express preference is for "polyhydroxy alcohols such as propylene glycol, polyethylene glycol, [and]

glycerol" as diluents—a category that excludes mPEG, which is not a polyhydroxy alcohol. Appx21 (FOF123-124). Wermeling '359's only discussion of viscosity-affecting agents involves viscosity *increasing* agents to promote nasal absorption. Appx22 (FOF132). And Wermeling '359 did not suggest that its formulations' viscosity was too high or that use of a modified spraying device was problematic. Appx36-37 (FOF227-228). Thus, nothing in Wermeling '359 pointed toward mPEG or reducing viscosity—let alone toward using an untested excipient, mPEG, to do so.

**(2) Carbowax**

The district court also made detailed findings regarding Carbowax, (Appx22-24, Appx36 (FOF135-147, 224-226)), correctly finding that it would not have suggested "us[ing] mPEG in an intranasal formulation." Appx36 (FOF224).

As the court found, Carbowax is a marketing brochure for commercial products, not a pharmaceutical reference, and discloses no exemplary pharmaceutical formulations comprising PEG or mPEG. Appx22-24 (FOF135, 144). Under "Liquid medications"—which discusses nose and ear drops and spray-on medications—Carbowax refers only to "CARBOWAX SENTRY liquid PEGs," not mPEG. Appx23 (FOF143). The

only pharmaceutical use for mPEG disclosed anywhere in Carbowax is as a "chemical intermediate." Appx23 (FOF141). By contrast, Carbowax discloses numerous non-pharmaceutical uses for mPEG, such as in adhesives, household products, printing and inks, and mandrel releases. Appx23 (FOF142). Carbowax discloses no intranasal formulations comprising midazolam or any other drug, no drug solubility in mPEG, and no information on mPEG's safety or tolerability for intranasal administration. Appx24 (FOF145, 147). The POSA reading Carbowax would thus see PEG highlighted for pharmaceutical applications, including nasal delivery, and mPEG relegated to industrial uses and chemical intermediates—far from a suggestion to use mPEG intranasally, or to treat PEG and mPEG as interchangeable across all applications.

Cipla wrongly accuses the district court of "view[ing] Carbowax in isolation." Cipla Br. 56-58. But the court reviewed Carbowax alongside the broader landscape of prior art discussed in Part I.A.3 and Part I.C below. It also found that even if the POSA were motivated to modify the Wermeling Formulation, it was wholly unpersuaded that mPEG as described in Carbowax would have been an obvious choice because "there

was little to no information *in the art*" suggesting mPEG would help achieve a lower-viscosity, device-compatible formulation. Appx46 (emphasis added). The court thus *explicitly* considered Carbowax in view of the art in its entirety.

#### (3) Cipla's other prior art

Despite Cipla's contrary arguments (Cipla Br. 56-59), the district court examined the prior art as a whole, finding a consistent picture: no use of or suggestion for using mPEG for intranasal formulations. As the court found, Bechgaard '608 disclosed intranasal benzodiazepine formulations using glycofurol and PEG-200, but did not mention mPEG. Appx24 (FOF148-149). The intranasal Knoester Formulation comprised midazolam, propylene glycol, benzyl alcohol, and water—no PEG or mPEG. Appx18 (FOF105); Appx25 (FOF155-156). Merkus '893 disclosed intranasal formulations comprising a midazolam salt, propylene glycol, water, and PEG—and notably discussed viscosity enhancing agents to promote absorption—but did not disclose mPEG. Appx26 (FOF162, 164). Wermeling 2006 reported administration of the Wermeling Formulation to healthy volunteers and did not discuss mPEG. Appx26-27 (FOF168, 171). Tracy '672, an injectable sustained-release composition reference,

mentioned mPEG only in a laundry list of dozens of potential viscosity-reducing agents and did not disclose any intranasal formulation or any exemplary formulation comprising mPEG. Appx27-28 (FOF173, 175-176).

