2026-1992

# United States Court of Appeals for the Federal Circuit

UCB, INC., UCB BIOPHARMA SRL, HANANJA EHF, UNIVERSITY OF ICELAND,

*Plaintiffs-Appellees,*

– v. –

CIPLA LIMITED, CIPLA USA INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Delaware in No. 1:21-cv-01229-JLH*

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

ANIL PATEL
ADAM S. BERLIN
K&L GATES LLP
609 Main Street, Suite 4150
Houston, Texas 77002
(713) 815-7300
anil.patel@klgates.com
adam.berlin@klgates.com

PETER L. GIUNTA
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900
peter.giunta@klgates.com

HAROLD STOREY
JENNA BRUCE
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
(206) 623-7580
harold.storey@klgates.com
jenna.bruce@klgates.com

*Attorneys for Defendants-Appellants*

AUGUST 28, 2026

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (394608)

## Table of Contents

**Page**

INTRODUCTION .......... 1
ARGUMENT .......... 3
I. It was Error to Disregard Similarities in Determining that PEG and MPEG were Not Interchangeable .......... 4
A. The District Court Did Not Address the Structural Similarity Between PEG and mPEG from the Perspective of a POSA .......... 5
B. The District Court Failed to Address the Functional Similarity Between PEG and mPEG .......... 7
C. Intervenor Admissions Corroborate Interchangeability .......... 13
II. Structural and Functional Similarity Should Be Considered Regardless of the Obviousness Framework Applied .......... 15
III. The Court Legally Erred by Applying an Overly Rigid Analysis of Motivation and Reasonable Expectation of Success .......... 17
A. It was Legal Error to Require an Explicit Teaching of Intranasal MPEG .......... 17
B. Failure to Consider the Interrelated Teachings of the Prior Art .......... 21
C. It Was Error to Require Wermeling '359 To Expressly Identify Its Use of a Modified Device as Problematic .......... 22
D. A POSA Would Have Had a Reasonable Expectation of Success Based on mPEG's Structural and Functional Similarity with PEG .......... 24
E. Requiring Reasonable Expectation of Success Beyond the Claim Scope .......... 26
IV. Objective Indicia Do Not Support Non-Obviousness .......... 31
CONCLUSION .......... 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allergan, Inc. v. Apotex Inc.*,
754 F.3d 952 (Fed. Cir. 2014) ....................3, 26, 30

*Almirall, LLC v. Amneal Pharms. LLC*,
28 F.4th 265 (Fed. Cir. 2022) ....................7, 11, 16, 23

*Anacor Pharms., Inc. v. Iancu*,
889 F.3d 1372 (Fed. Cir. 2018) ....................*passim*

*Bayer Pharma AG v. Watson Lab'ys Inc.*,
874 F.3d 1316 (Fed. Cir. 2017) ....................12, 23, 24

*Grünenthal GmbH v. Alkem Lab'ys Ltd.*,
919 F.3d 1333 (Fed. Cir. 2019) ....................24, 25

*Immunogen, Inc. v. Stewart*,
130 F.4th 1328 (Fed. Cir. 2025) ....................26, 27

*In re Copaxone Consol. Cases*,
906 F.3d 1013 (Fed. Cir. 2018) ....................14

*In re Cyclobenzaprine*,
676 F.3d 1063 (Fed. Cir. 2012) ....................29

*In re Dillon*,
919 F.2d 688 (Fed. Cir. 1990) ....................9, 10, 17

*In re Merck & Co.*,
800 F.2d 1091 (Fed. Cir. 1986) ....................5, 9, 11, 21

*In re Omeprazole Patent Litigation*,
483 F.3d 1364 (Fed. Cir. 2007) ....................14

*In re Payne*,
606 F.2d 303 (C.C.P.A. 1979) ....................9

*In re Wilder*,
563 F.2d 457 (C.C.P.A. 1977) ....................5, 11

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ....................28

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................................................................26, 27

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982)..................................................................................................3

*Janssen Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*,
141 F.4th 1367 (Fed. Cir. 2025) ...............................................................................28

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)..............................................................................4, 5, 17, 21

*Neptune Generics, LLC v. Eli Lilly & Co.*,
921 F.3d 1372 (Fed. Cir. 2019) ...............................................................................14

*Otsuka Pharmaceutical Co., Ltd. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ...............................................................................13

*Palo Alto Networks, Inc. v. Centripetal Networks, LLC*,
122 F.4th 1378 (Fed. Cir. 2024) ..............................................................................21

*Pfizer Inc. v. Watson Pharms., Inc.*,
920 F. Supp. 2d 552 (D. Del. 2013)...................................................................25, 26

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ..........................................................................*passim*

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) .................................................................................8

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) ............................................................................. 24-25

*Richardson-Vicks Inc. v. Upjohn, Co.*,
122 F.3d 1476 (Fed. Cir. 1997) .................................................................................9

*Sun Pharmaceutical Industries, Inc. v. Incyte Corp.*,
No. 2019-2011, 2023 WL 5370639 (Fed. Cir. Aug. 22, 2023)..........................17

*Unigene Laboratories, Inc. v. Apotex, Inc.*,
655 F.3d 1352 (Fed. Cir. 2011) .................................................................................2

*United Therapeutics Corp. v. Liquidia Technologies Inc.*,
74 F.4th 1360 (Fed. Cir. 2023) .................................................................................29

*Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*,
955 F.3d 25 (Fed. Cir. 2020) ..............................................................................*passim*

## INTRODUCTION

The district court made legal errors in analyzing obviousness that warrant reversal. UCB tries to recast those errors as "factual disagreements," but Cipla's appeal does not ask this Court to reweigh competing evidence. It challenges the legally erroneous framework that produced the district court's findings.