The pharmaceutical compendia reinforced the distinction between PEG and mPEG: USP 2006 maintained separate entries for PEG and mPEG and, "repeatedly distinguishes the uses of PEG from those of mPEG." Appx28 (FOF179). The Handbook of Pharmaceutical Excipients "contains a chapter on PEG, but does not reference mPEG at all." Appx29 (FOF182). And IID 2006 listed over 100 entries for PEG across numerous routes of administration including nasal, but listed mPEG only once—in connection with a topical gel. Appx29 (FOF184, 186). The court thus considered the interrelated teachings of multiple references and found the art, viewed as a whole, did not suggest mPEG for intranasal use.

#### c) The district court did not ignore record evidence

Cipla repeatedly accuses the court of "ignoring" record evidence. *See, e.g.*, Cipla Br. 13-15, 16-17, 24-25, 29, 30, 34-35, 37, 39, 56, 58. But the court "considered all of the evidence in the trial record in making its findings." Appx4 (FOFn.3). While reciting "only the facts necessary for

the Court's legal conclusions," the court's "decision to cite and credit certain witnesses' testimony but not others does not mean that the Court ignored or failed to consider all of the testimony." *Id.*

Contrary to Cipla's implication, a district court need not mention every piece of evidence or recite every detail of its reasoning in its opinion. *See Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1331 (Fed. Cir. 2014) ("A district court need not write an opinion that expressly discusses every admitted exhibit."); *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1263 (Fed. Cir. 2012) ("Where the record adequately supports the judgment, the district court does not have an obligation to recite every detail of its reasoning.") (citation omitted).

Moreover, the district court directly addressed much of what Cipla contends was "ignored." For example, while Cipla contends the court "ignored" testimony about the structural homology of PEG and mPEG (Cipla Br. 30) and some overlapping uses (Cipla Br. 14), the court expressly weighed both: it found "PEG and mPEG have different chemical structures" and "different physical and chemical properties," (Appx38 (FOF239)), and addressed their respective uses, finding them "different" *in the most relevant respects*—including that PEG had been

used in intranasal formulations while mPEG had not. Appx38-39 (FOF240-242).

It is *Cipla* that ignores the key evidence—of PEG's roughly sixty-year commercial availability without any intranasal use or suggestion thereof (Appx33 (FOF204-207)); the art's uniform distinction between PEG and mPEG and their uses across pharmaceutical compendia (Appx38-39 (FOF238-244)); the FDA's classification of mPEG as a "novel excipient" for intranasal purposes despite its previous topical use (Appx35 (FOF222)); the absence of any prior art information on how mPEG would affect solubility, permeability, safety, tolerability, stability, or sprayability intranasally; the complex, multivariate nature of intranasal formulation development (Appx33-35 (FOF209-218)); and that, for over two decades, every researcher working on intranasal midazolam formulations selected other excipients despite mPEG's ready availability (Appx17-19 (FOF101-108)). The district court considered all this evidence; Cipla ignores most of it.

#### 4. The district court correctly found objective indicia do not support obviousness

The court also considered objective indicia evidence and correctly found it "doesn't help Cipla meet its burden to prove by clear and

convincing evidence that the asserted claims are obvious." Appx47. Cipla does not contend otherwise. Cipla Br. 51.

The record supports several objective indicia of non-obviousness. As the court found, the industry recognized a need for an intranasal ARS rescue treatment as early as the 1960s, and through the 1990s continued to call for a non-rectal, non-oral rescue medication administrable by non-medical personnel. Appx40 (FOF247-248). Despite that decades-long need, no FDA-approved intranasal formulation for ARS existed prior to 2007, and no new treatment became available until Nayzilam in 2019. Appx42 (FOF254). Nayzilam also received industry praise, including from epileptologist Dr. Jacqueline French, who called it a "game changer," and Cipla itself, which acknowledged pre-litigation that Nayzilam "resulted in rapid and sustained seizure control," had "an acceptable safety profile," and addressed a "critical unmet clinical need." Appx42-43 (FOF255). The patents-in-suit were licensed by four companies between 2007 and 2019—ITI, Upsher-Smith, Proximagen, and UCB—further evidencing industry recognition of the invention. Appx43-44 (FOF257). And Cipla itself spent three years and tested at least 25 excipients in various formulations without mPEG, attempting to

design around the Nayzilam formulation, yet never sought approval for any formulation that omitted mPEG. Appx43 (FOF256).