The obviousness analysis should have been straightforward. Yet the Appeal Claims are before this Court because the district court's analysis began and ended with mPEG not being used in an intranasal formulation before, and being a "different" compound than PEG. The court treated those considerations as dispositive, finding no interchangeability, no motivation, and no reasonable expectation of success. It also erred in analyzing motivation by requiring Wermeling '359 to expressly state that its formulations were "problematic," and reading Carbowax in a silo, reasoning that it would not lead a POSA to use mPEG-350 as a pharmaceutical excipient—a use for which it was disclosed elsewhere—because Carbowax only disclosed it as a chemical intermediate. Moreover, the district court erroneously required reasonable expectation of success to extend to stability, safety, efficacy, and more—features outside the scope of the claims that amounted to FDA approval.

UCB cannot defend those errors. It tries to raise factual issues, but does not dispute the structural similarity of PEG and mPEG, or that Wermeling '359 nearly

anticipates the Appeal Claims. Its own expert, Dr. Smyth, confirmed that mPEG-350 functions as a solubilizer in the Appeal Claims, the same function it and PEG-400 had in prior art formulations. Nor does UCB identify any teaching away or other evidence that using mPEG in an intranasal midazolam formulation would have required more than confirmatory routine testing. UCB does not even attempt to address Cipla's distinction of *Unigene Laboratories, Inc. v. Apotex, Inc.*, 655 F.3d 1352 (Fed. Cir. 2011), the sole case cited by the district court in support of its conclusion of non-obviousness. Instead, UCB repeats the district court's findings that mPEG had not previously been used intranasally, and raises unfounded questions about formulation properties that are not claimed or even contemplated by the specification.

Had the district court analyzed obviousness under the correct legal framework, it would have had no choice but to hold the Appeal Claims invalid as obvious.[1] The judgment should be reversed.

---

[1] UCB states Cipla waived its anticipation argument by not raising it in its brief. Cipla's docketing statement and motion to expedite briefing removed anticipation. ECF 5; ECF 14-1 at 7.

## ARGUMENT

The district court made legal errors in analyzing obviousness. Specifically, the district court erred when it (1) demanded prior art expressly teach the use of mPEG in an intranasal formulation, (2) treated prior art references in isolation instead of together as a whole, (3) misapplied the obviousness framework by not considering the structural and functional similarity between PEG and mPEG, (4) required Wermeling '359 itself to identify a problem with its formulation to support motivation, and (5) required a reasonable expectation of success in achieving unclaimed features.

Factual findings that rest on a mistaken view of the law are not entitled to deference. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982); *accord Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 965-66 (Fed. Cir. 2014). Cipla is challenging the district court's legal error in failing to apply the proper obviousness framework to the Appeal Claims, not taking issue with any evidentiary finding or weighing. UCB cannot demonstrate that there was no legal error, and resorts to arguing facts, criticizing Cipla for "fail[ing] even to engage" with the clear error standard (UCB Br. 14-15) while itself failing to engage with errors of law by recasting them as issues of fact and repeating the court's factual findings (*e.g.*, UCB Br. 30-33, 41-44, 64-67).

## I. IT WAS ERROR TO DISREGARD SIMILARITIES IN DETERMINING THAT PEG AND MPEG WERE NOT INTERCHANGEABLE

The district court determined that mPEG-350 was not interchangeable with PEG-400 because they had "different" chemical structures, chemical and physical properties, and pharmaceutical uses, and a POSA could not "predict the effect of substituting mPEG for PEG in an intranasal midazolam formulation." *See* Appx38-39, Appx46, n.10. That holding rested on legal error because the court required an explicit teaching to use mPEG-350 as an intranasal excipient, instead of analyzing the structural and functional similarity of PEG and mPEG. *Id.* 29-38.

Obviousness does not require "precise teachings directed to the specific subject matter of the challenged claim" and allows consideration of the "inferences and creative steps that a [POSA] would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Within that framework, "structural similarity is an important factor in assessing the motivation to combine and reasonable expectation of success" because the obviousness inquiry "frequently turns on the structural similarities and differences between the compounds claimed and those in the prior art." *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1384 (Fed. Cir. 2018) (quotation omitted). The "expectation of similar uses necessarily implies an expectation that the claimed compound would have been a substantially equivalent substitute" for prior art

compounds used in a particular application. *In re Wilder*, 563 F.2d 457, 460-61 (C.C.P.A. 1977).

### A. The District Court Did Not Address the Structural Similarity Between PEG and mPEG from the Perspective of a POSA

The district court erred by focusing on whether mPEG and PEG were technically different compounds, rather than considering their known relevant properties and those a POSA would have inferred from the structural similarity of mPEG-350 and PEG-400. *See In re Merck & Co.*, 800 F.2d 1091, 1096-97 (Fed. Cir. 1986) (affirming Board's obviousness determination based on the compounds' structural similarity and a POSA's available knowledge and skill). The court disregarded the inferences and creative steps a POSA would have employed, and instead, as explained below in Section III.A, demanded an explicit teaching of intranasal mPEG-350. This constitutes legal error. *See KSR*, 550 U.S. at 420-22.

The question is not whether PEG and mPEG have some different properties, but whether a POSA would have expected them, as "structurally similar compounds to have similar properties," such as usefulness in an intranasal formulation. *Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*, 955 F.3d 25, 32 (Fed. Cir. 2020) (citation omitted). UCB argues that the court "expressly weighed" homology and overlapping uses by finding that PEG and mPEG have "different physical and chemical properties," and different uses because only PEG had been used intranasally. UCB Br. 51-52. UCB exemplifies the district court's error, highlighting the court's

analysis stopped at PEG and mPEG being technically different compounds, and the lack of explicit disclosure of intranasal mPEG. *E.g.*, Appx32-33, Appx36, Appx46. Moreover, UCB mischaracterizes the court's analysis of interchangeability as an analysis of structural similarity. UCB Br. 36 (citing Appx38), 51-52 (citing Appx38-39). UCB identifies no instance of the district court analyzing structural similarity, because it did not do so.