The district court nonetheless concluded that "the evidence offered for secondary considerations isn't particularly probative of non-obviousness under the circumstances here." Appx47. While Appellees maintain this evidence supports non-obviousness, affirmance does not depend on that point: even treating the evidence as neutral, neutral evidence cannot satisfy Cipla's burden to prove obviousness by clear and convincing evidence. *See In re Cyclobenzaprine*, 676 F.3d at 1080 n.8 (evidence that "do[es] not strongly support a finding of nonobviousness" but is "neutral" "add[s] little to [the challenger]'s claim of obviousness"). And Cipla has not proven aspects it would need to establish obviousness, including motivation and reasonable expectation of success.

#### 5. The district court correctly declined to treat the inventor's work as supporting obviousness

Cipla devotes significant ink citing to post-priority statements by the inventor, Dr. Gizurarson, in support of its obviousness contention. Cipla Br. 22-24, 34, 39-40, 49-50. But the district court did not clearly error in declining to give these statements weight. *See generally* Appx1-48. "The inventor's own path itself never leads to a conclusion of

obviousness; that is hindsight. What matters is the path [the POSA] would have followed, as evidenced by the pertinent prior art." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012). A factfinder therefore must not interpret the prior art "through the lens of what [the inventors] had invented." *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1377 (Fed. Cir. 2019).

Cipla relies heavily on an internal presentation in which Dr. Gizurarson suggested "[r]eplac[ing] all formulations where PEG has been used, with mPEG!" Cipla Br. 24, 39, 49. But this was from a November 2007 pitch to a pharmaceutical company prepared after the January 2007 priority date of the patents-in-suit—advocacy designed to generate commercial interest in his invention. Appx20 (FOF117). A post-invention promotional presentation by the inventor cannot retroactively establish that the invention was obvious to the POSA before the presentation was created. Moreover, the exclamation point in "with mPEG!" underscores that *the inventor* Dr. Gizurarson viewed this as a novel and exciting proposition—not a pedestrian substitution any formulator (or the POSA) would have made.

Cipla erroneously contends the district court "fail[ed] to consider" the Gizurarson Presentation (Cipla Br. 39-40, 49-50), but the court acknowledged it (Appx20 (FOF117)), and went on to find PEG and MPEG would not have been viewed interchangeably in view of the prior art. Appx38-39 (FOF238-245).

Cipla observes that Dr. Gizurarson's presentation contains data on physical and chemical properties of mPEG, which came from "Dow publications," but that does not help Cipla. Cipla Br. 23-24. It merely reinforces, as the district court found, that Carbowax discloses only mPEG's physical and chemical properties—not any suggestion that mPEG could be used as a pharmaceutical excipient in an intranasal formulation. Appx24 (146-145); Appx36 (FOF224-226).

Cipla's reliance on *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348 (Fed. Cir. 2007) and *In re Omeprazole Patent Litigation*, 483 F.3d 1364 (Fed. Cir. 2007) as support for obviousness misreads both cases. Cipla Br. 50. In *Pfizer*, the inventor's testimony was used to corroborate a finding of obviousness that was independently supported by the prior art itself—which suggested that "any and all pharmaceutically acceptable anions would form non-toxic acid addition salts and would work for their

intended purpose"—that is, improving the bioavailability, handling, and storage of the active ingredient. 480 F.3d at 1364-65. That there was some unpredictability in *Pfizer* did not "overcome the prior art's teaching that amlodipine besylate will work," and the inventor's testimony reflected a reasonable expectation of success the prior art *already* established. *Id.* at 1365 (cleaned up). Similarly, in *In re Omeprazole*, AstraZeneca's admissions corroborated obviousness where the prior art independently taught that L-arginine was a "an alkali substance" and where AstraZeneca conceded that "L-arginine is *generally known* as an alkaline reactive compound" and that its invention could easily "substitute [its claimed] alkaline reactive compounds [for the] L-arginine[.]" 483 F.3d at 1373-74. The admissions confirmed what the prior art already established as "generally known"; they were not foundational. Here, by contrast, the prior art did not independently establish motivation or reasonable expectation of success in using mPEG intranasally. Appx33-35 (FOF209-218); Appx45-46. With no prior-art foundation, there is nothing for Dr. Gizurarson's statements to corroborate. Cipla uses inventor testimony not to confirm what the art

showed, but to substitute for what it did not—hindsight reasoning *KSR* forbids. 550 U.S. at 421.