"[S]killed artisans can expect structurally similar compounds to have similar properties." *See Valeant*, 955 F.3d at 32. Neither UCB, nor the experts in this case, dispute that PEG and mPEG are 99% homologous, which UCB minimizes as "some backbone overlap." *See* Cipla Br. 43-44; UCB Br. 27, 35-36. UCB argues that "similarity of structure does not necessarily predict similarity in properties." *Id.* 28 (citing *Anacor*, 889 F.3d at 1385). The "chemical arts" in *Anacor*, however, involved the use of an active compound to treat a condition, not an inert excipient like mPEG. *See Anacor*, 889 F.3d at 1375-76. *Valeant*, which dealt with stability of drugs in a formulation, is more analogous. *See* 955 F.3d at 27. It recognized that a prima facie case of obviousness based on structure and function could be "rebutted" by "unexpected beneficial properties" or evidence that "the prior art teaches away." *See id.* at 33. Neither of those apply here; there is no teaching away, and UCB's allegation that mPEG provided unexpected beneficial properties failed below. The district court found secondary considerations not probative of non-obviousness.

Appx47. An assessment of structural and functional similarities under the correct legal framework requires the Appeal Claims be held invalid for obviousness.

### B. The District Court Failed to Address the Functional Similarity Between PEG and mPEG

It is obvious to substitute one excipient for another that performs the same function and is interchangeable. *See Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 273-76 (Fed. Cir. 2022). The district court failed to address the functional similarity between PEG and mPEG by halting its analysis after determining the compounds are technically different, and the lack of explicit teaching of intranasal mPEG. *E.g.*, Appx32-33, Appx36, Appx46. The prior art, however, taught that PEG and mPEG were useful in a wide variety of products and had similar properties such as the ability to solubilize a wide range of substances, and common uses, such as being in FDA-approved topical products and identified as solvent-excipients. Cipla Br. 32-38. UCB's expert, Dr. Smyth, explained that PEG had been used as a solubilizer in liquid formulations, and mPEG had been used as a solubilizer in creams, gels, and topical products (Appx5448-449) and that PEG and mPEG were likewise solvents in the claimed formulations (*see* Appx5547-548).

UCB claims that topical excipients could not simply be "repurpose[d]" for intranasal use, and in UCB's words, the court found "topical use did not mandate intranasal suitability." UCB Br. 32, 35, 46. But the Appeal Patents rebut UCB. They state, "it is understood that a [POSA] can choose other excipients … [including]

those that are currently allowed in topical and parenteral formulations." Appx104; *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the patentee for purposes of … obviousness.") (citations omitted). This is consistent with the district court's definition of a POSA, which does not require intranasal expertise. Appx20.

This is not a case of plucking a topical excipient from the art for intranasal use and expecting it to work; mPEG-350 was in an FDA-approved topical formulation and 99% homologous to PEG-400, another topical excipient with a proven track record of intranasal use. *See* Cipla Br. 45, 48; Appx29. UCB's own expert testified that determining whether a topical excipient could be used intranasally would require only routine testing. Appx5543-545. Additionally, the prior art taught the properties of mPEG relevant to intranasal formulation, including its ability and use to solubilize substances, its availability in pharmaceutical grade, and its relatively low viscosity. Cipla Br. 11-13, 44-45. UCB points to unclaimed features such as safety, tolerability, and sprayability to argue that "every relevant formulation functional characteristic" was unknown. UCB Br. 26. This ignores the inferences a POSA would draw based on mPEG's similarity to PEG, and is belied by their own expert's testimony that confirming those properties would have required only routine testing. Cipla Br. 48-50, 57, 62-63. A POSA would have understood that mPEG

could be used similarly to PEG in an intranasal formulation based on their similarities, which the POSA "merely had to verify through routine testing." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367 (Fed. Cir. 2007).

The law supports obviousness here. The prior art disclosed that PEG and mPEG had functional similarities, including their use as solvent-excipients and in approved topical products. Cipla Br. 35-38. UCB attempts to distinguish *Anacor*, *Merck*, *In re Payne*, 606 F.2d 303 (C.C.P.A. 1979), *Richardson-Vicks Inc. v. Upjohn, Co.*, 122 F.3d 1476 (Fed. Cir. 1997)[2], and *In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990), arguing that those cases "depended on demonstrated functional similarity—not bare structural resemblance—in the relevant application." UCB Br. 39. None of those cases involved prior art disclosing the claimed compounds used in the claimed application.

In *Payne*, the compound was not disclosed in the prior art and its pesticidal activity was inferred from its structural similarity to other pesticides. 606 F.2d at 308, 314. In *Valeant*, the prior art did not disclose the pH stability profile of the claimed methylnaltrexone, but it was inferred based on the known stability of structurally similar compounds, naltrexone and naloxone. 955 F.3d at 31-33. Here,

---

[2] *Richardson-Vicks* does not refer to structural similarity. *See* 122 F.3d at 1480, 1483.

the prior art disclosed mPEG-350, its use as a solvent-excipient in pharmaceutical formulations, and its structural similarity with PEG-400.