Moreover, when Dr. Gizurarson finally turned to mPEG, his own words reflect hypothesis-testing, not confident expectations of success: he "hypothes[ized]" that a methoxy substitution would improve solubility but "needed to test ... before knowing" (Appx5151-5152 (Gizurarson Tr. 340-341)), and "hop[ed]" lower viscosity "may solve some of the sprayability problems." Appx5153 (Gizurarson Tr. 342). This is the language of a researcher expressing hope in his intended research, not implementing a predictable substitution. *See OSI Pharms., LLC v. Apotex Inc.,* 939 F.3d 1375, 1384-85 (Fed. Cir. 2019) ("These references provide no more than hope—and hope … is not enough to create a reasonable expectation of success in a highly unpredictable art such as this.").

Finally, Cipla's characterization of Dr. Gizurarson's pre-filing testing as "minimal" (Cipla Br. 19-24, 39, 49) is not only irrelevant, but ignores that Dr. Gizurarson "worked to overcome challenges in solubilizing sufficient quantities of midazolam," and had "explored many excipients over nearly two decades." Appx19 (FOF112). Thus, Cipla

drastically understates the amount of work Dr. Gizurarson had done leading up to the invention.

### B. The district court properly applied the law of obviousness

#### 1. The district court properly found the claims non-obvious based on its factual findings

After making its factual findings, the court applied the law of obviousness. Appx45-47. Having found Cipla failed to establish the required motivation and reasonable expectation of success, and that no other evidence supported obviousness (Appx1-45), the district court reached the only conclusion permitted on these facts—Cipla had not demonstrated by clear and convincing evidence that the asserted claims were obvious. Appx45-48. Cipla now asserts that the district court made multiple legal errors, but Cipla is wrong.

#### 2. The district court did not commit legal error in reaching its conclusions of lack of motivation and reasonable expectation of success

Cipla's repeated assertion that the district court failed to follow *KSR* is specious. Cipla Br. 27-28, 38, 41, 48, 51-52, 56, 60. Consistent with *KSR*, the court made detailed findings on each *Graham* factor—(1) the scope and content of the prior art (Appx20-29 (FOF120-185)), (2) the differences between the claims and the prior art (Appx30-36 (FOF187-

225)), (3) the level of ordinary skill in the art (Appx20 (FOF119)), and (4) objective indicia of non-obviousness (Appx39-44 (FOF246-258))—and then applied those findings to the ultimate legal question of obviousness. Appx45-47; *KSR*, 550 U.S. at 406. The court then heeded *KSR*'s instruction that courts must guard against "*ex post reasoning*" (550 U.S. at 421), rejecting Cipla's obviousness contention as "pure hindsight." Appx45-46.

#### a) ***KSR's*** **simple substitution framework is inapplicable**

Cipla contends that "the district court erred by not properly applying the *KSR* test of combining known elements to yield predictable results" (Cipla Br. 28), and invokes the passage that "when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR*, 550 U.S. at 416. But that test is inapplicable here.

As the district court found—based on extensive trial testimony and documentary evidence—mPEG was not "known in the field" as an intranasal excipient, as it had never been used or suggested for intranasal delivery. Appx32 (FOF203); Appx45-46. And the court made

detailed findings that the effects of mPEG in an intranasal formulation were unknown and unpredictable, including its impact on the midazolam solubility, nasal mucosa permeability, safety and tolerability, formulation stability, and sprayability. Appx32-39 (FOF203-245); Appx45-47. In view of these findings, *KSR's* simple substitution framework does not apply, as it requires that the substitution yield "a predictable result." *KSR*, 550 U.S. at 416. Here, the district court found the opposite. *Cf. Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1364-66 (Fed. Cir. 2017) (holding that known components combined through a known technique did not render the product obvious where "neither the requisite motivation nor expectation of success is found in the prior art").