UCB's reliance on *Dillon* only underscores that structural similarity to a known class of compounds may itself supply the relevant motivation where the prior art supports an expectation of similar properties. UCB complains that Cipla "identifies nothing establishing [a POSA] understood structural overlap with PEG to translate into an understanding of mPEG's intranasal functional characteristics," but cites no precedent to support that requirement. UCB Br. 28. Instead, UCB cites *Dillon* to suggest a motivation "[must]" exist "beyond 'structural similarity' alone." *Id.* 28-29 (adding the words "must," "beyond" and "alone" to *Dillon*'s language). In *Dillon*, the claimed tetra-orthoesters were a "known class of chemical compounds" but it was "undisputed that their combination with hydrocarbon fuel" (the claimed application) and "use to reduce particulate emissions from combustion of hydrocarbon fuel [were] not shown or suggested in the prior art." 919 F.2d at 691. Contrary to UCB's rewording, *Dillon* explained "[t]he prior art provided the motivation to make the claimed [tetra-orthoester] compositions *in the expectation that they would have similar properties*" to prior art tri-orthoester compositions. *See id.* at 693-94 (emphasis added). This is directly analogous to the "known class" of mPEGs and PEGs as solvent-excipients, and the motivation to prepare the claimed

intranasal formulations based on the expectation mPEG-350 would have similar properties to PEG-400.

The other structural similarity cases do not support limiting the "relevant application" to the specific use claimed. *See Anacor*, 889 F.3d at 1382-84 (invalidating claims to using the compound tavaborole against dermatophytes, where prior art disclosed tavaborole activity against *C. albicans*—a different organism—and similar compounds' activity against dermatophytes); *Merck*, 800 F.2d at 1096 (invalidating claims to using amitriptyline for depression, where prior art disclosed amitriptyline's psychotropic properties, and similar compound imipramine's antidepressant activity). In each case, the known properties were not specific to the claimed application, but were inferred based on other similar properties and structures to other compounds.

UCB's attempt to distinguish *Almirall* is unavailing. UCB suggests *Almirall* should not apply because the claimed gelling agents "were interchangeable and equivalent gelling agents" and were used in other topical formulations. UCB Br. 38. As explained above, an explicit teaching that compounds were interchangeable in the specific claimed application is not required, particularly where there is great structural similarity. Additionally, substantial equivalence for a particular purpose can be inferred based on similarities in structure, properties, and uses. *See Wilder*, 563 F.2d at 460-61.

MPEG's properties as a solubilizer were known. Appx5448-49, Appx14744. UCB attempts to distinguish *Pfizer* by arguing that it "involved making a compound whose relevant functional properties were established." UCB Br. 39-40. But the claimed compound, amlodipine besylate, was not disclosed in the prior art, so its "relevant functional properties" were not known. *Pfizer*, 480 F.3d at 1361-63. The district court in *Pfizer* erred by ignoring prior art related to the besylate salt merely because it did not disclose medications similar to amlodipine. *Id.* at 1363. The court here erred by disregarding the properties of mPEG-350 disclosed in the art, such as its low viscosity, solubilizing properties, FDA-approved status, and identification as a solvent-excipient merely because the art did not specifically identify intranasal administration.[3] The FDA requiring "species-level toxicity testing" of mPEG-350 does not distinguish this case from *Pfizer*. Like *Pfizer,* those properties here merely had to be "verif[ied] through routine testing." 480 F.3d at 1367; Cipla Br. 62. UCB also argues FDA's classification of mPEG as a "novel excipient" distinguishes *Pfizer*, but in the FDA context "novel excipient" simply means one not approved in a particular route of administration. *See* Appx35 (FOF222). FDA approval is not the standard for obviousness. *See Bayer Pharma AG v. Watson Lab'ys Inc.*, 874 F.3d 1316, 1326 (Fed. Cir. 2017).

---

[3] The district court erred in distinguishing *Pfizer* based on mPEG lacking FDA-approval in an intranasal formulation. (Appx46 n.10).

### C. Inventor Admissions Corroborate Interchangeability

UCB seeks to distance itself from Dr. Gizurarson's suggestion to "replace all formulations where PEG had been used, with mPEG!" as mere "advocacy." UCB Br. 55; Appx15215. But it is clear confirmation that a POSA would have understood from the prior art that mPEG and PEG were interchangeable. Cipla Br. 39-40, 49-50. The only witness who testified Dr. Gizurarson's purpose was to "advocate" immediately clarified that he was "speculat[ing] outside [his] scope there." Appx5137-138. UCB elected not to call Dr. Gizurarson live at trial to clarify these statements.

UCB's reliance on *Otsuka Pharmaceutical Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280 (Fed. Cir. 2012), is misplaced. UCB Br. 54-55. *Otsuka* involved claims relating to a new chemical compound, aripiprazole. 678 F.3d at 1285. The prior art taught away from the proposed lead compound, which itself required three separate modifications to obtain the claimed compound. *Id.* at 1295-96. Otsuka's short development timeline was the "inventor's own path," and therefore, not relevant. *Id.* at 1296. This case involves claims to a nearly anticipated formulation with a known active and excipients, not a new compound requiring substantial chemical modification. Unlike *Otsuka*, Cipla does not merely point to Appellee's development timeline, but to Dr. Gizurarson's statements relating to the prior art. Dr. Gizurarson characterized mPEG's properties as "like other PEGs" after reviewing information

from Dow (publishers of Carbowax) and admitted to drafting examples in the priority application by substituting the word "mPEG-350" where "PEG-200" appeared in Bechgaard '608. Cipla Br. 23-24, 33-34, 39-40.

UCB's reliance on *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372 (Fed. Cir. 2019) is similarly unavailing. UCB Br. 55. *Neptune* recognized that "a patent owner's own disclosures to the FDA may be considered in assessing the state of the prior art." 921 F.3d at 1377 (citing *In re Copaxone Consol. Cases*, 906 F.3d 1013, 1030 (Fed. Cir. 2018)). *Copaxone* is more analogous—the non-prior art disclosure was not used as "invalidating prior art," but "merely as confirmation of how a [POSA] would understand" the prior art. 906 F.3d at 1029-30. The relevant Gizurarson evidence all bears on the POSA's understanding of the prior art.