#### b) ***KSR*'s "obvious to try" framework is also inapplicable**

Cipla also quotes *KSR's* statement that when "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." Cipla Br. 48 (citing *KSR*, 550 U.S. at 421). Cipla suggests the universe of

intranasal excipient options was narrow enough to trigger this framework (Cipla Br. 48), but Cipla is mistaken.

*First*, this framework requires a "design need or market pressure to solve a problem," *KSR*, 550 U.S. at 421, but the district court found that neither Wermeling '359 nor any other source identified a viscosity problem to be solved in the Wermeling Formulation, and the use of a modified device was not described as problematic. Appx17-19, Appx20-29, Appx32-33, Appx36-37 (FOF101-110, 120-186, 203-208, 227-232); Appx45-47. Without a "design need or market pressure to solve," *KSR*'s "finite solutions" framework has no trigger.

*Second*, *KSR*'s "obvious to try" framework also requires that the solutions be "predictable," but the court found that the POSA would not have been able to predict the effect of substituting mPEG for PEG in an intranasal midazolam formulation. Appx39 (FOF243).

*Third*, the universe of options was not as narrow as Cipla contends. Cipla cherry-picks four liquid Carbowax products (Cipla Br. 36) and 31 USP "solvent excipients"[4] (Cipla Br. 37) but the POSA was not so limited

---

[4] Cipla's citation to USP 2006, and observation that it lists both PEG and mPEG as "solvent excipients" attempts to introduce yet another functional characteristic as a motivation to use mPEG for PEG (one it (continued…)

and the prior art disclosed "many different classes of excipients" for intranasal formulations. Appx17 (FOF100). That intranasal research formulators working in the field for decades never incorporated mPEG (disclosed first in the 1940s (Appx33 FOF204)) is powerful evidence that the POSA viewing the available options in 2007 would not have selected mPEG either.

Cipla argues the existence of many excipients should not defeat motivation because the challenger need not "to show the motivation be the best option, only that it be a suitable option from which the prior art did not teach away." Cipla Br. 60 (citation omitted). But the fact that there were many excipients to consider alone renders *KSR*'s "obvious to try" framework inapplicable. Moreover, *PAR Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1197-98 (Fed. Cir. 2014) cited by Cipla, requires that the option be "suitable"—precisely what the district court found mPEG would not have been understood to be. Appx45-46.

---

never raised below). But a list of "solvent excipients" says nothing about how these excipients affect viscosity, nor has Cipla argued either here or below that the solubility of midazolam in Wermeling's Formulation needed improving. And the mere fact that mPEG, PEG, propylene glycol and four grades of water (Cipla Br. 37) are all generically listed as solvents in USP 2006 does not undermine the court's careful reasoning that mPEG had not been shown to have the functional characteristics needed for an intranasal formulation. Appx32 (FOF203).

### C. The district court properly viewed the prior art as a whole from the viewpoint of the POSA

#### 1. The district court considered the prior art holistically and did not require an "explicit" motivation

Cipla also accuses the district court of violating *KSR* in countless other ways—complaining the court improperly "required precise teachings" and "an explicit prior art teaching" directed to intranasal mPEG use; failed to consider the "inferences," "creativity" or common sense of the POSA; read the prior art "in silos" rather than as a whole; required an "explicit motivation" in Wermeling '359 itself; and conducted an "overly rigid" analysis. Cipla Br. 4, 13-17, 24-27, 29-30, 33-35, 38-39, 41-42, 51-52, 56-60, 65.

These bare attorney arguments, though framed in the language of *KSR*, all reduce to the same underlying complaint: Cipla's dissatisfaction with the district court's factual findings. Cipla cannot convert its unsupported factual disagreements with the district court—which are reviewed for clear error—into legal errors by labeling the court's analysis "too rigid"; claiming it "failed to consider inferences" and "common sense"; or otherwise invoking the language of *KSR*. Were that permitted, the

clear-error standard for obviousness's factual predicates would be a dead letter.