UCB asserts that *Pfizer* and *In re Omeprazole Patent Litigation*, 483 F.3d 1364 (Fed. Cir. 2007), where inventor or patent holder admissions were used to corroborate obviousness, are distinguishable because the admissions were not "foundational" to obviousness. UCB Br. 56-57. But Dr. Gizurarson's statements are not "foundational" either, they merely confirm a POSA's understanding of the art.

## II. STRUCTURAL AND FUNCTIONAL SIMILARITY SHOULD BE CONSIDERED REGARDLESS OF THE OBVIOUSNESS FRAMEWORK APPLIED

"[S]tructural similarity is an important factor in assessing the motivation to combine and reasonable expectation of success." *Anacor*, 889 F.3d at 1384. "[A] [POSA] can expect that compounds with common properties are likely to share other related properties as well" and "[w]hen compounds share significant structural and functional similarity, those compounds are likely to share other properties[.]" *Valeant*, 955 F.3d at 32 (citation omitted). The extensive structural and functional similarity between PEG and mPEG is the backdrop against which the analysis must take place.

Thus, whether a POSA would have understood the addition of mPEG-350 to Wermeling '359's nearly anticipatory formulations to be the mere combination of known elements to yield predictable results, or viewed PEG and mPEG as interchangeable, must begin from the POSA's foundational understanding of PEG and mPEG's similar structures, properties, and uses. Whether a POSA would have been motivated to combine Carbowax's mPEG-350 with Wermeling '359 with a reasonable expectation of success would begin from the same understanding.

UCB draws a false dichotomy between structural similarity and interchangeability, arguing "if structural similarity predicts similar properties, then the POSA would not expect a meaningful viscosity difference" and "if the viscosity

difference is meaningful enough to motivate the substitution … then the compounds do not have 'similar properties' and the interchangeability premise collapses." UCB Br. 29-30, 44. This Court does not require *identity* of properties for a POSA to infer *similar* properties based on structural and functional similarity. *See, e.g.*, *Valeant*, 955 F.3d at 32-33 (finding the district court erred by rejecting inference that a POSA "could expect similar" properties based on "strong structural and functional similarity between the molecules"). The prior art disclosed the viscosities of PEG-400 and mPEG-350, and that lower viscosity correlates to improved sprayability. Advantages of one interchangeable excipient can provide motivation to substitute for another. *Almirall*, 28 F.4th at 275-76. A POSA could expect that mPEG-350 would have similar properties to PEG-400 in an intranasal midazolam formulation (e.g., safety, tolerability, etc.), while also taking advantage of mPEG-350's lower viscosity.

Finally, UCB alleges structural similarity "proves too much" because mPEG was available for sixty years, but had not been used intranasally. UCB Br. 29. UCB begins from the wrong starting point. Obviousness is assessed as of the priority date, and Wermeling '359's viscous formulations published less than three years before the priority date. Appx11, Appx21. By that time, mPEG-350 was used in similar applications to PEG-400, including a topical formulation FDA approved in 2000—over 50 years after mPEG became commercially available. Appx4965.

## III. THE COURT LEGALLY ERRED BY APPLYING AN OVERLY RIGID ANALYSIS OF MOTIVATION AND REASONABLE EXPECTATION OF SUCCESS

### A. It was Legal Error to Require an Explicit Teaching of Intranasal MPEG

The district court erred by demanding an explicit teaching that mPEG had been used intranasally. Cipla Br. 15-16, 51-56. "[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. The "assumption that a [POSA] attempting to solve a problem will be led only to those elements of the prior art designed to solve the same problem" is legal error. *Id.* at 420-22. The "discovery that a claimed composition possesses a property not disclosed for the prior art subject matter" does not defeat obviousness. *Dillon*, 919 F.2d at 693.

UCB did not address *Sun Pharmaceutical Industries, Inc. v. Incyte Corp.*, No. 2019-2011, 2023 WL 5370639 (Fed. Cir. Aug. 22, 2023) (non-precedential), which was cited in Appellants' Opening Brief. *Sun* explains that motivation "need not be [based on] an explicit teaching that the claimed compound will have a particular utility" if "in light of the totality of the prior art" there is an expectation that "the new compound will have similar properties to the old," particularly where there is great structural similarity. 2023 WL 5370639, at *3 (quotation omitted). Here, the district court erred by requiring the prior art to disclose that mPEG had "particular

utility" as an intranasal excipient, and by failing to analyze structural similarity from the perspective of a POSA. Cipla Br. 28-38, 51-56.

The district court held that a POSA would not have been motivated to use mPEG intranasally with a reasonable expectation of success based on the following findings:

- MPEG and PEG are technically different compounds (different CAS numbers and terminal methoxy vs. hydroxyl group);
- MPEG had not been used in an intranasal formulation before; and
- The effects of mPEG in an intranasal formulation were unknown.

Under the proper legal framework, the district court should not have required an explicit teaching and instead should have viewed the prior art from the perspective of a POSA, including that:

- PEG was a solvent-excipient frequently used in intranasal formulations, including in the nearly anticipatory Wermeling '359 (Cipla Br. 10-11, 47-48);
- Carbowax disclosed PEG and mPEG together as a family of "water soluble linear polymers" (*id.* 43);
- PEG was FDA-approved for intranasal, topical, and vaginal applications (*id.* 45);
- MPEG was FDA-approved for topical use and in a marketed vaginal lubricant (*id.*);
- Dr. Smyth testified that determining whether a topically-approved excipient like mPEG was suitable for intranasal use would have been routine, including testing safety, stability, and solubility (*id.* 36, 48-50, 62);

- MPEG and PEG are 99% homologous, with the sole point of difference being a terminal methoxy vs. hydroxyl group (*id.* 43-44);
- Carbowax disclosed that PEG and mPEG dissolved a "wide range of substances … mak[ing] them useful in a wide variety of formulated products" (*id.* 47-48);
- Carbowax discloses mPEG-350 is the least viscous PEG, and blending products to obtain "intermediate viscosities" (*id.* 45, 47-48);
- USP 2006 lists PEG, mPEG, and every other Appeal Claim excipient in a short list of pharmaceutical solvents (*id.* 58);
- PEG and mPEG were both used as solubilizers in the prior art, and as solvents in the claimed formulations (Appx5448-449, Appx5547-548); and
- No prior art taught that mPEG had any property that made it unsuitable for intranasal administration.