Regardless, Cipla's accusations are meritless. For example, while Cipla accuses the court of viewing the prior art "in silos" (Cipla Br. 56), the court considered the prior art holistically. *See supra* Part I.A.3.

Nor did the court require the motivation to modify the Wermeling Formulation to come expressly from Wermeling '359 itself. Cipla Br. 59-60. The court found, as a matter of fact, that neither Wermeling '359 nor any other source supplied such a motivation. Appx17-19, Appx20-29, Appx32-33, Appx36-37 (FOF101-110, 120-186, 203-208, 227-232); Appx45-47. The court acknowledged that formulators generally prefer FDA-approved nasal devices and must consider sprayability, which viscosity affects. Appx15-16 (FOF85, 94). But viscosity is only one factor among many in a successful intranasal formulation, and that general principle did not compel a finding that the POSA would reduce viscosity in this formulation—one administered to healthy volunteers and "well tolerated." Appx21, Appx37-38 (FOF127, 233). Indeed, the court recognized *risks* of reducing viscosity, including drainage that can impair absorption, and "lowering viscosity does not always improve

sprayability." Appx16 (FOF88, 93). The court's finding on lack of motivation to reduce viscosity in the Wermeling Formulation was consequently not "inconsistent with its own factual findings," as Cipla erroneously argues (Cipla Br. 59-60), nor did the court require motivation to come from Wermeling '359 itself.

Cipla similarly argues that the district court required an "explicit prior art teaching" of mPEG used intranasally (Cipla Br. 4, 15, 51), and failed to account for the inferences and creative steps of the POSA (*id.* at 6). But the court found that a "POSA would not have been motivated to use mPEG in an intranasal midazolam formulation because mPEG was not a known excipient for intranasal formulations, and it had not been used, marketed, *or even suggested* for use in an intranasal formulation." Appx32 (FOF203) (emphasis added). The word "suggested"—not "disclosed" or "taught"—confirms the court did not demand explicit disclosure. Nor did the court hold that an excipient can be obvious only if previously disclosed for the same route of administration. *See* Cipla Br. 15-16. It found only that, on this record, Cipla failed to show that using mPEG in an intranasal midazolam formulation would have been obvious. That conclusion is reinforced by the fact that, as of the priority date, no

one had ever used mPEG intranasally—something likely to have occurred earlier if selecting mPEG required only "ordinary creativity." *See KSR*, 550 U.S. at 421.

#### 2. The district court held Cipla to the reasonable expectation of success standard, not "absolute predictability"

Cipla accuses the district court of requiring "absolute predictability" (Cipla Br. 18, 25, 38-39), but the court did not use the phrase "absolute predictability" or demand certainty of outcome. The court applied the correct legal standard—reasonable expectation of success—and found Cipla failed to satisfy it:

> [Cipla has not] established by clear and convincing evidence that a POSA ***would have had a reasonable expectation of success*** in using mPEG, or specifically mPEG-350, in an intranasal midazolam formulation. . . . And, although Cipla asserts that the POSA would have been motivated to use mPEG in order to arrive at a midazolam formulation that could be administered using a standard nasal spraying device, ***the Court finds that the POSA would not have had a reasonable expectation*** that the inclusion of mPEG would achieve that result.

Appx46-47 (emphases added); *see also* Appx32-39 (FOF203-245) (repeated focus on "reasonable expectation of success").

Cipla relies upon the district court's statement that "[t]he POSA would not have been able to predict the effect of substituting mPEG for

PEG in an intranasal midazolam formulation." Cipla Br. 15 (citing Appx39). But that was a factual finding about the absence of information in the prior art, not a legal requirement of absolute certainty. When the prior art provides no information about whether a compound will be safe, tolerable, or effective for a particular use—such that its effects cannot be predicted—that is powerful evidence of the absence of a reasonable expectation of success, not the imposition of a heightened standard. *See In re Cyclobenzaprine*, 676 F.3d at 1069-73 (no reasonable expectation of success where prior art did not provide sufficient basis to predict formulation behavior).