Because PEG and mPEG share significant structural and functional similarities, a POSA would have understood they are likely to share other properties in a formulation, particularly in the absence of teaching away or unexpected benefits. *See Valeant*, 955 F.3d at 33.

The opinion is replete with examples of the district court requiring an explicit teaching that mPEG had been used intranasally. *E.g.*, Appx10 ("mPEG had never been used in an intranasal formulation."), Appx28, Appx29, Appx33, Appx46. UCB points to the passage "mPEG … had not been … suggested for use in an intranasal formulation," and argues the word "suggested" confirms the court did not demand an explicit disclosure. UCB Br. 66. Using the word "suggested" does not negate the

district court's legal error. None of the instances where the court uses the term "suggested" in the obviousness context provide a reasoned analysis of why the prior art as a whole, and in combination with the POSA's ordinary creativity, would not have motivated a POSA to use mPEG.

In Section II.K.1.a of its decision ("mPEG Had Never Been Used or Suggested for Any Intranasal Formulation"), the district court stated that mPEG had not been used, marketed, or known for intranasal use, all variations of a requirement for explicit teaching. Appx33. It stated that "no reference suggested the use of mPEG in intranasal formulations," citing Dr. Smyth's testimony and discussing Tracy '672. Appx33 (FOF207). Tracy '672 disclosed mPEG-350 as a viscosity reducing agent and the intranasal administration route of administration. Appx27-28. The court determined that Tracy '672 did not "disclose or suggest the use of mPEG for an intranasal formulation, especially since Tracy '672 relates to injectable sustained release injections." Appx33. By using the word "suggest," the court is essentially saying that, because Tracy '672 discloses "mPEG-350" in a different paragraph from "intranasal," and was primarily directed to another route of administration, it does not explicitly disclose intranasal mPEG.

The district court stated that "Carbowax would not have suggested to … use mPEG in an intranasal formulation." Appx36 (FOF224); *see* Appx45. In support, the court states that "Carbowax refers to PEG and mPEG as different compounds

with different structures, properties, and uses" and the "only pharmaceutical use for mPEG disclosed in Carbowax is as a chemical intermediate." Appx36. Again, the court essentially required Carbowax to disclose identical properties and that mPEG was used intranasally without considering the prior art as a whole, including USP 2006's disclosure that mPEG was a solvent-excipient and mPEG's FDA-approved status.

### B. Failure to Consider the Interrelated Teachings of the Prior Art

Rather than analyzing each reference in a silo, the court should have considered the interrelated teachings of the prior art as a whole. Cipla Br. 56-59; *Merck*, 800 F.2d at 1097. *KSR* recognized that it was often "necessary for a court to look to interrelated teachings of multiple" prior art references. *KSR*, 550 U.S. at 418. The prior art "must be read together, not in isolation," and not by attacking "the disclosures of the two references individually." *Palo Alto Networks, Inc. v. Centripetal Networks, LLC*, 122 F.4th 1378, 1385-86 (Fed. Cir. 2024); *see Merck*, 800 F.2d at 1097-98. Failure to do so "constitutes legal error." *Palo Alto*, 122 F.4th at 1385-86.

UCB responds that the "court considered the prior art holistically," but only rehashes the court's isolated findings regarding the prior art and does nothing to address the court's siloed approach. UCB Br. 65 (citing UCB Br. Part I.A.3); *see id.* 46-50. UCB fails to identify one instance of the district court reading Carbowax

together with the pharmaceutical uses of mPEG-350 disclosed in USP 2006 and the IID, and its uses in other products. Instead, its analysis ended with the "only pharmaceutical use for mPEG disclosed in Carbowax is as a chemical intermediate." Appx36.

### C. It Was Error to Require Wermeling '359 To Expressly Identify Its Use of a Modified Device as Problematic

The district court found that formulators prefer formulations "that can be sprayed with a nasal spraying device that has previously been approved by the FDA" and that sprayability was an important consideration affected by viscosity. Appx15-16. Nevertheless, it found no motivation because Wermeling '359 did "not suggest that the viscosity … was too high" or that "use of a modified device was problematic." Appx36-37. Motivation "does not have to be found explicitly in the prior art references sought to be combined, but rather 'may be found in any number of sources including common knowledge, the prior art as a whole, or the nature of the problem itself.'" *Pfizer*, 480 F.3d at 1362 (citation omitted). The desire to minimize viscosity to enhance sprayability was known in the art. Appx36-37. Thus, Wermeling '359 need not criticize its own formulations for there to be motivation to improve them.

UCB argues the court did not require motivation to come expressly from Wermeling '359 because "viscosity is only one factor among many in a successful intranasal formulation," and the Wermeling Formulation was "well tolerated." UCB

Br. 65. Tolerability is a distinct consideration from sprayability (Appx17) and a POSA would not have been dissuaded from improving one attribute merely because another was acceptable. Moreover, Wermeling ’359 expressly ties the need for device modification to “accommodat[ing] higher viscosity compositions.” Appx14729. UCB also responds that lowering viscosity does not *always* improve sprayability. UCB Br. 65. Obviousness does not demand absolute predictability of success (*Almirall*, 28 F.4th at 275 (citation omitted)), and UCB does not dispute that lower viscosity typically correlates with better sprayability (Cipla Br. 13; *see* Appx15-16).