#### 3. The district court did not improperly go "beyond the scope of the claims" in its motivation and reasonable expectation of success analysis

Cipla also contends the district court erred by considering characteristics like efficacy, tolerability, and safety when assessing motivation and reasonable expectation of success, because, according to Cipla, those characteristics are not specifically recited in the claims, and thus go "beyond the scope of the claims." Cipla Br. 4, 18-19, 60-62. In Cipla's view, the POSA would only need to "reasonably expect success of combining the claimed excipients into a liquid pharmaceutical

composition for intranasal administration"—that is, only need to expect that the excipients could be physically mixed. Cipla Br. 60-61. Under Cipla's theory, any combination of excipients that can be stirred into a liquid would presumably satisfy reasonable expectation of success, effectively reading out the claims' requirement that it be a "pharmaceutical" and "intranasal" formulation. But Cipla is wrong, as shown by the relevant claim language, this Court's precedent, Cipla's concessions below, and the logic of its appeal.

Contrary to what Cipla contends, the properties the district court considered *are* tethered to relevant claim language, and thus do not go "beyond the scope of the claims." Each asserted claim requires a "liquid pharmaceutical composition" for "intranasal administration." Appx107 ('033 Patent, cl. 1, 13); Appx92 ('322 Patent, cl. 1, 10). The words "pharmaceutical" and "intranasal" are not surplusage—they reflect that the composition must function as an intranasal medicine, not merely a mixture. As both sides' experts agreed, the POSA developing a pharmaceutical composition for intranasal administration would consider criteria including solubility, safety, efficacy, tolerability, viscosity, and stability. Appx15, Appx17 (FOF78, 95-99); Appx5427-5436

(Smyth Tr. 576-85); Appx4884-4887 (Wermeling Tr. 113-16). The POSA assessing reasonable expectation of success in making a "liquid pharmaceutical composition formulated for intranasal administration" therefore would necessarily consider whether the resulting formulation would perform as a pharmaceutical—safely, effectively, tolerably, and stably—when administered intranasally.

This Court's precedent confirms this view, holding that "it is not legal error or clear error to consider unclaimed factors" in the obviousness analysis "if a skilled artisan would reasonably consider" them in "creating a useful claimed invention." *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 141 F.4th 1367, 1383 (Fed. Cir. 2025). That is the case here, as both sides' experts agreed the POSA would have considered properties that bear on the suitability of the formulation as an intranasal pharmaceutical formulation, even if not expressly recited in the claims. Appx15, Appx17 (FOF78, 95-99); Appx5427-5436 (Smyth Tr. 576-85); Appx4884-4887 (Wermeling Tr. 113-16). Other precedent is in accord. *See, e.g.*, *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1345-46 (Fed. Cir. 2013) (toxicity to cells "would bear

heavily on whether a skilled artisan would have a reasonable expectation of success" even though not claimed).

To the extent Cipla invokes *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1369 (Fed. Cir. 2023), that case is inapposite. Cipla Br. 62. In contrast to *United*, the district court here did not require FDA-approval-level data or "insert the FDA's responsibilities into claims." *Id.* at 1369. It found only—as this Court's precedent permits—that basic pharmaceutical viability (safety, tolerability, stability) bears on whether the POSA would reasonably expect to produce a functioning pharmaceutical composition. Appx34 (FOF213-214). And Cipla's reliance on *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286 (Fed. Cir. 2013) (hereinafter "*Allergan I*"), is likewise misplaced. Cipla Br. 63-64. There, the district court erred by requiring a reasonable expectation of success in developing the specific commercial product rather than the claimed formulation, and by tethering its motivation analysis to FDA approval considerations. 726 F.3d at 1291-92. Here, the district court did neither. It did not require Cipla to show a reasonable expectation of developing Nayzilam specifically—it found Cipla failed to show a reasonable expectation of producing the basic claimed liquid pharmaceutical

formulation suitable for intranasal administration comprising midazolam and mPEG. Appx46-47. And unlike *Allergan I*, where BAK was a known, widely-used preservative in formulations containing the well-established ophthalmic drugs (726 F.3d at 1291-93), mPEG had no established intranasal track record, and its relevant functional properties in an intranasal midazolam formulation were unknown. Appx33-35 (FOF209-218).