UCB alleges the district court recognized the “risks” of reducing viscosity, such as drainage. UCB Br. 65-66. The court referred generally to the potential for low viscosity solutions to “drain out the back of the nasal passage” (Appx16), but did not characterize this as a “risk” with the Wermeling Formulation. It found the opposite—that mPEG-350 would not markedly reduce viscosity. Appx37.

UCB states that it was “immaterial” in *Bayer* that the art did not identify a problem with prior art formulations because it taught the advantages of the claimed excipient combination. UCB Br. 21-22. But here, the prior art disclosed mPEG-350’s advantageous viscosity and the correlation between sprayability and viscosity. Cipla Br. 12-13, 46-48. UCB’s argument that *Bayer* does not apply because “no

reference affirmatively taught" intranasal mPEG merely repeats the court's error of requiring an explicit teaching.

*Bayer* also stated that the motivation inquiry is "not limited to what already has or could gain FDA approval." 874 F.3d at 1326. In *Bayer*, the district court erred by failing to consider teachings of the prior art. *Id.* at 1325-26. *Bayer*'s admonition regarding "FDA approval" was made even "[a]ccepting fully" expert testimony that a POSA "would look to currently-available ODT products to know whether the FDA considered the excipients safe and effective." *Id.* at 1326 (citation omitted). UCB alleges that, here, the district court did not "base its finding on FDA approval requirements." UCB Br. 22. But the district court determined there was no motivation or reasonable expectation of success based on FDA's requirement for additional toxicity testing, classification of mPEG as a "novel excipient," and lack of an FDA-approved mPEG-350 intranasal product. Those considerations were erroneous.

### D. A POSA Would Have Had a Reasonable Expectation of Success Based on mPEG's Structural and Functional Similarity with PEG

UCB's cited cases do not excuse the district court's failure to apply the proper reasonable expectation of success inquiry. UCB argues that "structural similarity does not supply a reasonable expectation of success where the relevant properties remain unpredictable." UCB Br. 36-37 (citing *Grünenthal GmbH v. Alkem Lab'ys Ltd.*, 919 F.3d 1333 (Fed. Cir. 2019); *Procter & Gamble Co. v. Teva Pharm. USA,*

*Inc.*, 566 F.3d 989 (Fed. Cir. 2009); and *Pfizer Inc. v. Watson Pharms., Inc.*, 920 F. Supp. 2d 552 (D. Del. 2013)). However, *Grünenthal* involved polymorph claims, where polymorphism of the claimed compound was unknown, and the court found the art did not provide any guidance on manipulating conditions to "even determine whether polymorphism occurred." *Grünenthal*, 919 F.3d at 1341, 1344 (citation omitted). No such unpredictability exists here, especially because Wermeling '359 disclosed how to make a nearly anticipatory formulation and the claimed compounds were known in the art. Cipla Br. 10-11. This case is more like *Pfizer*, where "the realm of possible anions could be reduced to a manageable number based on *known* properties of the anions." *Grünenthal*, 919 F.3d at 1344 (citing *Pfizer*). USP 2006 narrowed the realm to just thirty-one solvent excipients, which was even further narrowed by Carbowax to four liquid pharmaceutical-grade excipients. Cipla Br. 42-45, 48. Unlike in *Grünenthal*, the experts here agreed that the necessary testing was routine. *E.g.*, *id.* at 50.

UCB's remaining authorities are no closer to this case. *Procter* involved a new chemical compound, risedronate. 566 F.3d at 992-93. Prior art warned that "[t]o infer from one [bisphosphonate] compound the effects in another is dangerous and can be misleading," and evidence showed that close analogs did not exhibit similar activity. *Id.* at 995-96. Unlike *Procter*, the prior art here did not teach away from inferring the properties of mPEG-350 based on its similarity to PEG-400. More pertinently,

*Pfizer* distinguishes the "trial and error procedures often employed to *discover* a new compound" from routine experiments used to "*verify* the expected physicochemical characteristics of each salt." *Pfizer*, 480 F.3d at 1367. UCB's reliance on the district court case *Pfizer v. Watson* is also misplaced. There, the structural similarity was limited to a single "hemiketal moiety" with unknown function, while the "rest of the molecules were known to be very different." 920 F. Supp. 2d at 560-61. In contrast, PEG and mPEG are 99% homologous. Cipla Br. 43-44.

### E. Requiring Reasonable Expectation of Success Beyond the Claim Scope

Reasonable expectation of success must be tied to the scope of the claims. *See Immunogen, Inc. v. Stewart*, 130 F.4th 1328, 1336 (Fed. Cir. 2025). "Even if the district court does not commit clear error in its findings of fact, failure to consider the appropriate scope of the … claimed invention in evaluating reasonable expectation of success … constitutes a legal error that [this Court] review[s] without deference." *Allergan*, 754 F.3d at 965-66. This Court's "cases have held that the greater the structural similarity between compounds, the greater motivation to combine and reasonable expectation of success." *Anacor*, 889 F.3d at 1385.

UCB argues it was not error to consider reasonable expectation of achieving unclaimed features because Cipla argued a POSA would have used mPEG to lower viscosity. UCB Br. 73-74. Not so. In *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, it was legal error to fail "to consider the appropriate scope of the

[patent claim] in evaluating the reasonable expectation of success"—even where those features may have been relevant to motivation. 821 F.3d 1359, 1367-68 (Fed. Cir. 2016) (quotation omitted).