Indeed, Cipla's own counsel conceded at closing argument that properties bearing on a formulation's suitability as an intranasal pharmaceutical—including efficacy and safety—are relevant to reasonable expectation of success, even if not specifically recited in the claims. The district court asked Cipla's counsel whether the POSA would need to recognize that mPEG "would have been suitable … for … intranasal formulation," and counsel agreed. Appx14201-14202. When pressed further—"Does it have to work?"—counsel conceded: "It has to work for an intranasal formulation, correct" (Appx14202), and later acknowledged that the formulation "has to have a certain level of safety" to meet the test for obviousness. Appx14202-14203. Moreover, when the court asked whether mPEG "couldn't be poisonous, for example," Cipla's

counsel agreed. Appx14203. Having conceded below that a reasonable expectation of success encompasses whether mPEG would be "suitable," would "work," and have "a certain level of safety" for intranasal use, Cipla cannot now argue that the district court erred by considering those same factors.

Finally, Cipla's position is inconsistent with its own motivation theory. Cipla argues the POSA would have used mPEG to lower viscosity and make the formulation suitable for a commercial sprayer—even though viscosity and sprayability are not recited in the claims. Cipla Br. 17, 40-41, 46-48. But if unclaimed properties like viscosity and sprayability can supply motivation to combine, Appellees must be able to rebut that theory with evidence about those same properties and other characteristics bearing on intranasal suitability, including safety, tolerability, and efficacy—even if not explicitly recited in the claims. The POSA pursuing a functional advantage would need a reasonable expectation of achieving it without failing on other essential fronts. And no POSA would pursue, or deem successful, a nonviable formulation—a poisonous formulation, for example—simply because it sprayed well. Cipla cannot rely on unclaimed properties in support of its obviousness

theory, but dismiss such properties as irrelevant when they undermine its theory.

### D. Affirmance is compelled by the record

For the reasons discussed above, the district court neither committed clear error in its factual findings, nor incorrectly applied the law. As noted above, obviousness requires proof that the POSA would have been motivated to combine or modify the prior art to reach the claimed invention and reasonably expected success. *See supra* Part I.A-I.C; *Procter*, 566 F.3d at 994. The district court found Cipla proved neither requirement, and because those findings were not clearly erroneous, this Court must defer to them. *Allergan II*, 796 F.3d at 1303. With those findings—and no other evidence of obviousness—the law leaves only one conclusion: the asserted claims are not obvious, and the judgment should be affirmed.

## II. Cipla Has Waived Its Anticipation Theory

At trial, Cipla also contended that the asserted claims were invalid as anticipated by Wermeling '359. The district court rejected that theory. Appx44. Cipla does not challenge that ruling here and now concedes that Wermeling '359 did not anticipate. Cipla Br. 10. Cipla has thus waived any anticipation challenge. *See SmithKline*, 439 F.3d at 1319 (arguments

not raised in opening brief are waived). The only issue on appeal is the district court's non-obviousness finding, which this Court should affirm.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that the Court affirm the district court's judgment.

Dated: August 14, 2026

Respectfully Submitted,

*<u>/s/Alexa Hansen</u>*
Alexa Hansen
COVINGTON & BURLING LLP
415 Mission Street
Suite 5400
San Francisco, CA 94105
(415) 591-7035

Eric R. Sonnenschein
Kaveh Saba
Larissa Davis
Allyson Corigliano
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitations of Fed. Cir. R. 32(a) because the brief contains 13,779 words, excluding the parts of the brief exempted by Fed. R. App. 32(f) and Fed. Cir. R. 32(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Microsoft Word for Microsoft 365 using 14-point Century Schoolbook with double (exactly 28-point) line spacing.

*/s/Alexa Hansen*
Alexa Hansen

*Counsel for Plaintiffs-Appellees*