*Immunogen* concerned a claim to dosing an immunoconjugate using adjusted ideal body weight ("AIBW") to treat ovarian cancer. *Immunogen*, 130 F.4th at 1334-36. Prior art disclosed that AIBW dosing could reduce ocular toxicity, and this Court determined that disclosure would motivate a POSA to use AIBW dosing. *Id.* But a "reasonable expectation of eliminating ocular toxicity" was "not required" because "the claims [were] silent as to any ocular toxicity problem." *Id.* at 1336. Obviousness only required a reasonable expectation of success treating the claimed cancers. *Id.*

Here, the district court erred by requiring a reasonable expectation of achieving an unclaimed result. While the desire to deliver intranasal midazolam through an unmodified device would provide a motivation to use mPEG-350 (Cipla Br. 46-48, 59-60), there is no requirement for a reasonable expectation of delivery through an unmodified device (Appx37; UCB Br. 41-44) because the claims are agnostic to the device used. As explained in Appellant's Opening Brief, POSA would have been motivated to use mPEG-350 and to reduce viscosity regardless of the device used. Cipla Br. 16-17, 59.

UCB leans into the error, stating the "threshold level" of viscosity to use an unmodified device was unknown, and substituting mPEG-350 for a portion of PEG-

400 would not result in "markedly different" viscosity. UCB Br. 42-44. This ignores that the Appeal Claims recite no excipient quantities, and one also requires water, which would further reduce viscosity. It also ignores the preference against high viscosity formulations, regardless of the device. *See* Appx5123-124.

UCB argues that, under *Janssen Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, 141 F.4th 1367 (Fed. Cir. 2025), it is not an error to consider unclaimed features such as safety, efficacy, tolerability, and stability "if a skilled artisan would reasonably consider them." UCB Br. 70-71. The claims in *Janssen* were to a dosing regimen for administering a compound to a psychiatric patient in need of treatment for mental disorders. 141 F.4th at 1371-73. *Janssen*, however, distinguished its treatment-regimen claims from composition claims: "a choice … made here for the related doses in a (psychosis) treatment regimen" is different from cases involving "the makeup of … compositions." *Id.* at 1379. That distinction makes *Janssen* inapplicable to the Appeal Claims.

UCB's reliance on *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337 (Fed. Cir. 2013) is similarly misplaced. UCB Br. 70-71. The claims in *Institut Pasteur* were to a method of genetic modification, and the "prior art [taught] only" that the method "could be highly toxic to the cell." 738 F.3d at 1341, 1345-46. The Appeal Claims are not method claims, and there is no prior art teaching that intranasal mPEG-350 would be toxic. UCB claims that "this Court's

precedent permits" considering safety, tolerability, and efficacy in assessing reasonable expectation of "produc[ing] a functioning pharmaceutical composition." UCB Br. 71. But UCB offers no cases where this principle was applied in the formulation context, let alone where the only difference between the claims and prior art is an excipient like mPEG.

UCB cites *In re Cyclobenzaprine*, 676 F.3d 1063 (Fed. Cir. 2012), to argue that reasonable expectation of success "requires more than the ability to run an experiment—it requires a basis to expect the experiment will succeed." UCB Br. 44-45. In *Cyclobenzaprine*, the "experiment" was the determination of the claimed pharmacokinetic parameters and therapeutic plasma concentration, but the prior art lacked guidance on identifying what plasma concentration was therapeutically effective. 676 F.3d at 1066-67, 1070-72. The Appeal Claims are simple formulation claims, the experts agreed the testing was routine, and as explained above, the prior art disclosed bases to expect that testing to succeed in confirming mPEG's attributes.

In *United Therapeutics Corp. v. Liquidia Technologies Inc.*, the Federal Circuit refused to read "safety and efficacy requirements" into a claim to treating pulmonary hypertension because the Court would not import claim "requirements where they do not recite such limitations." 74 F.4th 1360, 1368-69 (Fed. Cir. 2023). UCB attempts to address *United Therapeutics* by stating that the district court here "did not require FDA-approval-level data" or insert the FDA's responsibilities into

the claims. UCB Br. 71. But the district court did precisely what *United Therapeutics* cautioned against by reading in safety and efficacy limitations, among others, where none are claimed. Cipla Br. 62; Appx35-36.

UCB's reference to Cipla's counsel "conced[ing] at closing argument that … efficacy and safety … are relevant to reasonable expectation of success" shows that the district court erred in requiring unclaimed parameters. UCB Br. 72-73; *see Allergan*, 754 F.3d at 965-66. Cipla's counsel clarified that "suitable for intranasal formulation, would be limited to it acting as a solvent" and that doesn't mean it would "necessarily subject to an FDA approved product." Appx14202. Counsel further clarified that, while it would need some level of safety, this is "[n]ot, again, for FDA approval purposes," and that "there's no evidence in the record that it was poisonous." Appx14202-203. The district court committed legal error when it made unclaimed considerations prerequisites for reasonable expectation of success.

UCB could not have gotten claims to a safe, stable, and efficacious intranasal formulation because there is no specification support for such claims. Cipla Br. 19-22; UCB Br. 6-7. The preamble "pharmaceutical composition formulated for intranasal administration" does not provide carte blanche to add limitations because a POSA would purportedly consider them. Such an approach would render the written description and enablement requirements meaningless.

## IV. OBJECTIVE INDICIA DO NOT SUPPORT NON-OBVIOUSNESS

UCB rehashes evidence of objective indicia that the court concluded was not "particularly probative of non-obviousness under the circumstances here." *See* UCB Br. 52-54. UCB identifies no clear error or legal error in the district court's conclusions that would warrant reconsideration of these factors.

## CONCLUSION

The judgment of the district court should be reversed.

Dated: August 28, 2026

Respectfully submitted,

/s/ Anil H. Patel
Anil H. Patel
Adam S. Berlin
K&L GATES LLP
609 Main Street, Suite 4150
Houston, Texas 77002
(713) 815-7300

Peter L. Giunta
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900

Harold Storey
Jenna Bruce
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
(206) 623-7580

*Attorneys for Defendants-Appellants Cipla Limited and Cipla USA Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1992

**Short Case Caption:** UCB, Inc. v. Cipla Limited

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6,866 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 08/28/2026

Signature: /s/ Anil H. Patel

Name: Anil H. Patel