**2026-1992**

# United States Court of Appeals for the Federal Circuit

UCB, INC., UCB BIOPHARMA SRL, HANANJA EHF, UNIVERSITY OF ICELAND,

*Plaintiffs-Appellees,*

– v. –

CIPLA LIMITED, CIPLA USA INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Delaware in No. 1:21-cv-01229-JLH*

## CORRECTED BRIEF FOR DEFENDANTS-APPELLANTS

ANIL PATEL
ADAM S. BERLIN
K&L GATES LLP
609 Main Street, Suite 4150
Houston, Texas 77002
(713) 815-7300
anil.patel@klgates.com
adam.berlin@klgates.com

PETER L. GIUNTA
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900
peter.giunta@klgates.com

HAROLD STOREY
JENNA BRUCE
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
(206) 623-7580
harold.storey@klgates.com
jenna.bruce@klgates.com

*Attorneys for Defendants-Appellants*

SEPTEMBER 3, 2026

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (394607)

***Claims 1, 2, 3, 5, 7, 10 and 13 of U.S. Patent No. 8,217,033***

Claim 13 is at issue on appeal.

> 1. A liquid pharmaceutical composition formulated for intranasal administration, comprising:
>
> > i) midazolam or a pharmaceutically acceptable salt thereof; and
> >
> > ii) a methoxy-polyethylene glycol selected from the group consisting of methoxy-polyethylene glycol 350 and methoxy-polyethylene glycol 550.
>
> 2. The pharmaceutical composition of claim 1, further comprising propylene glycol.
>
> 3. The pharmaceutical composition of claim 2, further comprising water.
>
> 5. The pharmaceutical composition of claim 3, wherein the methoxy-polyethylene glycol is methoxy-polyethylene glycol 350.
>
> 7. The pharmaceutical composition of claim 5, further comprising polyethylene glycol.
>
> 10. The pharmaceutical composition of claim 7, wherein the polyethylene glycol is polyethylene glycol 400.
>
> 13. The pharmaceutical composition of claim 10, wherein the midazolam is present in a concentration from 0.001% (w/v) to 20% (w/v).

Appx107.

***Claims 1 and 10 of U.S. Patent No. 8,809,322***

Claim 10 is at issue on appeal.

> 1. A liquid pharmaceutical composition formulated for intranasal administration comprising:
>
> > a) a therapeutically effective amount of a therapeutic agent selected from midazolam, a pharmaceutically acceptable salt thereof or combinations thereof; and
> >
> > b) a methoxy-polyethylene glycol of Formula I
> >
> > $$H_3C—O—(CH_2CH_2O)_n—H \qquad (I)$$
> >
> > wherein n is a number in the range of 2 to 12.
>
> 10. The pharmaceutical composition of claim 1 wherein the therapeutic agent is midazolam.

Appx92.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2026-1992

**Short Case Caption** UCB, Inc. v. Cipla Limited

**Filing Party/Entity** Cipla Limited, Cipla USA, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/20/2026

Signature: /s/ Anil H. Patel

Name: Anil H. Patel

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Cipla Limited | See attachment | See attachment |
| Cipla USA, Inc. | See attachment | See attachment |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Morris James LLP | | |
| Kenneth L. Dorsney | | |
| Cortlan S. Hitch | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Case: 26-1992 Document: 2 Page: 5 Filed: 07/30/2026

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*UCB, Inc. v. Cipla Limited*
No. 2026-1992

## ATTACHMENT TO CERTIFICATE OF INTEREST

**2. Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

Invagen Pharmaceuticals, Inc.; Cipla (EU Limited).

**3. Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Cipla Limited does not have a parent corporation, and no publicly held corporation owns 10% or more of Cipla Limited's stock.

Cipla USA Inc. is a 100% owned subsidiary of Invagen Pharmaceuticals, Inc. Invagen Pharmaceuticals, Inc. is a 100% owned subsidiary of Cipla (EU Limited), which is a 100% owned subsidiary of Cipla Limited.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ viii

TABLE OF ABBREVIATIONS ........ xi

STATEMENT OF RELATED CASES ........ 1

INTRODUCTION ........ 2

JURISDICTIONAL STATEMENT ........ 5

STATEMENT OF ISSUES ON APPEAL ........ 6

STATEMENT OF THE CASE ........ 7

I. BACKGROUND ON INTRANASAL MIDAZOLAM ........ 7

A. Midazolam ........ 7

B. Midazolam Formulated for Intranasal Use ........ 7

II. THE APPEAL PATENTS CLAIM ELEMENTS THAT WERE ALREADY WELL KNOWN IN THE ART ........ 9

A. Wermeling '359 Disclosed Nearly Anticipatory Intranasal Midazolam Formulations ........ 10

B. MPEG-350 Was a Pharmaceutical Grade Solvent That Was Highly Similar to PEG-400 But Significantly Less Viscous ........ 11

III. THE DISTRICT COURT FAILED TO APPLY THE KNOWLEDGE OF THE POSA TO THE ANALYSIS OF THE PRIOR ART ........ 13

A. The District Court Ignored the Substantial Similarity Between PEG and MPEG ........ 14

B. The District Court Required an Explicit Teaching that MPEG Had Been Used Intranasally ........ 15

C. The District Court's Required Wermeling '359 to Disclose a Motivation to Combine ........ 16

D. The District Court Failed to Consider the Actual Scope of the Claims and Required Absolute Predictability in Finding No Reasonable Expectation of Success ....................... 18

E. The District Court Found Objective Indicia Were Not Probative of Non-Obviousness ................................................ 19

IV. THE SCOPE OF THE APPEAL PATENTS AND APPEAL CLAIMS ........................................................................ 19

A. The Appeal Patents Describe Minimal Testing ........................ 19

B. The Appeal Patents Do Not Describe Midazolam as a Seizure Treatment, or Safety and Efficacy Testing of the Claimed Formulations ...................................................... 22

C. Dr. Gizurarson Performed Minimal Research Before Filing The Appeal Patents ...................................................... 22

SUMMARY OF THE ARGUMENT ...................................................... 24

STANDARD OF REVIEW ...................................................................... 26

ARGUMENT ............................................................................................ 27

I. THE DISTRICT COURT ERRED BY NOT PROPERLY APPLYING THE KSR TEST OF COMBINING KNOWN ELEMENTS TO YIELD PREDICTABLE RESULTS ....................... 28

A. The District Court Ignored the Structural Similarity Between PEG and MPEG ...................................................... 29

B. The Court Erred in Ignoring the Physical and Chemical Similarities Between PEG and MPEG..................................... 32

C. The Court Erred by Failing to Consider the Common Uses of PEG and MPEG ........................................................ 35

D. The Court Erred in Requiring the Substitution Be Made With Absolute Predictability.................................................. 38

E. The Court Ignored Highly Relevant Inventor Admissions Regarding the Interchangeability of PEG and MPEG ........................................................................ 39

II. THE DISTRICT COURT'S ANALYSES ON MOTIVATION AND REASONABLE EXPECTATION OF SUCCESS WERE PREMISED ON LEGAL ERROR.......................40

A. Level of Skill in the Art .........................................................42

B. Scope and Content of the Prior Art..........................................42

C. Motivation to Combine and Reasonable Expectation of Success ......................................................................................46

D. Objective Indicia.......................................................................51

III. THE DISTRICT COURT ERRED BY FAILING TO VIEW THE PRIOR ART AS A WHOLE FROM THE VIEWPOINT OF A POSA..........................................................................................51

A. The District Court Improperly Demanded an Explicit Prior Art Teaching of MPEG-350 in an Intranasal Formulation..............................................................................51

B. The Court Erred by Considering Prior Art References in Silos........................................................................................56

C. The District Court Erred by Requiring an Explicit Motivation to Combine in Wermeling '359 .............................59

D. The District Court Erred by Requiring Motivation and Reasonable Expectation of Success Well Beyond the Scope of the Claims ...................................................................60

CONCLUSION.................................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allergan, Inc. v. Apotex Inc.*,
754 F.3d 952 (Fed. Cir. 2014)....61

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) .... 61, 63, 64

*Almirall, LLC v. Amneal Pharms. LLC*,
28 F.4th 265 (Fed. Cir. 2022) .... *passim*

*Anacor Pharms., Inc. v. Iancu*,
889 F.3d 1372 (Fed. Cir. 2018) .... *passim*

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
499 F.3d 1293 (Fed. Cir. 2007) .... 35-36

*Bayer Pharma AG v. Watson Lab'ys. Inc.*,
874 F.3d 1316 (Fed. Cir. 2017) .... 53, 60, 62

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
807 F.2d 955 (Fed. Cir. 1986)....41

*DyStar Textilfarben GmbH v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) .... 41, 42

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
471 F.3d 1369 (Fed. Cir. 2006) .... 39, 44

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
365 F.3d 1054 (Fed. Cir. 2004) ....26

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)....41

*In re Dillon*,
919 F.2d 688 (Fed. Cir. 1990).... *passim*

*In re GPAC Inc.*,
57 F.3d 1573 (Fed. Cir. 1995).... 41, 56

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ....42

*In re Merck & Co.*,
800 F.2d 1091 (Fed. Cir. 1986) ................................................................ *passim*

*In re Omeprazole Patent Lit.*,
483 F.3d 1364 (Fed. Cir. 2007) ....................................................................50

*In re Payne*,
606 F.2d 303 (CCPA 1979) ........................................................................ 29, 52

*Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*,
456 U.S. 844 (1982)......................................................................................26

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)................................................................................ *passim*

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ....................................................................42

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ....................................................................60

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ................................................................ *passim*

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ....................................................................56

*Richardson-Vicks, Inc. v. Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997) ....................................................................38

*Sun Pharm. Indus. Inc. v. Incyte Corp.*,
No. 2019-2011, 2023 WL 5370639 (Fed. Cir. Aug. 22, 2023)..........................35

*Unigene Lab'ys, Inc. v. Apotex, Inc.*,
655 F.3d 1352 (Fed. Cir. 2011) ........................................................ 54, 55, 56

*United States v. Adams*,
383 U.S. 39 (1966)........................................................................................28

*United States v. U.S. Gypsum Co.*,
333 U.S. 364 (1948)......................................................................................26

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
74 F.4th 1360 (Fed. Cir. 2023) .....................................................................62

*Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*,
955 F.3d 25 (Fed. Cir. 2020).................................................................... *passim*

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1) .......... 5

28 U.S.C. § 1331 .......... 5

28 U.S.C. § 1338(a) .......... 5

35 U.S.C. § 103 .......... 65

Federal Circuit Rule 47.5 .......... 1

Fed. R. App. P. 4(a)(1)(A) .......... 5

MPEP § 2144.09 .......... 30

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Appeal Claims | Claim 10 of U.S. Patent No. 8,217,033, and<br>Claim 13 of U.S. Patent No. 8,809,322 |
| Appeal Patents | U.S. Patent No. 8,217,033, and<br>U.S. Patent No. 8,809,322 |
| Bechgaard '608 | U.S. Patent No. 5,693,608 (Appx14849) |
| CARBOWAX | Dow Chemical Co., CARBOWAX and CARBOWAX SENTRY Polyethylene Glycols and Methoxypolyethylene Glycols, PEGS & MPEGS (March 2006) (Appx14739) |
| FDA | U.S. Food and Drug Administration |
| Gizurarson Presentation | mPEG, methoxy-polyethylene glycol, Powerpoint by Sveinbjorn Gizurarson (Appx15208) |
| IID 2006 | U.S. FOOD & DRUG ADMINISTRATION, Inactive Ingredients Database (October 2006) (Appx18327) |
| IS 8593 | Icelandic Patent Application No. 8593/2007 (Appx15225) |
| mPEG | Methoxy-polyethylene glycol |
| PEG | Polyethylene glycol |
| POSA | Person of ordinary skill in the art |
| Tracy '672 | U.S. Patent Publication No. 2004/0247672 (Appx14884) |
| USP 2006 | UNITED STATES PHARMACOPEIAL CONVENTION, UNITED STATES PHARMACOPEIA/NATIONAL FORMULARY 2006 (USP 29/ NF 24) (January 1, 2006) (Appx14837) |
| Wermeling '359 | U.S. Patent Publication No. 2004/0176359 (Appx14721) |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, appellants state as follows:

(a) There have been no previous appeals in this case.

(b) U.S. Patent Nos. 8,217,033 and 8,809,322 have been asserted in two actions relating to generic midazolam products from other generic manufacturers in the United States District Court for the District of New Jersey, *UCB, Inc. et al. v. Hikma Pharms. USA Inc.*, No. 25-cv-00382 (JLH) (D. Del.) and *UCB, Inc. et al. v. Rubicon Research Ltd.*, No. 26-cv-00427 (JLH) (D. Del.), which may be directly affected by this Court's decision in the pending case.

## INTRODUCTION

This case involves repurposing an FDA-approved excipient to monopolize the well-known intranasal use of an old drug. Because the Appeal Claims recite nothing more than combining a known active ingredient with a known excipient, they would have been obvious to a person of ordinary skill in the art ("POSA"). Therefore, this Court should hold the Appeal Claims invalid as obvious.

This case arises out of Cipla's filing of an Abbreviated New Drug Application ("ANDA") for NAYZILAM, Appellee's intranasal midazolam product. NAYZILAM contains 5 mg/100µL midazolam in combination with mPEG-350, PEG-400, propylene glycol, ethanol, and water. NAYZILAM is indicated to treat Acute Repetitive Seizures ("ARS"), the phenomenon of multiple seizures over a short period of time, in patients with epilepsy.

The claims at issue in this appeal are claim 13 of U.S. Patent No. 8,217,033 ("the '033 patent") and claim 10 of U.S. Patent No. 8,809,322 ("the '322 patent") (together, "Appeal Patents" and "Appeal Claims"). The Appeal Claims include only elements disclosed in the prior art. The most limited claim recites an intranasal formulation comprising midazolam, mPEG-350, PEG-400, propylene glycol, and water. The claims do not recite any disorder or therapeutic effect, nor the quantities of any excipient. The Appeal Patents do not identify midazolam as an anti-epileptic,

much less refer to ARS. They do not describe the safety, stability, efficacy, effect of the formulations on the nasal cilia.

The prior art disclosed many concentrated intranasal midazolam formulations using excipients like PEG-400, propylene glycol, and water. Some prior art formulations with these excipients were poorly sprayable due to their high viscosity. MPEG-350, while not explicitly disclosed in intranasal formulations, was an FDA-approved excipient with many similarities to PEG-400, including the ability to solubilize a wide range of compounds.

The Appeal Claims do nothing more than combine midazolam and the components of a prior art formulation with mPEG-350. As an excipient, mPEG-350 was neither new nor different. MPEG-350 and PEG-400 had been marketed together for decades and were listed together as solvents in the United States Pharmacopeia ("USP"). MPEG-350 was in an FDA-approved topical drug product, an intimate lubricant, and soap products. PEG-400 had those same known uses and more, as it was more widely used, including for FDA-approved intranasal drug products. The similarities in properties and uses were known and not a surprise because PEG-400 and mPEG-350 have very similar chemical structures—they are about 99% homologous. The generic structures of PEG and mPEG are:

PEG: $H{-}(OCH_2CH_2)_n{-}OH$

mPEG: $CH_3{-}(OCH_2CH_2)_n{-}OH$

The only difference between PEG and mPEG is the substitution of a terminal hydroxyl (-OH) group for a methoxy (-$CH_3$) group.

The district court failed to consider how the structural similarity of PEG and mPEG would have informed a POSA's motivation and reasonable expectation of success. Instead, the court took an overly-rigid view of the prior art – demanding an explicit prior art teaching that mPEG had previously been used in intranasal formulations. The district court also failed to recognize the appropriate scope of the claims, reading in limitations related to stability, safety, efficacy, and more—instead of evaluating the obviousness of the Appeal Claims, the court evaluated the obviousness of NAYZILAM. Had the district court analyzed obviousness from the perspective of a POSA viewing the prior art as a whole, and analyzed the Appeal Claims for what they claimed instead of what they did not, it would have had no choice but to find the Appeal Claims obvious. Therefore, this Court should reverse the district court and conclude that the Appeal Claims are invalid as obvious.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and entered Final Judgment on May 27, 2026. Cipla timely appealed on June 26, 2026. Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES ON APPEAL

1. Whether the district court erred in holding that the Appeal Claims—directed to a formulation combining the known active ingredient, midazolam, with known excipients with no quantity limitations, including mPEG-350—are nonobvious.

2. Whether the district court committed legal error in its obviousness analysis by disregarding substantial portions of the prior art that a person of ordinary skill in the art ("POSA") would have known in holding that a POSA would not have combined a reference teaching mPEG-350 with a reference disclosing a nasal sprays containing the remainder of the claimed excipients.

3. Whether the district court erred by requiring precise teachings directed specifically to mPEG-350 used intranasally, and failing to account for the inferences and creative steps a POSA would employ when considering the prior art.

4. Whether the district court erred by failing to consider the language of the Appeal Patents in evaluating motivation and reasonable expectation of success, and as a result of that error, demanded more from the prior art than the Appeal Patents and Appeal Claims provide.

## STATEMENT OF THE CASE

### I. BACKGROUND ON INTRANASAL MIDAZOLAM

#### A. Midazolam

Midazolam is a benzodiazepine useful for treating seizures. Appx7. Before the priority date, midazolam was FDA approved in oral and intravenous dosage forms. *See id.* Before the priority date, physicians prescribed and used *intravenous* midazolam solution for *intranasal* administration to treat ARS in epilepsy patients. Appx7-8, Appx41. It was known that "intranasal drug delivery has several practical benefits, including that it is non-invasive and can be administered by people without medical training." Appx14.

The intravenous solution had a concentration of 5 mg/mL midazolam, requiring 1 mL solution intranasally to achieve a 5 mg therapeutic dose. Appx41-42. That was not ideal because the nasal cavity can only retain 100-200 µL of liquid. Appx15.

#### B. Midazolam Formulated for Intranasal Use

Before the 2007 priority date, several researchers disclosed concentrated midazolam formulations for intranasal use. *See* Appx17-19. To obtain the required midazolam concentrations of 5 mg midazolam in 100-200 µL of liquid, many of those formulations solubilized midazolam in blended non-aqueous (organic) excipients, often together with water. *See id.*, Appx21.

In 1990, Dr. Gizurarson disclosed midazolam intranasal formulations containing PEG-200, glycofurol, and other solvents in Bechgaard ’608. *See* Appx17-18, Appx24, Appx14867, Appx14874. Bechgaard ’608 discloses testing placebos containing tetraethylene glycol with and without glycofurol to nine healthy volunteers. Appx14872. Bechgaard ’608 also reports that glycofurol “in concentration of only 5% has a surprisingly positive effect on the sprayability of e.g. [tetraethylene glycol] by reducing viscosity.” Appx14870. Tetraethylene glycol is a component of PEG-200. Appx19, Appx14870.

In 2002, P.D. Knoester disclosed an intranasal formulation containing midazolam hydrochloride salt, propylene glycol, benzyl alcohol, and water. Appx18. This formulation was made in compounding pharmacies in the Netherlands, despite not having been approved by any regulatory authority in the Netherlands or the United States. Appx25.

In 2005, Dr. Merkus disclosed formulations containing a midazolam salt, propylene glycol, water, and PEG. Appx18-19.

In Wermeling ’359, Dr. Wermeling disclosed an exemplary formulation containing 25 mg midazolam, propylene glycol, and PEG 400. Appx18. Wermeling ’359 also discloses water as an optional excipient. Appx21, Appx14728. The pharmacokinetics and pharmacodynamics of the exemplary formulation disclosed in

Wermeling '359 were tested in twelve healthy volunteers. Appx26, Appx14799, Appx14804.

The prior art intranasal formulations prepared by Knoester, Wermeling, and Gizurarson were all administered to humans without FDA approval. Glycofurol was not in any FDA-approved products before the priority date, and benzyl alcohol was FDA approved for applications such as topical and vaginal administration, but not intranasal administration. *See* Appx18339-341.

## II. THE APPEAL PATENTS CLAIM ELEMENTS THAT WERE ALREADY WELL KNOWN IN THE ART

The Appeal Patents claim an intranasal midazolam composition comprising one or more excipients.

Claim 13 of the '033 patent, rewritten in independent form, recites: a liquid pharmaceutical composition formulated for intranasal administration, comprising: i) midazolam or a pharmaceutically acceptable salt thereof; and ii) methoxy polyethylene glycol 350, further comprising propylene glycol, water, and polyethylene glycol 400, wherein the midazolam is present in a concentration from 0.001% (w/v) to 20% (w/v). *See* Appx107.

Claim 10 of the '322 patent, rewritten in independent form, recites: a liquid pharmaceutical composition formulated for intranasal administration comprising: a) a therapeutically effective amount of midazolam; and b) a methoxy-polyethylene

glycol of Formula 1, wherein n is a number in the range of 2 to 12. Appx92. The mPEG recited in claim 12 encompasses mPEG-350. *See* Appx99.

As of the priority date, the prior art disclosed PEG-400, propylene glycol, and water in intranasal midazolam formulations. It also disclosed that mPEG-350 was highly similar to PEG-400 but had an advantageously lower viscosity. Making the claimed formulation required nothing more than combining the prior art formulations with the off-the-shelf excipient mPEG-350.

### A. Wermeling ’359 Disclosed Nearly Anticipatory Intranasal Midazolam Formulations

Wermeling ’359 nearly anticipated the claimed formulations. Wermeling ’359 disclosed intranasal midazolam compositions comprising aqueous and non-aqueous diluents. Appx21. It taught an exemplary formulation containing 25 mg/mL midazolam, propylene glycol, and PEG 400 (two of the four excipients recited in claim 13 of the ’033 patent). Appx18, Appx14730. Wermeling ’359 also taught aqueous, or water-containing, excipients. Appx21, Appx14728. Wermeling ’359 fell just short of anticipating the claimed formulations because it did not explicitly disclose mPEG-350. *See* Appx30-32, Appx44.

Wermeling ’359 discloses that, in certain embodiments, “the intranasal delivery device may be modified, for example, by increasing the size of the discharge orifice ... in order to accommodate higher viscosity compositions.” Appx22 (quoting

Appx14729). The exemplary formulation in Wermeling '359 required a modified device and produced a "jet" rather than a "plume" through the device. Appx22.

### B. MPEG-350 Was a Pharmaceutical Grade Solvent That Was Highly Similar to PEG-400 But Significantly Less Viscous

PEG and mPEG share a common chemical structure of the base polymer, with the only difference being one terminal hydroxy group of the PEG being substituted for a methoxy group in the mPEG. Appx4932-33. PEG and mPEG are "about 99 percent homologous" with "minor changes on one terminal end." Appx4982. Plaintiffs' witnesses confirmed the structural similarity. *See* Appx5152 (Gizurarson: "the difference is that you have a hydroxy group … when you have PEG, and a methoxy group, CH3, on mPEG."), Appx5448 (Smyth: "Q: What are the differences? A: Well, you can see on the slide that mPEG has a methoxy group instead of a hydroxy group.").

PEG and mPEG had uses in common as pharmaceutical excipients. MPEG-350 had been used in four topical products, including one FDA-approved product listed in the FDA's Inactive Ingredients Database "IID" of excipients used in approved drug products and one vaginal lubricant. Appx39, Appx18432. PEG was FDA-approved for routes of administration including nasal, topical, and vaginal, among others. Appx29, Appx18469-474. As discussed above, PEGs were also frequently used in intranasal midazolam formulations.

PEGs and mPEGs shared important physical and chemical properties. A POSA would have been interested in the solubility and viscosity properties disclosed in Carbowax when formulating an intranasal composition. Appx4938. Carbowax states that a "wide range of substances are soluble in CARBOWAX™ PEGs and MPEGs. This extensive chemical compatibility makes them useful in a wide variety of formulated products." Appx14744; *see also* Appx4938-39. Carbowax also discloses that PEGs and mPEGs are miscible with water and physically compatible with commonly used polar organic solvents. Appx14744, Appx4938-39. PEGs and mPEGs are effective at solubilizing other substances and making those substances soluble in water. Appx4938-39.

Carbowax commercially offered four pharmaceutical grade "CARBOWAX SENTRY" PEGs and mPEGs that met pharmacopeial standards and were supplied in liquid form: PEG-300, PEG-400, PEG-600, and mPEG-350. Appx4937, Appx14743.

Carbowax discloses that mPEG-350 had the lowest viscosity of any excipient in the family. Appx24, Appx14756-757, Appx14743. It discloses that mPEG-350 has a viscosity of 3.9 cSt at 100 °C, while PEG-200, PEG-300, and PEG-400 have viscosities of 4.3 cSt, 5.8 cSt, and 7.3 cSt, respectively. Appx24, Appx14756-757. It also discloses that "[i]ntermediate viscosities may be obtained by blending two different CARBOWAX™ Products" and provides guidance on choosing "the proper

blend of PEGs and MPEGs to obtain the desired viscosity at any temperature." Appx14745. Tracy '672 disclosed that mPEG-350, along with PEG-200 and PEG-400 were "PEG[s]" that could be used as "viscosity reducing agents." Appx28.

The relationship between sprayability and viscosity was well understood – with lower viscosity typically correlating to better spray performance. Appx5123-124, Appx4947-948, Appx14814, Appx4960. The district court found that "[w]hen coming up with a formulation, a formulator would prefer a formulation that can be sprayed with a nasal spraying device that has previously been approved by the FDA" and that "[f]ormulators must … consider a formulation's sprayability and its ability to be absorbed by the nasal mucosa, both of which are affected by viscosity." Appx15-16. Prior art testing of intranasal devices found "[a] noticeable trend is that viscosity considerably decreased plume areas over the range studied." Appx14814, Appx4958-960. There was no dispute that viscosity, among other factors, impacted sprayability. *See* Appx16.

## III. THE DISTRICT COURT FAILED TO APPLY THE KNOWLEDGE OF THE POSA TO THE ANALYSIS OF THE PRIOR ART

Cipla submitted an Abbreviated New Drug Application ("ANDA") to market a generic version of NAYZILAM and certified that the Appeal Patents were invalid. Appellees sued Cipla under the Hatch-Waxman act. After a bench trial, the district court held that the Appeal Claims are not obvious. The district court applied an overly rigid analysis that ignored the substantial similarity between PEG and mPEG,

required an explicit teaching of intranasal mPEG in the art rather than viewing the interrelated teachings of the art through the lens of a POSA, and failed to consider the actual scope of the claims.

### A. The District Court Ignored the Substantial Similarity Between PEG and MPEG

The district court found that PEG-400 and mPEG-350 were not interchangeable because they were different compounds, with certain different properties, that had been used for different pharmaceutical applications. Appx38-39. For example, the district court found that "[b]ecause PEG and mPEG have different chemical structures, they also have different physical and chemical properties such as melting point, freezing point,[1] viscosity, and chemical reactivity." Appx38. The district court ignored the structural similarity between PEG and mPEG and the common properties disclosed in Carbowax.

The district court also referred to the different prior uses of PEG and mPEG, noting that "PEG had been used as a solubilizer in a number of liquid formulations," while mPEG "had been used as a chemical intermediate, and in four topical products: one [FDA-approved] gel, one vaginal lubricant, and two bar soaps." Appx39. The district court ignored that PEG and mPEG shared certain uses, such as their use as

[1] Melting point and freezing point are the same property. *See, e.g.,* Appx14756-757.

pharmaceutical solvents and solubilizing agents, and their uses in topical and vaginal products.

The district court also erroneously found that Carbowax refers to PEGs and mPEGs as "comprising the Dow 'family of CARBOWAX products,'" but "[o]therwise, Carbowax does not refer to PEG and mPEG as belonging to the same 'family.'" Appx23. The court ignored that Carbowax discloses PEGs and mPEGs "are a family of water soluble linear polymers formed by the addition reaction of ethylene oxide to an ethylene glycol equivalent." Appx14742, Appx4935.

The district court concluded that the POSA "would not have been able to predict the effect of substituting mPEG for PEG in an intranasal midazolam formulation," but it is well settled that obviousness does not require absolute predictability of success. Appx39.

### B. The District Court Required an Explicit Teaching that MPEG Had Been Used Intranasally

The district court determined that the "POSA would not have been motivated to use mPEG in an intranasal midazolam formulation because mPEG was not a known excipient for intranasal formulations, and it had not been used, marketed, or even suggested for use in an intranasal formulation." Appx32. Effectively, the court required an explicit prior art teaching that mPEG had been used in an intranasal formulation. *See* Appx33, Appx45-47. Under the court's analysis, no pharmaceutical

excipient could ever be obvious unless it was previously disclosed in the same route of administration.

The district court failed to consider the inferences and creative steps that a POSA would have employed when preparing an intranasal midazolam formulation, and ignored uncontested testimony regarding the similar structures and uses of mPEG and PEG.

### C. The District Court's Required Wermeling '359 to Disclose a Motivation to Combine

The district court found that formulators "prefer a formulation that can be sprayed with a nasal spraying device that has previously been approved by the FDA" and that "[f]ormulators must … consider a formulation's sprayability … which [is] affected by viscosity." Appx15-16. Nevertheless, the court concluded there was no motivation to reduce the viscosity of the Wermeling '359 formulations, in part, because it "did not state that the use of a modified device was problematic." Appx36-37, Appx46. However, motivation need not be found explicitly in the references themselves.

The district court also concluded that, if a motivation to reduce viscosity did exist, then mPEG would not have been an obvious choice because "its suitability for any nasal formulation was unknown and there was little to no information in the art suggesting that mPEG or mPEG-350 would help a POSA achieve a lower viscosity intranasal formulation or that a formulation containing mPEG would be suitable for

administration with a standard device." Appx46. The court ignored that there was a general motivation in the art to optimize viscosity, and a preference against high viscosity formulations, regardless of the device used. Appx5123-124 ("As a formulator, I can tell you, if you have a high viscosity – you don't want to deal with that kind of formulation.")

The district court found that "mPEG-350's viscosity is similar to propylene glycol[2] and lower viscosity PEGs, such as PEG-200, which fall within the 'higher viscosity' formulations discussed in Wermeling '359," and therefore, a POSA would not have expected mPEG-350 to "markedly lower" viscosity. Appx37. The court ignored that the exemplary formulation in Wermeling '359 contained PEG-400, which is nearly twice as viscous as mPEG-350. *Id.*, Appx18, Appx14756-757. The district court also ignored Carbowax's teaching that "[i]ntermediate viscosities may be obtained by blending two different CARBOWAX™ Products" to achieve "the proper blend of PEGs and MPEGs to obtain the desired viscosity at any temperature." Appx14745. The district court also ignored that the Appeal Claims do not claim any concentration of excipients.

---

[2] The only record evidence that the viscosities of mPEG-350 and propylene glycol are "similar" is a conclusory statement by Dr. Smyth. Appx37, Appx5492. No documentary evidence supported this finding.

Even though obviousness does not demand that the claimed approach be the best solution to a problem, the Court also found that "[i]f the POSA were motivated to modify the viscosity of the Wermeling Formulation ... there would have been a large number of excipients in the pharmaceutical arts to consider." Appx37.

### D. The District Court Failed to Consider the Actual Scope of the Claims and Required Absolute Predictability in Finding No Reasonable Expectation of Success

The Appeal Claims require "a liquid pharmaceutical composition for intranasal administration comprising" midazolam and mPEG-350[3], and in the case of the '033 patent the additional excipients PEG-400, propylene glycol, and water. *See* Appx92, Appx107. Claim 13 of the '033 patent recites the broad range of 0.001-20% (w/v) midazolam, while claim 10 of the '322 patent recites a "therapeutically effective amount" of midazolam. *Id.* The Appeal Patents do not define a "therapeutically effective amount." Thus, all that is required for obviousness is that a POSA would combine midazolam with the claimed excipients into a liquid pharmaceutical composition for intranasal administration with a reasonable expectation of success.

---

[3] Claim 10 of the '322 patent claims mPEG by its structure and a range of "n" values. Claim 10 encompasses mPEG-350 and mPEG-550. For ease of reference in this Appeal, claim 10 is referred to as requiring mPEG-350.

The district court found no reasonable expectation of success primarily based on unclaimed features such as efficacy, tolerability, safety, stability, effect on the nasal cilia, and permeability. *See* Appx33-35. The district court's finding of no reasonable expectation of success was primarily based on features that are not claimed in the Appeal Patents.

### E. The District Court Found Objective Indicia Were Not Probative of Non-Obviousness

The district court found that "the evidence offered for secondary considerations isn't particularly probative of non-obviousness under the circumstances here." Appx47. The district court recognized "that there is significant evidence of a long-felt need for an FDA-approved, commercially available nasal formulation of midazolam" but gave that fact limited weight because "[t]he evidence at trial revealed that there were multiple publications describing intranasal midazolam formulations before the priority date." *Id.*

## IV. THE SCOPE OF THE APPEAL PATENTS AND APPEAL CLAIMS

### A. The Appeal Patents Describe Minimal Testing

The Appeal Patents claim priority to Icelandic Patent Application No. 8593/2007 ("IS 8593"), filed January 19, 2007. Dr. Gizurarson is listed as the sole inventor.

The Appeal Patents characterize the invention as being based on the "discovery that the inclusion of one or more alkoxy-polyethylene glycols in a

formulation provides certain advantages" including lower viscosity and less irritating formulations. Appx98. It explains reducing viscosity "can produce a spray pattern optimized for delivering the therapeutic agent," and claims that the compositions "minimize undesirable after taste" associated with other excipients. *Id*. The "substitution" of PEG-200 for mPEG-350 "at an equivalent concentration" results in a composition with a lower viscosity, which has a "surprisingly positive effect" on sprayability. Appx100.

The specification describes minimal testing to support these supposed advantages. Example 2 describes an "exemplary midazolam containing formulation" containing 10 mg of midazolam in 2 mL of mPEG-350, purportedly administered to rabbits. Appx105. Dr. Gizurarson admitted the formulation was not actually administered to animals. Appx5178. Pharmacokinetic testing in dogs of two test formulations and a control formulation (without mPEG-350) concluded that that the test formulations had comparable pharmacokinetics to the control formulation. Appx105, Appx5178.

Example 4 "describes the benefit of incorporating [mPEG] into certain intranasal formulations." Appx106. It describes mPEG-containing test formulations, and one control. *Id.* It states that "[t]he viscosity of the resulting formulations and spray pattern were tested" and the "spray patterns were found to be more reproducible as the viscosity of the formulation decreased." *Id.* Example 4 also

administered 100 µL of test and control placebo formulations to three healthy test subjects. *Id*. The only conclusion of that human testing was that the formulation containing mPEG-350 "had a less noticeable taste relative to the placebo formulation[.]" *Id*. Example 4 concludes "[t]hese collective results demonstrate that mPEG 350 is a suitable excipient for nasal administration, for example, with midazolam." *Id.*

Finally, Example 5 describes the spray diameter of mPEG-350 and PEG-300 from two commercial spray devices. Appx106. Example 5 does *not* describe the sprayability of an intranasal midazolam formulation. Appx5181. Dr. Gizurarson testified that Example 5 provided only a "small indication of [the] sprayability" of a midazolam formulation, and that "we were still optimizing when [the patent application] was filed." *Id*.

Dr. Gizurarson testified that all he had done before filing the first U.S. patent application to determine that mPEG was less irritating was that "I made the formulation, and I sprayed it up my nose," then concluded that it was less irritation than other excipients he had sprayed in his nose in the past. Appx5175-76. This "experiment" was not described in the specification.

Finally, the specification states "it is understood that a [POSA] can choose other excipients … [including] those that are currently allowed in topical and parenteral formulations." Appx104.

### B. The Appeal Patents Do Not Describe Midazolam as a Seizure Treatment, or Safety and Efficacy Testing of the Claimed Formulations

The patent specification is informative in what it does not describe. It does not describe any testing showing that formulations containing midazolam and mPEG-350 were safe, non-irritating, tolerable (other than taste as judged by three healthy subjects), stable, and without detrimental effects on the nasal cilia. It does not mention ARS, much less provide data showing that the claimed formulations are effective to treat ARS. The specification does not include midazolam in its list of "anti-epileptics," instead listing it under "anxiolytics, sedatives, hypnotics and neuroleptics." Appx100-101.

### C. Dr. Gizurarson Performed Minimal Research Before Filing The Appeal Patents

Appellee did not call Dr. Gizurarson to testify live at trial because there was no invention story to tell.

Dr. Gizurarson used solvents like PEGs and glycofurol to solubilize midazolam before using mPEG. Appx17-18, Appx5146, Appx14849. He testified that he first encountered mPEG-350 around May 2006 in a brochure "providing conjugated PEGs." Appx5149. Four days later, he was ready to write a patent application covering mPEG intranasal formulations. Appx5162-163. Before filing IS 8593, Dr. Gizurarson consulted a Dow Chemical Company sales brochure for the physical and chemical properties of mPEG-350, including its viscosity compared to

other PEGs. Appx5152-153, Appx5200-201. Based on the brochure, Dr. Gizurarson hoped that "having lower viscosity may solve some of the sprayability problems that we had been struggling with …." Appx5152-153.

Dr. Gizurarson testified that he believed that solubility of midazolam could be improved by "replacing a hydroxy group [from PEG] with a methoxy group [in mPEG] … [which] would increase, slightly, the … potential lipophilicity of [mPEG] …." Appx5151-152. Before filing IS 8593, Dr. Gizurarson performed a solubility study dissolving different benzodiazepines in mPEG-350. Appx5156-157. He measured spray distribution of mPEG-350 on a piece of paper, but did not include the results in IS 8593. Appx5158-169. Dr. Gizurarson admitted that the other tests in IS 8593 were prophetic. *See* Appx5169-171. He copied examples from Bechgaard '608, changing PEG-200 to mPEG-350. *See* Appx5197; *compare* Appx14874 (example 10) *with* Appx15248 (example 6).

After filing IS 8593 but before filing the first U.S. application, Dr. Gizurarson gave an internal presentation titled "mPEG" ("Gizurarson Presentation"), pitching the use of intranasal mPEG. *See* Appx5184, Appx15208-219. The Gizurarson Presentation identifies PEG, mPEG, and glycofurol as a chemical family. Appx15210. A slide titled "Technical Data" states that certain stability characteristics of mPEG are "like other PEGs." Appx15212. Dr. Gizurarson admitted that the data was all from Dow publications. Appx5188-189. Similarly, the

slide titled "Comparison" lists properties such as viscosity that match the data in Carbowax. *Compare* Appx15214 *with* Appx14756-757.

In a slide titled "Selecting Drugs for mPEG" Dr. Gizurarson suggested "[r]eplac[ing] all formulations where PEG has been used, with mPEG!" Appx15215. The same slide states that "PEG (and therefore mPEG) are bioadhesive and prolong duration of drugs at the mucosal surface" and are used to protect proteins and peptides. *Id.* The Gizurarson Presentation also suggests substituting mPEG for PEG-200 to avoid third-party patents. Appx15209.

## SUMMARY OF THE ARGUMENT

The district court's decision is premised on legal errors. First, in holding that the Appeal Claims are not obvious as a combination of known elements to yield predictable results, the district court failed to address the prior art from the perspective of a POSA. If it had, it would not have ignored their structural similarity, physical and chemical properties, and known uses among PEG-400 and mPEG-350 made them interchangeable for purposes of solubilizing midazolam in an intranasal midazolam formulation. Instead, the district court focused on them technically having different structures, CAS-numbers, and some properties that were not identical. This was even though there was no reason to expect mPEG-350 to be different.

Second, every element of the Appeal claims—midazolam, mPEG-350, PEG-400, propylene glycol, and water; and intranasal administration—is in the prior art. A POSA would have recognized that mPEG-350 had a lower viscosity than PEG-400, which would improve formulation sprayability. There would have been ample reasons to use mPEG-350 in an intranasal midazolam formulation with PEG-400, propylene glycol, and water. Nothing in the prior art taught away from such a formulation.

Third, the district court's determination that a POSA would not have been motivated to use mPEG-350 in an intranasal formulation with a reasonable expectation of success was premised on several legal errors. First, the district court erred by requiring precise teachings directed to the specific subject matter of the Appeal Claims, e.g., mPEG-350 used intranasally, rather than considering the inferences and creative steps a POSA would employ. Second, the district court required an explicit motivation in Wermeling '359 despite this Court's clear guidance that motivation need not come from the references themselves. Third, the court failed to consider the interrelated teachings of the prior art and perspective of a POSA when it held that Carbowax would not motivate a POSA to use mPEG-350 because the only disclosed pharmaceutical use for mPEG-350 in Carbowax was as a chemical intermediate—disregarding that mPEG-350 was in an FDA-approved pharmaceutical product. Fourth, the court erred by requiring absolute predictability,

rather than a reasonable expectation of success. Finally, the district court erred by failing to consider inventor admissions that Carbowax disclosed the pertinent properties of mPEG-350, which support motivation and reasonable expectation of success. Together, these errors compounded to the district court holding the Appeal Claims non-obvious.

## STANDARD OF REVIEW

On appeal from a bench trial, this Court reviews the district court's legal conclusions *de novo* and factual findings for clear error. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007) (citing *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1058 (Fed. Cir. 2004)). "The ultimate conclusion of whether a claimed invention would have been obvious is a question of law reviewed de novo based on underlying findings of fact reviewed for clear error." *Pfizer*, 480 F.3d at 1359 (citation omitted). However, factual findings that rest on a mistaken view of the law are not entitled to deference. *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 855 n.15 (1982) (citation omitted). "A factual finding is clearly erroneous if, despite some supporting evidence, 'the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.'" *Pfizer*, 480 F.3d at 1359 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## ARGUMENT

The district court's obviousness decision was premised on several legal errors. Specifically, instead of considering the prior art as a whole, the decision treated each prior art reference in its own silo, compromising its holding on the obviousness of the Appeal Claims. Every claim limitation is in the prior art. The prior art taught the advantages of intranasal midazolam, taught specific concentrated intranasal midazolam formulations, and taught that the excipient mPEG-350 had properties well-suited for use in a midazolam formulation. Nothing in the prior art taught away from mPEG-350, and the district court did not credit any secondary considerations of non-obviousness. Had the district court considered the prior art as a whole under the obviousness standards set forth in *KSR*, it would have concluded that each of the claim elements was disclosed in the prior art, and that a POSA would have combined those disclosures to make an intranasal midazolam formulation. This is correct under either of the analytical frameworks for obviousness *KSR* provided: (1) combining known elements to yield predictable results, and (2) that a POSA would have been motivated to combine the prior art disclosures to create an intranasal midazolam formulation.

## I. THE DISTRICT COURT ERRED BY NOT PROPERLY APPLYING THE *KSR* TEST OF COMBINING KNOWN ELEMENTS TO YIELD PREDICTABLE RESULTS

A POSA, considering the prior art as a whole, would have understood that using mPEG-350 in the Appeal Claim formulations would be substituting one known glycol-based excipient for another to yield a predictable result. In *KSR*, the Supreme Court cautioned that "when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) (citing *United States v. Adams*, 383 U.S. 39, 50-51 (1966)). That framework applies to pharmaceutical formulations. *See Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 273 (Fed. Cir. 2022) (holding the substitution of one excipient for another obvious where the excipients "perform the same function and are interchangeable."). Here, the district court erred by holding that a POSA would not substitute mPEG-350 for PEG-400 based on purported differences between them that are not pertinent to their role as excipients in a midazolam formulation, and by ignoring the common structures and properties that make them suitable.

The district court determined that PEG and mPEG were not interchangeable based, in part, on the finding that "[b]ecause PEG and mPEG have different chemical structures, they also have different physical and chemical properties such as melting

point, freezing point, viscosity, and chemical reactivity." Appx38. The court's finding is erroneous for several reasons.

### A. The District Court Ignored the Structural Similarity Between PEG and MPEG

The court erred by emphasizing that PEG and mPEG technically have "different" chemical structures while ignoring their overwhelming structural similarity and testimony about the inferences that a POSA would draw based on it. *See* Appx38-39. This Court has recognized that "skilled artisans can expect structurally similar compounds to have similar properties." *Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*, 955 F.3d 25, 32 (Fed. Cir. 2020) (citing *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990) ("[S]tructural similarity between claimed and prior art subject matter, proved by combining references or otherwise, where the prior art gives reason or motivation to make the claimed compositions, creates a *prima facie* case of obviousness….")); *In re Payne*, 606 F.2d 303, 314 (CCPA 1979) ("Because of the close structural similarity between the claimed compounds at issue here and the compounds [in the prior art], and because those prior art compounds possess pesticidal activity, we conclude that the required motivation is present here.") (citation omitted)); *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1384 (Fed. Cir. 2018) ("[I]t is reasonable to assume that similar compounds that share certain common properties are apt to share other related properties as well." (citing *In re Merck & Co.*, 800 F.2d 1091, 1096 (Fed. Cir. 1986)).

The district court completely ignored Dr. Wermeling's testimony that the PEG and mPEG are "99 percent homologous" with only a modest difference at the terminal end. *See* Appx4982. The Manual of Patent Examining Procedure ("MPEP") states that "homology and isomerism are facts which must be considered with all other relevant facts in determining obviousness" and that "[a] *prima facie* case of obviousness may be made when chemical compounds have very close structural similarities and similar utilities." MPEP § 2144.09. That similarity renders claims *prima facie* obvious "even though a particular benefit of the claimed compound asserted by patentee is not expressly disclosed in the prior art," and "applicant's recognition of the benefit is not in itself sufficient to distinguish the claimed compound from the prior art." *Id.* (citing *Dillon*, 919 F.2d at 693).

Here, PEG and mPEG were nearly identical structurally and were both used as pharmaceutical excipients in FDA-approved products. PEG and mPEG share a common chemical structure of the base polymer, with the only difference being one terminal hydroxy group of the PEG being substituted for a methoxy group in the mPEG. Appx4932-933. The prior art also disclosed that both PEG and mPEG were pharmaceutical solvents used as excipients. Appx14842. Dr. Wermeling explained that "PEG 400 and mPEG 350 have very close structural similar [sic], probably 98, 99 percent of the molecule is the same. Just the one little terminus end. So would I [sic] have expected mPEG 350 to solubilize this similar to PEG 400." Appx5788. It

follows that the district court should have held the Appeal Claims obvious had it considered the similarities between PEG and mPEG from the perspective of a POSA.

The experts for both parties and the inventor each agreed that PEG and mPEG are very structurally similar. Alongside Dr. Wermeling's testimony on homology, UCB's expert, Dr. Smyth agreed that the difference was "that mPEG has a methoxy group instead of a hydroxy group"—another way of saying the same thing. Appx5448. Dr. Gizurarson stated that "the difference is that you have a hydroxy group … when you have PEG, and a methoxy group, CH3, on mPEG." Appx5152. Dr. Gizurarson testified that he was "not really" surprised that "the saturation solubility of midazolam in mPEG 350 and mPEG 400 [sic] were comparable," as determined in post-priority testing during the development of NAYZILAM. Appx5183 (discussing Appx15773, Appx15782 (finding the saturation solubility of midazolam was "comparable" at about 130 mg/mL in mPEG-350 and PEG-400)).

Structurally similar prior art has rendered obvious new uses for known pharmaceutical compounds. In *Merck*, methods of using the compound amitriptyline to treat depression were obvious based on its structural similarity to imipramine, another psychoactive compound known to have antidepressive effects. *See Merck*, 800 F.2d at 1096-97. *Merck* involved the biological activities of active ingredient drug molecules, whereas mPEG-350 and PEG-400 are inactive excipients.

In *Anacor*, claims to the treatment of onychomycosis using tavaborole, a compound with known potency against the fungus *C. albicans* but unknown to treat onychomycosis, was obvious over prior art that taught the use of structurally similar boron compounds effective against the same fungus to treat onychomycosis. *See* 889 F.3d at 1383-84. The Court referenced both the structural and functional similarities of the compounds. *Id.* Like *Anacor*, this case does "not involve a patent on a new chemical compound" and, instead, involves the repurposed use of an old compound. *See id.* at 1384. Like *Anacor*, PEG and mPEG are not only closely related structurally, but had overlapping functions in the prior art as topical excipients and pharmaceutical solvents. Like *Merck*, *Anacor* involved uses of active ingredient drug molecules, rather than mere inactive ingredients.

Structurally similar prior art has also rendered obvious claims to a pharmaceutical preparation. In *Valeant Pharmaceuticals*, this Court found that a POSA would have expected the opioid receptor antagonist methylnaltrexone to be stable across the same pH range as two structurally similar opioid antagonists, rendering the claimed preparation obvious. *See* 955 F.3d at 29, 33.

### B. The Court Erred in Ignoring the Physical and Chemical Similarities Between PEG and MPEG

The court erred by finding that a POSA would not have understood mPEG to be substitutable for PEG because they had "different physical and chemical properties such as melting point, freezing point, viscosity, and chemical reactivity."

*See* Appx38. This Court does not require complete identity of properties to find two equivalent components substitutable. *See, e.g.*, *Almirall*, 28 F.4th at 271 (finding it obvious to substitute one gelling agent for another where the first "require[d] neutralization … and produc[ed] grittiness" while the substituted agent "is pre-neutralized, and reduces grittiness."). The difference in viscosity between mPEG-350 and other PEGs would have been a motivation, rather than a deterrent, for a POSA to include mPEG-350 in an intranasal composition to reduce viscosity.

With respect to the district court's finding on melting point, freezing point, and chemical reactivity: the melting/freezing temperature[4] ranges of mPEG-350 and PEG-400 overlap completely; Carbowax discloses the ranges as -5 to 10 °C for mPEG-350 and 4 to 8 °C for PEG-400. Appx14756. The district court's finding that PEG and mPEG have a different "chemical reactivity" appears to be based entirely on one conclusory statement by Plaintiffs' expert Dr. Smyth. *See* Appx38 (citing Appx5445-456, Appx5448). But that finding is not consistent with the record – under the heading "Chemical Reactivity," Carbowax states that "[t]he primary hydroxyl functionality of CARBOWAX™ PEGs and MPEGs allows them to undergo most reactions typical of alcohols." Appx14745. Dr. Gizurarson admitted that he included the statement "chemical reactivity is similar for both PEGs and

---

[4] Melting point and freezing point are the same property. *See* Appx14756-757.

MPEGs" in the Gizurarson Presentation based on "information that I have extracted from Dow's information and copied to the text." Appx5189 (discussing Appx15212). The district court ignored this inventor admission regarding the prior art, and the prior art itself, in favor of Dr. Smyth's conclusory statement.

The court also ignored the common properties between PEG and mPEG, including their ability to solubilize a wide range of substances. Appx14744. A POSA would have been interested in the solubility and viscosity properties disclosed in Carbowax when formulating an intranasal composition. Appx4938. Carbowax discloses that a "wide range of substances are soluble in CARBOWAX™ PEGs and mPEGs. This extensive chemical compatibility makes them useful in a wide variety of formulated products." Appx14744. Carbowax also teaches that PEGs and mPEGs are miscible with water and physically compatible with commonly used polar organic solvents. Appx4938-939, Appx14744. PEGs and mPEGs are effective at solubilizing other substances and making those substances soluble in water. Appx4938-939. Dr. Gizurarson himself testified that he believed that solubility of midazolam could be improved by "replacing a hydroxy group [from PEG] with a methoxy group [in MPEG]," which he hypothesized would at least slightly increase its lipophilicity. Appx5151-152. Dr. Gizurarson testified that he was "not really" surprised that "the saturation solubility of midazolam in mPEG 350 and mPEG 400 [sic] were comparable," as determined in post-priority testing during the

development of NAYZILAM. Appx5183 (discussing Appx15773, Appx15782 (finding the saturation solubility of midazolam was "comparable" at about 130 mg/mL in mPEG-350 and PEG-400)).

The district court erred by ignoring the physical and chemical similarities between PEG and mPEG.

### C. The Court Erred by Failing to Consider the Common Uses of PEG and MPEG

The district court erred by ignoring the ordinary creativity of a POSA in considering the overlapping uses of PEG and mPEG as excipients, including in topical and vaginal products, disclosed in the prior art, instead focusing on their "different pharmaceutical uses prior to 2007." *See* Appx38. But this Court does not require identical utilities to find the use of homologous compounds obvious. *See Dillon*, 919 F.2d at 698 ("When chemical compounds have 'very close' structural similarities and ***similar utilities***, without more a *prima facie* case may be made." (emphasis added) (citation omitted)).

"Motivation to combine 'need not be [based on] an explicit teaching that the claimed compound will have a particular utility; it is sufficient to show that the claimed and prior art compounds possess a sufficiently close relationship to create an expectation, in light of the totality of the prior art, that the new compound will have similar properties to the old." *Sun Pharm. Indus. Inc. v. Incyte Corp.*, No. 2019-2011, 2023 WL 5370639, at *3 (Fed. Cir. Aug. 22, 2023) (quoting *Aventis Pharma*

*Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007)) (non-precedential).

The record is clear that mPEG-350 had a similar utility to PEG as an FDA-approved pharmaceutical excipient and solubilizing agent. Specifically, the court found that "PEG had been used as a solubilizer in a number of liquid formulations and had been used as an active ingredient in laxatives" while mPEG "had been used as a chemical intermediate, and in four topical products: one gel, one vaginal lubricant, and two bar soaps. Of the four topical products, only the gel was FDA-approved." Appx39. The district court ignored the many similarities that were disclosed in the prior art.

For example, the court acknowledged that mPEG-350 was used in an FDA-approved topical product, and a vaginal lubricant, but ignored that PEG-400 was also used in FDA-approved topical and vaginal products. *See* Appx29. Appellee's own expert testified that it would have been routine to determine whether an excipient FDA-approved for topical use could also be used intranasally. Appx5543-545. Moreover, Carbowax discloses four pharmaceutical-grade excipients that are liquid at room temperature: PEG-200, PEG-300, PEG-400, and mPEG-350. Appx14743, Appx4937-938. The prior art disclosed the use of at least PEG-200 and PEG-400 in intranasal midazolam formulations. *See, e.g.,* Appx17-18, Appx5185-186. Carbowax disclosed that PEG and mPEG had similar properties, which would

have been reinforced by the great structural homology between the compounds. Tracy ’672 discloses that mPEG-350, along with PEG-200 and PEG-400 were “PEG[s]” that could be used as “viscosity reducing agents.” Appx28.

The court found that pharmaceutical compendia such as USP 2006 “distinguished between PEG and mPEG,” while ignoring that USP 2006 lists PEG and mPEG (“polyethylene glycol monomethyl ether”) among just thirty-one solvent-excipients. Appx14842, Appx5106 (“[T]here are a very limited number [of excipients] that are in the USP, and an even smaller number that had a statement made in FDA’s inactive ingredient list.”), Appx5456 (“So here, the USP is listing excipients by category.”). Not only are PEG and mPEG on that list of thirty-one excipients, but propylene glycol and four grades of water are also listed. Appx14842. Thus, every excipient recited by the Appeal Claims is represented as a solvent in the USP.

In finding the excipients not interchangeable, the district court also noted that PEG and mPEG have different Chemical Abstract Service (“CAS”) numbers, and that PEG is a polyhydroxy alcohol[5], while mPEG is not. *See* Appx39. CAS numbers “used by the industry to differentiate between chemical entities,” and merely indicate

[5] A “polyhydroxy alcohol” refers to an alcohol with more than one hydroxyl group. PEG has two terminal hydroxyl groups, while in mPEG one terminal group has been replaced with a methoxy group. *See* Appx30-31.

PEG and mPEG are not identical compounds. Appx31. The court also found that "Wermeling '359 did not suggest that PEG is interchangeable with mPEG." Appx39. Cipla's argument is not that PEG and mPEG were the *same* compound, rather that a POSA would have recognized that mPEG could be used in an intranasal formulation the same way as PEG.

In *Richardson-Vicks, Inc. v. Upjohn Co.*, the court held it obvious to substitute ibuprofen for acetaminophen or aspirin where ibuprofen was a "more effective pain reliever and also produced fewer gastrointestinal effects than aspirin." 122 F.3d 1476, 1483-84 (Fed. Cir. 1997)). Here, mPEG-350 was a known solvent-excipient and had similar uses to PEG but had a lower viscosity.

The district court erred by concluding that a POSA would not substitute mPEG-350 for other PEGs simply because there were no "precise teachings directed to the specific subject matter of the challenged claim," e.g., intranasal mPEG-350. *See KSR*, 550 U.S. at 418.

### D. The Court Erred in Requiring the Substitution Be Made With Absolute Predictability

The district court also erred in requiring that a POSA be "able to predict the effect of substituting mPEG for PEG in an intranasal midazolam formulation." Appx39. But the district court did not find anything unexpected about the claimed compounds. Therefore, factually and legally one would expect mPEG to behave similarly to PEG. *See Anacor Pharms.*, 889 F.3d at 1385 ("[T]he greater the

structural similarity between compounds, the greater motivation to combine and reasonable expectation of success." (citing *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1377 (Fed. Cir. 2006)). Based on the similar structures and uses of PEG and mPEG, a POSA would consider mPEG solubilizing midazolam in an intranasal composition containing the claimed excipients to be a predictable result.

### E. The Court Ignored Highly Relevant Inventor Admissions Regarding the Interchangeability of PEG and MPEG

The district court acknowledged the existence of the Gizurarson Presentation but erred in failing to consider the highly probative evidence of how a POSA would have understood the substitutability of PEG and mPEG in intranasal formulations. Appx20, Appx38-39. After reviewing the information provided by Dow and purportedly performing minimal testing, Dr. Gizurarson suggested "[r]eplac[ing] all formulations where PEG had been used, with mPEG!" *See* Appx15215, Appx5188-189. Dr. Gizurarson's statements should have been considered. *See Pfizer*, 480 F.3d at 1364-65.

The court distinguished *Almirall* because there "the agents 'were known for use in topical compositions with water insoluble drugs'" and "the Court has found that PEG and mPEG are not interchangeable, and mPEG was not known for use in intranasal formulations." Appx46 n. 10 (citing *Almirall*, 28 F.4th at 271, 273-76). As discussed above, the district court erroneously concluded that a POSA would not

have recognized mPEG-350 was substitutable for PEG because it failed to properly apply this Court's precedent on structurally and functionally similar compounds, and because it required an explicit teaching in the prior art that mPEG had been used in intranasal formulations. Moreover, *Almirall* held obvious the substitution of acrylamide/sodium acryloyldimethyl taurate copolymer (A/SA) for a carbomer thickening agent. *See Almirall*, 28 F.4th at 268, 270. The PEG and mPEG at issue in this appeal are far more similar chemically than the A/SA and carbomer thickening agents in *Almirall*.

Therefore, this Court should reverse the district court's decision to hold that the Asserted Claims would have been obvious.

## II. THE DISTRICT COURT'S ANALYSES ON MOTIVATION AND REASONABLE EXPECTATION OF SUCCESS WERE PREMISED ON LEGAL ERROR

Wermeling '359 discloses intranasal midazolam formulations with each claimed excipient except for mPEG-350. A POSA would have had ample motivation and reasonable expectation of success combining the mPEG-350 disclosed in Carbowax with the formulation disclosed in Wermeling '359. That is because mPEG-350 is: (1) nearly identical structurally to the PEG-400 used in Wermeling '359; (2) described as solubilizing a wide range of substances and useful in a wide variety of formulated product; (3) pharmaceutical grade and used in an FDA-approved composition; and (4) has the lowest viscosity of any excipient

disclosed in Carbowax, which a POSA would have recognized could improve the sprayability of the highly-viscous formulations disclosed in Wermeling ’359. The district court erred in concluding that the claims were non-obvious based on this record.

Obviousness is a question of law based on underlying factual findings concerning: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of non-obviousness. *See KSR*, 550 U.S. at 406; *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). A patent challenger can prove a claim obvious by showing “that a [POSA] would have been motivated to combine the prior art references to achieve the claimed invention and that the skilled artisan would have had a reasonable expectation of success in doing so.” *Pfizer*, 480 F.3d at 1361 (citing *DyStar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)). But the POSA need not get the motivation or reasonable expectation of success from a single reference; it “is presumed to know the relevant prior art.*” In re GPAC Inc.,* 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)). “Often, it will be necessary for a court to look to interrelated teachings of multiple patents[.]” *KSR*, 550 U.S. at 418. “Rigid preventative rules that deny factfinders recourse to common sense” are inconsistent with this Court’s precedent. *Id.* at 421;

*DyStar*, 464 F.3d at 1367 ("Our suggestion test is in actuality quite flexible and not only permits, but *requires*, consideration of common knowledge and common sense." (citing *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)). Importantly, a "finding of a reasonable expectation of success does not require absolute predictability of success." *Almirall*, 28 F.4th at 275 (citing *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019)).

### A. Level of Skill in the Art

The level of ordinary skill in the art, *per se*, is not at issue here. A POSA would have had "a doctorate in disciplines relating to pharmaceutical development such as pharmacy, pharmacology, pharmaceutics, chemistry, drug delivery, engineering, medicine, or a related discipline" with at least two years of practical experience, or a lower degree with more experience. Appx20.

### B. Scope and Content of the Prior Art

Wermeling '359 disclosed each element of the Appeal Claims except that it did not explicitly disclose mPEG-350. *See* Appx30-32, Appx44-45. Thus, the only difference between Wermeling '359 and the Appeal Claims is the inclusion of mPEG-350. The remaining question is whether a POSA would have been motivated to combine the mPEG-350 disclosed in Carbowax with the formulations disclosed in Wermeling '359.

Carbowax is a commercial brochure published by the Dow Chemical

Company. Appx22. Carbowax disclosed thirteen grades of PEG and three grades of mPEG, including four pharmaceutical grade "CARBOWAX SENTRY" PEGs and mPEGs that were supplied in liquid form: PEG-300, PEG-400, PEG-600, and mPEG-350. Appx23, Appx4937, Appx14743. Carbowax discloses that "CARBOWAX™ [PEGs and mPEGs] are a family of water soluble linear polymers formed by the addition reaction of ethylene oxide to an ethylene oxide equivalent."[6] Appx14742, Appx4935.

> Carbowax discloses the following structure for PEG and mPEG:
>
> The general formula for polyethylene glycol is:
>
> $$H{-}(OCH_2CH_2)_n{-}OH$$
>
> and for methoxy polyethylene glycol:
>
> $$CH_3{-}(OCH_2CH_2)_n{-}OH$$
>
> where "n" is the average number of repeating oxyethylene groups.

Appx14742; *see also* Appx30-31. Cipla's expert testified that PEG and mPEG are "about 99 percent homologous, so the minor changes on one terminal end. That's

[6] The district court erroneously found that Carbowax refers to PEGs and mPEGs as "comprising the Dow 'family of CARBOWAX products,'" but "[o]therwise, Carbowax does not refer to PEG and mPEG as belonging to the same 'family.'" Appx23. It also erroneously adopted Dr. Smyth's conclusory statement that "PEG is a different synthesis method from mPEG," which is contradicted by Carbowax. Appx31.

the truth of it." Appx4982; *see also* Appx5152 (Gizurarson: "the difference is that you have a hydroxy group … when you have PEG, and a methoxy group, CH3, on mPEG."); Appx5448 (Smyth: "Q: what are the differences? A: Well, you can see on the slide that mPEG has a methoxy group instead of a hydroxy group."). One of the inferences a court can make is that a POSA "can expect structurally similar compounds to have similar properties." *Valeant Pharms.*, 955 F.3d at 32 (Fed. Cir. 2020) (citing *Dillon*, 919 F.2d at 692); *see also Anacor Pharms*, 889 F.3d at 1384 (Fed. Cir. 2018) ("[I]t is reasonable to assume that similar compounds that share certain common properties are apt to share other related properties as well." (citing *Merck*, 800 F.2d at 1096). "[T]he greater the structural similarity between compounds, the greater motivation to combine and reasonable expectation of success." *Anacor Pharms.*, 889 F.3d at 1385 (citing *Eli Lilly*, 471 F.3d at 1377). Due to their structural similarity, a POSA would have expected PEG and mPEG to have similar properties. *See* Appx5788, Appx4949, *see also Valeant Pharms.*, 955 F.3d at 32; *Anacor Pharms.*, 889 F.3d at 1384-85.

Carbowax confirmed that expectation of similarity. A POSA would have been interested in the solubility and viscosity properties disclosed in CARBOWAX when formulating an intranasal composition. Appx4938. Carbowax states that a "wide range of substances are soluble in CARBOWAX PEGs and MPEGs. This extensive chemical compatibility makes them useful in a wide variety of formulated products."

Appx14744; *see also* Appx4937-39. Carbowax also discloses that PEGs and mPEGs are miscible with water and physically compatible with commonly used polar organic solvents. Appx4938-39, Appx14744. PEGs and mPEGs are effective at solubilizing other substances and making those substances soluble in water. Appx4938-939. Dr. Gizurarson himself testified that he believed that solubility of midazolam could be improved by "replacing a hydroxy group [from PEG] with a methoxy group [in mPEG] … [which] would increase, slightly, the lipophilicity – or potential lipophilicity" of mPEG. Appx5151-152.

USP 2006, a common pharmaceutical compendia, lists PEG and mPEG ("polyethylene glycol monomethyl ether") among just thirty-one solvent-excipients. Appx14842, Appx5106, Appx5456. USP 2006 would have reinforced the understanding that both PEG and mPEG were useful pharmaceutical solvents.

Moreover, IID 2006 listed PEG and mPEG as FDA-approved excipients. Appx29. PEG was listed for routes of administration including nasal, topical, and vaginal, among others. *Id*. MPEG-350 was listed in connection with a topical gel, and was also disclosed in the art as being used in a vaginal lubricant. *Id.*, Appx39.

Carbowax also discloses that mPEG-350 has the lowest viscosity of any product offered in Carbowax. *See* Appx24. It discloses that mPEG-350 has viscosity of 3.9 cSt at 100 °C, while PEG-200, PEG-300, and PEG-400 have viscosities of 4.3 cSt, 5.8 cSt, and 7.3 cSt, respectively. *Id.*, Appx14756-757.

### C. Motivation to Combine and Reasonable Expectation of Success

A POSA would have been motivated to combine Wermeling ’359 with Carbowax with a reasonable expectation of success in reducing the viscosity of the formulation, and because a POSA would have recognized that mPEG-350 could be substituted or used in addition to the PEG-400 disclosed in Wermeling ’359 based on the structural relationship of the compounds and their common use as pharmaceutical solvents.

Wermeling ’359 discloses “in various embodiments the intranasal delivery device may be modified, for example, by increasing the size of the discharge orifice ... in order to accommodate higher viscosity compositions.” Appx22, Appx14729. The exemplary formulation in Wermeling ’359 required a modified device, and produced a “jet” rather than a “plume” through the device. Appx22. The district court found that “[w]hen coming up with a formulation, a formulator would prefer a formulation that can be sprayed with a nasal spraying device that has previously been approved by the FDA” and that “[f]ormulators must … consider a formulation’s sprayability and its ability to be absorbed by the nasal mucosa, both of which are affected by viscosity.” Appx15-16. Published testing of intranasal devices reported “[a] noticeable trend is that viscosity considerably decreased plume areas over the range studied.” Appx14814, Appx4958, Appx4960.

Carbowax discloses that mPEG-350 has the lowest viscosity of any PEG or

mPEG. Appx24, Appx14756-757. Dr. Wermeling testified that a POSA would have been motivated to combine Wermeling '359 and Carbowax to "have a formulation with a reduced viscosity, meaning you could use a standard device instead of a modified device." Appx4947-948. He explained that a POSA "would make these modifications to use lower-viscosity solvents as a substitute for higher-viscosity solvents to reduce the overall average viscosity of the composition." Appx4948. Plaintiffs' own witness Raouf Ghaderi, a formulator who worked on the development of NAYZILAM testified that "[a]s a formulator, I can tell you, if you have a high viscosity – you don't want to deal with that kind of formulation. You always strive to go to the lowest possible viscosity, and you can't have a low, low viscosity." Appx5123-124.

Thus, there was strong evidence that a POSA would have been motivated to reduce the viscosity of the formulations disclosed Wermeling '359, both in the disclosures of Wermeling '359 and within the knowledge and understanding of a POSA. A POSA would have been motivated to reduce the viscosity of the formulations disclosed in Wermeling '359 to improve the spray plume and sprayability of the formulation, and would have done so with mPEG-350 because it was the lowest viscosity excipient in Carbowax.

Carbowax teaches PEGs and mPEGs dissolve a "wide range of substance … mak[ing] them useful in a wide variety of formulated products." Appx14744. It also

discloses blending Carbowax products to obtain "intermediate viscosities" and guidance on how to "choose the proper blend of PEGs and MPEGs to obtain the desired viscosity at any temperature." Appx14745. Both were known for use in topical and vaginal products, including FDA-approved products. Appx29, Appx39. Carbowax discloses four pharmaceutical-grade excipients that are liquid at room temperature: PEG-200, PEG-300, PEG-400, and mPEG-350. Appx14743, Appx4937-938. USP 2006 identified PEG and mPEG in a short list of just thirty-one solvent-excipients. Appx14842, Appx5106, Appx5456. *See KSR*, 550 U.S. at 421 ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.")

A POSA would have had a reasonable expectation of success incorporating mPEG-350 into an intranasal midazolam composition based on the close structural similarity between PEG and mPEG, and because PEGs were widely used in intranasal midazolam compositions. *See* Appx4948-949, Appx5788, Appx17-19. The physical and chemical properties in Carbowax and its statements about being able to readily solubilize substances would have reinforced a POSA's expectation. Appx4949. USP 2006 likewise confirmed that mPEG could be used as a pharmaceutical solvent-excipient. Appx5456, Appx5106, Appx14842. UCB's own expert agreed that solubility testing would have been routine to a POSA. Appx5548.

So, the specific solubility of midazolam in mPEG was not something the prior art needed to disclose for a POSA to have a motivation or reasonable expectation of success. A POSA assessing whether mPEG-350 could be used in an intranasal formulation would have considered the interrelated teachings of each of these references.

A POSA would have been motivated to use mPEG-350 in place of, or in addition to, PEG-400 with a reasonable expectation of success based on the similar structures, properties, and uses. *See* Appx5788 ("PEG 400 and mPEG 350 have very close structural similar[ity] …. So would I [sic] have expected mPEG 350 to solubilize this similar to PEG 400."), Appx4948-949, Appx4962-63; *see also Anacor Pharms.*, 889 F.3d at 1385; *Dillon*, 919 F.2d at 698.

While not necessary to show obviousness, Dr. Gizurarson's testimony confirmed how a POSA would have understood Carbowax. After reviewing the information provided by Dow and purportedly performing minimal testing, Dr. Gizurarson suggested "[r]eplac[ing] all formulations where PEG had been used, with mPEG!" *See* Appx15215, Appx5188-189. Dr. Gizurarson also testified that he "hypothesized" based on the chemical formulae that "replacing a hydroxy group with a methoxy group" would "improve solubility over at least PEG," which he "needed to test … before knowing." Appx5151-152. Dr. Gizurarson also testified to the effects of viscosity on sprayability, and stated that he wanted to know "if I

may be able to spray using mPEG instead of … PEG" and "how would mPEG affect the sprayability of a formulation." Appx5155-156.

Dr. Gizurarson's statements are properly considered as evidence of how a POSA would understand the prior art and as support for reasonable expectation of success. *See Pfizer*, 480 F.3d at 1364-65 (finding that "reasonable expectation of success is further amply reflected in [the inventor's] further testimony …."); *see also In re Omeprazole Patent Lit.*, 483 F.3d 1364,1374 (Fed. Cir. 2007) (finding that AstraZeneca's admissions corroborated obviousness).

The structural similarities and similar utilities of PEG and mPEG support obviousness of the Appeal Claims. *See Dillon*, 919 F.2d at 698 ("When chemical compounds have 'very close' structural similarities and similar utilities, without more a *prima facie* case may be made." (citation omitted)). There are no efficacy, safety, tolerability, or stability limitations in the claims. Nevertheless, performing such testing would have been routine to a POSA. Appx5543-545. Plaintiffs' expert Dr. Smyth admitted that the entire exercise of "getting from the solubility study to this point where you have the reformulation" was routine and "would involve just making formulations and testing them." Appx5547-550; *see also* Appx15772-782. Plaintiffs' witness Raouf Ghaderi testified that the work done to prepare the formulations in the patent application was "nothing more than routine … following the recipe [Dr. Gizurarson] was asking for." Appx5121-122.

### D. Objective Indicia

The district court found that "the evidence offered for secondary considerations isn't particularly probative of non-obviousness under the circumstances here." Appx47.

---

Based on the clear prima facie case of obviousness and lack of objective indicia of non-obviousness, the district court should have held the Appeal Claims obvious.

## III. THE DISTRICT COURT ERRED BY FAILING TO VIEW THE PRIOR ART AS A WHOLE FROM THE VIEWPOINT OF A POSA

### A. The District Court Improperly Demanded an Explicit Prior Art Teaching of MPEG-350 in an Intranasal Formulation

The district court repeatedly emphasized that "mPEG had never been used in an intranasal formulation before," and that finding underpinned the remainder of the court's obviousness analysis. *See, e.g.,* Appx10, Appx28-29, Appx32-33, Appx36, Appx46. It was an error to require an explicit teaching in the art that mPEG-350 had been used in an intranasal composition—the absence of prior intranasal use does not imply non-obviousness when the art taught all relevant properties and no technical barrier existed. That is more than would be required for a POSA to be motivated to make a formulation of the Appeal Claims with a reasonable expectation of success. *KSR* admonished that "the [obviousness] analysis *need not seek out precise teachings directed to the specific subject matter of the challenged claim,* for a court

can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418 (emphasis added).

The "inference" a POSA would make is that mPEG-350 would be advantageous in an intranasal formulation based on: (1) PEG's widespread use as an intranasal midazolam excipient; (2) the structural similarity between PEG and mPEG; (3) their similar use as solvent-excipients; (4) their similar solubilizing properties; and (5) the difference in their viscosities. *See, e.g.*, *Valeant Pharms.*, 955 F.3d at 32; *Anacor Pharms.*, 889 F.3d at 1384; *Payne*, 606 F.2d at 314. The district court erred by failing to consider these inferences. Instead, it required "precise teachings directed to the specific subject matter of the challenged claim"—prior art disclosure that mPEG had been used in an intranasal formulation. MPEG-350's properties suggested its usefulness in an intranasal midazolam formulation, which should have provided sufficient motivation and reasonable expectation of success. *See KSR*, 550 U.S. at 418.

This Court has reversed holdings of non-obviousness based on similar errors. In *Pfizer*, where the besylate salt of amlodipine was obvious, the prior art disclosed that the besylate acid addition salt was useful in promoting "solubility, as well as improving other physicochemical characteristics." *Pfizer*, 480 F.3d at 1363, Appx14744, Appx14756-757. Like besylate in *Pfizer*, mPEG has "no therapeutic effect, but merely serves as a means to deliver" midazolam to the body. *See Pfizer*,

480 F.3d at 1363. In *Pfizer*, besylate was one of fifty-three FDA-approved anions, but was "rarely used." *Id*. Here, USP 2006 identifies just thirty-one solvent-excipients, including mPEG, PEG, propylene glycol, and four entries for water. Appx14842. The *Pfizer* Court found it "unimportant, if not actually irrelevant" that the besylate salt had not been used with "a medication for treating hypertension or angina like amlodipine." *Pfizer*, 480 F.3d at 1363. So too here, it is irrelevant that mPEG was not explicitly used in prior art intranasal formulations.

Similarly, in *Bayer*, an orally disintegrating tablet ("ODT") containing mannitol and sorbitol was obvious, even though every ODT on the market contained only mannitol. *See Bayer Pharma AG v. Watson Lab'ys. Inc.*, 874 F.3d 1316, 1325 (Fed. Cir. 2017). There, the lower court "focused on the commercial availability of products while failing to address relevant prior art." *Id.* Pharmaburst, a prior art advertisement, disclosed the combination of sorbitol and mannitol had properties advantageous for an ODT and made a "highly flexible" excipient. *See id.* at 1326-26. Similarly, Carbowax disclosed mixtures of PEGs and mPEGs to obtain desired viscosities, and that the excipients were "useful in a wide variety of formulated products" for their ability to solubilize a "wide range of substances." Appx14744-745. Also like *Bayer*, the district court here failed to recognize that "the motivation to combine inquiry for drug formulations is not limited to what already has or could gain FDA approval." *See Bayer*, 874 F.3d at 1326.

MPEG-350 is merely an inactive ingredient in the formulation with no physiological effect. At best, the Appeal Claims repurpose mPEG-350 from a topical route of administration to an intranasal route, which a POSA would reasonably expect it would be suitable for based on the prior art. This Court has gone much further—it has held obvious claims to methods of using known compounds to treat diseases when those compounds had similar properties to other compounds known to treat the claimed disease. *Supra* pp. 31-32; *Anacor Pharms.*, 889 F.3d at 1383-84; *Merck*, 800 F.2d at 1096-97. If the method of use claims to the active ingredients in *Anacor* and *Merck* were held obvious, the formulation claims to the excipient mPEG should be held obvious here.

The district court only cited *Unigene Laboratories, Inc. v. Apotex, Inc*. to support its holding that the Appeal Claims were non-obvious. *See* Appx45. *Unigene* is distinguishable in several respects.

First, the claim in *Unigene* required specific concentrations of four different excipients: (1) about 20 mM citric acid; (2) about 0.2% phenylethyl alcohol; (3) 0.5% benzyl alcohol; and (4) about 0.1% polyoxyethylene(2) sorbitan monooleate. *See Unigene Lab'ys, Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1356 (Fed. Cir. 2011). The court found that a POSA "would not have considered using about 20 mM citric acid with the narrowly claimed amounts of [the other excipients] …." *Id.* at 1364. Unlike

*Unigene*, here the Appeal Claims have no concentration or quantity limitations for the excipients.

The motivation in *Unigene* was different from this case because the prior art taught away from using 20mM citric acid like the claimed solution. Here, however, there was no teaching away from using mPEG-350. The product covered by the asserted patent in *Unigene* was Fortical®, which was developed to be bioequivalent to the FDA-approved product Miacalcin®. *Id.* at 1355-56. Miacalcin® contained BZK as an absorption enhancer and buffer. *Unigene* held that the prior art taught away from including the claimed "about 20 mM citric acid" as an absorption enhancing agent in a liquid formulation. *Id.* at 1358, 1363. Because the prior art here did not teach away from using mPEG, *Unigene* is inapposite.

The prior art landscape in *Unigene* was not as close to the claims at issue as the prior art here is to the Appeal Claims. There, the primary reference Miacalcin® did not share any excipients in common with the claimed formulation. Here, Wermeling '359 nearly anticipates the Appeal Claims. *See* Appx30-32, Appx44. For the citric acid limitation, Apotex relied on a reference disclosing an oral solid dosage form, which discussed using citric acid in higher quantities than claimed. *See* *Unigene*, 655 F.3d at 1363. The Court found that citric acid "ha[d] a vague role in even the closest prior art." *Id.* at 1363. Here, the prior art made clear that mPEG-350, like PEG-400, was a solvent-excipient in pharmaceuticals. *See* Appx14744,

Appx14842, Appx5456, Appx5106. Therefore, *Unigene* does not present analogous facts based on the differences between the prior art and the claims, and does not support non-obviousness.

### B. The Court Erred by Considering Prior Art References in Silos

The district court also erred by reading the prior art in isolation, rather than considering the "interrelated teachings" of the prior art references. *See KSR*, 550 U.S. at 418. The POSA "is presumed to know the relevant art." *GPAC*, 57 F.3d at 1579 (citation omitted). This Court has found error where the fact finder "narrowly" focused on the prior art and ignored evidence to "demonstrate the knowledge and perspective of [a POSA]," thereby "fail[ing] to account for critical background information" explaining why a POSA would have arrived at the claimed inventions. *See Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). In *Pfizer,* this Court reversed the district court for "not considering [relevant] references in its obviousness analysis." 480 F.3d at 1363. Failure to consider the creativity and common sense of a POSA is also reversible error. *See KSR*, 550 U.S. at 421.

Here, the district court viewed Carbowax in isolation, which led to a conclusion that conflicts with the art as a whole. The district court found that "Carbowax would not have suggested to the POSA to use mPEG in an intranasal formulation" in part because "[t]he only pharmaceutical use for mPEG disclosed in Carbowax is as a chemical intermediate." Appx36. This reading completely ignores

that mPEG-350 had been used in an FDA-approved topical composition, among other uses. Appx39. And that approved topical use is important in the art in this case. The Appeal Patents admit that an excipient's approval for topical use would make it a choice for an intranasal formulation. They state, "it is understood that a [POSA] can choose other excipients and additives … [including] those that are currently allowed in topical and parenteral formulations." Appx104. Appellees' own expert, Dr. Smyth, testified that it would have been routine to determine whether an excipient FDA-approved for topical use could also be used intranasally. Appx5543-545.

Moreover, the Knoester formulation, which was administered to humans before the priority date, contained benzyl alcohol, an excipient that was FDA-approved for topical and vaginal use, but not intranasal use. Appx18, Appx18340-341. Had the district court viewed Carbowax from the perspective of a POSA aware of mPEG-350's topical pharmaceutical use, it would have found motivation to use it in an intranasal midazolam formulation with a reasonable expectation of success in lowering viscosity compared to the formulation in Wermeling '359.

Similarly, the district court found that Carbowax would not motivate a POSA to use mPEG-350 in an intranasal formulation because it "refers to PEG and mPEG as different compounds with different structures, properties, and uses." Appx36. The district court failed to consider the "common sense and appropriate perspective" of

a POSA in interpreting Carbowax. As discussed at length above, PEG's widespread use in intranasal midazolam formulations (including Wermeling '359), coupled with the structural and physical and chemical similarities between PEG and mPEG disclosed in Carbowax would have led a POSA to understand that mPEG-350 could likewise be used in an intranasal midazolam composition. The district court focused only on the differences disclosed in Carbowax, and ignored important similarities such as the disclosure that "wide range of substances are soluble in CARBOWAX PEGs and MPEGs" making them "useful in a wide variety of formulated products." Appx14744. The POSA's motivation and reasonable expectation of success would have been reinforced by the disclosures of USP 2006, which lists PEG, mPEG, and each of the other claimed excipients in a short list of pharmaceutically acceptable solvents. Appx14842.

The district court also ignored the teachings of the prior art as a whole in finding that a POSA would have expected "substituting mPEG into the Wermeling Formulation would not markedly lower viscosity." Appx37. Bechgaard taught that adding as little as 5% of a low viscosity excipient, glycofurol, to an ethylene glycol had a "surprisingly positive effect on the sprayability … by reducing viscosity." Appx14870. In considering reasonable expectation of success, the court failed to account for a POSA's knowledge that even small amounts of viscosity lowering agents could improve sprayability.

The district court held the Appeal Claims non-obvious by "attack[ing] references individually where the rejection is based upon the teachings of a combination of references" and reading art in "isolation," rather than for "what it fairly teaches in combination with the prior art as a whole." *See Merck*, 800 F.2d at 1097 (citation omitted). The court erred by assuming a POSA would only look to excipients that had explicitly been disclosed for intranasal use in the prior art.

### C. The District Court Erred by Requiring an Explicit Motivation to Combine in Wermeling '359

The district court found that "[w]hen coming up with a formulation, a formulator would prefer a formulation that can be sprayed with a nasal spraying device that has previously been approved by the FDA" and that "[f]ormulators must … consider a formulation's sprayability and its ability to be absorbed by the nasal mucosa, both of which are affected by viscosity." Appx15-16. Dr. Wermeling and Plaintiffs' fact witness testified to the general motivation to optimize viscosity, and a preference for low viscosity formulations. *See* Appx4947-948, Appx5123-124. Nevertheless, the district court concluded a POSA would not have been motivated to "reduce the viscosity of the Wermeling formulation so that it could be delivered through a standard device …." Appx46.

That conclusion was based, in part, on the finding that "Wermeling '359 did not state that the use of a modified device was problematic." Appx36-37. The district court's finding that a POSA would not have been motivated to reduce the viscosity

of the Wermeling formulation is inconsistent with its own factual findings and the guidance of *KSR* by demanding an explicit statement from Wermeling '359 that the formulation was "problematic" for there to be a motivation to improve the sprayability of the formulation. *See Bayer*, 874 F.3d at 1325 (finding motivation to use mannitol and sorbitol, despite no known problems with mannitol alone).

The Court also found that "[i]f the POSA were motivated to modify the viscosity of the Wermeling Formulation . . . there would have been a large number of excipients in the pharmaceutical arts to consider." Appx37. But it is not necessary to show "the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away." *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197-98 (Fed. Cir. 2014) (citations omitted); *see Bayer*, 874 F.3d at 1327. The district court did not find that the prior art taught away from using mPEG-350 in an intranasal formulation.

### D. The District Court Erred by Requiring Motivation and Reasonable Expectation of Success Well Beyond the Scope of the Claims

The Appeal Claims require "a liquid pharmaceutical composition formulated for intranasal administration comprising" midazolam and mPEG-350, and in the case of the '033 patent the additional excipients PEG-400, propylene glycol, and water. *See* Appx92, Appx107. All that is required for obviousness is that a POSA would have had motivation and a reasonable expectation of success combining the

claimed excipients into a liquid pharmaceutical composition for intranasal administration. *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 962, 966 (Fed. Cir. 2014) ("[T]he [POSA] need only have a reasonable expectation of success of developing the *claimed invention*." (citing *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013)).

Nevertheless, the district court's finding of no reasonable expectation of success primarily focused on unclaimed (and undescribed in the specification) features such as efficacy, tolerability, safety, stability, effect on the nasal cilia, and permeability. *See* Appx33-35. The court also referred to pharmacokinetics, which are not claimed. *Id.* The district court required a reasonable expectation of success that went beyond the scope of the claims and the description in the specification.

For example, the court found that "[t]o achieve efficacy, the POSA would have needed to understand the effect of the chosen excipients on factors such as the solubility of midazolam, viscosity, and sprayability of an intranasal midazolam formulation, and the permeability of the formulation through the nasal mucosa." Appx34. Neither Appeal Claim recites the use of the intranasal composition to treat a disorder, much less to a certain level of efficacy. The claims (and specification) are likewise silent on safety and tolerability, yet the court found no reasonable expectation of success, in part, because the prior art did not explicitly disclose whether intranasal mPEG was safe and tolerable. Appx33. The specification does

not include data showing the claimed compositions were safe, tolerable, or effective to treat ARS because that testing had not been performed.

The district court also read a safety requirement into the claims. The district court found that mPEG-350's prior use as an FDA-approved topical ingredient and vaginal lubricant "did not inform whether mPEG was safe for use in intranasal formulations, at least because there are different safety requirements for topical formulations than intranasal formulations," pointing to FDA's requirement for two-week toxicity studies of mPEG-350 prior to entering clinical trials. *See* Appx35, Appx39. Similarly, the court pointed to internal development discussions regarding questions that may be raised by the FDA regarding safety testing. Appx35-36, Appx17835. But "the motivation to combine inquiry for drug formulations is not limited to what already has or could gain FDA approval." *Bayer*, 874 F.3d at 1326 (reversing a finding that using an unapproved excipient was non-obvious); *see also United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1369 (Fed. Cir. 2023) ("We decline to insert the FDA's responsibilities into claims by importing requirements [related to safety and efficacy] where they do not recite such limitations."). Moreover, Plaintiffs' expert Dr. Smyth agreed that such toxicology testing was routine to a POSA. Appx5543-545 (testifying that the toxicology testing required to determine whether an excipient used topically could be used intranasally was "complicated, but … routinely done in the industry.").

Similarly, the district court found that "the POSA would not have known how mPEG could affect the stability of an intranasal midazolam formulation." Appx35. Again, stability is not a claim limitation. Even if it was, Plaintiffs' expert Dr. Smyth admitted that stability testing was routine in the art. *See* Appx5543-544. The court also found that "[t]he prior art did not disclose the solubility of midazolam in mPEG" while again ignoring testimony from Dr. Smyth that such testing was routine. *See* Appx34, Appx5548 (Smyth: "Looking at midazolam solubility in different solvents would be routine, yes.").

The district court also erred in requiring that a POSA be "able to predict the effect of substituting mPEG for PEG in an intranasal midazolam formulation," rather than have a reasonable expectation of success. Appx39; *see also Almirall*, 28 F.4th at 275.

In *Allergan v. Sandoz,* the Court reversed the judgement of non-obviousness for claims covering eye drops containing specific amounts of two active ingredients and the preservative BAK, and packaging material indicating the composition is useful to treat certain eye disorders with twice daily administration. *See* 726 F.3d at 1289. The district court improperly tethered the motivation to combine analysis to "those reasons the FDA sees fit to consider in approving drug applications" by finding no motivation to combine "because the FDA did not consider improving patient compliance as a factor in its approval decision." *Id.* at 1291-92 (citation

omitted). The district court also erred in its reasonable expectation of success analysis by focusing on "difficulties in developing Combigan®," the product covered by the claims, because "the claims are not drawn to the Combigan® formulation with any specificity" and "[t]here is no requirement that [the POSA] have a reasonable expectation of success in developing Combigan®." *Id.* at 1292. "Rather, the [POSA] need only have a reasonable expectation of success of developing the claimed invention." *Id.*

Here, the district court made similar errors – by reading features such as stability, tolerability, safety, efficacy, and others discussed above into the motivation and reasonable expectation of success analysis, and by emphasizing testing required by FDA for approval, the district court effectively required that Cipla prove a POSA would have had a reasonable expectation of success in developing NAYZILAM instead of the claimed formulations. The error is even more egregious here, given that neither the Appeal Claims nor specification refer to the ARS at all, where the claims in *Allergan v. Sandoz* indicated that the preparation was useful to treat the approved indication of Combigan®. *Id.* at 1289. Dr. Gizurarson admitted that the formulation was still being optimized when the patent application was filed. Appx5181.

## CONCLUSION

This Court should reverse the district court's judgment, and hold each Appeal Claim invalid for obviousness under 35 U.S.C. § 103.

Dated: July 24, 2026

Respectfully submitted,

/s/ Anil H. Patel
Anil H. Patel
Adam S. Berlin
K&L Gates LLP
609 Main Street, Suite 4150
Houston, Texas 77002
(713) 815-7300

Peter L. Giunta
K&L Gates LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900

Harold Storey
Jenna Bruce
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
(206) 623-7580

*Attorneys for Defendants-Appellants*
*Cipla Limited and Cipla USA Inc.*

# Addendum

## ADDENDUM

## TABLE OF CONTENTS


| | |
|---|---|
| Memorandum Opinion | Appx1-Appx48 |
| Final Judgment | Appx49-Appx51 |
| U.S. Patent No. 8,809,322 | Appx78-Appx92 |
| U.S. Patent No. 8,217,033 | Appx93-Appx107 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UCB, INC., UCB BIOPHARMA SRL, HANANJA EHF and UNIVERSITY OF ICELAND, | ) | |
| Plaintiffs, | ) | C.A. No. 21-1229-JLH |
| v. | ) | |
| CIPLA LIMITED and CIPLA USA INC., | ) | **FILED UNDER SEAL** |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

Jack B. Blumenfeld, Megan E. Dellinger, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; George F. Pappas, Kaveh V. Saba, Melissa Keech, John Y. Veiszlemlein, COVINGTON & BURLING LLP, Washington, D.C.; Alexa Hansen, Charles Hall, COVINGTON & BURLING LLP, San Francisco, California; Yiye Fu, COVINGTON & BURLING LLP, Palo Alto, California.

*Attorneys for Plaintiffs*

Kenneth L. Dorsney, Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, Delaware; Anil H. Patel, Adam S. Berlin, K&L GATES LLP, Houston, Texas; Peter Giunta, K&L GATES LLP, New York, New York; Harold Storey, Jenna Bruce, K&L GATES LLP, Seattle, Washington.

*Attorneys for Defendants*

Wilmington, Delaware
May 15, 2026

**JENNIFER L. HALL, U.S. DISTRICT JUDGE**

This is the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). This patent infringement case arises out of the filing of an Abbreviated New Drug Application ("ANDA") by Defendants Cipla Limited and Cipla USA Inc. (collectively, "Cipla") with the FDA for approval to market a generic version of NAYZILAM®, a drug made and sold by UCB Inc. and UCB Biopharma SRL.

Plaintiffs UCB Inc., UCB Biopharma SRL, Hananja EHF, and University of Iceland (collectively, "UCB") allege that Cipla's ANDA submission constitutes infringement of claim 13 of U.S. Patent No. 8,217,033 and claim 10 of U.S. Patent No. 8,809,322. Cipla stipulated to infringement of those claims, but it contends that the claims are invalid as anticipated and obvious.

The Court held a four-day bench trial in October 2023.[1] The Court has reviewed the evidence presented at trial, as well as the parties' post-trial submissions and arguments at the post-trial hearing. The Court concludes that Cipla has failed to prove that the asserted claims are invalid.

## I. LEGAL STANDARDS

### A. Anticipation

A prior art reference anticipates a patent's claim, and is thus invalid under pre-AIA[2] 35 U.S.C. § 102, if it "discloses each and every element of the claimed invention arranged or combined in the same way as in the claim." *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1342–43 (Fed. Cir. 2018) (quoting *Blue Calypso, LLC v. Groupon, Inc.*, 815

---

[1] The FDA granted Nayzilam orphan drug exclusivity under 21 C.F.R. § 316.31, which prevented Cipla from entering the market until May 17, 2026.

[2] The Patent Act was amended in 2011 by the America Invents Act ("AIA"). Patent applications filed before 2013 are subject to the pre-AIA versions of 35 U.S.C. §§ 102 and 103.

F.3d 1331, 1341 (Fed. Cir. 2016)). To prove anticipation, the challenger must show that "every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008). Anticipation is a question of fact. *Id.* Anticipation must be proven by clear and convincing evidence. *Whitserve, L.L.C. v. Comput. Packages, Inc.*, 694 F.3d 10, 21 (Fed. Cir. 2012).

### B. Obviousness

Pre-AIA 35 U.S.C. § 103 provides that a patent "may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Obviousness is a question of law based on underlying factual findings, including "the scope and content of the prior art," "differences between the prior art and the claims at issue," "the level of ordinary skill in the pertinent art," and "secondary considerations [such] as commercial success, long felt but unsolved needs, failure of others, etc." *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see also KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007).

Obviousness must be proven by clear and convincing evidence. *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 993–94 (Fed. Cir. 2009). "Generally, a party seeking to invalidate a patent as obvious must 'demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching[s] of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so.'" *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012) (quoting *Procter & Gamble*, 566 F.3d at 994).

## II. FINDINGS OF FACT[3]

### A. Epilepsy and Acute Repetitive Seizures

1. Epilepsy is a chronic neurological disorder characterized by chronic seizures. (D.I. 139, Ex. 1 (Statement of Uncontested Facts) ¶¶ 10–11.)[4] It is a neurological condition where a large number of a person's neurons misfire, resulting in recurrent seizures as well as altered behavior and perception. (Tr. (Klein) 414.)[5]

2. Patients with epilepsy experience seizures of varying length and degree. (*Id.*; Tr. (Privitera) 781; DTX-2362 at 85298.)

3. Following a seizure, many patients experience a postictal state, during which they may be unresponsive, uncooperative, or asleep. (Tr. (Klein) 430–31; Tr. (Privitera) 781–82.) The length of the postictal state can vary from minutes to hours. (Tr. (Klein) 430.)

4. Epilepsy is typically diagnosed after experiencing either two or more unprovoked seizures, or one unprovoked seizure with a high risk of additional seizures. (D.I. 139, Ex. 1 ¶ 11.)

---

[3] The following are the Court's findings of fact. The Court recites only the facts necessary for the Court's legal conclusions; this is not a comprehensive recitation of all evidence presented at trial. In determining the credibility of the witnesses, the Court has taken into account the rationality and internal consistency of the witnesses' testimony, the extent of detail and coherent nature of the testimony, the manner of testifying by the witnesses, and the degree to which the subject testimony is consistent or inconsistent with other evidence in the case. The Court has also drawn such reasonable inferences from the credible direct and circumstantial evidence as is permitted by reason and common sense.

The Court's decision to cite and credit certain witnesses' testimony but not others does not mean that the Court ignored or failed to consider all of the testimony. The Court has considered all of the evidence in the trial record in making its findings.

Unless otherwise specified, the Court's findings reflect the state of the art as of the priority date of the patents-in-suit.

[4] The Court's Pretrial Order provides that the parties' joint statement of uncontested facts "will become part of the evidentiary record in this case" and "require no proof at trial." (D.I. 140 ¶ 28.)

[5] The trial transcript is cited as "Tr."

5. Patients with epilepsy may be prescribed an anti-seizure medication ("ASM"), which is used to prevent chronic seizure recurrence. (*Id.* ¶ 12.)

6. Despite the availability of ASMs, some patients with epilepsy still experience uncontrolled or poorly controlled seizures. (*Id.* ¶ 13.) Around one-third of epilepsy patients have epilepsy that is not adequately controlled by currently available antiseizure medications. (Tr. (Klein) 414–15.)

7. Some patients with epilepsy also experience seizures that occur in clusters, meaning that they experience multiple seizures over a short period of time. (D.I. 139, Ex. 1 ¶ 13.)

8. The phenomenon of multiple seizures over a short period of time is known as "acute repetitive seizures" ("ARS"). (*Id.* ¶ 14.)

9. Although there is no agreed-upon clinical definition for ARS, defining features of ARS include (1) the occurrence of multiple seizures within a defined period (2) despite optimal/maximal therapy with ASMs, (3) a seizure pattern distinguishable from a patient's normal pattern with respect to type, duration, frequency, and/or severity, (4) onset clearly distinguishable (by patient, caregiver, or healthcare professional) from the patient's typical seizures, and (5) recovery between seizures. (*Id.* ¶ 15.)

10. ARS is most commonly defined as two or more seizures in close succession over a short period of time, typically 24–48 hours. (*Id.* ¶ 16.)

11. For most ARS patients, the timing of seizures within a cluster is often unpredictable. (Tr. (Klein) 498–499, 501.)

12. For a patient experiencing ARS, 24% of subsequent seizures occur within two hours of the first, 37% occur within three hours of the first, and 65% occur within six hours of the first. (Tr. (Klein) 495–99; DTX-2375 at 85424.)

13. ARS patients and their caregivers report that ARS has a significant negative effect on their quality of life. (Tr. (Klein) 419; DTX-2514 at 95392.)

14. ARS patients report feeling exhausted, confused, slow-thinking, stressed, depressed, helpless, and scared as a result of their condition. (Tr. (Klein) 419; DTX-2514 at 95392.)

15. ARS negatively affects patients' economic circumstances, due to both the expense of hospitalization for seizure clusters and greater difficulty in maintaining employment. (Tr. (Klein) 419–20; Tr. (Privitera) 839–40; DTX-2514 at 95392–93.)

16. Patients with ARS have an increased risk of injury, hospitalization, and death and a decreased likelihood of entering seizure remission compared to other epilepsy patients. (Tr. (Klein) 418, 420–21; Tr. (Privitera) 838–39; DTX-2514 at 95392.)

17. Relative to other epilepsy patients, ARS patients have an increased risk of entering status epilepticus, a condition that is characterized by five minutes of other uninterrupted seizure activity or recurrent seizure activity without interim recovery of consciousness and which carries a significant mortality and morbidity risk. (Tr. (Klein) 418, 420–21; Tr. (Privitera) 776–77, 838–39; DTX-2514 at 95392.)

18. Given the risks associated with ARS, ARS should be treated promptly and efficiently to prevent future seizures. (Tr. (Klein) 421–22, 428–29, 432–34; PTX-1197.001.)

**B. ARS Treatments, Compounds, and Drugs**

19. Since the 1980s, researchers have investigated a variety of at-home rescue treatments for ARS, including treatments administered via oral, rectal, nasal, and buccal routes. (Tr. (Klein) 428–29, 431–32, 435, 439–41, 512–12; Tr. (Privitera) 784–85, 837–38; PTX-1194.0001; PTX-1197.0001; PTX-1359.0001–02; PTX-1366.0003; DTX-2549 at 671796.)

20. Although patients can be treated with IV-administered medication, this can only be done in a hospital setting or by other medically-trained personnel, such as EMTs. (Tr. (Klein) 421–22, 427, 428–29; PTX-1148.0001; PTX-1197.0001.)

**1. Benzodiazepines**

21. Benzodiazepines are a class of compounds that have long been targeted for treating acute seizure emergencies. (D.I. 139, Ex. 1 ¶ 17.)

22. Benzodiazepines increase the activity of GABA (gamma-aminobutyric acid) receptors in neurons. This increase in GABA activity reduces the neuron's excitability, thereby stopping and preventing seizure activity. (*Id.* ¶ 18.)

23. Benzodiazepines used for treating acute seizure emergencies include lorazepam, diazepam, clonazepam, and midazolam. (*Id.* ¶ 20.) Midazolam, diazepam, and lorazepam were available in injectable formulations before January 19, 2007. (*Id.* ¶ 19.)

24. Prior to 1997, the only FDA-approved formulations comprising lorazepam, diazepam, midazolam, or clonazepam were approved for oral administration or administration by injection. (*Id.* ¶ 21.)

25. In 1997, the FDA approved DIASTAT® ("Diastat"), which is indicated for the acute treatment of intermittent, stereotypic episodes of frequent seizure activity (*i.e.*, seizure clusters, ARS) that are distinct from a patient's usual seizure pattern. (*Id.* ¶ 22.)

26. Diastat is a diazepam formulation for rectal administration. (*Id.* ¶ 24.)

27. Diastat was the first FDA-approved treatment indicated for ARS that could be administered by non-medical personnel. (*Id.* ¶ 23.)

28. Despite decades of effort, prior to 2007 there were no intranasal benzodiazepine formulations that were FDA-approved to treat ARS patients in the United States. (Tr. (Klein) 422,

425–26, 456–71; Tr. (Privitera) 834; PTX-1020; PTX-1026; PTX-1058 at "Results" Row 141; PTX-1062; PTX-1264; PTX-1362.0003; PTX-1370; DTX-2252.)

29. Prior to 2007, some physicians prescribed intravenous midazolam solution administered intranasally to treat ARS. (D.I. 139, Ex 1 ¶ 25.)

**2. NAYZILAM®**

30. UCB Inc. is the holder of New Drug Application No. 211321 for NAYZILAM® ("Nayzilam"), which was approved by the FDA on May 17, 2019. (*Id.* ¶¶ 26, 27.)

31. Nayzilam is indicated for the acute treatment of intermittent, stereotypic episodes of frequent seizure activity (*i.e.*, seizure clusters, ARS) that are distinct from a patient's usual seizure pattern in patients with epilepsy 12 years of age and older. (*Id.* ¶ 28.)

32. The active pharmaceutical ingredient in Nayzilam is midazolam. (*Id.* ¶ 29.)

33. Nayzilam is available in a single-dose nasal spray unit containing 5 mg midazolam in a 100 µL (0.1 mL) solution. (*Id.* ¶ 30.)

34. The Nayzilam single-dose spray device can be administered by a patient during an early phase of a seizure or by caretakers during a seizure. (Tr. (Klein) 423–25; JTX-3005.0004, .0030–31.)

35. The composition of Nayzilam is 5 mg midazolam, 53.17 mg methoxypolyethylene glycol 350, 18.45 polyethylene glycol 400, 6.51 mg propylene glycol, 7.60 mg ethanol, and 17.78 mg purified water. (D.I. 139, Ex. 1 ¶ 31.)

36. The Nayzilam prescribing information states that an initial dose of one spray (5 mg) should be administered into one nostril and a second dose of one additional spray (5 mg) into the opposite nostril may be administered after 10 minutes if the patient has not responded to the initial dose. (*Id.* ¶ 32.)

37. The Nayzilam prescribing information states that Nayzilam has a pH range of approximately 5 to 9. (*Id.* ¶ 33.)

38. Nayzilam was the first FDA-approved intranasal medication for the treatment of ARS. (Tr. (Klein) 422.)

39. The FDA granted Nayzilam orphan drug exclusivity under 21 C.F.R. § 316.31, which expires on May 17, 2026. (D.I. 139, Ex. 1 ¶ 34.)

**3. VALTOCO®**

40. VALTOCO® ("Valtoco") is indicated for the treatment of intermittent, stereotypic episodes of frequent seizure activity (*i.e.*, seizure clusters, ARS) that are distinct from a patient's usual seizure pattern in patients with epilepsy 6 years of age and older. (*Id.* ¶ 35.)

41. Valtoco is a diazepam formulation for intranasal administration, approved by the FDA in January 2020. (*Id.* ¶ 36.)

42. Valtoco is comprised of diazepam, benzyl alcohol, dehydrated alcohol, n-dodecyl beta-D-maltoside, and vitamin E. (*Id.* ¶ 37.)

**C. Patents-in-Suit and Asserted Claims**

43. The patents-in-suit are U.S. Patent No. 8,217,033 (JTX-3004) (the "'033 patent") and U.S. Patent No. 8,809,322 (JTX-3003) (the "'322 patent"). (*Id.* ¶ 38.)

44. The patents-in-suit list Sveinbjorn Gizurarson as the inventor. (*Id.* ¶ 39.)

45. The priority date for the patents-in-suit is January 19, 2007. (*Id.* ¶ 40.)

46. Plaintiff UCB Biopharma SRL is the exclusive licensee of the patents-in-suit and currently licenses all substantial rights to the patents-in-suit. (*Id.* ¶¶ 41–42.) Plaintiffs Hananja and UI are assignees and co-owners of the patents-in-suit. (*Id.* ¶ 43.)

47. The patents-in-suit are listed in connection with Nayzilam in the Orange Book. (*Id.* ¶ 44.) The Orange Book lists the expiration date of the patents-in-suit as January 18, 2028. (*Id.* ¶ 45.)

48. Nayzilam is an embodiment of each of the asserted claims. (*Id.* ¶ 47.)

49. The specifications of the '033 patent and the '322 patent are substantively identical. (*Id.* ¶ 46.)

50. The shared specification of the patents-in-suit discloses drug formulations used for nasal administration, which contain methoxypolyethylene glycol (aka "mPEG," an alkoxypolyethylene glycol) with different concentrations of therapeutic agents, including midazolam. ('322 patent at 19:4–20:5; '033 patent at 19:4–20:5; Tr. (Smyth) 615–616.)

51. As of the priority date, mPEG had never been used in an intranasal formulation. The patents-in-suit are the first public disclosure of the use of mPEG in an intranasal formulation. The patents-in-suit are the first public disclosure of the use of mPEG in an intranasal formulation containing midazolam. (*Id.* (all citations).)

52. The shared specification provides examples of liquid intranasal formulations containing mPEG and midazolam within the scope of the asserted claims. ('322 patent at 19:4–20:5; '033 patent at 19:4–20:5.)

53. The shared specification informs the POSA that intranasal formulations containing mPEG are effective at solubilizing midazolam at high levels, with a favorable effect on sprayability relative to other solvents such as PEG. ('322 patent at 3:29–45, 7:12–21; '033 patent at 3:29–45, 7:12–21.)

54. The shared specification explains that the patents-in-suit represent an advance over the prior art because the invention is rapidly absorbed, can be administered by non-medical

personnel, can be delivered via a commercially available nasal spraying device, and avoids unwanted side-effects. ('322 patent at 1:23–46, 16:11–20; '033 patent at 1:23–46, 16:11–20.) The specification explains:

> The invention is based, in part, upon the discovery that the inclusion of one or more alkoxy-polyethylene glycols in a formulation provides certain advantages when the resulting composition is to be applied, for example, to a mucosal surface. For example, it has been discovered that when alkoxy-polyethylene glycol is used in such formulations, the therapeutic agent can be still be solubilized (which is especially useful for poorly soluble therapeutic agents) but the resulting formulations are less viscous and cause less irritation to mucosal membranes because the amount of other potentially viscous and irritable excipients, for example, polyethylene glycol or propylene glucol, can be reduced or eliminated altogether. As a result, the lower viscosity formulations, when converted into droplets, for example, by a nasal sprayer during intranasal delivery, can produce a spray pattern optimized for delivering the therapeutic agent to the mucosal membrane. In addition, formulations containing alkoxy-polyethylene glycols create less irritation (burning sensation) when applied to a mucosal surface, for example, a nasal membrane following nasal administration. In addition, when administered intranasally, the compositions of the invention minimize undesirable after taste (for example, a petroleum-like after taste) that can be associated with certain other excipients.

('322 patent at 3:29–51; '033 patent at 3:29–51.)

**1. The '033 Patent**

55. The '033 patent is entitled "Methods and Compositions for the Delivery of a Therapeutic Agent." It issued on July 10, 2012, from U.S. Patent Application No. 12/469,448, filed on May 20, 2009, and is a continuation of U.S. Patent Application No. 12/016,724, filed on January 18, 2008. The '033 patent further claims priority to Icelandic Patent Application No. 8593/2007, filed on January 19, 2007. (D.I. 139, Ex. 1 ¶ 48.)

56. Plaintiffs assert Claim 13 of the '033 patent.

57. Claim 1 of the '033 patent recites the following:

> A liquid pharmaceutical composition formulated for intranasal administration, comprising: (i) midazolam or a pharmaceutically [acceptable] salt thereof; and (ii) a methoxy-polyethylene glycol selected from the group consisting of methoxy-polyethylene glycol 350 and methoxy-polyethylene glycol 550.

58. Claim 2 of the ’033 patent recites the following:

> The pharmaceutical composition of claim 1, further comprising propylene glycol.

59. Claim 3 of the ’033 patent recites the following:

> The pharmaceutical composition of claim 2, further comprising water.

60. Claim 5 of the ’033 patent recites the following:

> The pharmaceutical composition of claim 3, wherein the methoxy-polyethylene glycol is methoxy-polyethylene glycol 350.

61. Claim 7 of the ’033 patent recites the following:

> The pharmaceutical composition of claim 5, further comprising polyethylene glycol.

62. Claim 10 of the ’033 patent recites the following:

> The pharmaceutical composition of claim 7, wherein the polyethylene glycol is polyethylene glycol 400.

63. Claim 13 of the ’033 patent recites the following:

> The pharmaceutical composition of claim 10, wherein the midazolam is present in a concentration from 0.001% (w/v) to 20% (w/v).

**2. The ’322 Patent**

64. The ’322 patent is entitled “Methods and Compositions for the Delivery of a Therapeutic Agent.” It issued on August 19, 2014, from U.S. Patent Application No. 13/446,284, filed on April 13, 2012, and is a continuation of U.S. Patent Application No. 12/016,724, filed on

January 18, 2008. The ’322 patent further claims benefit and priority to Icelandic Patent Application No. 8593/2007, filed on January 19, 2007. (D.I. 139, Ex. 1 ¶ 66.)

65. Plaintiffs assert Claim 10 of the ’322 patent.

66. Claim 1 of the ’322 patent recites the following:

> A liquid pharmaceutical composition formulated for intranasal administration comprising:
>
> (a) a therapeutically effective amount of a therapeutic agent selected from midazolam, a pharmaceutically acceptable salt thereof or combinations thereof; and
>
> (b) a methoxy-polyethylene glycol of Formula I
>
> $$H_3C—O—(CH_2CH_2O)_n—H$$
>
> wherein n is a number in the range of 2 to 12.

67. Claim 10 of the ’322 patent recites the following:

> The pharmaceutical composition of claim 1 wherein the therapeutic agent is midazolam.

**D. Cipla’s ANDA and ANDA Product**

68. Cipla submitted Abbreviated New Drug Application No. 216048 (“Cipla’s ANDA”) to the FDA under 21 U.S.C. § 355(j) seeking FDA approval to engage in the commercial manufacture, use, or sale of a generic version of Nayzilam for the treatment of intermittent, stereotypic episodes of frequent seizure activity (*i.e.*, seizure clusters, ARS) that are distinct from a patient’s usual seizure pattern in patients with epilepsy 12 years of age and older. (D.I. 139, Ex. 1 ¶ 75.)

69. By letter dated July 17, 2021, Cipla notified Plaintiffs that Cipla submitted Cipla’s ANDA to the FDA under 21 U.S.C. § 355(j). (*Id.* ¶ 76.)

70. Cipla’s ANDA contains a certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) for the patents-in-suit. (*Id.* ¶ 77.)

71. Cipla's ANDA was tentatively approved on November 1, 2022. (*Id.* ¶ 78.)

72. Cipla's ANDA Product is a formulation for nasal administration. (*Id.* ¶ 79.)

73. The composition of Cipla's ANDA Product is 5 mg midazolam, 53.17 mg methoxypolyethylene glycol 350, 18.45 polyethylene glycol 400, 6.51 mg propylene glycol, 7.60 mg ethanol, and q.s. to 0.1 mL water for injection. (*Id.* ¶ 80.)

74. The parties have stipulated that the offer for sale, sale, use, commercial manufacture, and/or importation into the United States of Cipla's ANDA Product would constitute an act of infringement of Claim 13 of the '033 patent and Claim 10 of the '322 patent under 35 U.S.C. §§ 271(e)(2)(A) and 271(a), except as to any such claim that is found invalid. (*Id.* ¶ 83.)

**E. Intranasal Formulation Development Before the 2007 Priority Date**[6]

75. The parties agree that, "[f]or purposes of this case," the patents-in-suit have a priority date of January 19, 2007. (D.I. 139, Ex. 1 ¶ 40.)

76. It was known before the 2007 priority date that intranasal drug delivery has several practical benefits, including that it is non-invasive and can be administered by people without medical training. (Tr. (Wermeling) 107–09; Tr. (Smyth) 576.)

77. Intranasal drug delivery can also result in more rapid drug absorption and enhanced bioavailability compared to orally administered drugs, because intranasal drug delivery avoids gastrointestinal and hepatic metabolism. (Tr. (Wermeling) 107–09; Tr. (Smyth) 576; Tr. (Privitera) 784–86.)

[6] Given Dr. Smyth's extensive experience in drug formulation, including development of intranasal formulations specifically, the internal consistency of his testimony, the consistency of his testimony with other evidence in the record, and his demeanor testifying at trial, the Court finds Dr. Smyth's testimony particularly credible. To the extent that Dr. Smyth's testimony conflicts with the testimony of other testifying experts, the Court credits Dr. Smyth's testimony.

78. It was known before the 2007 priority date that, in developing formulations intended for intranasal administration, a formulator must consider several formulation properties, including, but not limited to, solubility, stability, pH, drug absorption, viscosity, sprayability, safety, and tolerability. (Tr. (Wermeling) 113–16; Tr. (Smyth) 576–77; Tr. (Gizurarson) 340.)

79. Solubility refers to how an active ingredient dissolves in the vehicle used for intranasal formulation. (Tr. (Smyth) 577.)

80. The nasal cavity can only retain 100–200 µL of liquid. (Tr. (Wermeling) 84–85; Tr. (Smyth) 577–78.)

81. Given the nasal cavity's volume constraints, a formulation will need to solubilize a therapeutically effective amount of a drug in 100–200 µL of liquid. (Tr. (Wermeling) 113–14; Tr. (Smyth) 577–79.)

82. Formulators must also consider the stability of an intranasal formulation, including physical stability, chemical stability, and biological stability. (Tr. (Wermeling) 113–16; Tr. (Smyth) 578–79.)

83. Formulators can alter the pH of a formulation to change drug solubility. (Tr. (Smyth) 578–79.) The pH can also affect the stability of a formulation and its excipients. (Tr. (Smyth) 579.)

84. The pH of the nasal cavity is between 5.5 and 6.5. (Tr. (Wermeling) 114; Tr. (Smyth) 578.)

85. Formulators must also consider a formulation's sprayability and its ability to be absorbed by the nasal mucosa, both of which are affected by viscosity. (Tr. (Smyth) 579–84.)

86. Nasal absorption is affected by the mucociliary clearance mechanism, through which a layer of mucus in the nasal cavity traps foreign particles and nasal cilia convey the mucus

and particles down the throat, where they are swallowed. (Tr. (Wermeling) 109–110; Tr. (Smyth) 580.)

87. With normally functioning cilia, foreign particles are removed from the nasal cavity in a matter of 10–20 minutes. (Tr. (Wermeling) 109–110; Tr. (Smyth) 580–81.)

88. Low viscosity solutions may also drain out the back of the nasal passage and into the gastrointestinal system or may drip out the front of the nose, which affects the absorption of active ingredients through the nasal mucosa. (Tr. (Ghaderi) 312–13; Tr. (Smyth) 581–82.)

89. Increasing the viscosity of a formulation can slow down the clearance of a drug from the nasal cavity. (DTX-2208 at 37; DTX-2294 at 41817:9–14; Tr. (Smyth) 581, 639, 643–44.)

90. Sprayability refers to the ability of a formulation and device in combination to form a spray. (Tr. (Smyth) 582.)

91. Several factors influence sprayability, including viscosity, surface tension, the presence of certain excipients, and the type of spraying device used. (Tr. (Gizurarson) 341–44; Tr. (Smyth) 581, 583.)

92. In formulations comprising multiple excipients, the excipients can interact in complex ways and affect the formulation's sprayability. (Tr. (Smyth) 643.)

93. Because multiple factors can affect sprayability, lowering viscosity does not always improve sprayability. For example, although ethanol has a lower viscosity than water, it does not have better sprayability. (Tr. (Gizurarson) 366.)

94. When coming up with a formulation, a formulator would prefer a formulation that can be sprayed with a nasal spraying device that has previously been approved by the FDA. (Tr. (Wermeling) 179, 271.)

95. Formulators must also consider the safety and tolerability of an intranasal formulation in humans. (Tr. (Smyth) 584–85.)

96. A safety consideration unique to intranasal formulations is the effect of the formulation on the nasal cilia, because damage to the cilia impairs a patient's immune system. (Tr. (Wermeling) 144; Tr. (Smyth) 581, 584; DTX-2294 at 41810.)

97. Excipients listed for the intranasal route in the FDA's Inactive Ingredients Database ("IID") have been tested for safety and toxicity in intranasal formulations. (Tr. (Smyth) 586–87.)

98. Tolerability, including factors such as taste and feel of a nasal spray, is important for patient acceptability. (Tr. (Smyth) 584–85.) If formulations are intolerable, patients may not use the medication and physicians may not prescribe it. (Tr. (Smyth) 585.)

99. Prior to the 2007 priority date, it was known that a formulator must balance all these factors—solubility, stability, pH, absorption, viscosity, sprayability, safety, and tolerability—through selection of excipients and devices. (Tr. (Smyth) 585.)

100. Many different classes of excipients had been used in intranasal formulations before the 2007 priority date, including stabilizing agents, pH adjusting agents, permeation enhancers, solubilizers, viscosity enhancers, preservatives, flavoring agents/sweeteners, and antioxidants. (Tr. (Wermeling) 254–57; Tr. (Smyth) 585; DTX-2294 at 41818–19.)

**F. Intranasal Midazolam Formulations as of 2007**

101. Although there were many efforts to develop a concentrated intranasal midazolam formulation reported in the literature before the 2007 priority date, none of this literature or the attempted formulations used or suggested the inclusion of mPEG. (Tr. (Wermeling) 246–49; Tr. (Smyth) 720; PTX-1367.0003; DTX-2048 at 36301; DTX-2294 at 41809.)

102. In 1990, Dr. Gizurarson joined Dr. Bechgaard and others in filing a patent application that resulted in Bechgaard '608, which reported intranasal benzodiazepine

formulations (the "Bechgaard Formulations"). (DTX-2134 at Cover.) The Bechgaard Formulations contained PEG-200 and glycofurol, among other optional excipients. (Tr. (Wermeling) 238–241; Tr. (Gizurarson) 385–86; DTX-2134 at 3, 18.)

103. In 1991, Lui et al. published an intranasal midazolam formulation comprising midazolam hydrochloride salt (11.1 mg/mL), methocel (1.5% w/w) (a viscosity enhancing agent), and water. (Tr. (Wermeling) 246–47; DTX-2294 at 41809.)

104. In 2001, T. Loftsson and H. Gudmundsdottir published on cyclodextrin-based intranasal midazolam formulations. (Tr. (Wermeling) 247–48, 290–91; DTX-2251 at 39998; DTX-2294 at 41809, 41823–25.) One formulation comprised midazolam base (17 mg/ml), sulfobutylether-β-cyclodextrin sodium salt (14% w/w), hydroxypropyl methylcellulose (0.1% w/w), benzalkonium chloride (0.02 % w/w), EDTA (0.1% w/w), phosphoric acid (0.43% w/w), and water (the "Loftsson Formulation"). (Tr. (Wermeling) 247–48, 290–91; DTX-2294 at 41809.)

105. In 2002, P.D. Knoester and colleagues published on an intranasal midazolam formulation (the "Knoester Formulation"). (DTX-2048 at 36300; PTX-1367.0002.) The Knoester Formulation comprised the midazolam hydrochloride salt (3.090 g), propylene glycol (25.90 g), benzyl alcohol (1.046 g), and water (up to 100 mL). (Tr. (Wermeling) 248–49; Tr. (Smyth) 720; DTX-2048 at 36301; PTX-1367.0003.)

106. In 2004, Dr. Wermeling published on a non-aqueous formulation (the "Wermeling Formulation") comprising 25 mg midazolam base, 0.18 mL PEG-400, 0.1 mg butylated hydroxytoluene, 1 mg saccharin powder, and q.s. to 1 mL propylene glycol. (Tr. (Wermeling) 262–63; DTX-2208 at 61, 85.)

107. In 2005, Dr. Merkus published on intranasal midazolam formulations. (DTX-2294 ("Merkus '893") at Cover.) Dr. Merkus focused on aqueous formulations comprising a midazolam

salt, as well as other known intranasally administered excipients such as propylene glycol, water, and PEG. (Tr. (Wermeling) 140; Tr. (Smyth) 637–38; DTX-2294 at 41818–19.)

108. One of the exemplary formulations in Merkus ’893 comprises midazolam hydrochloride (corresponding to 35–75 mg/mL midazolam), propylene glycol (5–50% v/v), glycerol (5–50% v/v), polyethylene glycol (5–50% v/v), povidone (1–20% w/v), and water (the “Merkus Formulation”). (Tr. (Wermeling) 154; DTX-2294 at 41819.)

109. Midazolam base has poor solubility in water. (Tr. (Wermeling) 252; Tr. (Smyth) 636–37; DTX-2251 at 39998.)

110. By using midazolam in its salt form at a low pH, Dr. Merkus was able to solubilize high concentrations of midazolam in water. (DTX-2294 at 41817–18; Tr. (Smyth) 649.)

**G. Dr. Gizurarson’s Invention Using mPEG to Formulate Intranasal Midazolam**

111. Dr. Gizurarson first began formulating intranasal midazolam compositions to treat epileptic seizures in 1987 with the company Novo Nordisk. (Tr. (Gizurarson) 334–35, 388.) From 1991 to 2005, he continued his research for a company called Lyfjathroun. (Tr. (Gizurarson) 336.)

112. Dr. Gizurarson worked to overcome challenges in solubilizing sufficient quantities of midazolam. (Tr. (Gizurarson) 334–337, 339–40.) He explored many excipients over nearly two decades. (Tr. (Gizurarson) 334–337.) He focused on formulations comprising PEG, particularly PEG-200, and single-chain ethylene glycols like tetra ethylene glycol. (*Id.* at 335–37.)

113. Dr. Gizurarson conceived of the idea of using mPEG in a midazolam formulation around May 2006. (Tr. (Gizurarson) 337.)

114. Prior to 2006, Dr. Gizurarson was unaware of the existence of mPEG and had not worked with mPEG. (Tr. (Gizurarson) 335, 338.)

115. Dr. Gizurarson performed solubility studies using mPEG with different benzodiazepines, and also explored the sprayability and bioadhesion of formulations comprising mPEG. (Tr. (Gizurarson) 345–47, 355.)

116. Dr. Gizurarson filed the Icelandic patent application leading to the patents-in-suit on January 19, 2007. (DTX-2507 at 68587; D.I. 139, Ex. 1 ¶¶ 48, 66; Tr. (Gizurarson) 361.)

117. Dr. Gizurarson sought to develop a commercial product in collaboration with a pharmaceutical company. (Tr. (Gizurarson) 372–74, 388.) He delivered a confidential presentation to ITI advocating for his invention in November 2007. (Tr. (Gizurarson) 373–74; Lusty 326–27; DTX-2456.)

118. Dr. Gizurarson signed a licensing and collaboration agreement with ITI in September 2007. (DTX-2417 at 33960–78.)

### H. Person of Ordinary Skill in the Art

119. The person of ordinary skill in the art ("POSA") would have had a doctorate in disciplines relating to pharmaceutical development such as pharmacy, pharmacology, pharmaceutics, chemistry, drug delivery, engineering, medicine, or a related discipline. (D.I. 139, Ex. 1 ¶ 84; Tr. (Smyth) 591; Tr. (Wermeling) 104–05.) The POSA would also have had at least two years of practical experience in the field of pharmaceutical formulation development. (*Id.* (all citations).) The POSA alternatively may have a lower degree with more years of experience. (*Id.* (all citations).)

### I. Scope and Content of the Prior Art

#### 1. Cipla's Anticipation and Obviousness References

120. Cipla asserts that the asserted claims are anticipated by a reference referred to by the parties as Wermeling '359. Cipla asserts that the asserted claims are obvious in view of Wermeling '359 and a reference referred to by the parties as Carbowax.

**a. Wermeling '359 (DTX 2208)**

121. U.S. Patent Application Publication No. 2004/0176359 ("Wermeling '359"), entitled "Intranasal Benzodiazepine Compositions," published on September 9, 2004. (D.I. 139, Ex. 1 ¶ 86.) Wermeling '359 is prior art to the patents-in-suit.

122. Wermeling '359 discloses intranasal formulations comprising a benzodiazepine and a nasal carrier, including the Wermeling Formulation. (DTX-2208 at Cover.)

123. Although Wermeling '359 states that the nasal carrier may comprise aqueous or non-aqueous diluents, it expresses a preference that non-aqueous diluents used in the nasal carrier be "polyhydroxy alcohols such as propylene glycol, polyethylene glycol, [and] glycerol." (DTX-2208 at [0030]; Tr. (Wermeling) 264; Tr. (Smyth) 595.)

124. An alcohol is any compound that has a hydroxy group (-OH) bonded covalently to a saturated carbon. (Tr. (Wermeling) 265–66; Tr. (Smyth) 595.) A polyhydroxy alcohol is an alcohol with more than one hydroxy (-OH) group. (Tr. (Wermeling) 265–66; Tr. (Smyth) 595.)

125. Wermeling '359 discloses one exemplary formulation: the Wermeling Formulation. (Tr. (Wermeling) 262; Tr. (Smyth) 636.) The Wermeling Formulation is comprised of roughly 80% w/w propylene glycol. (Tr. (Wermeling) 263; Tr. (Smyth) 637; DTX-2208 at 85.) It does not comprise water. (Tr. (Wermeling) 263–64; Tr. (Smyth) 636.)

126. Wermeling '359 discusses the administration of the Wermeling Formulation to healthy volunteers. (DTX-2208 at [0071]–[0109].)

127. The Wermeling Formulation was "well tolerated" in healthy volunteers. (DTX-2208 at [0071], [0078], [0098]; Tr. (Wermeling) 91.)

128. Wermeling '359 discloses other exemplary excipients for intranasal midazolam formulations, including aqueous diluents such as saline and dextrose, and glycerol, a non-aqueous diluent. (Tr. (Wermeling) 264–65; DTX-2208 at [0030].)

129. Wermeling ’359 does not mention mPEG by name or structure. (Tr. (Wermeling) 261 (admitting that “mPEG” appeared “nowhere” in Wermeling ’359); Tr. (Smyth) 594; DTX-2208.)

130. Wermeling ’359 does not discuss the use of PEG derivatives in an intranasal midazolam formulation. (Tr. (Smyth) 611–12, 616; DTX-2208.)

131. Wermeling ’359 does not disclose any exemplary formulations comprising midazolam and water. (Tr. (Smyth) 612; DTX-2208.)

132. Wermeling ’359 discloses embodiments comprising “one or more agents that increase viscosity.” (DTX-2208 at [0037]; Tr. (Smyth) 639.)

133. Wermeling ’359 discloses embodiments where “the intranasal delivery device may be modified, for example, by increasing the size of the discharge orifice . . . in order to accommodate higher viscosity compositions.” (DTX-2208 at [0047].)

134. According to Dr. Wermeling, the Wermeling Formulation required the use of a modified version of a commercially available spraying device. (Tr. (Wermeling) 86, 179, 184–85.) This was because when the solvent system of the Wermeling Formulation was placed in a nasal sprayer, it formed a “jet” like a “squirt gun” instead of the desirable “plume.” (Tr. (Wermeling) 86.) Dr. Wermeling testified that use of a modified spraying device is not optimal for various reasons, including that it would trigger additional review by the FDA. (Tr. (Wermeling) 179, 271.)

**b. Carbowax (DTX-2022)**

135. Dow Chemical Company, “CARBOWAX™ and CARBOWAX™ SENTRY™: Polyethylene Glycols and Methoxypolyethylene Glycols” (“Carbowax”) is a marketing brochure published by the Dow Chemical Company in March 2006. (D.I. 139, Ex. 1 ¶ 88; DTX-2022.) Carbowax is prior art to the patents-in-suit.

136. Defendants' expert, Dr. Wermeling, was not familiar with Carbowax before this litigation. (Tr. (Wermeling) 213.)

137. Dow (or its subsidiaries) has sold PEG and mPEG since 1940. (Tr. (Wermeling) 219; Tr. (Smyth) 617–18; DTX-2022 at 36038.)

138. Carbowax describes thirteen different grades of PEG and three different grades of mPEG. (DTX-2022 at 36038.) A "grade" of PEG or mPEG refers to the average molecular weight of the polymers in the mixture. (*Id.*)

139. Carbowax refers to the thirteen Carbowax PEG and three Carbowax mPEG products as comprising the Dow "family of CARBOWAX products." (*Id.*) Otherwise, Carbowax does not refer to PEG and mPEG as belonging to the same "family." (*Id.*; Tr. (Wermeling) 227; Tr. (Smyth) 601–602.)

140. Carbowax does not discuss the use of mPEG as a pharmaceutical excipient. (DTX-2022 at 36043–44; Tr. (Wermeling) 221–23; Tr. (Smyth) 599–600.)

141. The only pharmaceutical use for mPEG discussed in Carbowax is as a chemical intermediate. (DTX-2022 at 36044; Tr. (Wermeling) 223; Tr. (Smyth) 600.)

142. Carbowax discloses numerous non-pharmaceutical uses for mPEG, such as in adhesives, household products, printing and inks, and mandrel releases. (DTX-2022 at 36048–51; Tr. (Wermeling) 224–25; Tr. (Smyth) 600–01.)

143. Under the heading "Liquid medications"—which discusses liquid-oral dose medications, nose and ear drops, and spray-on medications—Carbowax refers only to "CARBOWAX SENTRY liquid PEGs," not mPEG. (DTX-2022 at 36044; Tr. (Wermeling) 222.)

144. Carbowax does not disclose any exemplary pharmaceutical formulations comprising PEG or mPEG. (DTX-2022.)

145. Carbowax does not disclose intranasal formulations comprising midazolam. (*Id.*) Nor does it disclose the solubility of midazolam, or any drug, in mPEG. (*Id.*; Tr. (Wermeling) 231.)

146. Carbowax discloses that the viscosities of PEG-200 and PEG-300 are lower than that of PEG-400. It discloses that the viscosity of PEG-200 is 4.3 cSt at 100°C and the viscosity of PEG 300 is 5.8 cSt at 100°C. (DTX-2022 at 36053.) Carbowax discloses that the viscosity of mPEG-350 is 3.9 cSt at 100°C. (DTX-2022 at 36053–54.)

147. Carbowax does not disclose any information regarding the safety of mPEG-350 for intranasal administration. (Tr. (Wermeling) 232, 287–88.) Nor does it indicate whether mPEG would be tolerable or non-irritating when administered intranasally. (DTX-2022; Tr. (Wermeling) 232; Tr. (Smyth) 625, 627.)

**2. Other Prior Art Presented at Trial**

**a. Bechgaard '608 (DTX-2134)**

148. Bechgaard '608 is a patent relating to intranasal formulations comprising glycofurol, which is different from mPEG. (DTX-2134 at 3; Tr. (Wermeling) 240; Tr. (Smyth) 624–25.)

149. Bechgaard '608 does not mention mPEG by name or structure. (DTX-2134; Tr. (Wermeling) 239–40; Tr. (Smyth) 624.)

150. The patent examiner considered Bechgaard '608 during prosecution of the patents-in-suit. (JTX-3003.0002; JTX-3004.0002; Tr. (Smyth) 587–88.)

151. Bechgaard '608 states that "[t]he n-glycofurols of the formula I are considered to be a pharmaceutically acceptable carrier, especially a pharmaceutically acceptable carrier for nasal administration." (DTX-2134 at 8.)

152. Bechgaard '608 discloses multiple potential solubilizers for use in intranasal formulations, including ethanol, benzyl alcohol, acetic acid, nitric acid, nitrate, oxalic acid, and phosphoric acid. (DTX-2134 at Fig. 10; Tr. (Wermeling) 242–43.)

**b. Knoester 2002 (PTX-1354) and Knoester 2002b (PTX-1367)**

153. Knoester 2002 and Knoester 2002b are articles reporting on the Knoester Formulation. (PTX-1354; PTX-1367.)

154. Knoester 2002b reports that the Knoester Formulation was "reasonably well tolerated." (PTX-1367.0006; Tr. (Wermeling) 143–44.)

155. Neither Knoester 2002 nor Knoester 2002b discloses formulations comprising PEG, or PEG-400 specifically. (PTX-1354; PTX-1367.)

156. Neither Knoester 2002 nor Knoester 2002b discloses formulations comprising mPEG, or mPEG-350 specifically. (*Id.* (both citations); Tr. (Wermeling) 248.)

157. The Knoester Formulation has been made by compounding pharmacies in the Netherlands but is not approved by any regulatory authority in the Netherlands or United States. (Tr. (Klein) 469.) The Knoester Formulation has never been available to patients in the United States. (*Id.*; Tr. (Privitera) 848.)

**c. Merkus '893 (DTX-2294)**

158. International Publication No. WO 2005/067893 A2 ("Merkus '893") published on July 28, 2005. (D.I. 139, Ex. 1 ¶ 87.)

159. Merkus '893 was a patent application for intranasal midazolam formulations. (DTX-2294 at Title, 41804–5.)

160. The patent examiner considered and cited Merkus '893 during prosecution of the patents-in-suit. (JTX-3003.0003–.0004; Tr. (Smyth) 587–89.)

161. Merkus '893 states that the "aqueous solubility of the midazolam base at neutral pH is too low to prepare suitable midazolam formulations and for this purpose midazolam salts (e.g., hydrochloride) have to be used." (DTX-2294 at 41818.) Merkus '893 guides the POSA to use midazolam salts rather than midazolam base. (Tr. (Smyth) 709; Tr. (Wermeling) 115.)

162. Merkus '893 discloses intranasal midazolam formulations comprising a midazolam salt, propylene glycol, water, and PEG. (DTX-2294 at 41818–19; Tr. (Wermeling) 253–55.) It also discloses additional solubilizers, including glycerol and povidone. (*Id.* (both citations).)

163. Merkus '893 explains that propylene glycol is an attractive solubilizer because it does not have a strong adverse effect on ciliary movement. (DTX-2294 at 41815.) Merkus '893 suggests a preference for formulations comprising propylene glycol, including in concentrations up to 90% v/v. (*Id.* at 41814–15.)

164. Merkus '893 states that its compositions may comprise "viscosity enhancing agents" which can "enhance the delivery of the midazolam." (DTX-2294 at 41817; Tr. (Wermeling) 259–260.)

165. Merkus '893 states that "suitable devices" for spray delivery of its formulations (comprising PEG and propylene glycol) were already commercially available and did not discuss any need for a modified device. (DTX-2294 at 41822; Tr. (Wermeling) 260; Tr. (Smyth) 644.)

166. Merkus '893 does not disclose mPEG, by name or structure. (DTX-2294; Tr. (Wermeling) 288–89.)

167. Merkus '893 states that "there are no adverse effects or disadvantages associated with a composition having a [low] pH." (DTX-2294 at 41817.)

**d. Wermeling 2006 (DTX-2251)**

168. Wermeling 2006 describes a study that administered the Wermeling Formulation to twelve healthy volunteers. (DTX-2251 at 39993.)

169. Wermeling 2006 also discusses studies of the Knoester Formulation and the Loftsson Formulation. Wermeling 2006 suggests that any nasal irritation caused by these formulations resulted from midazolam. (Tr. (Wermeling) 92, 290–91; DTX-2251 at 39998.)

170. Wermeling 2006 does not suggest that propylene glycol causes nasal irritation. (Tr. (Wermeling) 92, 290–91; DTX-2251 at 39998.)

171. Wermeling 2006 does not discuss mPEG, by name or structure. (Tr. (Wermeling) 290; DTX-2251.)

**e. Tracy '672 (DTX-2211)**

172. United States Patent Application Publication US 2004/0247672 ("Tracy '672") published on December 9, 2004. (DTX-2211 at Cover.)

173. Tracy '672 is entitled, "Injectable Sustained Release Compositions." It generally discloses injectable, polymer-paste, sustained-release formulations. (DTX-2211 at Title, [0006], [0046]; Tr. (Wermeling) 233–34; Tr. (Smyth) 620–21.)

174. Multiple paragraphs in Tracy '672 contain laundry lists of possible excipients and embodiments. Although Tracy '672 purports to disclose an advance in the form of an injectable polymer paste, it also contains a paragraph with a laundry list of "almost all of the routes of administration that you would use to deliver medications." (Tr. (Smyth) 621–22.) It lists potential administration via "injection, implantation (*e.g.*, subcutaneously, intramuscularly, intraperitoneally, intracranially, and intradermally), administration to mucosal membranes (*e.g.*, intranasally, intravaginally, intrapulmonary, buccally or by means of a suppository), topically, or in situ delivery (*e.g.*, by enema or aerosol spray)." (DTX-2211 at [0088].) That is the only paragraph that mentions intranasal administration.

175. mPEG is mentioned in Tracy '672 as one of dozens of potential excipients—including polyethylene glycol polymers, surfactants, organic solvents, and aqueous solvents—

under the heading "Viscosity Reducing Agents." (DTX-2211 at [0050]–[0055]; Tr. (Wermeling) 234–36; Tr. (Smyth) 622–24.)

176. In one of the paragraphs under the heading "Viscosity Reducing Agents," Tracy '672 states as follows:

> Polyethylene glycol polymers (PEG) are liquid and solid polymers of the general formula $H(OCH_2CH_2)_nOH$, where n is greater than or equal to 4. In general, each PEG is followed by a number which corresponds to its average molecular weight. For example, PEG200 has an average value of n of 4 with a molecular weight range between 190 and 210, PEG400 has an average value of n between 8.2 and 9.1 with a molecular weight range between 380-420, PEG600 has an average value of n between 12.5 and 13.9 with a molecular weight range between 570 and 630. In a particular embodiment, the PEG is a liquid at room temperature. For example, the PEG can be PEG200, PEG400 or MPEG350 (monomethoxy PEG) which are all liquids at room temperature.

(DTX-2211 at [0052].)

177. Tracy '672 does not disclose any exemplary intranasal pharmaceutical formulations, nor does it disclose any exemplary formulations comprising mPEG. (DTX-2211.)

**f. USP 2006 (DTX-2078)**

178. The United States Pharmacopeia, published in 2006 ("USP 2006"), provides general information on pharmaceutical excipients, such as structures, properties, and test methods. (DTX-2078; Tr. (Smyth) 604.)

179. USP 2006 has different entries for Polyethylene Glycol and Polyethylene Glycol Monomethyl Ether (mPEG). USP 2006 repeatedly distinguishes the uses of PEG from those of mPEG. (DTX-2078 at 36778–86; Tr. (Smyth) 604–06.)

180. USP 2006 does not indicate whether mPEG was ever used in, or could be used in, intranasal formulations. (DTX-2078.)

Case: 26-1992 Document: 24 Page: 111 Filed: 09/29/2026

### g. Handbook of Pharmaceutical Excipients (PTX-1090)

181. The version Handbook of Pharmaceutical Excipients published in 2006 (the "Handbook") was widely used by formulators before the priority date. (PTX-1090.0001, .0004; Tr. (Wermeling) 237; Tr. (Smyth) 603.) The Handbook describes the physical properties and uses of pharmaceutical excipients. (PTX-1090.0017–22; Tr. (Smyth) 603.)

182. The Handbook contains a chapter on PEG, but does not reference mPEG at all. (PTX-1090.0017–22; Tr. (Wermeling) 237–38; Tr. (Smyth) 603.)

### h. IID (DTX-2583)

183. The IID is published by the FDA and includes information on excipients that have been used in FDA-approved products, including the specific routes of administration for which they have been used. (DTX-2583; Tr. (Wermeling) 193.)

184. Before January 2007, mPEG (specifically mPEG-350) was listed only once in the IID—in connection with a topical gel product. (DTX-2583; Tr. (Wermeling) 193; Tr. (Smyth) 618–19.)

185. Before January 2007, mPEG was not listed in connection with any intranasal formulations. (DTX-2583; Tr. (Smyth) 619; Tr. (Mittal) 555–56.)

186. Before January 2007, there were over 100 entries for PEG in the IID, including for topical, oral, vaginal, transdermal, rectal, subcutaneous, ophthalmic, nasal, intravenous, intramuscular, inhalation, and dental administration. (DTX-2583.)

### J. Wermeling ’359 Does Not Disclose Each Element of the Asserted Claims

187. Cipla argues that the asserted claims are invalid under pre-AIA 35 U.S.C. § 102 because they are anticipated by Wermeling ’359.[7] The Court finds that Wermeling ’359 does not disclose each of the elements of either asserted claim. (Tr. (Smyth) 593–612.)

#### 1. Wermeling ’359 Does Not Disclose mPEG

188. Both of the asserted claims require methoxy polyethylene glycol, otherwise known as mPEG. (’033 patent at cl. 13; ’322 patent at cl. 10.)

189. Wermeling ’359 does not expressly disclose mPEG. (Tr. (Smyth) 594; DTX-2208.)

190. Wermeling ’359 does not inherently disclose mPEG. (Tr. (Smyth) 594–612.) The POSA would not generally understand a reference to PEG to include mPEG. (Tr. (Smyth) 595, 607–12, 619.) The POSA would not understand the reference to PEG in Wermeling ’359 to include or encompass mPEG. (Tr. (Smyth) 595, 607–12.)

191. PEG and mPEG are not the same thing. (Tr. (Wermeling) 210–11; Tr. (Smyth) 595–99.)

192. PEG and mPEG have different chemical structures. (Tr. (Wermeling) 210–11; Tr. (Smyth) 595–99; DTX-2022 at 36038.)

193. PEG is a polyhydroxy alcohol, with two terminal hydroxy groups. (Tr. (Smyth) 596.)

---

[7] Although Cipla’s post-trial briefs argue that the claims are invalid for “anticipation” under pre-AIA 35 U.S.C. § 102, Cipla specified in the Pre-trial Order that it is alleging invalidity under 35 U.S.C. § 102(b). (D.I. 139, Ex. 3 ¶ 60.) Both sides agree that, to prove invalidity under § 102, Cipla must demonstrate that each and every limitation is present (either expressly or inherently) in a single reference.

194. mPEG is not a polyhydroxy alcohol. It has a hydroxy group on one end of the carbon backbone and a methoxy group on the other end. (Tr. (Smyth) 597; Tr. (Wermeling) 266; DTX-2022 at 36038.)

195. Although mPEG is sometimes referred to as a PEG derivative, mPEG is not derived from PEG; i.e., "PEG is a different synthesis method from mPEG." (Tr. (Smyth) 608–09.)

196. The Chemical Abstract Service assigns numbers ("CAS Registry Numbers") to chemicals, which are used by the industry to differentiate between chemical entities. (Tr. (Smyth) 598.) PEG and mPEG have different CAS Registry Numbers. (Tr. (Wermeling) 210–11; Tr. (Smyth) 598; PTX-1090.0017; DTX-2583.)

197. General pharmaceutical compendia used by formulators, such as the Handbook and USP 2006, distinguished between PEG and mPEG. (Tr. (Smyth) 603–06; Tr. (Wermeling) 237–38; DTX-2078 at 36778–86; PTX-1090.0017–22.) There is no suggestion in the compendia that a reference to PEG includes or encompasses mPEG. Carbowax does not evidence that the POSA would have understood PEG to include or encompass mPEG. (DTX-2022; Tr. (Smyth) 599–602.)

198. Cipla asserts that Tracy '672 is evidence that the POSA would understand that the term PEG, as used in the art (including in Wermeling '359), would include mPEG. The Court does not so find. The Court finds that any suggestion in Tracy '672 that "MPEG350" falls under the category of "PEG" does not reflect how the POSA would have generally understood the term "PEG" as of the priority date. (Tr. (Smyth) 620.) The Court finds other record evidence more persuasive than Tracy '672 as to how a POSA would understand what Wermeling '359 disclosed (expressly or inherently) when it referred to PEG. (Tr. (Smyth) 597–99, 602–07, 620–24; DTX-2078 at 36778–86; PTX-1090.0017–22; DTX-2583.)

### 2. Wermeling '359 Does Not Disclose the Combination of Midazolam, mPEG-350, PEG-400, Propylene Glycol, and Water

199. Wermeling '359 does not disclose the combination of mPEG-350, PEG-400, propylene glycol, and water, as recited in Claim 13 of the '033 patent. (Tr. (Smyth) 594, 606–12.)

200. Even if PEG were understood to encompass mPEG and other PEG derivatives (and it does not), Wermeling '359 still would not disclose the combination of excipients in Claim 13 of the '033 patent. (Tr. (Smyth) 594, 606–12.)

201. Wermeling '359's general disclosure of "aqueous and/or non-aqueous diluents" would have encompassed hundreds of potential combinations of excipients. The POSA would not have immediately envisioned the combination of mPEG-350, PEG-400, propylene glycol, and water from this disclosure. (Tr. (Smyth) 610–12.)

202. Wermeling '359 did not combine PEG, propylene glycol, and water in any formulation, let alone mPEG-350, PEG-400, propylene glycol and water. (Tr. (Wermeling) 205–06; Tr. (Smyth) 610–12; DTX-2208.)

## K. The POSA Would Not Have Been Motivated, With a Reasonable Expectation of Success, to Arrive at the Claimed Invention

### 1. The POSA Would Not Have Been Motivated to Use mPEG in an Intranasal Midazolam Formulation with a Reasonable Expectation of Success.

203. The POSA would not have been motivated to use mPEG in an intranasal midazolam formulation because mPEG was not a known excipient for intranasal formulations, and it had not been used, marketed, or even suggested for use in an intranasal formulation. (Tr. (Smyth) 613, 615–25.) Nor would the POSA have known how mPEG would affect factors such as solubility of midazolam, permeability through the nasal mucosa, sprayability, or safety and tolerability for nasal administration. (*Id.*)

### a. mPEG Had Never Been Used or Suggested for Any Intranasal Formulation

204. Although it had been commercially available from Dow since the 1940s, mPEG was not a known excipient for intranasal formulations prior to 2007. (Tr. (Wermeling) 211, 219, 297–98; Tr. (Smyth) 615–22, 650; DTX-2022 at 36038.)

205. Before 2007, mPEG had not been used in an intranasal formulation. (Tr. (Wermeling) 211, 297–98; Tr. (Smyth) 615–20.)

206. Before 2007, mPEG had not been marketed for use in an intranasal formulation. (Tr. (Wermeling) 211; Tr. (Smyth) 615–20; DTX-2022 at 36044.)

207. Before 2007, no reference suggested the use of mPEG in intranasal formulations. (Tr. (Smyth) 615–22.) Although Tracy '672 refers to the use of mPEG as one pharmaceutical excipient in a laundry list of excipients that might be used in a pharmaceutical composition as a viscosity reducing agent, a POSA would not understand Tracy '672 to disclose or suggest the use of mPEG for an intranasal formulation, especially since Tracy '672 generally relates to injectable sustained release injections. (Tr. (Smyth) 620–24; DTX-2211 at [0050]–[0056], [0088].)

208. Prior to this litigation, Cipla internally described mPEG as a "novel" and "special" excipient. (PTX-1229.0005; PTX-1220; Tr. (Mittal) 555–56; Tr. (Smyth) 680–82.)

### b. The POSA Would Not Have Had a Reasonable Expectation that mPEG was Suitable for Use in an Intranasal Formulation

209. Before 2007, the POSA would not have known whether mPEG was tolerable for use in an intranasal formulation. (Tr. (Smyth) 625–27.)

210. Before 2007, the POSA would not have known whether mPEG was safe for use in an intranasal formulation. (Tr. (Smyth) 625–35; PTX-1069.0001; PTX-1073.0009–10; DTX-2586 at 144–46.)

211. Before 2007, no reference indicated how mPEG would affect the nasal cilia. (Tr. (Smyth) 628–29.)

212. Before 2007, no reference disclosed pharmacokinetic data for an intranasal formulation comprising mPEG-350. (Tr. (Wermeling) 213.)

**c. The POSA Would Not Have Had a Reasonable Expectation that mPEG Was Suitable for Use in an Intranasal Midazolam Formulation**

213. The POSA would have considered at least efficacy, safety, stability, and tolerability to be requirements for a successful intranasal midazolam formulation. (Tr. (Wermeling) 113–14; Tr. (Smyth) 576–79, 584–85, 625–26.)

214. To achieve efficacy, the POSA would have needed to understand the effect of the chosen excipients on factors such as the solubility of midazolam, viscosity, and sprayability of an intranasal midazolam formulation, and the permeability of the formulation through the nasal mucosa. (Tr. (Smyth) 576–84.)

215. Before 2007, the POSA would not have known how well mPEG could solubilize midazolam. (Tr. (Smyth) 625–26, 647.) The prior art did not disclose the solubility of midazolam in mPEG. (Tr. (Wermeling) 211, 231, 287; Tr. (Smyth) 625–26.)

216. Before 2007, the POSA would not have known how mPEG would affect the sprayability of an intranasal midazolam formulation. (Tr. (Smyth) 625–27.) Before 2007, no prior art reference provided data on the spray plume of formulations comprising mPEG-350. (Tr. (Wermeling) 213, 231–32.)

217. Before 2007, the POSA would not have known how mPEG would affect the permeability of midazolam through the nasal mucosa. (Tr. (Wermeling) 213; Tr. (Smyth) 625–26.)

218. Before 2007, the POSA would not have known how mPEG would affect the stability of an intranasal midazolam formulation. (Tr. (Smyth) 625–26, 645–46.)

**d. The Sparse Use of mPEG in Topical Products Would Not Have Motivated the POSA to Use mPEG in an Intranasal Formulation With a Reasonable Expectation of Success**

219. Before 2007, mPEG had been used in only one FDA-approved product, a topical gel. (Tr. (Wermeling) 193; Tr. (Smyth) 617–19; DTX-2583.)

220. The use of mPEG-350 in topical formulations did not inform whether mPEG was safe for use in intranasal formulations, at least because there are different safety requirements for topical formulations than intranasal formulations and the skin and nasal mucosa are different tissues. (Tr. (Smyth) 627–35; PTX-1069.0001; PTX-1073.0009–10; DTX-2586 at 144–46.)

221. There are additional unique formulation development considerations for intranasal formulations that are not considerations for topical formulations, including the limitations on the volume of the formulation, which requires highly concentrated formulations, and the effect of the mucociliary clearance mechanism, which can affect drug absorption. (Tr. (Smyth) 578–84, 627–29; Tr. (Wermeling) 113–14.)

222. The FDA determined that, for safety evaluation purposes, mPEG's prior use in topical products was "not relevant" to the use of mPEG in an intranasal formulation. (Tr. (Smyth) 631–33; DTX-2586 at 145–46.) Because the FDA determined that mPEG was a "novel excipient" for intranasal use, the FDA required two-week toxicity studies of mPEG in two species before intranasal formulations comprising mPEG could progress to clinical trials. (Tr. (Smyth) 631–35; DTX-2586 at 144–46; PTX-1073.0009.)

223. In June 2007, Dr. Fisher discussed safety concerns regarding mPEG with the inventor, Dr. Gizurarson, noting that there was no published toxicity data for intranasal use of mPEG. (Tr. (Smyth) 629–31; PTX-1069.) Dr. Fisher expressed particular concerns regarding the

"exposure of the nasal mucosa surface" to mPEG and potential toxicity from enzymatic conversion of mPEG to other compounds. (Tr. (Smyth) 629–31; PTX-1069.0001–02.)

#### e. Carbowax Would Not Have Led the POSA to Use mPEG in an Intranasal Formulation

224. Carbowax would not have suggested to the POSA to use mPEG in an intranasal formulation. (Tr. (Smyth) 599–602, 619–20; DTX-2022 at 36043–44, 36050–51.)

225. While use of PEG in an intranasal formulation was known in the art as of the priority date, Carbowax refers to PEG and mPEG as different compounds with different structures, properties, and uses. (Tr. (Wermeling) 219–25; Tr. (Smyth) 599–602, 619–20; DTX-2022 at 36038, 36041, 36043–44, 36050–51.)

226. Carbowax describes a wide variety of pharmaceutical uses for PEG, including in liquid medications such as nose and ear drops. (DTX-2022 at 36043–44; Tr. (Wermeling) 221–22; Tr. (Smyth) 599–600, 619–20.) The only pharmaceutical use for mPEG disclosed in Carbowax is as a chemical intermediate. (DTX-2022 at 36043–44; Tr. (Wermeling) 221–23; Tr. (Smyth) 599–600.)

### 2. The POSA Would Not Have Been Motivated, With a Reasonable Expectation of Success, to Use mPEG to Reduce the Viscosity of the Wermeling Formulation

227. Wermeling '359 did not suggest that the viscosity of the Wermeling Formulation (or any other formulation) was too high. (Tr. (Smyth) 639, 641; Tr. (Wermeling) 269; DTX-2208.) Indeed, its only discussion of agents that affect viscosity are viscosity increasing agents—such as methylcellulose and carboxymethylcellulose sodium—to promote nasal absorption. (DTX-2208 at [0037]; Tr. (Wermeling) 269; Tr. (Smyth) 639.)

228. Although Dr. Wermeling himself testified that the POSA would have been motivated to reduce the viscosity of the Wermeling Formulation (as disclosed in Wermeling '359)

so that it could be used with an unmodified spraying device, Wermeling ’359 did not state that the use of a modified device was problematic. (Tr. (Smyth) 639, 641; DTX-2208.) Dr. Wermeling did not attempt to reformulate the Wermeling Formulation to be delivered through an unmodified device. (Tr. (Wermeling) 286–87.)

229. Even if the POSA were motivated to modify the Wermeling Formulation to lower its viscosity to allow the use of a standard commercial device, the POSA would not have been motivated to use mPEG to do so. (Tr. (Smyth) 637–46.)

230. The POSA would not have expected that adding mPEG to the Wermeling Formulation would result in a viscosity compatible with standard commercial devices. (Tr. (Smyth) 639–42.) If anything, the POSA would have expected that non-aqueous formulations comprising mPEG would still require device modification. (Tr. (Smyth) 639–42.)

231. mPEG-350’s viscosity is similar to propylene glycol and lower viscosity PEGs, such as PEG-200, which fall within the “higher viscosity” formulations discussed in Wermeling ’359. (Tr. (Smyth) 639–42, 647; DTX-2022 at 36052–53.) The POSA would therefore have expected that substituting mPEG into the Wermeling Formulation would not markedly lower viscosity. (Tr. (Smyth) 639–42.)

232. If the POSA were motivated to modify the viscosity of the Wermeling Formulation and were willing to consider excipients not used in intranasal formulations to do so, there would have been a large number of excipients in the pharmaceutical arts to consider. (Tr. (Smyth) 641–42, 650.)

**3. The POSA Would Not Have Been Motivated, with a Reasonable Expectation of Success, to Use mPEG and Water to Improve the Tolerability of the Wermeling Formulation**

233. The POSA would not have been motivated to improve the tolerability of the Wermeling Formulation. (Tr. (Smyth) 646–50.) No prior art suggested that the Wermeling

Formulation was intolerable. (DTX-2208 at [0071], [0078], [0098]; Tr. (Wermeling) 91–92; Tr. (Smyth) 646–50.)

234. Even if the POSA were motivated to reduce the amount of propylene glycol to improve tolerability, the POSA would not have been motivated to use mPEG-350 instead. The POSA would not have known whether mPEG would be a tolerable excipient in an intranasal formulation. (Tr. (Smyth) 625, 627, 646–47.)

235. The POSA would not have known whether mPEG could solubilize midazolam as well as propylene glycol, which was known to be an excellent solubilizer. Before 2007, nothing was known about mPEG's ability to solubilize midazolam. (Tr. (Smyth) 647; Tr. (Wermeling) 257.)

236. Because midazolam base has poor solubility in water, the POSA would have been concerned that adding water to the Wermeling Formulation would negatively affect the stability of the formulation and could cause midazolam to precipitate. (Tr. (Wermeling) 252; Tr. (Smyth) 636–37, 648–49; DTX-2294 at 41818.)

237. Thus, the POSA would not have been motivated to add mPEG and water to a formulation with midazolam base. (Tr. (Smyth) 636–37, 648–49.)

**4. mPEG Was Not Interchangeable with PEG**

238. PEG and mPEG were not known to be interchangeable in the art as of the priority date. (Tr. (Smyth) 596–607.)

239. Because PEG and mPEG have different chemical structures, they also have different physical and chemical properties such as melting point, freezing point, viscosity, and chemical reactivity. (Tr. (Smyth) 594–95, 597; Tr. (Lusty) 325.)

240. As a result, they also had different pharmaceutical uses prior to 2007. (Tr. (Smyth) 597–98; DTX-2022 at 36043–44; DTX-2078 at 36778–81.)

241. Before 2007, PEG had been used as a solubilizer in a number of liquid formulations and had been used as an active ingredient in laxatives. (Tr. (Smyth) 597; DTX-2022 at 36044–45.)

242. Before 2007, mPEG had been used as a chemical intermediate, and in four topical products: one gel, one vaginal lubricant, and two bar soaps. (Tr. (Wermeling) 194–95, 223; Tr. (Smyth) 597–98, 617–18; DTX-2022 at 36044–45.) Of the four topical products, only the gel was FDA-approved. (Tr. (Smyth) 617–19; DTX-2583.)

243. The POSA would not have been able to predict the effect of substituting mPEG for PEG in an intranasal midazolam formulation. (Tr. (Smyth) 645–46, 650.)

244. Before 2007, PEG and mPEG were distinguished and treated differently in the art. (Tr. (Smyth) 594–95, 606–07; Tr. (Wermeling) 220–21; DTX-2022 at 36038.) PEG and mPEG have different CAS Registry Numbers. (Tr. (Wermeling) 210–11; Tr. (Smyth) 598; PTX-1090.0017; DTX-2583.) General pharmaceutical compendia used by formulators, such as the Handbook and USP 2006, distinguished between PEG and mPEG. (Tr. (Smyth) 603–06; Tr. (Wermeling) 237–38; DTX-2078 at 36778–86; PTX-1090.0017–22.)

245. Wermeling ’359 did not suggest that PEG is interchangeable with mPEG. It described PEG as a “polyhydroxy alcohol.” mPEG is not a polyhydroxy alcohol. (DTX-2022 at [0030]; Tr. (Wermeling) 264–65; Tr. (Smyth) 616–17.)

### L. Facts that (UCB says) are Relevant to Objective Indicia of Non-Obviousness

246. As of January 2007, the industry recognized a need for an ARS treatment that could be administered by non-medical personnel (i.e., a “rescue treatment” or an “at-home treatment”) and particularly recognized the need for an intranasal treatment for ARS. (Tr. (Klein) 425, 439–41; PTX-1109.0001; PTX-1197.0001; PTX-1366.0001; PTX-1148.0001.)

Case: 26-1992 Document: 24 Page: 122 Filed: 05/15/2026

247. As early as the 1960s, the industry recognized that ARS should be promptly treated because of the risks inherent to any seizure and because of the risk of status epilepticus. (Tr. (Klein) 425, 427; Tr. (Privitera) 837–38; PTX-1148.001.) Through the 1980s, the industry continued to recognize that ARS should be treated quickly with a medication that did not require administration by trained medical professionals. (Tr. (Klein) 428–29; PTX-1109.0001; PTX-1366.0003.)

248. Beginning as early as the 1990s, the industry recognized that intranasal benzodiazepines would be an advantageous ARS rescue medication. (Tr. (Wermeling) 202–03; Tr. (Klein) 438–40; PTX-1109.0001; PTX-1366.0003.)

249. In 1997, Diastat, a rectal gel formulation of diazepam, became the first FDA-approved rescue product for the treatment of ARS, and remained the only FDA-approved rescue product available prior to 2007. (Tr. (Klein) 425, 436; Tr. (Privitera) 843–44; DTX-2327 at 82761.) In order to administer Diastat, a caretaker was required to turn the patient on their side, lower their pants or skirt to bare their buttocks, separate the buttocks to access the rectum, insert and plunge the syringe, and close the buttocks together to prevent leakage. (Tr. (Wermeling) 119; Tr. (Klein) 436–38.) Caregivers and most patients, especially older children and adults, found administration of Diastat embarrassing and socially unacceptable and therefore were reluctant to use it. (Tr. (Wermeling) 119; Tr. (Klein) 436–41, 449–50, 452–53; Tr. (Privitera) 844–45; PTX-1109.0001; PTX-1366.0001–03; PTX-1183.0005.)

250. Prior to 2007, some patients were prescribed off-label uses of benzodiazepines, such as oral lorazepam, or intranasal administration of an intravenous midazolam formulation. (Tr. (Wermeling) 120–21; Tr. (Klein) 425–26, 441.)

251. Orally administered benzodiazepines (including buccal and sublingual formulations) were not ideal as at-home rescue treatments for ARS, at least because of limitations in their route of administration and their time to peak plasma levels. (Tr. (Klein) 425–26, 430–31, 493, 511, Tr. (Privitera) 785, 840–42; PTX-1194.0001; PTX-1197.0001; DTX-2536 at 85198.) Oral medications require the patient's cooperation for administration and therefore cannot be administered while a patient is actively seizing or in a postictal state in which a patient experiences unconsciousness or substantial cognitive impairment. (Tr. (Klein) 430–32, 511; Tr. (Privitera) 785, 842; PTX-1194.0001.) If oral medication is administered to the patient during a seizure or postictal state, there is a risk the medication will be inhaled. (Tr. (Klein) 430–32; Tr. (Privitera) 785; DTX-2549 at 671797; PTX-1194.0001.) Orally administered drugs, including benzodiazepines, are absorbed more slowly than other routes of administration. (Tr. (Klein) 430–32; Tr. (Privitera) 785; DTX-2549 at 671797; PTX-1194.0001.) Orally administered lorazepam may not reach peak plasma levels for up to three hours following administration. (Tr. (Klein) 430–31; Tr. (Privitera) 795–96; DTX-2356 at 85203.)

252. Intranasal administration of the IV midazolam formulation was known since the 1980s but it had drawbacks. (Tr. (Klein) 441–46, 451–52; PTX-1369.0013–15; DTX-2326 at 82755; DTX-2251 at 39993.) The IV midazolam formulation was not convenient for intranasal administration. (Tr. (Wermeling) 120; Tr. (Klein) 441–46; DTX-2326 at 82755; DTX-2251 at 39993.) To administer intranasally, the IV midazolam formulation was administered either via a dropper or through an atomizer obtained from a compounding pharmacy. (Tr. (Wermeling) 82; Tr. (Privitera) 797, 835–36.) Intranasal administration of IV midazolam led to unpredictable absorption and unpredictable effectiveness. (Tr. (Klein) 441–42.) The IV midazolam solution has a concentration of 5 mg/mL midazolam, and therefore requires the administration of 1 mL solution

intranasally to achieve a therapeutic dose of midazolam. (Tr. (Wermeling) 119–20; Tr. (Klein) 441–42.) Administering 1mL of solution is too large for the nasal cavity, resulting in the formulation leaking out of the patient's nose or being swallowed and causing discomfort to the patient. (Tr. (Klein) 441–45; Tr. (Wermeling) 120; DTX-2326 at 82755; DTX-2251 at 39993.) If a patient were administered the IV midazolam solution intranasally during a seizure and inhaled the excess solution, it could cause pneumonia. (Tr. (Klein) 442–43.) The FDA concluded that intranasal administration of IV midazolam could lead to dosing errors. (Tr. (Klein) 448–50, PTX-1372.0012–14, .0060.) Intranasal administration of IV midazolam was not a widely used treatment for ARS prior to 2007. (Wermeling 83; Tr. (Klein) 443; Tr. (Privitera) 846.)

253. In 2008, the FDA granted fast-track status to Nayzilam. (Tr. (Klein) 448–49; Tr. (Picciolo-Lehrke) 730; Tr. (Privitera) 857; PTX-1372.0020.)

254. No new FDA-approved treatment options for ARS became available between 2007 and Nayzilam's approval in 2019. (Tr. (Klein) 426, 446–49; Tr. (Privitera) 850–51; PTX-1361.0005–6; PTX-1121.0002; PTX-1372.0002, .0013–14.) Nayzilam was the first FDA-approved intranasal benzodiazepine indicated for the treatment of ARS. (Tr. (Klein) 431, 472–75; Tr. (Privitera) 834.) Nayzilam provided a safe and effective rescue treatment for ARS that patients or their caregivers could administer. (Tr. (Klein) 422–23, 474–75; DTX-2515 at 95437.) Nayzilam is the best rescue treatment option for many patients with ARS, particularly patients whose second seizure follows soon after the first. (Tr. (Klein) 433–34, 478–79; Tr. (Privitera) 834–35, 837.) Valtoco was approved in 2020. (Tr. (Klein) 478, 480.)

255. Nayzilam has received some recognition and praise in the industry. (Tr. (Klein) 480–82; Tr. (Smyth) 679–82.) Dr. Jacqueline French—a well-respected epileptologist, past president of the American Epilepsy Society, chief medical and innovation officer of the Epilepsy

Foundation of American, and professor of neurology at NYU Langhorne Health—praised Nayzilam, describing it as a "game changer" based on its formulation and intranasal method of delivery. (PTX-1364.0045; Tr. (Klein) 480–81; Tr. (Privitera) 854–55.) Prior to this litigation, Cipla publicly praised Nayzilam. (Tr. (Klein) 481–82.) Cipla recognized that Nayzilam "resulted in rapid and sustained seizure control in patients with [seizure clusters]," that Nayzilam "had an acceptable safety profile," and that Nayzilam could "potentially provide a solution for the critical unmet clinical need of acute treatment of [ARS] in an outpatient setting." (PTX-1183.0007.)

256. Beginning in 2018, Cipla spent three years attempting to design around the Nayzilam composition by developing and testing intranasal midazolam formulations without mPEG. (PTX-1210; Tr. (Mittal) 547–48; Tr. (Smyth) 667–79; D.I. 139, Ex. 1 ¶¶ 31, 80.) Cipla tried dozens of different formulations as an alternative to Nayzilam's formulation, using at least 25 different excipients. (PTX-1211; PTX-1216.0004–05; PTX-1031.0001–03; PTX-1032.0001–02; Tr. (Gandhi) 538; Tr. (Smyth) 667–72.) Ultimately, Cipla did not seek FDA approval of any formulation that did not include mPEG. (Tr. (Smyth) 667–68, 670–72, 677, 679.) This was at least partially because an intranasal midazolam formulation without mPEG would have required the inclusion of hydrochloric acid, which would have resulted in conversion of some of the midazolam into the salt form and would have prevented Cipla from using the ANDA (generic) pathway for FDA approval. (Tr. (Ghandi) 541–43; Tr. (Smyth) 674–75.)

257. Between 2007 and 2019, the patents-in-suit were licensed by four companies. (Tr. (Smyth) 657.) These include ITI, Upsher-Smith Laboratories, Proximagen, LLC, and UCB. (Tr. (Smyth) 657–61; DTX-2417 at NAYZILAM_00033958–78 (September 12, 2007 Exclusive Patent License Agreement between Hananja and ITI); DTX-2416 (June 21, 2010 Exclusive License Agreement between Ikano (f/k/a ITI) and USL); DTX-2414 at NAYZILAM_00033807 (reflecting

2017 assignment of license from USL to Proximagen); DTX-2409 (April 18, 2018 Asset Purchase Agreement between UCB and Proximagen); DTX-2415 (April 18, 2018 License and Asset Purchase Agreement between Ikano (f/k/a ITI) and UCB).) As of 2006, ITI had rights to other intranasal benzodiazepine formulations, including the Wermeling Formulation and the ITI Intranasal Lorazepam formulation, both of which were in clinical studies for the treatment of seizures. (Tr. (Wermeling) 208; Tr. (Smyth) 662–63.)

258. UCB sought to acquire an ARS rescue medication that was an alternative to Diastat. (Tr. (Picciolo-Lehrke) 726–27.) UCB valued Nayzilam over Valtoco because Nayzilam was the better choice for ARS patients as demonstrated by its superior pharmacokinetic profile, including its faster onset of action and recovery time. (Tr. (Picciolo-Lehrke) 724.) UCB would have purchased the rights to Nayzilam even if Nayzilam was second to market. (Tr. (Picciolo-Lehrke) 756–57.)

## III. FINDINGS OF FACT REGARDING ANTICIPATION

Anticipation is a question of fact. Cipla contends that the asserted claims are anticipated[8] by Wermeling '359 "because it expressly discloses intranasal midazolam formulations comprising PEG-400, propylene glycol, and water, and because a POSA would have understood the disclosure of 'polyethylene glycol' to include mPEG-350." (D.I. 172, Cipla's Post-Trial Br., at 3.)[9] UCB responds that Wermeling '359 does not expressly or inherently disclose mPEG, and that even if it did, Wermeling '359 does not disclose the combination of elements as arranged in the claims. (D.I. 170, UCB's Post-Trial Br., at 5, 8.) I agree with UCB.

---

[8] *See* n.77, *supra*.

[9] Cipla's Reply Brief did not respond to UCB's arguments as to why the asserted claims were not anticipated. Cipla's Reply Brief did not substantively address anticipation at all.

As discussed above, the Court finds that Wermeling '359 does not disclose mPEG or mPEG-350, either expressly or inherently. Because Cipla has failed to prove by clear and convincing evidence that Wermeling '359 discloses mPEG or mPEG-350, Cipla has not established that the asserted claims are invalid as anticipated.

## IV. CONCLUSIONS OF LAW REGARDING OBVIOUSNESS

Obviousness is a question of law. Cipla contends that the asserted claims are obvious based on the combination of Wermeling '359 and Carbowax. Cipla asserts that the POSA would have been motivated to reduce the viscosity of the Wermeling Formulation (as described in Wermeling '359) and would have tried including the excipient mPEG-350 (as described in Carbowax) in the formulation. Cipla also asserts that the POSA would have been motivated to substitute propylene glycol in the Wermeling Formulation with mPEG-350 and water to improve tolerability. And Cipla contends that the POSA would have had a reasonable expectation of success. I disagree with Cipla.

"In this case, the patent claims a new composition or formulation to deliver an FDA-approved active ingredient. Thus, the claimed invention is not obvious if a person of ordinary skill would not select and combine the prior art references to reach the claimed composition or formulation." *Unigene Lab'ys, Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed Cir. 2011) (citation omitted).

The Court finds that the POSA would not have been motivated to select mPEG, or mPEG-350 specifically, as described in Carbowax, as an excipient for use in an intranasal formulation of midazolam. There was no suggestion in Carbowax or elsewhere in the art that mPEG would be useful or suitable as an excipient in an intranasal formulation. Cipla's contention otherwise is pure hindsight.

In reaching this conclusion, I reject Cipla's specific assertion that the POSA would have been motivated to modify the formulation disclosed in Wermeling '359 by using the mPEG disclosed in Carbowax in order to (1) reduce the viscosity of the Wermeling Formulation so that it could be delivered through a standard device, and (2) improve tolerability. Even if the Court thought Cipla had proven that the POSA would have been motivated to modify the Wermeling Formulation in the ways that Cipla says (and the Court does not think that has been proven), the Court is wholly unpersuaded that mPEG (as described in Carbowax) would have been an obvious choice, given that its suitability for any nasal formulation was unknown and there was little to no information in the art suggesting that mPEG or mPEG-350 would help a POSA achieve a lower viscosity intranasal formulation or that a formulation containing mPEG would be suitable for administration with a standard device.[10]

Nor has Cipla established by clear and convincing evidence that a POSA would have had a reasonable expectation of success in using mPEG, or specifically mPEG-350, in an intranasal midazolam formulation. Again, mPEG had never been used in an intranasal formulation before.

[10] In support of its obviousness argument, Cipla cites *Almirall, LLC v. Amneal Pharmaceuticals LLC*, 28 F.4th 265, 271, 273–76 (Fed Cir. 2022). (D.I. 172 at 11.) In *Almirall*, the Federal Circuit affirmed the PTAB's holding that claims directed to a topical dapsone composition using a certain gelling agent were invalid as obvious because it was "simply a case of substituting one known gelling agent for another" and the agents "were known for use in topical compositions with water insoluble drugs." *Almirall*, 28 F.4th at 273–74. *Almirall* is inapposite because the Court has found that PEG and mPEG are not interchangeable and mPEG was not known for use in intranasal formulations.

Cipla also relies on *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1365–67 (Fed. Cir. 2007). (D.I. 172 at 12–13.) That case held that it was obvious to make a tablet containing a particular salt form of a known active ingredient by employing an FDA-approved anion known to be useful for making a pharmaceutically acceptable salt, where the POSA would have expected success with that particular anion due to its known chemical characteristics. *Id. Pfizer* is distinguishable from the situation here for many reasons, including because the FDA had never approved a nasal formulation containing mPEG, and because a POSA would not have reasonably expected success in using mPEG in a nasal formulation.

It had been available since the 1940s yet had only been used in one FDA-approved product—a topical gel. As of the priority date, it was not reasonably known whether midazolam would be sufficiently soluble in mPEG, or mPEG-350 specifically, or that using mPEG in an intranasal midazolam formulation would be stable, safe, sprayable, and tolerable. And, although Cipla asserts that the POSA would have been motivated to use mPEG in order to arrive at a midazolam formulation that could be administered using a standard nasal spraying device, the Court finds that the POSA would not have had a reasonable expectation that the inclusion of mPEG would achieve that result.

The parties spill a lot of ink discussing the import of evidence that they contend is (or isn't) relevant to secondary considerations of non-obviousness. The law requires the Court to consider that evidence, and I have. Even assuming that there is a nexus between the asserted claims and the FDA-approved Nayzilam product, the evidence offered for secondary considerations isn't particularly probative of non-obviousness under the circumstances here.[11] And that evidence certainly doesn't help Cipla meet its burden to prove by clear and convincing evidence that the asserted claims are obvious.

Cipla has not established by clear and convincing evidence that the asserted claims are invalid for obviousness.

---

[11] For example, UCB argues that Cipla's decision to "copy" the claimed formulation after it tried to design around supports a conclusion of non-obviousness. The Court does not find that evidence particularly probative of non-obviousness where, as here, Cipla copied because potential alternative formulations would have taken it off the generic pathway for FDA approval.

The Court also recognizes that there is significant evidence of a long-felt need for an FDA-approved, commercially available nasal formulation of midazolam, but the Court gives limited weight to that fact for purposes of its non-obviousness determination. The evidence at trial revealed that there were multiple publications describing intranasal midazolam formulations before the priority date. And there are lots of business and financial reasons why a pharmaceutical company may or may not choose to further develop a particular project or pursue FDA approval for a particular formulation.

## V. CONCLUSION

For the reasons above, the Court concludes that Cipla has failed to prove that the asserted claims are invalid.

The parties are ordered to meet and confer and submit a proposed final judgment consistent with this Memorandum Opinion on or before May 22, 2026.

The parties filed their post-trial briefs under seal. Accordingly, I'm issuing this Memorandum Opinion under seal in the unlikely event that it discusses any evidence that was admitted at trial under seal. To the extent that either side seeks to have any portion of this Memorandum Opinion redacted, the parties shall jointly submit a proposed redacted version no later than May 18, 2026, for review by the undersigned, along with a motion supported by a declaration that includes a detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). The Court intends to issue a public version of this Memorandum Opinion no later than May 19, 2026.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UCB INC., UCB BIOPHARMA SRL, HANANJA EHF and UNIVERSITY OF ICELAND, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 21-1229 (JLH) |
| CIPLA LIMITED and CIPLA USA INC., | ) | |
| Defendants. | ) | |

**~~[PROPOSED]~~ FINAL JUDGMENT**

This action, having been tried before the Court from October 2–5, 2023, Honorable Jennifer L. Hall presiding, the evidence and testimony of witnesses of each side having been heard and a decision having been rendered;

IT IS HEREBY ORDERED AND ADJUDGED this 27th day of May 2026, for the reasons set forth in the May 15, 2026 Opinion (D.I. 199), that:

1. Judgment is entered in favor of Plaintiffs UCB Inc., UCB BioPharma SRL, Hananja EHF, and the University of Iceland, and against Defendants Cipla Limited and Cipla USA Inc. (together, "Cipla") on Plaintiffs' claim that Cipla's filing of Abbreviated New Drug Application No. 216048 ("Cipla's ANDA") infringed Claim 13 of the '033 Patent and Claim 10 of the '322 Patent and that the commercial manufacture, use, sale or offer for sale in the United States, or importation into the United States, of the product that is the subject of Cipla's ANDA ("Cipla's ANDA Product") would infringe Claim 13 of the '033 Patent and Claim 10 of the '322 Patent.

2. Judgment is entered in favor of Plaintiffs and against Cipla on Cipla's counterclaims for invalidity of Claim 13 of the '033 Patent and Claim 10 of the '322 Patent.

3. Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any final approval by the Food and Drug Administration of Cipla's ANDA No. 216048 shall be a date that is not earlier than the date of expiration of the '033 Patent and the '322 Patent, and any additional periods of exclusivity to which Plaintiffs have or may become entitled.

4. Pursuant to 35 U.S.C. § 271(e)(4)(B), Cipla and each of its officers, agents, servants, employees, successors, and attorneys, and all persons and entities acting in concert or participation with them, are enjoined, until the expiration of the '033 Patent and the '322 Patent from commercially manufacturing, using, selling or offering for sale in the United States, or importing into the United States, Cipla's ANDA Product.

* * *

Any motion for attorneys' fees and/or costs, including but not limited to any motion that this case is exceptional under 35 U.S.C. § 285, or a bill of costs pursuant to D. Del. LR 54.1, shall be considered timely if filed and served within thirty (30) days after the issuance of a mandate from the Federal Circuit, if any appeal is filed, or the time for appeal to the Federal Circuit expires, if no appeal is filed. Any oppositions to any such motion shall be considered timely if filed and served within thirty (30) days after the motion is filed.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Megan E. Dellinger*

Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Plaintiffs UCB Inc., UCB Biopharma SRL, Hananja EHF, and University of Iceland*

May 22, 2026

MORRIS JAMES LLP

*/s/ Kenneth L. Dorsney*

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants Cipla Limited and Cipla USA Inc.*

SO ORDERED this 27th day of May, 2026.

The Honorable Jennifer L. Hall
United States District Court Judge

U 8147298

THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

August 25, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,809,322*
ISSUE DATE: *August 19, 2014*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer

JOINT EXHIBIT
JTX-3003
UCB v. Cipla (21-1229-JLH)

NAYZILAM_00002083

JTX-3003.0001

US008809322B2

(12) **United States Patent**
**Gizurarson**

(10) **Patent No.: US 8,809,322 B2**
(45) **Date of Patent: *Aug. 19, 2014**

(54) **METHODS AND COMPOSITIONS FOR THE DELIVERY OF A THERAPEUTIC AGENT**

(75) Inventor: **Sveinbjorn Gizurarson**, Reykjavik (IS)

(73) Assignees: **Hananja EHF**, Reykjavik (IS); **University of Iceland**, Reykjavik (IS)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/446,284**

(22) Filed: **Apr. 13, 2012**

(65) **Prior Publication Data**

US 2012/0264745 A1 Oct. 18, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/016,724, filed on Jan. 18, 2008, now abandoned.

(30) **Foreign Application Priority Data**

Jan. 19, 2007 (IS) .................................... 85932007

(51) **Int. Cl.**
*A61K 31/55* (2006.01)

(52) **U.S. Cl.**
USPC .......................................................... 514/220

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,812,853 | A | 5/1974 | Crain |
| 4,153,689 | A | 5/1979 | Hirai et al. |
| 4,464,378 | A | 8/1984 | Hussain |
| 4,673,679 | A | 6/1987 | Aungst et al. |
| 4,782,047 | A | 11/1988 | Benjamin et al. |
| 4,863,720 | A | 9/1989 | Burghart et al. |
| 4,889,860 | A | 12/1989 | Rzeszotarski et al. |
| 4,946,069 | A | 8/1990 | Fuchs |
| 4,950,664 | A | 8/1990 | Goldberg |
| 4,973,596 | A | 11/1990 | Cohen |
| 5,132,114 | A | 7/1992 | Stanley et al. |
| 5,166,202 | A | 11/1992 | Schweizer |
| 5,169,029 | A | 12/1992 | Behar et al. |
| 5,225,183 | A | 7/1993 | Purewal et al. |
| 5,307,953 | A | 5/1994 | Regan |
| 5,369,095 | A | 11/1994 | Kee et al. |
| 5,393,773 | A | 2/1995 | Craig et al. |
| 5,397,771 | A | 3/1995 | Bechgaard et al. |
| 5,428,006 | A | 6/1995 | Bechgaard et al. |
| 5,457,100 | A | 10/1995 | Daniel |
| 5,474,759 | A | 12/1995 | Fassberg et al. |
| 5,529,787 | A | 6/1996 | Merrill et al. |
| 5,543,434 | A | 8/1996 | Weg |
| 5,554,639 | A | 9/1996 | Craig et al. |
| 5,577,497 | A | 11/1996 | Mecikalski et al. |
| 5,622,166 | A | 4/1997 | Eisele et al. |
| 5,629,011 | A | 5/1997 | Illum |
| 5,637,314 | A | 6/1997 | Sharpe et al. |
| 5,683,677 | A | 11/1997 | Purewal et al. |
| 5,693,608 | A | 12/1997 | Bechgaard et al. |
| 5,695,743 | A | 12/1997 | Purewal et al. |
| 5,702,725 | A | 12/1997 | Merrill et al. |
| 5,705,520 | A | 1/1998 | Craig et al. |
| 5,766,573 | A | 6/1998 | Purewal et al. |
| 5,789,375 | A | 8/1998 | Mukae et al. |
| 5,855,907 | A | 1/1999 | Peyman |
| 5,866,143 | A | 2/1999 | Elkhoury |
| 5,897,858 | A | 4/1999 | Haslwanter et al. |
| 5,948,389 | A | 9/1999 | Stein |
| 5,958,379 | A | 9/1999 | Regenold et al. |
| 6,007,834 | A | 12/1999 | Merkus |
| 6,013,632 | A | 1/2000 | Jones et al. |
| 6,015,797 | A | 1/2000 | Camborde et al. |
| 6,017,963 | A | 1/2000 | Alfonso et al. |
| RE36,744 | E | 6/2000 | Goldberg |
| 6,110,486 | A | 8/2000 | Dugger, III |
| 6,193,984 | B1 | 2/2001 | Ghiasi et al. |
| 6,193,985 | B1 | 2/2001 | Sonne |
| 6,228,383 | B1 | 5/2001 | Hansen et al. |
| 6,234,366 | B1 | 5/2001 | Fuchs |
| 6,255,502 | B1 | 7/2001 | Penkler et al. |
| 6,274,635 | B1 | 8/2001 | Travis |
| 6,274,653 | B1 | 8/2001 | Hecht et al. |
| 6,514,482 | B1 | 2/2003 | Bartus et al. |
| 6,528,465 | B1 | 3/2003 | Cantoro |
| 6,565,832 | B1 | 5/2003 | Haslwanter et al. |
| 6,565,841 | B1 | 5/2003 | Niven et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2582374 | 4/2006 |
| EP | 0519351 | 12/1992 |

(Continued)

OTHER PUBLICATIONS

Abrams et al., "Safety and Effectiveness of Intranasal Administration of Sedative Medications (ketamine, midazolam or sufentanil) for Urgent Brief Pediatric Dental Procedures," Anesth. Prog. 1993, 40(3): 63-6. (abstract only).
Aurora, "Development of Nasal Delivery Systems: A Review," Drug Delivery Tecynology, vol. 2 No. 7 (2002), pp. 1-8.
Bechgaard, E. et al., "Solubilization of Various Benzodiazepines for Intranasal Administration, A Pilot Study," Pharm Dev. Technol. (1997) 2(3): pp. 293-296.
Bhattacharya et al., Pediatr Neurol 2006, 34:355-359.
Bjorkman, S. et al., "Pharmacokinetics of Midazolam Given as an Intranasal Spray to Adult Surgical Patients," Br. J. Anaesth. (1997) 79(5): pp. 575-580.
Burstein et al., "Intranasal Midazolam Plasma Concentration Profile and Its Effect on Anxiety Associate With Dental Procedures," Anesth. Prog. (1996) 43: pp. 52-57.
Burstein et al., "Pharmacokinetics and Pharmacodynamics of Midazolam After Intranasal Administration," J. Clin. Pharmacol. (1997) 37: pp. 711-718.

(Continued)

*Primary Examiner* — Craig Ricci
(74) *Attorney, Agent, or Firm* — Kagan Binder, PLLC

(57) **ABSTRACT**

The present invention provides a liquid pharmaceutical composition comprising a therapeutic agent and an alkoxy-polyethylene glycol, for example, methoxy-polyethylene glycol, for administration of the therapeutic agent to the mammal. The compositions can be applied to a membrane, for example, a nasal membrane during intranasal administration. The invention also provides methods of administering such compositions to a mammal.

**10 Claims, No Drawings**

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,608,073 | B1 | 8/2003 | Hussain et al. |
| 6,610,271 | B2 | 8/2003 | Wermeling |
| 6,613,308 | B2 | 9/2003 | Bartus et al. |
| 6,627,211 | B1 | 9/2003 | Choi et al. |
| 6,737,043 | B2 | 5/2004 | Rabinowitz et al. |
| 6,805,853 | B2 | 10/2004 | Rabinowitz et al. |
| 6,936,605 | B2 | 8/2005 | March |
| 6,977,070 | B2 | 12/2005 | Dugger, III |
| 6,979,437 | B2 | 12/2005 | Bartus et al. |
| 7,018,619 | B2 | 3/2006 | Rabinowitz et al. |
| 7,045,119 | B2 | 5/2006 | Rabinowitz et al. |
| 7,060,255 | B2 | 6/2006 | Rabinowitz et al. |
| 7,070,765 | B2 | 7/2006 | Rabinowitz et al. |
| 7,087,218 | B2 | 8/2006 | Rabinowitz et al. |
| 7,090,830 | B2 | 8/2006 | Hale et al. |
| 7,132,112 | B2 | 11/2006 | Choi et al. |
| 7,449,173 | B2 | 11/2008 | Rabinowitz et al. |
| 7,470,421 | B2 | 12/2008 | Rabinowitz et al. |
| 7,645,442 | B2 | 1/2010 | Hale et al. |
| 7,700,588 | B2 | 4/2010 | Merkus |
| 2002/0037319 | A1 | 3/2002 | Drizen et al. |
| 2003/0012738 | A1 | 1/2003 | Rabinowitz et al. |
| 2003/0077300 | A1 | 4/2003 | Wermeling |
| 2003/0134811 | A1 | 7/2003 | Jackson et al. |
| 2003/0163099 | A1 | 8/2003 | Wermeling et al. |
| 2003/0171439 | A1 | 9/2003 | Lawyer et al. |
| 2003/0175354 | A1 | 9/2003 | Drizen et al. |
| 2003/0206867 | A1 | 11/2003 | Wermeling |
| 2004/0115133 | A1 | 6/2004 | Wermeling |
| 2004/0146359 | A1 | 7/2004 | Doolaege |
| 2004/0166158 | A1 | 8/2004 | Davis et al. |
| 2004/0185003 | A1 | 9/2004 | Rabinowitz et al. |
| 2005/0137164 | A1 | 6/2005 | Arkin et al. |
| 2005/0153956 | A1 | 7/2005 | Merkus et al. |
| 2005/0244517 | A1 | 11/2005 | Hall et al. |
| 2006/0110415 | A1 | 5/2006 | Gupta |
| 2006/0116350 | A1 | 6/2006 | Pasricha et al. |
| 2006/0147386 | A1 | 7/2006 | Wermeling |
| 2006/0167064 | A1 | 7/2006 | Seth |
| 2006/0198896 | A1 | 9/2006 | Liversidge et al. |
| 2006/0210614 | A1 | 9/2006 | Quay et al. |
| 2007/0208011 | A1 | 9/2007 | Cloyd et al. |
| 2007/0212307 | A1 | 9/2007 | Wermeling et al. |
| 2008/0070904 | A1 | 3/2008 | Jamieson et al. |
| 2008/0138383 | A1 | 6/2008 | Bortz et al. |
| 2008/0279784 | A1 | 11/2008 | Cartt et al. |
| 2009/0088421 | A1 | 4/2009 | Orr |
| 2009/0130216 | A1 | 5/2009 | Cartt et al. |
| 2009/0227568 | A1 | 9/2009 | Gizurarson |
| 2009/0233912 | A1 | 9/2009 | Castile et al. |
| 2009/0304801 | A1 | 12/2009 | Liversidge et al. |
| 2009/0318502 | A1 | 12/2009 | Plucinski et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0698388 | 2/1996 |
| EP | 1703896 | 9/2006 |
| JP | 2003-507514 | 2/2003 |
| JP | 2004-203795 | 7/2004 |
| JP | 2005-531570 | 10/2005 |
| WO | 8705210 | 9/1987 |
| WO | 9002737 | 3/1990 |
| WO | 9501414 | 1/1995 |
| WO | 9800152 | 1/1998 |
| WO | 9921908 | 5/1999 |
| WO | 01/12718 | 2/2001 |
| WO | 0106987 | 2/2001 |
| WO | 0112230 | 2/2001 |
| WO | 0112718 | 2/2001 |
| WO | 0211778 | 2/2002 |
| WO | 02089751 | 11/2002 |
| WO | 03/099264 | 12/2003 |
| WO | 03101494 | 12/2003 |
| WO | 2004082589 | 9/2004 |
| WO | 2005020906 | 3/2005 |
| WO | 2005/044199 | 5/2005 |
| WO | 2005067893 | 7/2005 |
| WO | 2005072826 | 8/2005 |
| WO | 2006119803 | 11/2006 |
| WO | 2007032962 | 3/2007 |
| WO | 2007067761 | 6/2007 |
| WO | 2007109141 | 9/2007 |
| WO | 2007111933 | 10/2007 |
| WO | 2008063634 | 5/2008 |
| WO | 2009053741 | 4/2009 |

OTHER PUBLICATIONS

Carbowax MPEG 350 & 350E Kinematic Viscosity Report, Dow Chemical Company (1 page).

Carbowax MPEG 500E & 550 Kinematic Viscosity Report, Dow Chemical Company (1 page).

Coda, B.A. et al., "Pharmacokinetics and Bioavailability of Single Dose Intranasal Hydromorphone Hydrochloride in Healthy Volunteers," Anesth. Analg. (2003) 97: pp. 117-123.

Constantino et al., International Journal of Pharmaceutics, 2007, vol. 337, pp. 1-24.

Crankshaw et al., "The Effect of Solvents on the Potency of Chloridiazepoxide, Diazepam, Medazepam and Nitrazepam," J. Pharm Pharmc. (1971) 23: pp. 313-321.

Dale et al., "Intranasal Midazolam: A Comparison of Two Delivery Devices in Human Volunteers," J. Pharm. Pharmacol. 2006, 58(1): 1311-8 (abstract only).

Dallman et al., "Comparing the Safety, Efficacy and Recovery of Intranasal Midazolam vs. Oral Chloral Hydrate and Promethazine," Pediatr Dent. 2001, 23(5): 424-30 (abstract only).

de Haan et al, Epilepsia, 51 (13): 478-482.

European Patent Office Supplementary Partial European Search Report; European Application No. EP05725332, completed Nov. 9, 2007 (4 pages).

Excerpts from the Handbook of Pharmaceutical Excipients (R.C. Rowe, O.J. Sheskey & S.C. Owen, eds., PhP Pharmaceutical Press, 5th ed. 2006).

Fisgin et al., J. Child Neurol. 2000, 833-835.

Fisgin et al., Journ. of Child Neurology, 17(2): 123-126.

Fuks et al., "Assessment of Two Doses of Intranasal Midazolam for Sedation of Young Pediatric Dental Patients," Pediatr Dent 1994, 16(4): 301-5 (abstract only).

Gilchrist et al., "The Use of Intranasal Midazolam in the Treatment of Pediatric Dental Patients," Anaesthesia, 2007, 62(12): 1262-5 (abstract only).

Greenblatt, D. et al., "Pharmacokinetics and Pharmacodymanics of Single-dose Triazolam: Electroencephalography Compared with Digital Symbol Substitution Test," Br. J. Clin. Pharmacol. (2005) 60: pp. 244-248.

Gudmundsdottir et al., "Intranasal Administration of Midazolam in a Cyclodextrin Based Formulation: Bioavability and Clinical Evaluation in Humans," Pharmazie 2001, 56(12): pp. 963-966 (abstract only).

Harboard et al., J Pediatr. Child Health, 2004, 40:556-558.

Harris et al., "Effect of Viscosity on the Pharmacokinetics and Biological Response to Intranasal Desmopressin," Journal of Pharmaceutical Sciences, vol. 78 (1989(, pp. 470-471.

Hjortkjaer, R.K. et al., "Single-and Repeated-dose Local Toxicity in the Nasal Cavity of Rabbits After Intranasal Administration of Difference Glycols for Formulations Containing Benzodiazepines," H. Pharm. Pharmacol. (1999) 51(4): pp. 377-383.

Holsti et al., Pediatric Emergency Care, 2007, 23(3): 148-153.

Ilum et al., "Nasal Clearance in Health and Disease," Journal of Aerosol Medicine, vol. 19 (2006), pp. 92-99.

Ivaturi et al., Acta Neurol Scand. 2009, 120:353-357.

Jeannet et al., Euro. Journ. of Pediatric Neurology, 1999, 3:73-77.

Kain, Z.N. et al., "Premedication in the United States: A Status Report," Anesth. Analg. (1997) 84: pp. 427-432.

Karabas et al., "Probing for Nasolacrimal Duct Obstruction Using Intranasal Midazolam Sedation as an Alternative to General Anesthesia," J. Pediatr. Ophthamol. Strabismuc., 2006; 43(2): 79-84 (abstract only).

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

(56) **References Cited**

OTHER PUBLICATIONS

Karst et al., "Auricular Acupuncture for Dental Anxiety: A Randomized Controlled Trial," Anesth. Analg., 2007, 104(2): 295-300 (abstract only).
Kaufman et al., "Comparison Between Intranasal and Intravenous Midazolam Sedation (with or without patient control) in a Dental Phobia Clinic," J. Oral Maxillofac. Surg., 1994, 52(8): 840-3, abstract only.
Kilian et al., "The Effect of Viscosity on an Absorption Enhancer on the Intra Nasal Absorption of Metoprolol in Rats," International Journal of Pharmaceutics, vol. 163 (1998), pp. 211-217.
Knoester, P.D. et al., "Pharmakokinetics and Pharmacodynamics of Midazolam Adminsitered as a Concentrated Intranasal Spray. A Study in Healthy Volunteers," Br. J. Clin. Pharmacol. (2002), 53(5), pp. 501-507.
Kupietzky et al., "Intranasal Midazolam Better at Effecting Amnesia After Sedation Than Oral Hydroxyzine: A Pilot Study," Pediatr Dent., 1996, 18(1): 32-4 (abstract only).
Kutlu et al., Brain & Develop., 2000, 22:359:361.
Kyrkou et al., Journ. of Intellect. & Develop. Disability, 2006, 31(3): 131-138.
Lacoste et al., "Intranasal Midazolam in Piglets: Pharmacodymanics (0.2 vs. 0.4 mg/kg) and Pharmacokinetics (0.4 mg/kg) with Bioavability Determination," Laboratory Animals (2000) 34, pp. 29-35.
Lahat, E. et al., "Comparison of intranasal Midazolam with Intravenous Diazepam in Treating Febrile Seizures in Children: Prospective Randomized Study," BMJ (2000), 321, pp. 83-86.
Lau, S.W.J. et al., "Absorption of Diazepam and Lorazepam Following Intranasal Administration," International Journal of Pharmaceutics (1989, 54, p. 1710174.
Lloyd et al., "Intranasal Midazolam as an Alternative to General Anaesthesia in the Management of Children with Oral and Maxillofacial Trauma," Br. J. Oral Maxillofac. Surg., 2000, 38(6): 593-595 (abstract only).
Loftsson et al., "Cyclodestrin Solubilization of Benzodiazepines: Formulation of Midazolam Nasal Spray," International Journal of Pharmaceutics (2001) 212: pp. 29-40.
Lui et al., "Intranasal Aborption of Flurazepam, Midazolam and Triazolam in Dogs," J. Pharm. Sci, 80: 1125-1129 (1991).
Mahmoudian et al., Epilepsy & Behavior, 2004, 5:253-255.
Mazaheri et al., "Assessment of Intranasal Midazolam Administration with a Dose of 0.5 mg/kg in Behavior Management of Uncooperative Children," J. Clin. Pediatr. Dent. 2008, 32(2): 95-0 (abstract only).
McIlwain et al., "Allergic Reaction to Intranasal Midazolam HCl: A Case Report," Pediatr Dent. 2004, 26(40: 359-61 (abstract only).
Methocel Cellulose Ethers Technical Handbook, Dow Chemical Company (32 pages).
Morimoto et al., "Nasal Absorption of Nifeipine from Gel Preparations in Rats," Chem. Pharm. Bull. (1987) 35, pp. 3041-3044.
O'Regan et al., Develop. Medicine & Child Neurology, 1996, 38: 1037-1045.
Patent Cooperation Treaty (PCT) International Search Report and Written Opinion: International Application No. PCT/US2008/051466, completed Dec. 1, 2008 and mailed Dec. 17, 2008 (11 pages.)
Patent Cooperation Treaty (PCT) International Search Report, International Application No. PCT/US2005/008090, completed Jun. 12, 2005 and mailed Jun. 30, 2005 (2 pages).
Pennington et al., "The Influence of Solution Viscosity on Nasal Spray Deposition and Clearance," International Journal of Pharmaceutics, vol. 43 (1988), pp. 221-224.
Rey et al., "Pharmacokinetics of Midazolam in Children: Comparative Study of Intranasal and Intravenous Administration," European Journal of Clinical Pharmacology (1991) 41: pp. 355-357.
Scheepers et al., "Midazolam Via the Intranasal Route: An Effective Rescue Medication for Severe Epilepsy in Adults with Learning Disability," Seizure, 1998, 7(6): 509-12 (abstract only).
Scheepers et al., Science, 2000, 9:417-422.
Suzuki et al., "Mucosal Drug Delivery Using Cellulose Derivatives as a Functional Polymer," Journal of Controlled Release, vol. 62 (1999), pp. 101-107.
The Dow Chemical Company (PEGs & MPEGs, Mar. 2006).
Vesal et al., "Clinical Evaluation of Intranasal Benzodiazepines, Alpha-Agonists and Their Antagonists in Canaries," Vet. Anaesth. Analg., 2006, 33(3): 143-8 (abstract only).
Walberg et at, "Plasma Concentrations of Midazolam in Children Following Intranasal Administration," Anesthesiology (1991) 74: pp. 233-235.
Weber et al., "Premedication with Nasal S-ketamine and Midazolam Provides Good Conditions for Induction of Anesthetic in Preschoool Children," Can. J. Anesth., (2003) 50: pp. 470-475.
Wermeling et al., "Bioavability and Pharmacokinetics of Lorazepam After Intranasal, Intravenous, and Intramuscular Administration," J. Clin. Pharmacol. (2001) 41: pp. 1225-1231.
Wermeling et al., "Pharmacokinetics and Pharmacodynamics of a New Intranasal Midazolam Formulation in Healthy Volunteers," International Anesthesia Research Society (2006) 103: pp. 344-349.
Wermeling et al., Epilepsy Research, 2009, 83:124-132.
Wilson et al., "Nasal/Buccal Midazolam Use in the Community," Arch. Dis. Child., 2004, 89(1), 50-1 (abstract only).
Wilton et al., Preanesthetic Sedation of Preschool Children Using Intranasal Midazolam Anesthesiology (1988) 69(6): pp. 972-975.

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

## METHODS AND COMPOSITIONS FOR THE DELIVERY OF A THERAPEUTIC AGENT

### RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/016,724, filed Jan. 18, 2008 and also claims the benefit of and priority to Icelandic patent application Ser. No. 8593/2007, filed Jan. 19, 2007, the entire disclosure of the above applications are incorporated by reference herein for all purposes.

### FIELD OF THE INVENTION

This invention relates generally to compositions for the delivery of a therapeutic agent and to related methods, and more particularly relates to compositions containing one or more alkoxy-polyethylene glycols for the delivery of a therapeutic agent and to related methods.

### BACKGROUND

The administration of a therapeutic agent by injection (e.g., intravenous, intramuscular or subcutaneous injection) typically is regarded as the most convenient way of administration when the purpose is to achieve a rapid and strong systemic effect, for example, within 3-10 minutes, when the agent is not absorbed by the gastrointestinal tract, or when the agent is inactivated in the gastrointestinal tract or by first-pass hepatic metabolism. However, administration by injection presents a range of disadvantages. For example, sterile syringes must be used and injections cannot be administered by untrained personnel. Furthermore, this mode of administration may cause pain and/or irritation, especially in the case of repeated injections at the same site.

Mucosal administration, such as, intranasal, buccal, sublingual, rectal and pulmonal administration, is receiving particular interest as it avoids many of the disadvantages of injecting a therapeutic agent while, at the same time, still providing a strong and rapid systemic effect. In order to be an attractive alternative to injection, mucosal administration, for example, intranasal administration, should neither cause significant pain, discomfort or irritation nor cause any irreversible damage to the mucosal surface. However, in the case of acute health threatening indications, a relatively high local irritation to the mucosa may be acceptable.

In mucosal administration, such as during nasal, buccal or rectal administration, the therapeutic agent should be applied to the mucosa in a vehicle that permits it to penetrate, or be absorbed through, the mucosa. In order to penetrate the mucus, the vehicle should be biocompatible with mucus and hence have a certain degree of hydrophilicity. However, the vehicle should preferably also possess lipophilic properties to dissolve a clinically relevant amount of the therapeutic agent of interest.

The extensive network of blood capillaries under the mucosal surface, especially in the nasal mucosa, is well suited to provide a rapid and effective systemic absorption of drugs, vaccines and biologicals. Moreover, the nasal epithelial membrane in effect contains a single layer of epithelial cells (pseudostratified epithelium) and, therefore, is more suited for drug administration than other mucosal surfaces having squamous epithelial layers, such as, the mouth and vagina.

It has been hypothesized that the usefulness of nasal administration can be limited if the therapeutic agent has limited solubility in water (Proctor, D. F. (1985) *Nasal Physiology in Intranasal Drug Administrations*, in Chien, Y. W.



(Ed.) Transnasal Systemic Medications, Fundamentals, Developmental Concepts and Biomedical Assessments, Elsevier Science Publishers, Amsterdam, pp. 101-105). As a result, this hypothesis, if correct, may limit the delivery of certain therapeutic agents that are sparingly soluble in water.

To facilitate delivery to the nasal cavity, an effective amount of the therapeutic agent should be dissolved in a small volume, for example, less than about 1000 μL, preferably less than 300 μL, and more preferably less than 150 μL. Larger volumes drain out anteriorly through the nostrils or posteriorly toward the pharynx where excess liquid is swallowed. As a result, if large volumes are administered, a portion of the therapeutic agent can be lost from the absorption site, and it can be difficult if not impossible to reproducibly administer the correct dose of the therapeutic agent.

A variety of delivery systems have been developed for the nasal administration of therapeutic agents. Lau and Slattery studied the absorption characteristics of diazepam and lorazepam following their intranasal administration for the treatment of epilepticus (Lau, S. W. J. & Slattery, J. T. (1989), *Absorption of Diazepam and Lorazepam Following Intranasal Administration*, Int. J. Pharm., 54, 171-174). In order to solubilize the therapeutic agent, a non-ionic surfactant—polyoxyethylated castor oil—was selected as the least irritating solvent of several solvents studied, including polyethylene glycol 400 (PEG 400). Diazepam absorption was 84% and 72%, respectively, in two adults measured over a period of 60 hours. However, the peak concentration was not observed until 1.4 hours after the nasal administration and was only about 27% with reference to intravenous administration, suggesting that most of the absorption had taken place after the test substance passed down to pharynx and swallowed. Similar results were obtained for lorazepam but with an even longer time to peak (2.3 hours). The authors concluded that the intranasal route of administration had limited potential for the acute treatment of epileptic seizures.

Wilton et al. attempted to administer midazolam to 45 children to achieve pre-anesthetic sedation (Wilton et al. (1988) *Preanaesthetic Sedation of Preschool Children Using Intranasal Midazolam*, Anesthesiology, 69, 972-975). However, the volumes used were impractical and exceeded the maximal volume required for efficient administration. This resulted in coughing and sneezing with expulsion of at least part of the dose.

Morimoto et al. studied a gel preparation for nasal application in rats of nifedipine containing the gelling agent carbopol (polyacrylic acid) in PEG 400, for achieving prolonged action and high bioavailability of the therapeutic agent (Morimoto et al. (1987) *Nasal Absorption of Nifedipine from Gel Preparations in Rats*, Chemical and Pharmaceutical Bulletins, 35, No. 7, 3041-3044). A mixture of equal amounts of carbopol and PEG 400 was preferred. It was shown that nasal application provided higher bioavailability of nifedipine than after peroral administration, but the peak plasma concentration was not observed until 30 minutes after administration.

Danish Patent Application No. 2586/87 discloses a pharmaceutical composition comprising an anti-inflammatory steroid, water, 2 to 10% (v/v) propylene glycol, 10 to 25% (v/v) PEG 400, and 1 to 4% (v/v) Tween 20.

U.S. Pat. No. 4,153,689 discloses a stable aqueous solution of insulin intended for intranasal administration. The solutions had a pH not more than 4.7, and contained from 0.1 to 20% by weight of a stabilizing agent including (a) one or more non-ionic surface active agents whose hydrophile-lipophile balance value was in the range of 9 to 22, and/or (b) polyethylene glycol whose molecular weight was in the range of from 200 to 7500. Exemplary non-ionic surface active

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

agents included polyoxyethylene fatty acid ester, a polyoxyethylene higher alcohol ether, a polyoxyethylene alkylphenyl ether, or a polyoxyethylene alkylphenyl ether, or a polyoxyethylene hydrogenated castor oil.

International Patent Publication No. DK-2075/90 discloses the nasal administration of therapeutic agents, for example, benzodiazepines, in compositions containing n-glycofurol, a derivative of polyethyleneglycol, for mucosal administration. The application discloses the nasal administration of therapeutic agents, for example, benzodiazepines, in formulations containing at least 30% n-ethyleneglycols ranging from 1-8 ethylene glycol, for example, polyethylene glycol 200 (PEG 200).

U.S. Pat. No. 5,693,608 discloses a method of administering a therapeutic agent via the nasal mucosa of a mammal, where the agent is dissolved or suspended in an n-ethyleneglycol containing vehicle where the n-ethyleneglycol is represented by the formula, $H(OCH_2CH_2)_pOH$, wherein p is a number from 1 to 8.

Notwithstanding, there is still a need for compositions deliverable through mucosal membranes that produce therapeutic plasma concentrations of the therapeutic agent as fast as or nearly as fast as by intravenous administration but without causing irritation and/or unacceptable damage to the mucosal membrane.

## SUMMARY OF THE INVENTION

The invention is based, in part, upon the discovery that the inclusion of one or more alkoxy-polyethylene glycols in a formulation provides certain advantages when the resulting composition is to be applied, for example, to a mucosal surface. For example, it has been discovered that when alkoxy-polyethylene glycol is used in such formulations, the therapeutic agent can be still be solubilized (which is especially useful for poorly soluble therapeutic agents) but the resulting formulations are less viscous and cause less irritation to mucosal membranes because the amount of other potentially viscous and irritable excipients, for example, polyethylene glycol or propylene glucol, can be reduced or eliminated altogether. As a result, the lower viscosity formulations, when converted into droplets, for example, by a nasal sprayer during intranasal delivery, can produce a spray pattern optimized for delivering the therapeutic agent to the mucosal membrane. In addition, formulations containing alkoxy-polyethylene glycols create less irritation (burning sensation) when applied to a mucosal surface, for example, a nasal membrane following nasal administration. In addition, when administered intranasally, the compositions of the invention minimize undesirable after taste (for example, a petroleum-like after taste) that can be associated with certain other excipients.

In one aspect, the invention provides a liquid pharmaceutical composition comprising a therapeutic agent and an alkoxy-polyethylene glycol represented by Formula I:

$$R—O—(CH_2CH_2O)_n—H \quad (I)$$

wherein,

R is methyl, ethyl, n-propyl, isopropyl, or cyclopropyl; and

n, which is the average number of oxyethylene repeating units, is a number in the range of from about 1 to about 25.

In another aspect, the invention provides a liquid formulation for solubilizing a poorly soluble therapeutic agent, for example, a poorly soluble organic therapeutic agent. The composition comprises a poorly soluble therapeutic agent and an alkoxy-polyethylene glycol represented by Formula I:

$$R—O—(CH_2CH_2O)_n—H \quad (I)$$

wherein,

R is $(C_1-C_6)$alkyl; and

n, which is the average number of oxyethylene repeating units, is a number in the range of from about 1 to about 25.

In another aspect, the invention provides methods of delivering a therapeutic agent of interest to a mammal, for example, a human, using an alkoxy-polyethylene glycol containing composition described herein. The composition is particularly useful when the composition is applied to a mucosal membrane, for example, a nasal membrane during intranasal drug delivery.

These and other aspects and advantages of the invention will become apparent upon consideration of the following detailed description and claims.

## DETAILED DESCRIPTION OF THE INVENTION

The invention is based, in part, upon the discovery that the inclusion of one or more alkoxy-polyethylene glycols into formulations provides certain advantages over other excipients when the formulations are applied, for example, to a mucosal surface, For example, it has been discovered that when an alkoxy-polyethylene glycol is used in such a formulation, the therapeutic agent (for example, a poorly soluble therapeutic agent) can be solubilized more easily and in larger amounts than when other excipients, for example, polyethylene glycol (more particularly PEG 400), are used. However, the resulting formulations are less viscous and cause less irritation to mucosal membranes as the amount of other viscous and irritable excipients can be reduced or eliminated altogether. As a result, the lower viscosity formulations, when converted into droplets, for example, by a nasal sprayer during intranasal delivery, produce a spray pattern optimized for delivering the therapeutic agent to the mucosal membrane. In addition, formulations containing one or more alkoxy-polyethylene glycols cause less irritation (for example, a burning sensation) when applied to a mucosal surface, for example, a nasal membrane during intranasal administration. In addition, when administered intranasally, the compositions of the invention have less undesirable after taste (for example, a petroleum-like after taste) than when other excipients, for example, propylene glycol, are used.

Under certain circumstances, the alkoxy-group also increases the bioadhesion of the composition to the site of administration on the mucosal surface thereby prolonging the duration of the composition at the site of administration. This can increase the amount of therapeutic agent that is ultimately absorbed.

I—Formulations

In one aspect, the invention provides a liquid pharmaceutical composition comprising a therapeutic agent and an alkoxy-polyethylene glycol represented by Formula I:

$$R—O—(CH_2CH_2O)_n—H \quad (I)$$

wherein,

R is methyl, ethyl, n-propyl, isopropyl, or cyclopropyl; and n is the average number of oxyethylene repeating units and is a number in the range of from about 1 to about 25.

In another aspect, the invention provides a liquid formulation for solubilizing a poorly soluble therapeutic agent. The liquid pharmaceutical composition comprises a poorly soluble therapeutic agent, for example, a poorly soluble organic therapeutic agent, and an alkoxy-polyethylene glycol represented by Formula I:

$$R—O—(CH_2CH_2O)_n—H \quad (I)$$

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

wherein,

R is $(C_1-C_6)$alkyl; and

n is the average number of oxyethylene repeating units and is a number in the range of from about 1 to about 25. The formulations typically are in liquid form at 20° C., 25° C., 30° C., 35° C., or 40° C. Certain formulations preferably are liquid formulations at 37° C.

The term "poorly soluble therapeutic agent" refers to a compound having biological activity and a solubility in water of less than about 1 mg/mL at pH 7 and 20° C. In certain embodiments, the poorly soluble therapeutic agent is an organic compound that has a molecular weight of less than 1500 g/mol, and preferably less than 500 g/mol. In certain embodiments, the poorly soluble therapeutic agent is a compound, for example, an organic compound, having an aqueous solubility of less than about 0.5 mg/mL, less than about 0.3 mg/mL, or less than about 0.1 mg/mL, at pH 7 and 20° C.

In addition, the term "alkyl" is art-recognized, and includes saturated aliphatic groups, including straight-chain alkyl groups, branched-chain alkyl groups, cycloalkyl(alicyclic) groups, alkyl substituted cycloalkyl groups, and cycloalkyl substituted alkyl groups. The term "$(C_1-C_6)$alkyl" refers to an alkyl group having between 1 and 6 carbon atoms. Representative alkyl groups include methyl, ethyl, n-propyl, isopropyl, n-butyl, sec-butyl, isobutyl, tert-butyl, pentyl, hexyl, cyclopropyl, cyclobutyl, cyclopropylmethylene, cyclopentyl, cyclobutylmethylene, cyclobutylethylene, cyclohexyl, cyclopropylpropylene, cyclobutylethylene, and cyclopentylmethylene. The term cyclopropylmethylene, for example, is art-recognized and refers to a radical having the following formula:



In certain embodiments, the alkoxy-polyethylene glycol can comprise from about 0.1% (v/v) to about 80% (v/v), or from about 0.5% (v/v) to about 70% (v/v), of the composition. In certain other embodiments, the alkoxy-polyethylene glycol can comprise from about 5% (v/v) to about 80% (v/v), or from about 30% (v/v) to about 75% (v/v) or from about 40% (vlv) to about 70% (v/v), of the composition. For certain hydrophilic drugs, the alkoxy-polyethylene glycol can comprise from about 0.1% (v/v) to about 80% (v/v), or from about 0.5% (v/v) to about 70% (vlv), or from about 1% (vlv) to about 60% of the composition. For certain lipophilic drugs, the alkoxy-polyethylene glycol can comprise from about 1% (v/v) to about 80% (v/v), or from about 2% (v/v) to about 65% (v/v), or from about 5% (v/v) to about 50% of the composition. Furthermore, the therapeutic agent can comprise from about 0.001% (w/v) to about 20% (w/v) of the composition, or from about 0.1% (w/v) to about 10% (w/v) of the composition.

The pharmaceutical composition can have a pH in the range of from about 4.5 to about 8.5, or from about 4.5 to about 7.5, or from about 4.5 to about 6.5, or from about 5.5 to about 8.5, or from about 6.5 to about 8.5, or from about 5.5 to about 7.5.

As discussed, one of the advantages of using an alkoxy-polyethylene glycol is that it can be used in place of or can be used to reduce the amount of other excipients, for example, certain polyethylene glycols and propylrnr glycol, so as to reduce the viscosity of the resulting formulation. By reducing the viscosity of the resulting formation it is possible to create sprays that have more uniform spray characteristics (for example, more uniform droplet sizes and/or plume geometries) for the intranasal administration of therapeutic agent. The resulting pharmaceutical composition at a temperature of 20° C. has a viscosity in the range of about 1.5 cP to about 60 cP, or from about 2 cP to about 50 cP, or from about 3 cP to about 40 cP, or from about 4 cP to about 30 cP, or from about 5 cP to about 25 cP.

Exemplary alkoxy-polyethylene glycols, therapeutic agents, and other excipients useful in creating compositions of the invention are described in the following sections.

A. Alkoxy-polyethylene Glycol

Useful alkoxy-polyethylene glycol excipients useful in the practice of the invention are represented by Formula (I):

$$R—O—(CH_2CH_2O)_n—H \qquad (I)$$

wherein, n, as the average number of oxyethylene repeating units, is a number in the range of from about 1 to about 25. Accordingly, n can be a number about 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, or 25. In certain embodiments, n is an number in the range of from about 2 to about 15, or from about 2 to about 14, or from about 2 to about 13, or from about 2 to about 12, or from about 2 to about 11, or from about 2 to about 10, or from about 3 to about 15, or from about 3 to about 14, or from about 3 to about 13, or from about 3 to about 12, or from about 3 to about 11, or from about 3 to about 10.

In certain embodiments, R is $(C_1-C_6)$alkyl. For example, as discussed above, R can be methyl, ethyl, n-propyl, isopropyl, n-butyl, sec-butyl, isobutyl, tent-butyl, pentyl, hexyl, cyclopropyl, cyclobutyl, cyclopropylmethylene, cyclopentyl, cyclobutylmethylene, cyclobutylethylene, cyclohexyl, cyclopropylpropylene, cyclobutylethylene, or cyclopentylmethylene. In certain embodiments, R is selected from the group consisting of methyl, ethyl, n-propyl, isopropyl, and cyclopropyl.

In a preferred embodiment, the alkoxy-polyethylene glycol is methoxy-polyethylene glycol where R is methyl and n is an number from about 1 to about 25, or from about 2 to about 12, or from about 3 to about 10.

Useful methoxy-polyethylene glycols include, for example, methoxy-diethyleneglyol (m2EG), methoxy-triethylene glycol (m3EG), methoxy-tetraethylene glycol (m4EG), methoxy-pentaethylene glycol (m5EG), methoxy-hexaethylene glycol (m6EG), methoxy-heptaethylene glycol (m7EG), methoxy-octaethylene glycol (m8EG), methoxy-nonaethylene glycol (m9EG), methoxy-decaethylene glycol (m10EG), methoxy-undecaethylene glycol (m11EG), methoxy-dodecaethylene glycol (m12EG), methoxy-tridecaethylene glycol (m13EG) and methoxy-tetradecaethylene glycol (m14EG). The ethylene glycols may be used in the form of the single compounds or as a mixture of two or more methoxy-n-ethylene glycols.

In certain embodiments, the alkoxy-polyethylene glycol is methoxy-polyethylene glycol 350 (mPEG 350) or is methoxy-polyethylene glycol 550 (mPEG 550) or is methoxy-polyethylene glycol 750 (mPEG 750). The term "mPEG 350" is understood to mean methoxy polyethylene glycol having an average molecular weight of about 350, and in certain embodiments "n," as denoted in Formula I, is 7.2. The term "mPEG550" is understood to mean methoxy polyethylene glycol having an average molecular weight of about 550, and in certain embodiments "n," as denoted in Formula I, is 11.8. The term "mPEG750" is understood to mean methoxy polyethylene glycol having an average molecular weight of about 750, and in certain embodiments "n," as denoted in Formula I, is 16.3.

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

Certain, preferred alkoxy-polyethylene glycols include Carbowax™ mPEG 350, Carbowax™ mPEG 550 or Carbowax™ mPEG 750, which are available commercially from Dow Chemical Company. Both mPEG350 and mPEG550 are colorless liquids that are miscible with water, alcohols, such as methanol, ethanol, n-propanol, glycerol and various oils in all proportions, and have a boiling point about 155° C. It is understood that alkoxy-polyethylene glycols are known by other names, where, for example, methoxy-polyethylene glycol is also known as mono-methyl polyethylene glycol and poly(ethylene glycol)methyl ether.

By using one or more of the alkoxy-polyethylene glycols described herein, the resulting pharmaceutical compositions can be optimized, for example, with respect to bioadhesion, viscosity and sprayability. For example, mPEG 350, at an equivalent concentration as PEG 200, can still solubilize a therapeutic agent but the resulting composition has a lower viscosity. As a result, this substitution has a surprisingly positive effect on the sprayability compared with lower molecular weight PEG 200, which is important where the formulation is to be sprayed.

B. Therapeutic Agent

The pharmaceutical composition of the invention may comprise one or more therapeutic agents (also referred to as biologically active substances) selected from the group consisting of hydrophobic therapeutic agents, hydrophilic therapeutic agents, and combinations thereof.

The alkoxy-polyethylene glycol excipients are surprisingly capable of solubilizing and delivering a wide variety of hydrophilic and hydrophobic therapeutic agents. The hydrophobic drugs have little or no water solubility. It is understood that the excipients described herein can be used to solubilize therapeutic agents that have a solubility in water of less than about 1.0 mg/mL, less than about 0.5 mg/mL, less than about 0.3 mg/mL, or less than about 0.1 mg/mL, or less than about 0.01 mg/mL, at pH 7 and 20° C. Such therapeutic agents can be any agents having therapeutic or other value when administered to a mammal, for example, a human, and can include organic molecules (for example, small molecule drugs having a molecular weight of less than 1,500 g/mol., or less than 500 g/mol.), proteins, peptides, immungens (e.g. vaccines, cytokines, etc.), nutrients, and cosmetics (cosmeceuticals).

In certain embodiments, the therapeutic agent is an analgesic agent, an anti-inflammatory agent, an anti-arrhythmic agent, an anti-asthma agent, an anti-bacterial agent, an anti-viral agent, an anti-coagulant, an anti-depressant, an anti-diabetic, an anti-epileptic, an anti-fungal agent, an anti-hypertensive agent, an anti-malarial, an anti-migraine agent, an anti-muscarinic agent, an anti-neoplastic agent, an immunosuppressant, an anti-protozoal agent, an anti-thyroid agent, an anxiolytic agent, a sedative, a hypnotic agent, a neuroleptic agent, a beta-Blocker, a cardiac inotropic agent, a corticosteroid, a diuretic agent, an anti-Parkinsonian agent, a gastrointestinal agent, an anti-histamine, a histamine-receptor antagonist, a lipid regulating agent, a muscle relaxant, nitrate and other anti-anginal agent, a nutritional agent, an opioid analgesic, sex hormone, stimulant, cytokine, peptidomimetic, peptide, protein, toxoid, sera, antibody, vaccine, nucleoside, nucleotide, nucleic acid and peptidyl-nucleic acid.

Specific non-limiting examples of hydrophobic therapeutic agents that can be used in the pharmaceutical compositions of the present invention include the following representative compounds, as well as their pharmaceutically acceptable salts, isomers, esters, ethers and other derivatives including, for example: (1) analgesics and anti-inflammatory agents, such as, aloxiprin, auranofin, azapropazone, benorylate, capsaicin, celecoxib, diclofenac, diflunisal, etodolac, fenbufen, fenoprofen calcium, flurbiprofen, ibuprofen, indomethacin, ketoprofen, ketorolac, leflunomide, meclofenamic acid, mefenamic acid, nabumetone, naproxen, oxaprozin, oxyphenbutazone, phenylbutazone, piroxicam, refocoxib, sulindac, tetrahydrocannabinol, tramadol and tromethamine; (2) anti-arrhythmic agents, such as, amiodarone HCl, disopyramide, flecainide acetate and quinidine sulfate; (3) anti-asthma agents, such as, zileuton, zafirlukast, montelukast, and albuterol; (4) anti-bacterial agents, such as, baclofen, benzathine penicillin, cinoxacin, clarithromycin, clofazimine, cloxacillin, demeclocycline, dirithromycin, doxycycline, erythromycin, ethionamide, furazolidone, grepafloxacin, imipenem, levofloxacin, lorefloxacin, moxifloxacin HCl, nalidixic acid, nitrofurantoin, norfloxacin, ofloxacin, rifampicin, rifabutine, rifapentine, sparfloxacin, spiramycin, sulphabenzamide, sulphadoxine, sulphamerazine, sulphacetamide, sulphadiazine, sulphafurazole, sulphamethoxazole, sulphapyridine, tetracycline, trimethoprim and trovafloxacin; (5) anti-viral agents, such as, abacavir, amprenavir, delavirdine, efavirenz, indinavir, lamivudine, nelfinavir, nevirapine, ritonavir, saquinavir, and stavudine; (6) anti-coagulants, such as, cilostazol, clopidogrel, dicumarol, dipyridamole, nicoumalone, oprelvekin, phenindione, ticlopidine, and tirofiban; (7) anti-depressants, such as amoxapine, bupropion, citalopram, clomipramine, maprotiline HCl, mianserin HCl, nortriptyline HCl, paroxetine HCl, sertraline HCl, trazodone HCl, trimipramine maleate, and venlafaxine HCl; (8) anti-diabetics, such as, acetohexamide, chlorpropamide, glibenclamide, gliclazide, glipizide, glimepiride, miglitol, pioglitazone, repaglinide, rosiglitazone, tolazamide, tolbutamide and troglitazone; (9) anti-epileptics, such as, beclamide, carbamazepine, clonazepam, ethotoin, felbamate, fosphenytoin sodium, lamotrigine, methoin, methsuximide, methylphenobarbitone, oxcarbazepine, paramethadione, phenacemide, phenobarbitone, phenytoin, phensuximide, primidone, sulthiame, tiagabine HCl, topiramate, valproic acid, and vigabatrin; (10) anti-fungal agents, such as, amphotericin, butenafine HCl, butoconazole nitrate, clotrimazole, econazole nitrate, fluconazole, flucytosine, griseofulvin, itraconazole, ketoconazole, miconazole, natamycin, nystatin, sulconazole nitrate, oxiconazole, terbinafine HCl, terconazole, tioconazole and undecenoic acid; (11) anti-hypertensive agents, such as, amlodipine, benidipine, benezepril, candesartan, captopril, darodipine, dilitazem HCl, diazoxide, doxazosin HCl, elanapril, eposartan, losartan mesylate, felodipine, fenoldopam, fosenopril, guanabenz acetate, irbesartan, isradipine, lisinopril, minoxidil, nicardipine HCl, nifedipine, nimodipine, nisoldipine, phenoxybenzamine HCl, prazosin HCl, quinapril, reserpine, terazosin HCl, telmisartan, and valsartan; (12) anti-malarials, such as, amodiaquine, chloroquine, chlorproguanil HCl, halofantrine HCl, mefloquine HCl, proguanil HCl, pyrimethamine and quinine sulfate; (13) anti-migraine agents, such as, dihydroergotamine mesylate, ergotamine tartrate, frovatriptan, methysergide maleate, naratriptan HCl, pizotyline malate, rizatriptan benzoate, sumatriptan succinate, and zolmitriptan; (14) anti-muscarinic agents, such as, atropine, benzhexol HCl, biperiden, ethopropazine HCl, hyoscyamine, oxyphencyclimine HCl and tropicamide; (15) anti-neoplastic agents and immunosuppressants, such as, aminoglutethimide, amsacrine, azathioprine, bicalutamide, bisantrene, busulfan, camptothecin, chlorambucil, cyclosporin, dacarbazine, ellipticine, estramustine, etoposide, irinotecan, lomustine, melphalan, mercaptopurine, mitomycin, mitotane, mitoxantrone, mofetil mycophenolate, nilutamide, paclitaxel, procarbazine HCl, sirolimus, tacrolimus, tamoxifen citrate, teniposide, tes-

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

tolactone, topotecan HCl, and toremifene citrate; (16) anti-protozoal agents, such as, atovaquone, benznidazole, clioquinol, decoquinate, diiodohydroxyquinoline, diloxanide furoate, dinitolmide, furazolidone, metronidazole, nimorazole, nitrofurazone, omidazole and tinidazole; (17) anti-thyroid agents, such as, carbimazole, paracalcitol, and propylthiouracil; anti-tussives, such as, benzonatate; (18) anxiolytics, sedatives, hypnotics and neuroleptics, such as, alprazolam, amylobarbitone, barbitone, bentazepam, bromazepam, bromperidol, brotizolam, butobarbitone, carbromal, chlordiazepoxide, chlormethiazole, chlorpromazine, chlorprothixene, clonazepam, clobazam, clotiazepam, clozapine, diazepam, droperidol, ethinamate, flunanisone, flunitrazepam, triflupromazine, fluphenthixol decanoate, fluphenazine decanoate, flurazepam, gabapentin, haloperidol, lorazepam, lormetazepam, medazepam, meprobamate, mesoridazine, methaqualone, methylphenidate, midazolam, molindone, nitrazepam, olanzapine, oxazepam, pentobarbitone, perphenazine pimozide, prochlorperazine, pseudoephedrine, quetiapine, rispiridone, sertindole, sulpiride, temazepam, thioridazine, triazolam, zolpidem, and zopiclone; (19) beta-Blockers, such as, acebutolol, alprenolol, labetalol, metoprolol, nadolol, oxprenolol, pindolol and propranolol; (20) cardiac inotropic agents, such as, amrinone, digitoxin, digoxin, enoximone, lanatoside C and medigoxin; (21) a corticosteroid, such as, beclomethasone, betamethasone, budesonide, cortisone acetate, desoxymethasone, dexamethasone, fludrocortisone acetate, flunisolide, fluocortolone, fluticasone propionate, hydrocortisone, methylprednisolone, prednisolone, prednisone and triamcinolone; (22) diuretics, such as, acetazolamide, amiloride, bendroflumethiazide, bumetanide, chlorothiazide, chlorthalidone, ethacrynic acid, frusemide, metolazone, spironolactone and triamterene; (23) anti-Parkinsonian agents, such as, bromocriptine mesylate, lysuride maleate, pramipexole, ropinirole HCl, and tolcapone; (24) gastrointestinal agents, such as bisacodyl, cimetidine, cisapride, diphenoxylate HCl, domperidone, famotidine, lansoprazole, loperamide, mesalazine, nizatidine, omeprazole, ondansetron HCl, rabeprazole sodium, ranitidine HCl and sulphasalazine; (25) anti-histamines and histamine-receptor antagonists, such as, acrivastine, astemizole, chlorpheniramine, cinnarizine, cetrizine, clemastine fumarate, cyclizine, cyproheptadine HCl, dexchlorpheniramine, dimenhydrinate, fexofenadine, flunarizine HCl, loratadine, meclizine HCl, oxatomide, and terfenadine; (26) lipid regulating agents, such as, atorvastatin, bezafibrate, cerivastatin, ciprofibrate, clofibrate, fenofibrate, fluvastatin, gemfibrozil, pravastatin, probucol, and simvastatin; (27) muscle relaxants, such as, dantrolene sodium and tizanidine HCl; (28) nitrates and other anti-anginal agents, such as, amyl nitrate, glyceryl trinitrate, isosorbide dinitrate, isosorbide mononitrate and pentaerythritol tetranitrate; (29) nutritional agents, such as, calcitriol, carotenes, dihydrotachysterol, essential fatty acids, non-essential fatty acids, phytonadiol, vitamin A, vitamin $B_2$, vitamin D, vitamin E and vitamin K; (30) opioid analgesics, such as, codeine, dextropropoxyphene, diamorphine, dihydrocodeine, fentanyl, meptazinol, methadone, morphine, hydromorphone, nalbuphine and pentazocine; (31) sex hormones, such as, clomiphene citrate, cortisone acetate, danazol, dehydroepiandrosterone, ethynyl estradiol, finasteride, fludrocortisone, fluoxymesterone, medroxyprogesterone acetate, megestrol acetate, mestranol, methyltestosterone, norethisterone, norgestrel, oestradiol, conjugated estrogens, progesterone, rimexolone, stanozolol, stilbestrol, testosterone and tibolone; and (32) stimulants, such as, amphetamine, dexamphetamine, dexfenfluramine, fenfluramine and mazindol; and others, such as, becaplermin, donepezil HCl, L-thyroxine, methoxsalen, verteporfrin, physostigmine, pyridostigmine, raloxifene HCl, sibutramine HCl, sildenafil citrate, tacrine, tamsulosin HCl, and tolterodine.

Certain exemplary hydrophobic therapeutic agents include sildenafil citrate, amlodipine, tramadol, celecoxib, rofecoxib, oxaprozin, nabumetone, ibuprofen, terbenafine, itraconazole, zileuton, zafirlukast, cisapride, fenofibrate, tizanidine, nizatidine, fexofenadine, loratadine, famotidine, paricalcitol, atovaquone, nabumetone, alprazolam, bromazepam, chlorpromazine, clonazepam, diazepam, flunitrazepam, flurazepam, haloperidol, lorazepam, lormetazepam, midazolam, nitrazepam, oxazepam, pseudoephedrine, temazepam, triazolam, zolpidem, zopiclone, tetrahydrocannabinol, testosterone, megestrol acetate, repaglinide, progesterone, rimexolone, cyclosporin, tacrolimus, sirolimus, tenipo side, paclitaxel, pseudoephedrine, troglitazone, rosiglitazone, finasteride, vitamin A, vitamin D, vitamin E, and pharmaceutically acceptable salts, isomers and derivatives thereof. It should be appreciated that the listing of hydrophobic therapeutic agents and their therapeutic classes is merely illustrative. It is understood, that mixtures of hydrophobic therapeutic agents may also be used where desired.

An advantage of using alkoxy-polyethylene glycol as an excipient in the pharmaceutical composition is that, for example, highly lipophilic substances, such as, lorazepam, midazolam, clonazepam, alprazolam and other compounds belonging to the benzodiazepines, as well as water soluble substances, for example, peptides and proteins, such as, the pancreatic hormones can be solubilized in a clinically relevant volume (for example, 25-300 μL) for delivery to a human subject. By way of comparison, clinically relevant doses of midazolam, lorazepam, alprazolam, diazepam and clonazepam would have to be dissolved in at least 5 mL of water.

Although the alkoxy-polyethylene glycol excipients are particularly useful for the delivery of hydrophobic agents, alkoxy-polyethylene glycol can also be used to deliver a variety of hydrophilic therapeutic agents. Alkoxy-polyethylene glycols, under certain circumstances, may prolong the duration of the therapeutic agent at the absorption site thereby increasing the amount of agent ultimately delivered. Exemplary hydrophilic therapeutic agents include hydrophilic drugs (i.e., conventional non-peptidic drugs), hydrophilic macromolecules, such as, cytokines, peptides, proteins, peptidomimetics, toxoids, sera, antibodies, vaccines, nucleosides, nucleotides, nucleic acids, and genetic material. The hydrophilic therapeutic agent can be administered alone or in combination with other agents, for example, a hydrophobic therapeutic agent discussed hereinabove or a second, different hydrophilic therapeutic agent.

Without limitation, exemplary hydrophilic therapeutic agents that can be delivered using the compositions and methods of the present invention, include the following compounds as well as their pharmaceutically acceptable salts, isomers, esters, ethers and other derivatives, for example: acarbose; acyclovir; acetyl cysteine; acetylcholine chloride; alatrofloxacin; alendronate; alglucerase; amantadine hydrochloride; ambenomium; amifostine; aminocaproic acid; antihemophilic factor (human); antihemophilic factor (porcine); antihemophilic factor (recombinant); aprotinin; asparaginase; atenolol; atracurium besylate; azithromycin; aztreonam; BCG vaccine; bacitracin; becalermin; belladona; bepridil hydrochloride; bleomycin sulfate; calcitonin human; calcitonin salmon; carboplatin; capecitabine; capreomycin sulfate; cefamandole nafate; cefazolin sodium; cefepime hydrochloride; cefixime; cefonicid sodium; cefoperazone; cefotetan disodium; cefotoxime; cefoxitin sodium; cefti-

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

zoxime; ceftriaxone; cefuroxime axetil; cephalexin; cephapirin sodium; cholera vaccine; chorionic gonadotropin; cidofovir; cisplatin; cladribine; clidinium bromide; clindamycin and clindamycin derivatives; ciprofloxacin; clondronate; colistimethate sodium; colistin sulfate; cortocotropin; cosyntropin; cromalyn sodium; cytarabine; daltaperin sodium; danaproid; deforoxamine; denileukin diftitox; desmopressin; diatrizoate megluamine and diatrizoate sodium; dicyclomine; didanosine; dopamine hydrochloride; dornase alpha; doxacurium chloride; doxorubicin; editronate disodium; elanaprilat; enkephalin; enoxacin; enoxaprin sodium; ephedrine; epinephrine; epoetin alpha; esmol hydrochloride; Factor IX; famiciclovir; fludarabine; fluoxetine; foscarnet sodium; ganciclovir; granulocyte colony stimulating factor; granulocyte-macrophage stimulating factor; growth hormones (human or bovine); gentamycin; glucagon; glycopyrolate; gonadotropin releasing hormone and synthetic analogs thereof; GnRH; gonadorelin; grepafloxacin; hemophilus B conjugate vaccine; Hepatitis A virus vaccine inactivated; Hepatitis B virus vaccine inactivated; heparin sodium; indinavir sulfate; influenza virus vaccine; interleukin-2; interleukin-3; insulin-human; insulin-porcine; insulin NPH; insulin aspart; insulin glargine; insulin detemir; interferon-α; interferon-β; ipratropium bromide; isofosfamide; japanese encephalitis virus vaccine; leucovorin calcium; leuprolide acetate; levofloxacin; lincomycin and lincomycin derivatives; lobucavir; lomefloxacin; loracarbef; mannitol; measles virus vaccine; meningococcal vaccine; menotropins; mephenzolate bromide; mesalmine; methanamine; methotrexate; methscopolamine; metformin hydrochloride; metroprolol; mezocillin sodium; mivacurium chloride; mumps viral vaccine; nedocromil sodium; neostigmine bromide; neostigmine methyl sulfate; neutontin; norfloxacin; octreotide acetate; olpadronate; oxytocin; pamidronate disodium; pancuronium bromide; paroxetine; pefloxacin; pentamindine isethionate; pentostatin; pentoxifylline; periciclovir; pentagastrin; phentolamine mesylate; phenylalanine; physostigmine salicylate; plague vaccine; piperacillin sodium; platelet derived growth factor-human; pneumococcal vaccine polyvalent; poliovirus vaccine (live or inactivated); polymixin B sulfate; pralidoxine chloride; pramlintide; pregabalin; propofenone; propenthaline bromide; pyridostigmine bromide; rabies vaccine; residronate; ribavarin; rimantadine hydrochloride; rotavirus vaccine; salmetrol xinafoate; sincalide; small pox vaccine; solatol; somatostatin; sparfloxacin; spectinomycin; stavudine; streptokinase; streptozocin; suxamethonium chloride; tacrine hydrochloride; terbutaline sulfate; thiopeta; ticarcillin; tiludronate; timolol; tissue type plasminogen activator; TNFR:Fc; TNK-tPA; trandolapril; trimetexate gluconate; trospectinomycin; trovafloxacin; tubocurarine chloride; tumor necrosis factor; typhoid vaccine live; urea; urokinase; vancomycin; valaciclovir; varicella virus vaccine live; vasopres sin and vasopessin derivatives; vecoronium bromide; vinbiastin; vincristine; vinorelbine; warfarin—sodium; yellow fever vaccine; zalcitabine; zanamavir; zolandtronate; and zidovudine.

Other therapeutic agents that can be administered in this formulation may comprise adrenal hormones, corticosteroids and derivatives, such as, ACTH and analogs thereof, teracosactrin, alsactide, cortisone, hydrocortisone alcohol, hydrocortisone acetate, hydrocortisone hemisuccinate, prednisolone terbutate, 9-alpha-fluoroprednisolone, triamcinolone acetonide, dexamethasone phosphate, flurisolide, toxicorol pivalate; anorectics, such as, benzphetamine HCl chlorphentermine HCl; antibiotics, such as, tetracycline HCl, tyrothricin, cephalosporine, aminoglycosides, streptomycin, gentamycin, leucomycin, penicillin and derivatives; anti-allergic agents; antibodies, such as, monoclonal or polyclonal antibodies; anti-cholinergic agents; anti-depressants, such as, amitriptyline HCl, imipramine HCl; anti-emitics, such as, neuroleptica, for example, metopimazin, anti-emetics having a regulatory effect on the motility of the intestine, such as, domperidon; anti-histaminic agents and histaminic agents, such as, diphenhydramin HCl, chloropheniramine maleate, histamine, prophenpyridamine maleate, chlorprophenpyridamine maleate, disodium cromoglyc ate, meclizine; anti-hypertensive agents, such as, clonidine HCl; anti-inflammatory agents (enzymatic), such as, chymotrypsin, bromelain seratiopeptidase; anti-inflammatory agents (non-steroidal), such as, acetaminophen, aspirin, aminopyrine, phenylbutazone, colchicine, probenocid; anti-inflammatory agents (steroidal), such as, fluticasone, predonisolone, triaxncinolone acetonide; anti-neoplastic agents, such as, actinomycin C.; anti-septics, such as, chlorhexidine HCl, hexylresorcinol, dequalinium cloride, ethacridine; anti-tussive expectorant (asthmatic agents), such as, sodium cromoglycate, isoproterenol HCl; anti-viral and anti-cancer agents such as interferons (such as alpha-2 interferon for treatment of common colds), phenyl-p-guanidino benzoate, enviroxime, etc.; beta-adrenergic blocking agents, such as, propranolol HCl; blood factors, such as, factor VII, factor VIII; bone metabolism controlling agents, such as, vitamin $D_3$; bronchoisters, such as, clenbuterol HCl, bitolterol mesylate; cardiotonics such as digitalis; cardiovascular regulatory hormones, drugs and derivatives, such as, bradykin antagonists, atrial natriuretic peptide and derivatives, such as, hydrailsazine, angiotensin II antagonist, nitroglycerin, propranolol, clofilium rosylate; chemotherapeutic agents, such as, sulphathiazole, nitrofurazone; CNS-stimulants, such as, lidocaine, cocaine; corticosteroids, such as, lacicortone, hydrocorticeone, fluocinolone acetonide, triamcinolone acetonide; enzymes, such as, lysozyme chloride, dextranase; gastrointenstinal hormones and derivatives, such as, secretin, substance P; hypothalamus hormones and derivatives, such as, LHRH and analogues (such as naferelin, buserelin, zolidex), TRH (thyrotropin releasing hormone); hypothensives; local anaesthetics, such as, benzocaine; migraine treatment substances, such as, dihydroergot amine, ergometrine, ergotamine, pizotizin; pancreatic hormones and derivatives, such as, insulin (hexameric/dimeric/monomeric forms); parasympathomimetics, such as, nicotine, methacholine; parasympatholytics, such as, scopolamine, attopine, ipratropium; Parkinson's disease substances, such as, apomorphin; pituitary gland hormones and derivatives, such as, growth hormone (e.g. human), vasopressin and analogues (DDAVP, Lypressin); prostaglandins, such as, PGA and derivatives thereof, $PGE_1$ and derivatives thereof, $PGE_2$ and derivatives thereof, $PGF_1$ and derivatives thereof, dinoprost trometamol; protease inhibitors, such as, citrate, or $\alpha_1$-antitrypsin; sex-hormones, such as, ethinyloestradiol, levonorgestrel, FSH, LH, LTH, estradiol-17-beta, norethindrone; sympathomimetics, such as, phenylephrine, xylometazoline, tramazoline, dopamine, dobutamine; sleep-aids, such as granistron and ramelteon, tranquilizers, such as, brotizolam, camazepam, chlorazepic acid, cloxazolam, delorazepam, estazolam, ethyl loflazepate, fludiazepam, flutazolam, halazepam, haloxazolam, ketazolam, loprazolam, lormetazepam, nimetazepam, nitrazepam, nordiazepam, oxazepam, pinazepam, prazepam, temazepam, tetrazepam, tofisopam; vaccines, such as, AIDS-vaccines, parainfluenza virus, polio, rhinovirus type 13, respiratory syncytial virus; vasoconstrictors, such as, phenylephrine HCl, tetrahydrozoline HCl, naphazoline nitrate, oxymetazoline HCl, tramazoline HCl; vasodilators, such as, papaverine HCl, Substance P, vasoactive intestinal peptide (VIP).

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

Certain exemplary formulations comprising alkoxy-polyethylene glycol also comprise one or more therapeutic agents selected from the group consisting of peptide drugs, such as, oxytocin, vasopression (desmopresin), insulin, calcitonin, elcatonin, cyanocobalmin $B_{12}$, and glucagon-like protein-1 (GLP-1), and small organic molecules, such as, dinoprsoone, misoprostol, apomorphine, fentanyl, metoclopramide, butorphanol, and midazolam

C. Other Excipients

It is understood that the compositions of the invention, in addition to the alkoxy-polyethylene glycol and the therapeutic agent, can comprise a number of other excipients known to those skilled in the art, including absorption promoters, buffering agents, water absorbing polymers, alcohols, lipids, osmotic pressure controlling agents, pH-controlling agents, preservatives, propellants, surfactants, enzyme inhibitors, excipients for adjusting hydrophilic-lipophilic balance (HLB) and stabilizers.

Exemplary surfactants, include, for example nonoxynol, octoxynol, tweens, spans, sodium lauryl sulfate, and sorbitan monopalmitate. Exemplary absorption promoters include, for example, bile salts and derivatives thereof, fusidic acid and derivatives thereof, oleic acid, lecithin, lysolechitins, dodecanoyl phosphatidylcholine (DDPC), sucrose monododecanoate, n-dodecyl-β-D-maltopyranoside, pectin, chitosan, α-, β- and γ-cyclodextrins and derivatives thereof, pegylated caprylic-/capric glycerides and derivatives thereof, such as, Softigen and Labrasol. Exemplary water absorbing polymers include, for example, polyethylene glycols having an average molecular weight ranging from 200 to 7500, propylene glycol, or mixtures thereof, or single ethylene glycols such as tetraethylene glycol and pentaethylene glycol. Exemplary alcohols include, for example, ethanol, isopropyl alcohol. Exemplary lipids include, for example, vegetable oil, soyabean oil, peanut oil, coconut oil, maize oil, olive oil, sunflower oil, monoglycerides, diglycerides, mono/diglycerides, mono/di/triglycerides. Exemplary osmotic pressure controlling agents include, for example, glycerol, dextrose, maltose, sucrose, mannitol, xylitol, various salts (for example, sodium chloride). Exemplary pH-controlling agents include, for example, buffers, acids (for example, nitric acid, phosphoric acid, or acetic acid). Exemplary preservatives include, for example, methyl paraoxybenzoate, phenyl ethyl alcohol or benzoic acid. Exemplary propellants, include, for example, butane or air displacement such as nitrogen. Excipients adjusting the HLB of the formulation include, for example, Tween 20, 25, 40, 45, 65, 85, Span 20-80, Brij 30-98, acacia. Exemplary enzyme inhibitors include, for example aprotinin and other peptidase inhibitors, diisopropylfluorophosphate (DFP), carbopol. Exemplary stabilizers include, for example, cyclodextrins.

Although it is understood that the alkoxy-polyethylene glycols described herein, for example, methoxy-polyethylene glycol, can solubilize poorly soluble therapeutic agents, under certain circumstances, it may be helpful to include additional compounds that enhance the solubility of the therapeutic agent. Examples of such solubilizers include, for example, alcohols and polyols, such as ethanol, isopropanol, butanol, benzyl alcohol, ethylene glycol, propylene glycol, butanediols and isomers thereof, glycerol, pentaerythritol, sorbitol, mannitol, transcutol, dimethyl isosorbide, polyethylene glycol, polypropylene glycol, pegylated-mono/di-caprylic/capric glycerides, polyvinylalcohol, hydroxypropyl methylcellulose and other cellulose derivatives, cyclodextrins (for example, α-, β-, or γ-cyclodextrins) and cyclodextrin derivatives; ethers of polyethylene glycols having an average molecular weight of about 200 to about 6000 or tetrahydrofurfuryl alcohol PEG ether (glycofurol, available commercially from BASF under the trade name Tetraglycol); surfactants, such as, sodium lauryl sulfate, oleic acid, linoleic acid, monoolein, lecithin, lysolecithin, deoxycholate, taurodeoxycholate, glycochenodeoxycholate, polyoxyethylene X-lauryl ether, where X is from 9 to 20, sodium tauro-24,25-dihydrofusidate, polyoxyethylene ether, polyoxyethylene sorbitan esters, p-t-octylphenoxypolyoxyethylene, N-lauryl-β-D-maltopyranoside, 1-dodecylazacycloheptane-2-azone; amides, such as, 2-pyrrolidone, 2-piperidone, caprolactam, N-alkylpyrrolidone, N-hydroxyalkylpyrrolidone, N-alkylpiperidone, N-alkylcaprolactam, dimethylacetamide, and polyvinylpyrrolidone; esters, such as, ethyl propionate, tributylcitrate, acetyl triethylcitrate, acetyl tributyl citrate, triethylcitrate, ethyl oleate, ethyl caprylate, ethyl butyrate, triacetin, propylene glycol monoacetate, propylene glycol diacetate, caprolactone and isomers thereof, valerolactone and isomers thereof, β-butyrolactone and isomers thereof; and other solubilizers known in the art, such as dimethyl acetamide, dimethyl isosorbide (Arlasolve DMI (ICI)), N-methyl pyrrolidones (Pharmasolve (ISP)), monooctanoin, and diethylene glycol monoethyl ether (available from Gattefosse under the trade name Transcutol).

Preferred additional solubilizers include triacetin, triethylcitrate, ethyl oleate, ethyl caprylate, dimethylacetamide, N-methylpyrrolidone, N-hydroxyethylpyrrolidone, polyvinylpyrrolidone, hydroxypropyl methylcellulose, hydroxypropyl cyclodextrins, ethanol, polyethylene glycol 200-1000, PEG 300, PEG 400, Transcutol, and dimethyl isosorbide, sorbitol, glycerol, triacetin, glycofurol and propylene glycol. Typically, the solubilizer, if present, is present in an amount of from about 0.1% (w/v) to about 50% (w/v), from about 1% (w/v) to about 40% (w/v) or from about 2% (w/v) to about 25% (w/v). In addition, the liquid pharmaceutical composition can comprise water, for example, from about 2% (v/v) to about 99% (v/v), from about 10% (v/v) to about 95% (v/v), or from about 20% (v/v) to about 90% (v/v), of the liquid composition.

As discussed, the composition can comprise a preservative. In addition or in the alternative, the composition can be sterilized. Sterilization can be achieved by filter sterilization, autoclaving, exposure to ionizing radiation, for example, gamma radiation, UV irradiation, and chemical sterilization. In one embodiment, the sterile composition has a sterility assurance level of at least about $10^3$. The resulting liquid compositions preferably are stable at room temperature, such that less than 5%, 4%, 3%, 2% or 1% by weight of the therapeutic agent degrades after storage for 30 days, or more preferably 6 months, at 20° C.

In addition, the formulations may also include a sweetener or flavoring agent. Exemplary sweeteners or flavoring agents include, for example, acacia syrup, acesulfame potassium, anethole, anise oil, aromatic elixir, aspartame, benzaldehyde, benzaldehyde elixir, cyclodextrins, caraway, caraway oil, cardamom oil, cardamom seed, cardamom spirit, cardamom tincture, cherry juice, cherry syrup, cinnamon, cinnamon oil, cinnamon water, citric acid, citric acid syrup, clove oil, cocoa, cocoa syrup, coriander oil, dextrose, eriodictyon, eriodictyon fluid extract, eriodictyon syrup, aromatic, ethylacetate, ethyl vanillin, fennel oil, ginger, ginger fluid extract, ginger oleoresin, glucose, sugar, maltodextrin, glycerin, glycyrrhiza, glycyrrhiza elixir, glycyrrhiza extract, glycyrrhiza extract pure, glycyrrhiza fluid extract, glycyrrhiza syrup, honey, isoalcoholic elixir, lavender oil, lemon oil, lemon tincture, maltodextrin, maltose, mannitol, methyl salicylate, menthol, nutmeg oil, orange bitter, elixir, orange bitter, oil, orange flower oil, orange flower water, orange oil, orange peel, bitter,

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

orange peel sweet, tincture, orange spirit, orange syrup, peppermint, peppermint oil, peppermint spirit, peppermint water, phenylethyl alcohol, raspberry juice, raspberry syrup, rosemary oil, rose oil, rose water, saccharin, saccharin calcium, saccharin sodium, sarsaparilla syrup, sarsaparilla compound, sorbitol solution, spearmint, spearmint oil, sucrose, sucralose, syrup, thyme oil, tolu balsam, tolu balsam syrup, wintergreen oil, vanilla, vanilla tincture, vanillin, wild cherry syrup, xylitol, or combinations thereof.

In addition, the formulations optionally can contain a taste masking agents. Exemplary masking agents include, for example, cyclodextrins, cyclodextrin emulsions, cyclodextrin particles, cyclodextrin complexes, or combinations thereof.

The foregoing list of excipients and additives is by no means complete, and it is understood that a person of ordinary skill in the art can choose other excipients and additives from the GRAS (generally regarding as safe) list of chemicals used in pharmaceutical preparations and those that are currently allowed in topical and parenteral formulations.

Exemplary liquid compositions of the invention contain, for example, the active ingredient (for example, midazolam), 40% (v/v) to 70% (v/v) methoxy-polyethylene glycol (for example, mPEG 350), 0% (v/v) to 20% (vlv) polyethylene glycol (for example, PEG 400), 0% (v/v) to 10% (v/v) propylene glycol, and 0% (v/v) to 5% (vlv) ethanol. Other exemplary liquid compositions of the invention contain, for example, the active ingredient dissolved in 50% (v/v) to 70% (v/v) mPEG 350, 1% (v/v) to 4% (v/v) propylene glycol, and 1% (v/v) to 4% (v/v) ethanol.

It is understood that the choice and amounts of each of the therapeutic agents, alkoxy-polyethyline glycol and other excipients combined to produce the compositions of the invention will depend upon the ultimate use of the composition, and the intended therapy and mode of administration. When the liquid compositions ultimately are administered to a patient, the amount of a given excipient, unless the circumstances dictate otherwise, preferably is limited to a bioacceptable amount, which is readily determined by one of skill in the art. Furthermore, it is understood that the liquid compositions of the invention can be formulated using techniques known to those skilled in the art. A thorough discussion of formulations and the selection of pharmaceutically acceptable carriers, stabilizers, etc. can be found, for example, in *Remington's Pharmaceutical Sciences* (18th Ed.), Mack Publishing Company, Eaton, Pa.

Although the therapeutic agent and the alkoxy-polyethylene glycol are combined in the liquid formulations of the invention, they are not covalently linked to one another. In certain embodiments, the liquid formulations of the invention are free or are substantially free of chitosan. In certain embodiments, the compositions of the invention may be prepared in a powder form.

II Modes of Administration and Pharmacokinetics

The compositions of the invention are particularly useful in delivering one or more therapeutic agents to a mucosal membrane or the skin of a mammal, for example, a human. The mucosal membrane to which the pharmaceutical preparation of the invention is administered may be any mucosal membrane of the mammal to which the therapeutic agent is to be applied, for example, the nose (for example, via a nasal membrane), vagina, eye (for example, via an ocular membrane), ear (for example, via a tympanic membrane), mouth (for example, via the buccal membrane), lungs (for example, via the pulmonal membrane), or rectum (for example, via the rectal membrane). The compositions are particularly useful in delivering a therapeutic agent to the mucosa of the nose, mouth (buccal, gingual, sublingual or to the hard palate), or the vagina.

It is understand that the compositions of the invention are particularly useful in the intranasal delivery of a therapeutic agent. When the composition is applied to the nasal mucosa, the volume of the pharmaceutical composition applied typically is in the range of 1-1000 μL, preferably not more than 700 μL, more preferably 50-150 μL per nostril, and most preferably about 100 μL/nostril.

It is understood that when administered intranasally, the compositions are delivered via a spray device that produces a plume of spray droplets that contact the nasal mucosa. It is contemplated that the compositions can be delivered using commercially available spray devices available from, for example, Pfeiffer of America, Princeton, N.J.; Valois of America, Inc., Greenwich, Conn.; or Becton Dickinson, Franklin Lakes, N.J. Furthermore, these devices are easily operable by the patient or care giver, and leave little or no residual formulation in the device after use.

Such devices can be filled with single or multi-dose amounts of the desired formulation. The container holding the pharmaceutical composition and its sealing means are sterilizable. At least the parts of the device that are in contact with the pharmaceutical composition should be constructed and assembled in a configuration that can be sterilized. Exemplary delivery devices with one or more unit-dose(s) are described, for example, in U.S. Pat. Nos, 4,946,069; 5,307,953; 6,948,492; and 6,446,839. Individual devices can be packaged, sterilized and shipped; alternatively, entire shipping and storage packages can be sterilized at once, and the devices removed individually for dispensing, without affecting the sterility of the remaining units.

The mucosal epithelium in the nasal cavity is covered with many hair-like cilia that provide an important defense mechanism against inhaled dust, allergens and microorganisms. The normal half-time for non-absorbed substances administered to the nasal cavity is about 15 minutes due to the mucociliary clearance removing foreign particles and excess mucus toward the pharynx. For this reason it is preferred that the absorption occurs rapidly and preferably within 0.5 to 20 minutes. However, in the current invention due to bioadhesive properties of the invention, the preferred absorption may occur within 0.5 to 300 minutes (e.g., for vaccines and biologicals), preferably between 0.5 to 60 minutes (e.g., for large molecules) and more preferably between 0.5 and 20 minutes, for example, within 2, 3, 4, 5, 10, 15 or 20 minutes post administration. The composition can be formulated so that upon administration to a subject, for example, via intranasal administration to the subject, the therapeutic agent has a peak concentration ($T_{max}$) in the blood of the subject within 30, 25, 20, 15, 10 8, 5, 3 or 2 minutes after administration of the therapeutic agent.

In addition to administration to humans, the compositions of the invention can be used to deliver the therapeutic agent to an animal, for example: pets, for example, dogs, cats, rabbits, and guinea pigs; and farm animals, for example, horses, sheep, pigs, cattle, and chickens.

Throughout the description, where compositions are described as having, including, or comprising specific components, it is contemplated that compositions also consist essentially of, or consist of, the recited components. Similarly, where processes are described as having, including, or comprising specific process steps, the processes also consist essentially of, or consist of, the recited processing steps. Except where indicated otherwise, the order of steps or order for performing certain actions are immaterial so long as the

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

invention remains operable. Moreover, unless otherwise noted, two or more steps or actions may be conducted simultaneously.

## EXAMPLES

The invention is explained in more detail with reference to the following Examples, which are to be considered as illustrative and not to be construed so as to limit the scope of the invention as set forth in the appended claims.

### Example 1

### Exemplary Lorazapam Containing Formulation

In this Example, 10 mg lorazepam is dissolved in 2 mL of mPEG 350 using ultrasound to obtain a solution containing 5 mg/mL of lorazepam. 50 μL of the resulting composition is administered into each nasal cavity of male New Zealand White rabbits held in a supine position during, and then one minute after application. An Eppendorf pipette is used for each application. After administration, blood samples then are harvested from a marginal ear vein at 0, 2, 5, 10, 15, 30 and 60 minutes, and the lorazepam concentration determined by high performance liquid chromatography (HPLC). The pharmacokinetics of lorazepam delivery via intranasal administration can then be compared with the pharmacokinetics of lorazepam delivery by intravenous administration. It is contemplated that the pharmacokinetics of the intranasally administered lorazepam will be comparable to those of the intravenously administered lorazepam.

### Example 2

### Exemplary Midazolam Containing Formulation

In this Example, 10 mg of midazolam is dissolved in 2 mL of mPEG 350 using ultrasound to obtain a solution containing 5 mg/mL midazolam. 50 μL of the resulting composition is then administered into each nasal cavity of male New Zealand White rabbits, held in a supine position during, and then one minute after application. After administration, blood samples then are harvested from a marginal ear vein at 0, 2, 5, 10, 15, 30 and 60 minutes, and the midazolam concentration determined by HPLC. The pharmacokinetics of midazolam delivery via intranasal administration can then be compared with the pharmacokinetics of midazolam delivery by intravenous administration. It is contemplated that the pharmacokinetics of the intranasally administered midazolam will be comparable to those of the intravenously administered midazolam.

### Example 3

### Pharmacokinetics of Exemplary Midazolam Formulations

This Example describes a variety of formulations containing methoxy-polyethylene glycol that demonstrate comparable pharmacokinetic properties to a control formulation containing polyethylene glycol and propylene. hi addition to having comparable pharmacokinetic properties, the methoxy-polyethylene glycol formulations had a lower viscosity than the control formulation.

Table 1 lists the composition of a first test formulation, Table 2 lists the composition of a second test formulation, and Table 3 lists the composition of a control formulation.

TABLE 1

Test Formulation 1 Containing 50 mg/mL Midazolam base

| Component | Percent of Final (% v/v) |
|---|---|
| mPEG 350 | 47 |
| PEG 400 | 18 |
| Propylene Glycol | 5 |
| Ethanol | 7 |
| Water | 21 |

TABLE 2

Test Formulation 2 Containing 50 mg/mL Midazolam base

| Component | Percent of Final (% v/v) |
|---|---|
| mPEG 350 | 47 |
| PEG 400 | 18 |
| Propylene Glycol | 10 |
| Polysorbate 80 | 0.1 |
| Water | 22 |

TABLE 3

Control Containing 50 mg/mL Midazolam base

| Component | Percent of Final (% v/v) |
|---|---|
| PEG 400 | 18 |
| Propylene Glycol | 78 |
| Butylatedhydoxytoluene | 0.01 |

Each of the test and control formulations contained 50 mg/mL midazolam. Once made, 5 mg of midazolam in 0.1 mL was delivered intranasally to the right nostril of each dog (3 dogs per set) for each formulation in a cross over manner. Blood was harvested from the dogs predose and at 0.03, 0.08, 0.16, 0.25, 0.5, 0.75, 1, 2, and 4 hours after administration, and the concentration of midazolam in the blood measured by HPLC. The pharmacokinetic properties are summarized in Table 4.

TABLE 4

Pharmacokinetic Properties

| Formulation | $T_{max}$ (hr) | $C_{max}$ (ng/mL) | $AUC_{last}$ (hr * ng/mL) | $AUC_{INF}$ (hr * ng/mL) |
|---|---|---|---|---|
| Test Formulation 1 | 0.11 ± 0.05 | 2220 ± 289 | 506 ± 94 | 508 ± 95 |
| Test Formulation 2 | 0.05 ± 0.03 | 1880 ± 682 | 399 ± 75 | 403 ± 76 |
| Control Formulation | 0.07 ± 0.03 | 2350 ± 796 | 506 ± 72 | 509 ± 71 |

In Table 4, Cmax refer to the maximum plasma concentration, $T_{max}$ refers to the time to reach $C_{max}$, $AUC_{last}$ refers to area under the concentration curve from time zero to the last measurable plasma concentration, and $AUC_{INF}$ refers to the area under the concentration curve from time zero to infinity.

The results demonstrate that the test formulations, when administered intranasally to the dogs, produced comparable pharmacokinetics to the control formulation. The test formulations, however, had a lower viscosity than the control formulations. Lower viscosity correlates with better spray pattern characteristics.

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

Example 4

Additional Exemplary Methoxy-Polyethylene Glycol Containing Formulations

This example describes the benefit of incorporating methoxy-polyethylene glycol into certain intranasal formulations. Table 5 describes a formulation containing methoxy-polyethylene glycol and PEG 400, Table 6 describes a formulation containing methoxy-polyethylene glycol without PEG 400, Table 7 describes a formulation containing methoxy-polyethylene glycol without PEG 400 (with reduced ethanol), and Table 8 describes a control formulation containing PEG 400 but no methoxy-polyethylene glycol.

TABLE 5

| Component | Viscosity (cP) | % (w/w) |
|---|---|---|
| Propylene glycol | 40 | 5 |
| PEG 400 | 80 | 18 |
| mPEG 350 | 29 | 47 |
| Ethanol | — | 6 |
| Water | 1 | 18 |
| Midazolam | — | 7 |

TABLE 6

| Component | Viscosity (cP) | % (w/w) |
|---|---|---|
| Propylene glycol | 40 | 2 |
| mPEG 350 | 29 | 64 |
| Ethanol | — | 5 |
| Water | 1 | 23 |
| Midazolam | — | 7 |

TABLE 7

| Component | 75 mg Midazolam/dose (% w/w) | 50 mg Midazolam/dose (% w/w) | 25 mg Midazolam/dose (% w/w) |
|---|---|---|---|
| MPEG 350 | 64.8 | 64.8 | 64.8 |
| Propylene glycol | 2.0 | 2.0 | 2.0 |
| Ethanol | 2.5 | 2.5 | 2.5 |
| Water | 23.7 | 26.0 | 28.3 |
| Phenethyl Alcohol | 0.025 | 0.025 | 0.025 |
| Midazolam | 6.9 | 4.6 | 2.3 |

TABLE 8

Control Formulation (Without Methoxy-polyethylene Glycol)

| Component | Viscosity (cP) | (% w/w) |
|---|---|---|
| PEG 400 | 89 | 19 |
| Propylene Glycol | 40 | 76 |
| Butylatedhydroxytoluene | — | 0.01 |
| Midazolam | — | 5 |

The formulation of Table 5 was prepared by mixing the propylene glycol, PEG 400, mPEG 350, and ethanol. The midazolam was then added to the mixture, and then after the midazolam had dissolved following mixing the water was added to the formulation. The formulations in Tables 6 and 7 were prepared as follows. The midazolam was weighed in a container and the ethanol was added to wet the active ingredient. After mixing, about 65% of the mPEG 350 was added, and the resulting mixture mixed for 2 minutes. Thereafter, the additional organic phase was added. The remaining 35% of the mPEG 350 was mixed with water, and the diluted mPEG 350 then was gradually added with mixing to the midazolam solution until a clear solution was produced. The viscosity of the resulting formulations and spray patterns were tested.

The viscosity of the resulting formulations was tested at 25° C. using a viscometer (Brookfield DV-II PRO). The viscosity of the control formulation without methoxy-polyethylene glycol (Table 8) was found to be about 42 cP, whereas the viscosity of the test formulation of Table 5 was found to be about 30 cP, and the viscosity of the test formulation of Table 6 was found to be about 23 cP. The reduced viscosity of the test formulations relative to the control formulation permitted the creation of more reproducible spray patterns.

The spray patterns produced by the two test formulations of Tables 5 and 6 were tested using a Proveris spray view instrument. The resulting parameters of the resulting spray patterns were found to be more reproducible as the viscosity of the formulation decreased.

In addition, 100 μL of placebo formulations (no midazolam) corresponding to the formulations set forth in Tables 7 and 8 were administered intranasally to three healthy test subjects using a commercially available spray device from Pfeiffer. The placebo formulation corresponding to Table 7 containing methoxy-polyethylene glycol had a less noticeable taste relative to the placebo formulation corresponding to Table 8.

These collective results demonstrate that mPEG 350 is a suitable excipient for nasal administration, for example, with midazolam.

Example 5

Sprayability of Methoxy-Polyethylene Glycol Containing Formulations

This Example demonstrates that methoxy-polyethylene glycol-based formulations produce superior spray flumes relative to polyethylene glycol. Solutions containing 100% methoxy-polyethylene glycol 350 (MPEG 350) from Sigma-Aldrich Chemie GmbH (St. Louis, Mo., USA) and 100% polyethylene glycol 300 (PEG 300) from Croda Chemicals Europe Ltd. (Goole, UK) were placed into Pfeiffer 20 mL bottles (Pfeiffer 34473) and attached to certain pumps from Valois or Pfeiffer (see Table 8). Each spray device was placed 25 cm under a sheet of absorbent paper and the sprayability was measured as the diameter across of the paper wetted by the resulting spray. The results are summarized in Table 9.

TABLE 9

| Pump Type | Formulation | Spray diameter (cm) |
|---|---|---|
| Pfeiffer 71514 | PEG 300 | 2.0-3.2 cm |
| Pfeiffer 71514 | mPEG 350 | 22-26 cm |
| Valois VP6/100 | PEG 300 | 5.0-7.5 cm |
| Valois VP6/100 | mPEG 350 | 15-21 cm |

The results show that there is a clear difference in the sprayability of mPEG 350 compared with PEG 300. The required spray angle is not achieved using PEG 300, whereas a clinically relevant spray-angle can be achieved using mPEG 350.

INCORPORATION BY REFERENCE

The entire disclosure of each of the patent documents and scientific articles referred to herein is incorporated by reference for all purposes.

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

## EQUIVALENTS

The invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The foregoing embodiments are therefore to be considered in all respects illustrative rather than limiting on the invention described herein. Scope of the invention is thus indicated by the appended claims rather than by the foregoing description, and all changes that come within the meaning and range of equivalency of the claims are intended to be embraced therein.

What is claimed is:

1. A liquid pharmaceutical composition formulated for intranasal administration comprising:

a) a therapeutically effective amount of a therapeutic agent selected from midazolam, a pharmaceutically acceptable salt thereof or combinations thereof; and

b) a methoxy-polyethylene glycol of Formula I

$$H_3C—O—(CH_2CH_2O)_n—H \quad (I)$$

wherein n is a number in the range of 2 to 12.

2. The pharmaceutical composition of claim 1 wherein n is in the range of 3 to 10.

3. The pharmaceutical composition of claim 1 further comprising water.

4. The pharmaceutical composition of claim 1, wherein the methoxypolyethylene glycol comprises methoxy-polyethylene glycol 350.

5. The pharmaceutical composition of claim 1, wherein the methoxypolyethylene glycol comprises methoxy-polyethylene glycol 550.

6. The pharmaceutical composition of claim 1 further comprising polyethylene glycol 200, 300 or 400.

7. The pharmaceutical composition of claim 1 further comprising propylene glycol.

8. The pharmaceutical composition of claim 1 wherein the midazolam or pharmaceutically acceptable salt thereof comprises about 0.0001% (w/v) to about 50% (w/v) of the pharmaceutical composition.

9. The pharmaceutical composition of claim 8 wherein the midazolam or pharmaceutically acceptable salt thereof comprises about 0.001% (w/v) to about 20% (w/v) of the pharmaceutical composition.

10. The pharmaceutical composition of claim 1 wherein the therapeutic agent is midazolam.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 08-17-2021



U 8147298

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

August 25, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,217,033*
ISSUE DATE: *July 10, 2012*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer

JOINT EXHIBIT
JTX-3004
UCB v. Cipla (21-1229-JLH)

NAYZILAM_00002114

US008217033B2

(12) **United States Patent**
**Gizurarson**

(10) **Patent No.: US 8,217,033 B2**
(45) **Date of Patent: Jul. 10, 2012**

(54) **METHODS AND COMPOSITIONS FOR THE DELIVERY OF A THERAPEUTIC AGENT**

(75) Inventor: **Sveinbjorn Gizurarson**, Reykjavik (IS)

(73) Assignees: **Hananja EHF**, Reyjavik (IS); **University of Iceland**, Reykjavik (IS)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/469,448**

(22) Filed: **May 20, 2009**

(65) **Prior Publication Data**

US 2009/0227568 A1 Sep. 10, 2009

**Related U.S. Application Data**

(63) Continuation of application No. 12/016,724, filed on Jan. 18, 2008.

(30) **Foreign Application Priority Data**

Jan. 19, 2007 (IS) .................................... 8593/2007

(51) **Int. Cl.**
*A61K 31/55* (2006.01)

(52) **U.S. Cl.** ........................................................ **514/220**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,812,853 A 5/1974 Crain
4,153,689 A 5/1979 Hirai et al.
4,464,378 A 8/1984 Hussain
4,673,679 A 6/1987 Aungst et al.
4,782,047 A 11/1988 Benjamin et al.
4,863,720 A 9/1989 Burghart et al.
4,889,860 A 12/1989 Rzeszotarski et al.
4,946,069 A 8/1990 Fuchs et al.
4,950,664 A 8/1990 Goldberg
4,973,596 A 11/1990 Cohen
5,132,114 A 7/1992 Stanley et al.
5,166,202 A 11/1992 Schweizer
5,169,029 A 12/1992 Behar et al.
5,225,183 A 7/1993 Purewal et al.
5,307,953 A 5/1994 Regan et al.
5,369,095 A 11/1994 Kee et al.
5,393,773 A 2/1995 Craig et al.
5,397,771 A 3/1995 Bechgaard et al.
5,428,006 A 6/1995 Bechgaard et al.
5,457,100 A 10/1995 Daniel
5,474,759 A 12/1995 Fassberg et al.
5,529,787 A 6/1996 Merrill et al.
5,543,434 A 8/1996 Weg
5,554,639 A 9/1996 Craig et al.
5,577,497 A 11/1996 Mecikalski et al.
5,622,166 A 4/1997 Eisele et al.
5,629,011 A 5/1997 Illum et al.
5,637,314 A 6/1997 Sharpe et al.
5,683,677 A 11/1997 Purewal et al.
5,693,608 A 12/1997 Bechgaard et al.
5,695,743 A 12/1997 Purewal et al.
5,702,725 A 12/1997 Merrill et al.
5,705,520 A 1/1998 Craig et al.
5,766,573 A 6/1998 Purewal et al.
5,789,375 A 8/1998 Mukae et al.
5,855,907 A 1/1999 Peyman
5,866,143 A 2/1999 Elkhoury
5,897,858 A 4/1999 Haslwanter et al.
5,948,389 A 9/1999 Stein
5,958,379 A 9/1999 Regenold et al.
6,007,834 A 12/1999 Merkus
6,013,632 A 1/2000 Jones et al.
6,015,797 A 1/2000 Camborde et al.
6,017,963 A 1/2000 Alfonso et al.
RE36,744 E 6/2000 Goldberg
6,110,486 A 8/2000 Dugger, III
6,193,984 B1 2/2001 Ghiasi et al.
6,193,985 B1 2/2001 Sonne et al.
6,228,383 B1 5/2001 Hansen et al.
6,234,366 B1 5/2001 Fuchs et al.
6,255,502 B1 7/2001 Penkler et al.
6,274,635 B1 8/2001 Travis
6,274,653 B1 8/2001 Hecht et al.
6,514,482 B1 2/2003 Bartus et al.
6,528,465 B1 3/2003 Cantoro
6,565,832 B1 5/2003 Haslwanter et al.
6,565,841 B1 5/2003 Niven et al.
6,608,073 B1 8/2003 Hussain et al.
6,610,271 B2 8/2003 Wermeling
6,613,308 B2 9/2003 Bartus et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0519351 12/1992

(Continued)

OTHER PUBLICATIONS

The Dow Chemical Company (PEGs & MPEGs, Mar. 2006).*
Weber et al., "Premedication with nasal s-ketamine and midazolam provides good conditions for induction of anesthesia in preschool children" *Can. J. Anesth.* (2003) 50, pp. 470-475.
Patent Cooperation Treaty (PCT) International Search Report; International Application No. PCT/US05/08090, completed Jun. 12, 2005 and mailed Jun. 30, 2005 (2 pages).
Knoester, P.D. et al., "Pharmacokinetics and pharmacodynamics of midazolam administered as a concentrated intranasal spray. A study in healthy volunteers" *Br. J. Clin. Pharmacol.* (2002); 53(5), pp. 501-507.
Bechgaard, E. et al., "Solubilization of various benzodiazepines for intranasal administration, a pilot study" *Pharm. Dev. Technol.* (1997); 2(3), pp. 293-296.
Hjortkjaer, R.K. et al., "Single- and repeated-dose local toxicity in the nasal cavity of rabbits after intranasal adminstration of different glycols for formulations containing benzodiazepines" *J. Pharm. Pharmacol.* (1999); 51(4), pp. 377-383.

(Continued)

*Primary Examiner* — Brandon Fetterolf
*Assistant Examiner* — Craig Ricci
(74) *Attorney, Agent, or Firm* — Kagan Binder, PLLC

(57) **ABSTRACT**

The present invention provides a liquid pharmaceutical composition comprising a therapeutic agent and an alkoxy-polyethylene glycol, for example, methoxy-polyethylene glycol, for administration of the therapeutic agent to the mammal. The compositions can be applied to a membrane, for example, a nasal membrane during intranasal administration. The invention also provides methods of administering such compositions to a mammal.

**21 Claims, No Drawings**

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,627,211 | B1 | 9/2003 | Choi et al. |
| 6,737,043 | B2 | 5/2004 | Rabinowitz et al. |
| 6,805,853 | B2 | 10/2004 | Rabinowitz et al. |
| 6,936,605 | B2 | 8/2005 | March |
| 6,977,070 | B2 | 12/2005 | Dugger, III |
| 6,979,437 | B2 | 12/2005 | Bartus et al. |
| 7,018,619 | B2 | 3/2006 | Rabinowitz et al. |
| 7,045,119 | B2 | 5/2006 | Rabinowitz et al. |
| 7,060,255 | B2 | 6/2006 | Rabinowitz et al. |
| 7,070,765 | B2 | 7/2006 | Rabinowitz et al. |
| 7,087,218 | B2 | 8/2006 | Rabinowitz et al. |
| 7,090,830 | B2 | 8/2006 | Hale et al. |
| 7,132,112 | B2 | 11/2006 | Choi et al. |
| 7,449,173 | B2 | 11/2008 | Rabinowitz et al. |
| 7,470,421 | B2 | 12/2008 | Rabinowitz et al. |
| 7,645,442 | B2 | 1/2010 | Hale et al. |
| 7,700,588 | B2 | 4/2010 | Merkus |
| 2002/0037319 | A1 | 3/2002 | Drizen et al. |
| 2003/0012738 | A1 | 1/2003 | Rabinowitz et al. |
| 2003/0077300 | A1 | 4/2003 | Wermeling |
| 2003/0134811 | A1 | 7/2003 | Jackson et al. |
| 2003/0163099 | A1 | 8/2003 | Wermeling et al. |
| 2003/0171439 | A1 | 9/2003 | Lawyer et al. |
| 2003/0175354 | A1 | 9/2003 | Drizen et al. |
| 2003/0206867 | A1 | 11/2003 | Wermeling |
| 2004/0115133 | A1 | 6/2004 | Wermeling |
| 2004/0166158 | A1 | 8/2004 | Davis et al. |
| 2004/0176359 | A1 | 9/2004 | Wermeling |
| 2004/0185003 | A1 | 9/2004 | Rabinowitz et al. |
| 2005/0137164 | A1 | 6/2005 | Arkin et al. |
| 2005/0153956 | A1 | 7/2005 | Merkus |
| 2005/0244517 | A1 | 11/2005 | Hall et al. |
| 2006/0110415 | A1 | 5/2006 | Gupta |
| 2006/0116350 | A1 | 6/2006 | Pasricha et al. |
| 2006/0147386 | A1 | 7/2006 | Wermeling |
| 2006/0198896 | A1 | 9/2006 | Liversidge et al. |
| 2006/0210614 | A1 | 9/2006 | Quay et al. |
| 2007/0208011 | A1 | 9/2007 | Cloyd et al. |
| 2007/0212307 | A1 | 9/2007 | Wermeling et al. |
| 2008/0070904 | A1 | 3/2008 | Jamieson et al. |
| 2008/0138383 | A1 | 6/2008 | Bortz et al. |
| 2008/0279784 | A1 | 11/2008 | Cartt et al. |
| 2009/0088421 | A1 | 4/2009 | Orr |
| 2009/0130216 | A1 | 5/2009 | Cartt et al. |
| 2009/0233912 | A1 | 9/2009 | Castile et al. |
| 2009/0304801 | A1 | 12/2009 | Liversidge et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0698388 | | 2/1996 |
| EP | 0698388 | B1 | 12/1999 |
| EP | 1703896 | | 12/2008 |
| WO | WO-87/05210 | | 9/1987 |
| WO | WO-90/02737 | | 3/1990 |
| WO | 95/01414 | | 1/1995 |
| WO | WO-95/01414 | | 1/1995 |
| WO | WO-98/00152 | | 1/1998 |
| WO | WO-99/21908 | | 5/1999 |
| WO | WO-01/06987 | | 2/2001 |
| WO | WO-01/12230 | | 2/2001 |
| WO | WO-01/12718 | | 2/2001 |
| WO | WO-2002/11778 | | 2/2002 |
| WO | WO-2002/089751 | | 11/2002 |
| WO | 03/101494 | | 12/2003 |
| WO | WO-03/101494 | | 12/2003 |
| WO | 2004/082589 | | 9/2004 |
| WO | WO-2004/082589 | A2 | 9/2004 |
| WO | WO-2005/020906 | | 3/2005 |
| WO | WO-2005/067893 | | 7/2005 |
| WO | WO 2005/067893 | * | 7/2005 |
| WO | 2005/072826 | | 8/2005 |
| WO | WO-2005/072826 | A2 | 8/2005 |
| WO | 2006/119803 | | 11/2006 |
| WO | WO-2006/119803 | A1 | 11/2006 |
| WO | WO-2007/032962 | | 3/2007 |
| WO | WO-2007/067761 | | 6/2007 |
| WO | WO-2007/109141 | | 9/2007 |
| WO | WO-2007/111933 | | 10/2007 |
| WO | WO-2008/063634 | | 5/2008 |
| WO | WO-2009/053741 | | 4/2009 |

OTHER PUBLICATIONS

Björkman, S. et al., "Pharmacokinetics of midazolam given as an intranasal spray to adult surgical patients" *Br. J. Anaesth.* (1997); 79(5), pp. 575-580.

European Patent Office Supplementary Partial European Search Report; European Application No. EP05725332, completed Nov. 9, 2007.

Greenblatt, D. et al., "Pharmacokinetics and pharmacodynamics of single-dose triazolam: electroencephalography compared with digital symbol substitution test" *Br. J. Clin. Pharmacol.* (2005); 60, pp. 244-248.

Lahat, E. et al., "Comparison of intranasal midazolam with intravenous diazepam in treating febrile seizures in children: prospective randomized study" BMJ (2000); 321, pp. 83-86.

Kain, Z.N. et al., "Premedication in the United States: a status report." Anesth. Analg. (1997); 84, pp. 427-432.

Coda, B.A. et al., "Pharmacokinetics and bioavailability of single does intranasal hydromorphone hydrochloride in healthy volunteers" Anesth. Analg. (2003); 97, pp. 117-123.

Crankshaw et al., "The Effect of Solvents on the Potency of Chlordiazepoxide, Diazepam, Medazepam and Nitrazepam," J. Pharm. Pharmac., 1971, 23, pp. 313-321.

Lau, S.W.J. et al., "Absorbtion of Diazepam and Lorazepam Following Intranansal Administration" International Journal of Pharmaceutics (1989); 54, pp. 171-174.

Wermeling et al., "Pharmacokinetics and Pharmacodynamics of a New Intranasal Midazolam Formulation in Healthy Volunteers," International Anesthesia Research Society, vol. 103, No. 2, Aug. 2006, pp. 344-349.

Dale et al., "Intranasal Midazolam: A Comparison of Two Delivery Devices in Human Volunteers," Journal of Pharmacy and Pharmacology 2006, 58: pp. 1311-1318.

Morimoto et al., "Nasal Absorption of Nifedipine from Gel Preparations in Rats," Chem. Pharm. Bull., 35(7) pp. 3041-3044, (1987).

Wermeling et al., "Bioavailability and Pharmacokinetics of Lorazepam after Intranasal, Intravenous, and Intramuscular Administration." J. Clin. Pharmacol. 2001; 41; 1225, pp. 1225-1231.

Burstein et al., "Pharmacokinetics and Pharmacodynamics of Midazolam after Intranasal Administration," J. Clin. Pharmacol. 1997; 37: 711-718.

Loftsson et al., "Cyclodextrin Solubilization of Benzodiazepines: Formulation of Midazolam Nasal Spray," International Journal of Pharmaceutics 212 (2001) pp. 29-40.

Lacoste et al., "Intranasal Midazolam in Piglets: Pharmacodynamics (0.2 vs 0.4 mg/kg) and Pharmacokinetics (0.4 mg/kg) with Bioavailability Determination," Laboratory Animals Ltd. Laboratory Animals (2000) 34, pp. 29-35.

Dale et al., "Intranasal Midazolam: A comparison of Two Delivery Devices in Human Volunteers," PubMed, 1: J Pharm Pharmacol. Oct. 2006; 58(10): 1311-8. (abstract only).

Mazaheri et al., "Assessment of Intranasal Midazolam Administration with a Dose of 0.5 mg/kg in Behavior Management of Uncooperative Children," PubMed, 1: J Clin Pediatr Dent. 2008 Winter; 32(2): 95-9. (abstract only).

McIlwain et al., "Allergic Reaction to Intranasal Midazolam HCl: A Case Report," PubMed, 1: Pediatr Dent. Jul.-Aug. 2004; 26(4): 359-61. (abstract only).

Gilchrist et al., "The Use of Intranasal Midazolam in the Treatment of Paediatric Dental Patients," PubMed, 1: Anaesthesia. Dec. 2007; 62(12): 1262-5. (abstract only).

Gudmundsdottir et al., "Intranasal Administration of Midazolam in a Cyclodextrin Based Formulation: Bioavailability and Clinical Evaluation in Humans," PubMed, 1: Pharmazie. Dec. 2001; 56(12): 963-6. (abstract only).

Lloyd et al., "Intranasal Midazolam as an Alternative to General Anaesthesia in the Management of Children with Oral and Maxillofacial Trauma," PubMed, 1: Br J Oral Maxillofac Surg. Dec. 2000; 38(6): 593-595. (abstract only).

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

Scheepers et al., "Midazolam via the Intranasal Route: An Effective Rescue Medication for Severe Epilepsy in Adults with Learning Disability," PubMed, 1: Seizure. Dec. 1998; 7(6): 509-12. (abstract only).
Dallman et al., "Comparing the Safety, Efficacy and Recovery of Intranasal Midazolam vs. Oral Chloral Hydrate and Promethazine," PubMed, 1: Pediatr Dent. Sep.-Oct. 2001; 23(5): 424-30. (abstract only).
Vesal et al., "Clinical Evaluation of Intranasal Benzodiazepines, Alpha-Agonists and Their Antagonists in Canaries," PubMed, 1: Vet Anaesth Analg. May 2006; 33(3): 143-8. (abstract only).
Karst et al., "Auricular Acupuncture for Dental Anxiety: A Randomized Controlled Trial," PubMed, 1: Anesth Analg. Feb. 2007; 104(2): 295-300. (abstract only).
Wilson et al., "Nasal/Buccal Midazolam Use in the Community," PubMed, 1: Arch Dis Child. Jan. 2004; 89(1): 50-1. (abstract only).
Kupietzky et al., "Intranasal Midazolam Better at Effecting Amnesia after Sedation than Oral Hydroxyzine: A Pilot Study," PubMed, 1: Pediatr Dent. Jan.-Feb. 1996; 18(1): 32-4. (abstract only).
Kaufman et al., "Comparison Between Intranasal and Intravenous Midazolam Sedation (with or without patient control) in a Dental Phobia Clinic," PubMed, 1: J Oral Maxillofac Surg. Aug. 1994; 52(8): 840-3; discussion 844. (abstract only).
Fuks et al., "Assessment of Two Doses of Intranasal Midazolam for Sedation of Young Pediatric Dental Patients," PubMed, 1: Pediatr Dent. Jul.-Aug. 1994; 16(4): 301-5. (abstract only).
Abrams et al., "Safety and Effectiveness of Intranasal Administration of Sedative Medications (ketamine, midazolam, or sufentanil) for Urgent Brief Pediatric Dental Procedures," PubMed, 1: Anesth Prog. 1993; 40(3): 63-6. (abstract only).
Karabas et al., "Probing for Nasolacrimal Duct Obstruction Using Intranasal Midazolam Sedation as an Alternative to General Anesthesia," PubMed, 1: J Pediatr Ophthalmol Strabismuc. Mar.-Apr. 2006; 43(2): 79-84; quiz 100-1.
Wilton et al., "Preanesthetic Sedation of Preschool Children Using Intranasal Midazolam," Clinical Report, Anesthesiology, vol. 69, No. 6, Dec. 1988, pp. 972-975.
Patent Cooperation Treaty (PCT) International Search Report and Written Opinion: International Application No. PCT/US2008/051466, completed Dec. 1, 2008 and mailed Dec. 17, 2008 (11 pages).
Burstein et al., "Intranasal Midazolam Plasma Concentration Profile and Its Effect on Anxiety Associated with Dental Procedures," Anesth Prog (1996) 43: pp. 52-57.
Rey et al., "Pharmacokinetics of Midazolam in Children: Comparative Study of Intranasal and Intravenous Administration," European Journal of Clinical Pharmacology, (1991) 41: pp. 355-357.
Walberg et al., "Plasma Concentrations of Midazolam in Children Following Intranasal Administration," Anesthesiology, (1991) 74: pp. 233-235.
Methocel Cellulose Ethers Technical Handbook, Dow Chemical Company (32 pages), Sep. 2002.
Carbowax MPEG 350 & 350E Kinematic Viscosity Report, Dow Chemical Company (1 page), Sep. 2009.
Carbowax MPEG 500E & 550 Kinematic Viscosity Report, Dow Chemical Company (1 page), Sep. 2009.
Lui et al., "Intranasal Aborption of Flurazepam, Midazolam and Triazolam in Dogs," *J. Pharm. Sci.* 80: 1125-1129 (1991).
Ivaturi et al., Acta Neurol Scand. 2009, 120:353-357.
Costantino et al., International Journal of Pharmaceutics, 2007, vol. 337, pp. 1-24.
Bhattacharyya et al., Pediatr Neurol 2006 34:355-359.
de Haan et al., Epilepsia, 2010, 51(13):478-482.
Fisgin et al., J. Child Neurol. 2000, 833-835.
Fisgin et al., Journ. of Child Neurology. 2002, 17(2):123-126.
Harbord et al., J. Paediatr. Child Health. 2004, 40:556-558.
Holsti et al., Pediatric Emergency Care. 2007, 23(3):148-153.
Jeannet et al., Euro. Journ. of Paediatric Neurology. 1999, 3:73-77.
Kutlu et al., Brain & Develop. 2000, 22:359-361.
Kyrkou et al., Journ. of Intellec. & Develop. Disability. 2006, 31(3):131-138.
Mahmoudian et al., Epilepsy & Behavior. 2004. 5:253-255.
O'Regan et al., Develop. Medicine & Child Neurology. 1996, 38:1037-1045.
Scheepers et al., Seizure, 2000, 9:417-422.
Wermeling et al., Epilepsy Research, 2009, 83:124-132.
Aurora, Drug Delivery Technology, vol. 2 No. 7 (2002), pp. 1-8.
Harris et al., Journal of Pharmaceutical Sciences, vol. 78 (1989), pp. 470-471.
Illum et al., Journal of Aerosol Medicine, vol. 19 (2006), pp. 92-99.
Kilian et al., International Journal of Pharmaceutics, vol. 163 (1998), pp. 211-217.
Pennington et al., International Journal of Pharmaceutics, vol. 43 (1988), pp. 221-224.
Suzuki et al., Journal of Controlled Release, vol. 62 (1999), pp. 101-107.
Excerpts from the Handbook of Pharmaceutical Excipients (R.C. Rowe, P.J. Sheskey, & S.C. Owen, eds., PhP Pharmaceutical Press, 5th ed. 2006).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

# METHODS AND COMPOSITIONS FOR THE DELIVERY OF A THERAPEUTIC AGENT

## RELATED APPLICATIONS

This application is a continuation of co-pending U.S. application Ser. No. 12/016,724, filed Jan. 18, 2008, which claims the benefit of and priority to Icelandic Patent Application Serial No. 8593/2007, filed Jan. 19, 2007, the entire disclosure of each of which is incorporated by reference herein for all purposes.

## FIELD OF THE INVENTION

This invention relates generally to compositions for the delivery of a therapeutic agent and to related methods, and more particularly relates to compositions containing one or more alkoxy-polyethylene glycols for the delivery of a therapeutic agent and to related methods.

## BACKGROUND

The administration of a therapeutic agent by injection (e.g., intravenous, intramuscular or subcutaneous injection) typically is regarded as the most convenient way of administration when the purpose is to achieve a rapid and strong systemic effect, for example, within 3-10 minutes, when the agent is not absorbed by the gastrointestinal tract, or when the agent is inactivated in the gastrointestinal tract or by first-pass hepatic metabolism. However, administration by injection presents a range of disadvantages. For example, sterile syringes must be used and injections cannot be administered by untrained personnel. Furthermore, this mode of administration may cause pain and/or irritation, especially in the case of repeated injections at the same site.

Mucosal administration, such as, intranasal, buccal, sublingual, rectal and pulmonal administration, is receiving particular interest as it avoids many of the disadvantages of injecting a therapeutic agent while, at the same time, still providing a strong and rapid systemic effect. In order to be an attractive alternative to injection, mucosal administration, for example, intranasal administration, should neither cause significant pain, discomfort or irritation nor cause any irreversible damage to the mucosal surface. However, in the case of acute health threatening indications, a relatively high local irritation to the mucosa may be acceptable.

In mucosal administration, such as during nasal, buccal or rectal administration, the therapeutic agent should be applied to the mucosa in a vehicle that permits it to penetrate, or be absorbed through, the mucosa. In order to penetrate the mucus, the vehicle should be biocompatible with mucus and hence have a certain degree of hydrophilicity. However, the vehicle should preferably also possess lipophilic properties to dissolve a clinically relevant amount of the therapeutic agent of interest.

The extensive network of blood capillaries under the mucosal surface, especially in the nasal mucosa, is well suited to provide a rapid and effective systemic absorption of drugs, vaccines and biologicals. Moreover, the nasal epithelial membrane in effect contains a single layer of epithelial cells (pseudostratified epithelium) and, therefore, is more suited for drug administration than other mucosal surfaces having squamous epithelial layers, such as, the mouth and vagina.

It has been hypothesized that the usefulness of nasal administration can be limited if the therapeutic agent has limited solubility in water (Proctor, D. F. (1985) *Nasal Physiology in Intranasal Drug Administrations*, in Chien, Y. W. (Ed.) Transnasal Systemic Medications, Fundamentals, Developmental Concepts and Biomedical Assessments, Elsevier Science Publishers, Amsterdam, pp. 101-105). As a result, this hypothesis, if correct, may limit the delivery of certain therapeutic agents that are sparingly soluble in water.



To facilitate delivery to the nasal cavity, an effective amount of the therapeutic agent should be dissolved in a small volume, for example, less than about 1000 μL, preferably less than 300 μL, and more preferably less than 150 μL. Larger volumes drain out anteriorly through the nostrils or posteriorly toward the pharynx where excess liquid is swallowed. As a result, if large volumes are administered, a portion of the therapeutic agent can be lost from the absorption site, and it can be difficult if not impossible to reproducibly administer the correct dose of the therapeutic agent.

A variety of delivery systems have been developed for the nasal administration of therapeutic agents. Lau and Slattery studied the absorption characteristics of diazepam and lorazepam following their intranasal administration for the treatment of epilepticus (Lau, S. W. J. & Slattery, J. T. (1989), *Absorption of Diazepam and Lorazepam Following Intranasal Administration*, Int. J. Pharm., 54, 171-174). In order to solubilize the therapeutic agent, a non-ionic surfactant—polyoxyethylated castor oil—was selected as the least irritating solvent of several solvents studied, including polyethylene glycol 400 (PEG 400). Diazepam absorption was 84% and 72%, respectively, in two adults measured over a period of 60 hours. However, the peak concentration was not observed until 1.4 hours after the nasal administration and was only about 27% with reference to intravenous administration, suggesting that most of the absorption had taken place after the test substance passed down to pharynx and swallowed. Similar results were obtained for lorazepam but with an even longer time to peak (2.3 hours). The authors concluded that the intranasal route of administration had limited potential for the acute treatment of epileptic seizures.

Wilton et al. attempted to administer midazolam to 45 children to achieve pre-anesthetic sedation (Wilton et al. (1988) *Preanaesthetic Sedation of Preschool Children Using Intranasal Midazolam*, Anesthesiology, 69, 972-975). However, the volumes used were impractical and exceeded the maximal volume required for efficient administration. This resulted in coughing and sneezing with expulsion of at least part of the dose.

Morimoto et al. studied a gel preparation for nasal application in rats of nifedipine containing the gelling agent carbopol (polyacrylic acid) in PEG 400, for achieving prolonged action and high bioavailability of the therapeutic agent (Morimoto et al. (1987) *Nasal Absorption of Nifedipine from Gel Preparations in Rats*, Chemical and Pharmaceutical Bulletins, 35, No. 7, 3041-3044). A mixture of equal amounts of carbopol and PEG 400 was preferred. It was shown that nasal application provided higher bioavailability of nifedipine than after peroral administration, but the peak plasma concentration was not observed until 30 minutes after administration.

Danish Patent Application No. 2586/87 discloses a pharmaceutical composition comprising an anti-inflammatory steroid, water, 2 to 10% (v/v) propylene glycol, 10 to 25% (v/v) PEG 400, and 1 to 4% (v/v) Tween 20.

U.S. Pat. No. 4,153,689 discloses a stable aqueous solution of insulin intended for intranasal administration. The solutions had a pH not more than 4.7, and contained from 0.1 to 20% by weight of a stabilizing agent including (a) one or more non-ionic surface active agents whose hydrophile-lipophile balance value was in the range of 9 to 22, and/or (b) polyethylene glycol whose molecular weight was in the range of from 200 to 7500. Exemplary non-ionic surface active

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

agents included polyoxyethylene fatty acid ester, a polyoxyethylene higher alcohol ether, a polyoxyethylene alkylphenyl ether, or a polyoxyethylene alkylphenyl ether, or a polyoxyethylene hydrogenated castor oil.

International Patent Publication No. DK-2075/90 discloses the nasal administration of therapeutic agents, for example, benzodiazepines, in compositions containing n-glycofurol, a derivative of polyethyleneglycol, for mucosal administration. The application discloses the nasal administration of therapeutic agents, for example, benzodiazepines, in formulations containing at least 30% n-ethyleneglycols ranging from 1-8 ethylene glycol, for example, polyethylene glycol 200 (PEG 200).

U.S. Pat. No. 5,693,608 discloses a method of administering a therapeutic agent via the nasal mucosa of a mammal, where the agent is dissolved or suspended in an n-ethyleneglycol containing vehicle where the n-ethyleneglycol is represented by the formula, $H(OCH_2CH_2)_pOH$, wherein p is a number from 1 to 8.

Notwithstanding, there is still a need for compositions deliverable through mucosal membranes that produce therapeutic plasma concentrations of the therapeutic agent as fast as or nearly as fast as by intravenous administration but without causing irritation and/or unacceptable damage to the mucosal membrane.

## SUMMARY OF THE INVENTION

The invention is based, in part, upon the discovery that the inclusion of one or more alkoxy-polyethylene glycols in a formulation provides certain advantages when the resulting composition is to be applied, for example, to a mucosal surface. For example, it has been discovered that when alkoxy-polyethylene glycol is used in such formulations, the therapeutic agent can be still be solubilized (which is especially useful for poorly soluble therapeutic agents) but the resulting formulations are less viscous and cause less irritation to mucosal membranes because the amount of other potentially viscous and irritable excipients, for example, polyethylene glycol or propylene glucol, can be reduced or eliminated altogether. As a result, the lower viscosity formulations, when converted into droplets, for example, by a nasal sprayer during intranasal delivery, can produce a spray pattern optimized for delivering the therapeutic agent to the mucosal membrane. In addition, formulations containing alkoxy-polyethylene glycols create less irritation (burning sensation) when applied to a mucosal surface, for example, a nasal membrane following nasal administration. In addition, when administered intranasally, the compositions of the invention minimize undesirable after taste (for example, a petroleum-like after taste) that can be associated with certain other excipients.

In one aspect, the invention provides a liquid pharmaceutical composition comprising a therapeutic agent and an alkoxy-polyethylene glycol represented by Formula I:

$$R—O—(CH_2CH_2O)_n—H \quad (I)$$

wherein,

R is methyl, ethyl, n-propyl, isopropyl, or cyclopropyl; and

n, which is the average number of oxyethylene repeating units, is a number in the range of from about 1 to about 25.

In another aspect, the invention provides a liquid formulation for solubilizing a poorly soluble therapeutic agent, for example, a poorly soluble organic therapeutic agent. The composition comprises a poorly soluble therapeutic agent and an alkoxy-polyethylene glycol represented by Formula I:

$$R—O—(CH_2CH_2O)_n—H \quad (I)$$

wherein,

R is $(C_1\text{-}C_6)$alkyl; and

n, which is the average number of oxyethylene repeating units, is a number in the range of from about 1 to about 25.

In another aspect, the invention provides methods of delivering a therapeutic agent of interest to a mammal, for example, a human, using an alkoxy-polyethylene glycol containing composition described herein. The composition is particularly useful when the composition is applied to a mucosal membrane, for example, a nasal membrane during intranasal drug delivery.

These and other aspects and advantages of the invention will become apparent upon consideration of the following detailed description and claims.

## DETAILED DESCRIPTION OF THE INVENTION

The invention is based, in part, upon the discovery that the inclusion of one or more alkoxy-polyethylene glycols into formulations provides certain advantages over other excipients when the formulations are applied, for example, to a mucosal surface. For example, it has been discovered that when an alkoxy-polyethylene glycol is used in such a formulation, the therapeutic agent (for example, a poorly soluble therapeutic agent) can be solubilized more easily and in larger amounts than when other excipients, for example, polyethylene glycol (more particularly PEG 400), are used. However, the resulting formulations are less viscous and cause less irritation to mucosal membranes as the amount of other viscous and irritable excipients can be reduced or eliminated altogether. As a result, the lower viscosity formulations, when converted into droplets, for example, by a nasal sprayer during intranasal delivery, produce a spray pattern optimized for delivering the therapeutic agent to the mucosal membrane. In addition, formulations containing one or more alkoxy-polyethylene glycols cause less irritation (for example, a burning sensation) when applied to a mucosal surface, for example, a nasal membrane during intranasal administration. In addition, when administered intranasally, the compositions of the invention have less undesirable after taste (for example, a petroleum-like after taste) than when other excipients, for example, propylene glycol, are used.

Under certain circumstances, the alkoxy-group also increases the bioadhesion of the composition to the site of administration on the mucosal surface thereby prolonging the duration of the composition at the site of administration. This can increase the amount of therapeutic agent that is ultimately absorbed.

I—Formulations

In one aspect, the invention provides a liquid pharmaceutical composition comprising a therapeutic agent and an alkoxy-polyethylene glycol represented by Formula I:

$$R—O—(CH_2CH_2O)_n—H \quad (I)$$

wherein,

R is methyl, ethyl, n-propyl, isopropyl, or cyclopropyl; and

n is the average number of oxyethylene repeating units and is a number in the range of from about 1 to about 25.

In another aspect, the invention provides a liquid formulation for solubilizing a poorly soluble therapeutic agent. The liquid pharmaceutical composition comprises a poorly soluble therapeutic agent, for example, a poorly soluble organic therapeutic agent, and an alkoxy-polyethylene glycol represented by Formula I:

$$R—O—(CH_2CH_2O)_n—H \quad (I)$$

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

wherein,

R is $(C_1-C_6)$alkyl; and

n is the average number of oxyethylene repeating units and is a number in the range of from about 1 to about 25. The formulations typically are in liquid form at 20° C., 25° C., 30° C., 35° C., or 40° C. Certain formulations preferably are liquid formulations at 37° C.

The term "poorly soluble therapeutic agent" refers to a compound having biological activity and a solubility in water of less than about 1 mg/mL at pH 7 and 20° C. In certain embodiments, the poorly soluble therapeutic agent is an organic compound that has a molecular weight of less than 1500 g/mol, and preferably less than 500 g/mol. In certain embodiments, the poorly soluble therapeutic agent is a compound, for example, an organic compound, having an aqueous solubility of less than about 0.5 mg/mL, less than about 0.3 mg/mL, or less than about 0.1 mg/mL, at pH 7 and 20° C.

In addition, the term "alkyl" is art-recognized, and includes saturated aliphatic groups, including straight-chain alkyl groups, branched-chain alkyl groups, cycloalkyl (alicyclic) groups, alkyl substituted cycloalkyl groups, and cycloalkyl substituted alkyl groups. The term "$(C_1-C_6)$alkyl" refers to an alkyl group having between 1 and 6 carbon atoms. Representative alkyl groups include methyl, ethyl, n-propyl, isopropyl, n-butyl, sec-butyl, isobutyl, tert-butyl, pentyl, hexyl, cyclopropyl, cyclobutyl, cyclopropylmethylene, cyclopentyl, cyclobutylmethylene, cyclobutylethylene, cyclohexyl, cyclopropylpropylene, cyclobutylethylene, and cyclopentylmethylene. The term cyclopropylmethylene, for example, is art-recognized and refers to a radical having the following formula:



In certain embodiments, the alkoxy-polyethylene glycol can comprise from about 0.1% (v/v) to about 80% (v/v), or from about 0.5% (v/v) to about 70% (v/v), of the composition. In certain other embodiments, the alkoxy-polyethylene glycol can comprise from about 5% (v/v) to about 80% (v/v), or from about 30% (v/v) to about 75% (v/v) or from about 40% (v/v) to about 70% (v/v), of the composition. For certain hydrophilic drugs, the alkoxy-polyethylene glycol can comprise from about 0.1% (v/v) to about 80% (v/v), or from about 0.5% (v/v) to about 70% (v/v), or from about 1% (v/v) to about 60% of the composition. For certain lipophilic drugs, the alkoxy-polyethylene glycol can comprise from about 1% (v/v) to about 80% (v/v), or from about 2% (v/v) to about 65% (v/v), or from about 5% (v/v) to about 50% of the composition. Furthermore, the therapeutic agent can comprise from about 0.001% (w/v) to about 20% (w/v) of the composition, or from about 0.1% (w/v) to about 10% (w/v) of the composition.

The pharmaceutical composition can have a pH in the range of from about 4.5 to about 8.5, or from about 4.5 to about 7.5, or from about 4.5 to about 6.5, or from about 5.5 to about 8.5, or from about 6.5 to about 8.5, or from about 5.5 to about 7.5.

As discussed, one of the advantages of using an alkoxy-polyethylene glycol is that it can be used in place of or can be used to reduce the amount of other excipients, for example, certain polyethylene glycols and propylmr glycol, so as to reduce the viscosity of the resulting formulation. By reducing the viscosity of the resulting formation it is possible to create sprays that have more uniform spray characteristics (for example, more uniform droplet sizes and/or plume geometries) for the intranasal administration of therapeutic agent. The resulting pharmaceutical composition at a temperature of 20° C. has a viscosity in the range of about 1.5 cP to about 60 cP, or from about 2 cP to about 50 cP, or from about 3 cP to about 40 cP, or from about 4 cP to about 30 cP, or from about 5 cP to about 25 cP.

Exemplary alkoxy-polyethylene glycols, therapeutic agents, and other excipients useful in creating compositions of the invention are described in the following sections.

A. Alkoxy-Polyethylene Glycol

Useful alkoxy-polyethylene glycol excipients useful in the practice of the invention are represented by Formula (I):

$$R—O—(CH_2CH_2O)_n—H \qquad (I)$$

wherein, n, as the average number of oxyethylene repeating units, is a number in the range of from about 1 to about 25. Accordingly, n can be a number about 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, or 25. In certain embodiments, n is an number in the range of from about 2 to about 15, or from about 2 to about 14, or from about 2 to about 13, or from about 2 to about 12, or from about 2 to about 11, or from about 2 to about 10, or from about 3 to about 15, or from about 3 to about 14, or from about 3 to about 13, or from about 3 to about 12, or from about 3 to about 11, or from about 3 to about 10.

In certain embodiments, R is $(C_1-C_6)$alkyl. For example, as discussed above, R can be methyl, ethyl, n-propyl, isopropyl, n-butyl, sec-butyl, isobutyl, tert-butyl, pentyl, hexyl, cyclopropyl, cyclobutyl, cyclopropylmethylene, cyclopentyl, cyclobutylmethylene, cyclobutylethylene, cyclohexyl, cyclopropylpropylene, cyclobutylethylene, or cyclopentylmethylene. In certain embodiments, R is selected from the group consisting of methyl, ethyl, n-propyl, isopropyl, and cyclopropyl.

In a preferred embodiment, the alkoxy-polyethylene glycol is methoxy-polyethylene glycol where R is methyl and n is an number from about 1 to about 25, or from about 2 to about 12, or from about 3 to about 10.

Useful methoxy-polyethylene glycols include, for example, methoxy-diethyleneglycol (m2EG), methoxy-triethylene glycol (m3EG), methoxy-tetraethylene glycol (m4EG), methoxy-pentaethylene glycol (m5EG), methoxy-hexaethylene glycol (m6EG), methoxy-heptaethylene glycol (m7EG), methoxy-octaethylene glycol (m8EG), methoxy-nonaethylene glycol (m9EG), methoxy-decaethylene glycol (m10EG), methoxy-undecaethylene glycol (m11EG), methoxy-dodecaethylene glycol (m12EG), methoxy-tridecaethylene glycol (m13EG) and methoxy-tetradecaethylene glycol (m14EG). The ethylene glycols may be used in the form of the single compounds or as a mixture of two or more methoxy-n-ethylene glycols.

In certain embodiments, the alkoxy-polyethylene glycol is methoxy-polyethylene glycol 350 (mPEG 350) or is methoxy-polyethylene glycol 550 (mPEG 550) or is methoxy-polyethylene glycol 750 (mPEG 750). The term "mPEG 350" is understood to mean methoxy polyethylene glycol having an average molecular weight of about 350, and in certain embodiments "n," as denoted in Formula I, is 7.2. The term "mPEG550" is understood to mean methoxy polyethylene glycol having an average molecular weight of about 550, and in certain embodiments "n," as denoted in Formula I, is 11.8. The term "mPEG750" is understood to mean methoxy polyethylene glycol having an average molecular weight of about 750, and in certain embodiments "n," as denoted in Formula I, is 16.3.

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

Certain, preferred alkoxy-polyethylene glycols include Carbowax™ mPEG 350, Carbowax™ mPEG 550 or Carbowax™ mPEG 750, which are available commercially from Dow Chemical Company. Both mPEG350 and mPEG550 are colorless liquids that are miscible with water, alcohols, such as methanol, ethanol, n-propanol, glycerol and various oils in all proportions, and have a boiling point about 155° C. It is understood that alkoxy-polyethylene glycols are known by other names, where, for example, methoxy-polyethylene glycol is also known as mono-methyl polyethylene glycol and poly(ethylene glycol) methyl ether.

By using one or more of the alkoxy-polyethylene glycols described herein, the resulting pharmaceutical compositions can be optimized, for example, with respect to bioadhesion, viscosity and sprayability. For example, mPEG 350, at an equivalent concentration as PEG 200, can still solubilize a therapeutic agent but the resulting composition has a lower viscosity. As a result, this substitution has a surprisingly positive effect on the sprayability compared with lower molecular weight PEG 200, which is important where the formulation is to be sprayed.

B. Therapeutic Agent

The pharmaceutical composition of the invention may comprise one or more therapeutic agents (also referred to as biologically active substances) selected from the group consisting of hydrophobic therapeutic agents, hydrophilic therapeutic agents, and combinations thereof.

The alkoxy-polyethylene glycol excipients are surprisingly capable of solubilizing and delivering a wide variety of hydrophilic and hydrophobic therapeutic agents. The hydrophobic drugs have little or no water solubility. It is understood that the excipients described herein can be used to solubilize therapeutic agents that have a solubility in water of less than about 1.0 mg/mL, less than about 0.5 mg/mL, less than about 0.3 mg/mL, or less than about 0.1 mg/mL, or less than about 0.01 mg/mL, at pH 7 and 20° C. Such therapeutic agents can be any agents having therapeutic or other value when administered to a mammal, for example, a human, and can include organic molecules (for example, small molecule drugs having a molecular weight of less than 1,500 g/mol., or less than 500 g/mol.), proteins, peptides, immungens (e.g. vaccines, cytokines, etc.), nutrients, and cosmetics (cosmeceuticals).

In certain embodiments, the therapeutic agent is an analgesic agent, an anti-inflammatory agent, an anti-arrhythmic agent, an anti-asthma agent, an anti-bacterial agent, an anti-viral agent, an anti-coagulant, an anti-depressant, an anti-diabetic, an anti-epileptic, an anti-fungal agent, an anti-hypertensive agent, an anti-malarial, an anti-migraine agent, an anti-muscarinic agent, an anti-neoplastic agent, an immuno-suppressant, an anti-protozoal agent, an anti-thyroid agent, an anxiolytic agent, a sedative, a hypnotic agent, a neuroleptic agent, a beta-Blocker, a cardiac inotropic agent, a corticosteroid, a diuretic agent, an anti-Parkinsonian agent, a gastrointestinal agent, an anti-histamine, a histamine-receptor antagonist, a lipid regulating agent, a muscle relaxant, nitrate and other anti-anginal agent, a nutritional agent, an opioid analgesic, sex hormone, stimulant, cytokine, peptidomimetic, peptide, protein, toxoid, sera, antibody, vaccine, nucleoside, nucleotide, nucleic acid and peptidyl-nucleic acid.

Specific non-limiting examples of hydrophobic therapeutic agents that can be used in the pharmaceutical compositions of the present invention include the following representative compounds, as well as their pharmaceutically acceptable salts, isomers, esters, ethers and other derivatives including, for example: (1) analgesics and anti-inflammatory agents, such as, aloxiprin, auranofin, azapropazone, benorylate, capsaicin, celecoxib, diclofenac, diflunisal, etodolac, fenbufen, fenoprofen calcium, flurbiprofen, ibuprofen, indomethacin, ketoprofen, ketorolac, leflunomide, meclofenamic acid, mefenamic acid, nabumetone, naproxen, oxaprozin, oxyphenbutazone, phenylbutazone, piroxicam, refocoxib, sulindac, tetrahydrocannabinol, tramadol and tromethamine; (2) anti-arrhythmic agents, such as, amiodarone HCl, diisopyramide, flecaimide acetate and quinidine sulfate; (3) anti-asthma agents, such as, zileuton, zafirlukast, montelukast, and albuterol; (4) anti-bacterial agents, such as, baclofen, benzathine penicillin, cinoxacin, clarithromycin, clofazimine, cloxacillin, demeclocycline, dirithromycin, doxycycline, erythromycin, ethionamide, furazolidone, grepafloxacin, imipenem, levofloxacin, lomefloxacin, moxifloxacin HCl, nalidixic acid, nitrofurantoin, norfloxacin, ofloxacin, rifampicin, rifabutin, rifapentine, sparfloxacin, spiramycin, sulphabenzamide, sulphadoxine, sulphamerazine, sulphacetamide, sulphadiazine, sulphafurazole, sulphamethoxazole, sulphapyridine, tetracycline, trimethoprim and trovafloxacin; (5) anti-viral agents, such as, abacavir, amprenavir, delavirdine, efavirenz, indinavir, lamivudine, nelfinavir, nevirapine, ritonavir, saquinavir, and stavudine; (6) anti-coagulants, such as, cilostazol, clopidogrel, dicumarol, dipyridamole, nicoumalone, oprelvekin, phenindione, ticlopidine, and tirofiban; (7) anti-depressants, such as amoxapine, bupropion, citalopram, clomipramine, maprotiline HCl, mianserin HCl, nortriptyline HCl, paroxetine HCl, sertraline HCl, trazodone HCl, trimipramine maleate, and venlafaxine HCl; (8) anti-diabetics, such as, acetohexamide, chlorpropamide, glibenclamide, gliclazide, glipizide, glimepiride, miglitol, pioglitazone, repaglinide, rosiglitazone, tolazamide, tolbutamide and troglitazone; (9) anti-epileptics, such as, beclamide, carbamazepine, clonazepam, ethotoin, felbamate, fosphenyloin sodium, lamotrigine, methoin, methsuximide, methylphenobarbitone, oxcarbazepine, paramethadione, phenacemide, phenobarbitone, phenyloin, phensuximide, primidone, sulthiame, tiagabine HCl, topiramate, valproic acid, and vigabatrin; (10) anti-fungal agents, such as, amphotericin, butenafine HCl, butoconazole nitrate, clotrimazole, econazole nitrate, fluconazole, flucytosine, griseofulvin, itraconazole, ketoconazole, miconazole, natamycin, nystatin, sulconazole nitrate, oxiconazole, terbinafine HCl, terconazole, tioconazole and undecenoic acid; (11) anti-hypertensive agents, such as, amlodipine, benidipine, benezepril, candesartan, captopril, darodipine, diltiazem HCl, diazoxide, doxazosin HCl, elanapril, eprosartan, losartan mesylate, felodipine, fenoldopam, fosenopril, guanabenz acetate, irbesartan, isradipine, lisinopril, minoxidil, nicardipine HCl, nifedipine, nimodipine, nisoldipine, phenoxybenzamine HCl, prazosin HCl, quinapril, reserpine, terazosin HCl, telmisartan, and valsartan; (12) anti-malarials, such as, amodiaquine, chloroquine, chlorproguanil HCl, halofantrine HCl, mefloquine HCl, proguanil HCl, pyrimethamine and quinine sulfate; (13) anti-migraine agents, such as, dihydroergotamine mesylate, ergotamine tartrate, frovatriptan, methysergide maleate, naratriptan HCl, pizotyline malate, rizatriptan benzoate, sumatriptan succinate, and zolmitriptan; (14) anti-muscarinic agents, such as, atropine, benzhexyl HCl, biperiden, ethopropazine HCl, hyoscyamine, oxyphencyclimine HCl and tropicamide; (15) anti-neoplastic agents and immunosuppressants, such as, aminoglutethimide, amsacrine, azathioprine, bicalutamide, bisantrene, busulfan, camptothecin, chlorambucil, cyclosporin, dacarbazine, ellipticine, estramustine, etoposide, irinotecan, lomustine, melphalan, mercaptopurine, mitomycin, mitotane, mitoxantrone, mofetil mycophenolate, nilutamide, paclitaxel, procarbazine HCl, sirolimus, tacrolimus, tamoxifen citrate, teniposide, tes-

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

tolactone, topotecan HCl, and toremifene citrate; (16) anti-protozoal agents, such as, atovaquone, benznidazole, clioquinol, decoquinate, diiodohydroxyquinoline, diloxanide furoate, dinitolmide, furazolidone, metronidazole, nimorazole, nitrofurazone, omidazole and tinidazole; (17) anti-thyroid agents, such as, carbimazole, paracalcitol, and propylthiouracil; anti-tussives, such as, benzonatate; (18) anxiolytics, sedatives, hypnotics and neuroleptics, such as, alprazolam, amylobarbitone, barbitone, bentazepam, bromazepam, bromperidol, brotizolam, butobarbitone, carbromal, chlordiazepoxide, chlormethiazole, chlorpromazine, chlorprothixene, clonazepam, clobazam, clotiazepam, clozapine, diazepam, droperidol, ethinamate, fluanisone, flunitrazepam, triflupromazine, flupenthixol decanoate, fluphenazine decanoate, flurazepam, gabapentin, haloperidol, lorazepam, lormetazepam, medazepam, meprobamate, mesoridazine, methaqualone, methylphenidate, midazolam, molindone, nitrazepam, olanzapine, oxazepam, pentobarbitone, perphenazine pimozide, proclorperazine, pseudoephedrine, quetiapine, rispiridone, sertindole, sulpiride, temazepam, thioridazine, triazolam, zolpidem, and zopiclone; (19) beta-Blockers, such as, acebutolol, alprenolol, labetalol, metoprolol, nadolol, oxprenolol, pindolol and propranolol; (20) cardiac inotropic agents, such as, aminone, digitoxin, digoxin, enoximone, lanatoside C and medigoxin; (21) a corticosteroid, such as, beclomethasone, betamethasone, budesonide, cortisone acetate, desoxymethasone, dexamethasone, fludrocortisone acetate, flunisolide, fluocortolone, fluticasone propionate, hydrocortisone, methylprednisolone, prednisolone, prednisone and triamcinolone; (22) diuretics, such as, acetazolamide, amiloride, bendroflumethiazide, bumetamide, chlorothiazide, chlorthalidone, ethacrynic acid, frusemide, metolazone, spironolactone and triamterene; (23) anti-Parkinsonian agents, such as, bromocriptine mesylate, lysuride maleate, pramipexole, ropinirole HCl, and tolcapone; (24) gastrointestinal agents, such as bisacodyl, cimetidine, cisapride, diphenoxylate HCl, domperidone, famotidine, lansoprazole, loperamide, mesalazine, nizatidine, omeprazole, ondansetron HCl, rabeprazole sodium, ranitidine HCl and sulphasalazine; (25) anti-histamines and histamine-receptor antagonists, such as, acrivastine, astemizole, chlorpheniramine, cinnarizine, cetirizine, clemastine fumarate, cyclizine, cyproheptadine HCl, dexchlorpheniramine, dimenhydrinate, fexofenadine, flunarizine HCl, loratadine, meclizine HCl, oxatomide, and terfenadine; (26) lipid regulating agents, such as, atorvastatin, bezafibrate, cerivastatin, ciprofibrate, clofibrate, fenofibrate, fluvastatin, gemfibrozil, pravastatin, probucol, and simvastatin; (27) muscle relaxants, such as, dantrolene sodium and tizanidine HCl; (28) nitrates and other anti-anginal agents, such as, amyl nitrate, glyceryl trinitrate, isosorbide dinitrate, isosorbide mononitrate and pentaerythritol tetranitrate; (29) nutritional agents, such as, calcitriol, carotenes, dihydrotachysterol, essential fatty acids, non-essential fatty acids, phytonadiol, vitamin A, vitamin $B_2$, vitamin D, vitamin E and vitamin K; (30) opioid analgesics, such as, codeine, dextropropoxyphene, diamorphine, dihydrocodeine, fentanyl, meptazinol, methadone, morphine, hydromorphone, nalbuphine and pentazocine; (31) sex hormones, such as, clomiphene citrate, cortisone acetate, danazol, dehydroepiandrosterone, ethynyl estradiol, finasteride, fludrocortisone, fluoxymesterone, medroxyprogesterone acetate, megestrol acetate, mestranol, methyltestosterone, norethisterone, norgestrel, oestradiol, conjugated estrogens, progesterone, rimexolone, stanozolol, stilbestrol, testosterone and tibolone; and (32) stimulants, such as, amphetamine, dexamphetamine, dexfenfluramine, fenfluramine and mazindol; and others, such as, becaplermin, donepezil HCl, L-thryroxine, methoxsalen, verteporfin, physostigmine, pyridostigmine, raloxifene HCl, sibutramine HCl, sildenafil citrate, tacrine, tamsulosin HCl, and tolterodine.



Certain exemplary hydrophobic therapeutic agents include sildenafil citrate, amlodipine, tramadol, celecoxib, rofecoxib, oxaprozin, nabumetone, ibuprofen, terbinafine, itraconazole, zileuton, zafirlukast, cisapride, fenofibrate, tizanidine, nizatidine, fexofenadine, loratadine, famotidine, paricalcitol, atovaquone, nabumetone, alprazolam, bromazepam, chlorpromazine, clonazepam, diazepam, flunitrazepam, flurazepam, haloperidol, lorazepam, lormetazepam, midazolam, nitrazepam, oxazepam, pseudoephedrine, temazepam, triazolam, zolpidem, zopiclone, tetrahydrocannabinol, testosterone, megestrol acetate, repaglinide, progesterone, rimexolone, cyclosporin, tacrolimus, sirolimus, teniposide, paclitaxel, pseudoephedrine, troglitazone, rosiglitazone, finasteride, vitamin A, vitamin D, vitamin E, and pharmaceutically acceptable salts, isomers and derivatives thereof. It should be appreciated that the listing of hydrophobic therapeutic agents and their therapeutic classes is merely illustrative. It is understood, that mixtures of hydrophobic therapeutic agents may also be used where desired.

An advantage of using alkoxy-polyethylene glycol as an excipient in the pharmaceutical composition is that, for example, highly lipophilic substances, such as, lorazepam, midazolam, clonazepam, alprazolam and other compounds belonging to the benzodiazepines, as well as water soluble substances, for example, peptides and proteins, such as, the pancreatic hormones can be solubilized in a clinically relevant volume (for example, 25-300 μL) for delivery to a human subject. By way of comparison, clinically relevant doses of midazolam, lorazepam, alprazolam, diazepam and clonazepam would have to be dissolved in at least 5 mL of water.

Although the alkoxy-polyethylene glycol excipients are particularly useful for the delivery of hydrophobic agents, alkoxy-polyethylene glycol can also be used to deliver a variety of hydrophilic therapeutic agents. Alkoxy-polyethylene glycols, under certain circumstances, may prolong the duration of the therapeutic agent at the absorption site thereby increasing the amount of agent ultimately delivered. Exemplary hydrophilic therapeutic agents include hydrophilic drugs (i.e., conventional non-peptidic drugs), hydrophilic macromolecules, such as, cytokines, peptides, proteins, peptidomimetics, toxoids, sera, antibodies, vaccines, nucleosides, nucleotides, nucleic acids, and genetic material. The hydrophilic therapeutic agent can be administered alone or in combination with other agents, for example, a hydrophobic therapeutic agent discussed hereinabove or a second, different hydrophilic therapeutic agent.

Without limitation, exemplary hydrophilic therapeutic agents that can be delivered using the compositions and methods of the present invention, include the following compounds as well as their pharmaceutically acceptable salts, isomers, esters, ethers and other derivatives, for example: acarbose; acyclovir; acetyl cysteine; acetylcholine chloride; alatrofloxacin; alendronate; alglucerase; amantadine hydrochloride; ambenomium; amifostine; aminocaproic acid; antihemophilic factor (human); antihemophilic factor (porcine); antihemophilic factor (recombinant); aprotinin; asparaginase; atenolol; atracurium besylate; azithromycin; aztreonam; BCG vaccine; bacitracin; becalermin; belladonna; bepridil hydrochloride; bleomycin sulfate; calcitonin human; calcitonin salmon; carboplatin; capecitabine; capreomycin sulfate; cefamandole nafate; cefazolin sodium; cefepime hydrochloride; cefixime; cefonicid sodium; cefoperazone; cefotetan disodium; cefotaxime; cefoxitin sodium; cefti-

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

zoxime; ceftriaxone; cefuroxime axetil; cephalexin; cephapirin sodium; cholera vaccine; chorionic gonadotropin; cidofovir; cisplatin; cladribine; clidinium bromide; clindamycin and clindamycin derivatives; ciprofloxacin; clondronate; colistimethate sodium; colistin sulfate; corticotropin; cosyntropin; cromalyn sodium; cytarabine; daltaperin sodium; danaproid; deforoxamine; denileukin diftitox; desmopressin; diatrizoate megluamine and diatrizoate sodium; dicyclomine; didanosine; dopamine hydrochloride; dornase alpha; doxacurium chloride; doxorubicin; editronate disodium; elanaprilat; enkephalin; enoxacin; enoxaparin sodium; ephedrine; epinephrine; epoetin alpha; esmol hydrochloride; Factor IX; famiciclovir; fludarabine; fluoxetine; foscarnet sodium; ganciclovir; granulocyte colony stimulating factor; granulocyte-macrophage stimulating factor; growth hormones (human or bovine); gentamycin; glucagon; glycopyrrolate; gonadotropin releasing hormone and synthetic analogs thereof; GnRH; gonadorelin; grepafloxacin; hemophilus B conjugate vaccine; Hepatitis A virus vaccine inactivated; Hepatitis B virus vaccine inactivated; heparin sodium; indinavir sulfate; influenza virus vaccine; interleukin-2; interleukin-3; insulin-human; insulin-porcine; insulin NPH; insulin aspart; insulin glargine; insulin detemir; interferon-$\alpha$; interferon-$\beta$; ipratropium bromide; isofosfamide; japanese encephalitis virus vaccine; leucovorin calcium; leuprolide acetate; levofloxacin; lincomycin and lincomycin derivatives; lobucavir; lomefloxacin; loracarbef; mannitol; measles virus vaccine; meningococcal vaccine; menotropins; mephenzolate bromide; mesalmine; methanamine; methotrexate; methscopolamine; metformin hydrochloride; metoprolol; mezocillin sodium; mivacurium chloride; mumps viral vaccine; nedocromil sodium; neostigmine bromide; neostigmine methyl sulfate; neutontin; norfloxacin; octreotide acetate; olpadronate; oxytocin; pamidronate disodium; pancuronium bromide; paroxetine; pefloxacin; pentamidine isethionate; pentostatin; pentoxifylline; periciclovir; pentagastrin; phentolamine mesylate; phenylalanine; physostigmine salicylate; plague vaccine; piperacillin sodium; platelet derived growth factor-human; pneumococcal vaccine polyvalent; poliovirus vaccine (live or inactivated); polymixin B sulfate; pralidoxime chloride; pramlintide; pregabalin; propafenone; propenthaline bromide; pyridostigmine bromide; rabies vaccine; residronate; ribavarin; rimantadine hydrochloride; rotavirus vaccine; salmetrol xinofoate; sincalide; small pox vaccine; solatol; somatostatin; sparfloxacin; spectinomycin; stavudine; streptokinase; streptozocin; suxamethonium chloride; tacrine hydrochloride; terbutaline sulfate; thiopeta; ticarcillin; tiludronate; timolol; tissue type plasminogen activator; TNFR:Fc; TNK-tPA; trandolapril; trimetrexate gluconate; trospectinomycin; trovafloxacin; tubocurarine chloride; tumor necrosis factor; typhoid vaccine live; urea; urokinase; vancomycin; valaciclovir; varicella virus vaccine live; vasopressin and vasopressin derivatives; vecoronium bromide; vinblastin; vincristine; vinorelbine; warfarin-sodium; yellow fever vaccine; zalcitabine; zanamavir; zolandtronate; and zidovudine.

Other therapeutic agents that can be administered in this formulation may comprise adrenal hormones, corticosteroids and derivatives, such as, ACTH and analogs thereof, tetracosactrin, alsactide, cortisone, hydrocortisone alcohol, hydrocortisone acetate, hydrocortisone hemisuccinate, prednisolone terbutate, 9-alpha-fluoroprednisolone, triamcinolone acetonide, dexamethasone phosphate, flunisolide, toxicorol pivalate; anorectics, such as, benzphetamine HCl chlorphentermine HCl; antibiotics, such as, tetracycline HCl, tyrothricin, cephalosporine, aminoglycosides, streptomycin, gentamycin, leucomycin, penicillin and derivatives; anti-allergic agents; antibodies, such as, monoclonal or polyclonal antibodies; anti-cholinergic agents; anti-depressants, such as, amitriptyline HCl, imipramine HCl; anti-emitics, such as, neuroleptica, for example, metopimazin, anti-emetics having a regulatory effect on the motility of the intestine, such as, domperidon; anti-histaminic agents and histaminic agents, such as, diphenhydramin HCl, chloropheniramine maleate, histamine, prophenpyridamine maleate, chlorprophenpyridamine maleate, disodium chromoglycate, meclizine; anti-hypertensive agents, such as, clonidine HCl; anti-inflammatory agents (enzymatic), such as, chymotrypsin, bromelain seratiopeptidase; anti-inflammatory agents (non-steroidal), such as, acetaminophen, aspirin, aminopyrine, phenylbutazone, colchicine, probenocid; anti-inflammatory agents (steroidal), such as, fluticasone, predonisolone, triaxncinolone acetonide; anti-neoplastic agents, such as, actinomycin C.; anti-septics, such as, chlorhexidine HCl, hexylresorcinol, dequalinium chloride, ethacridine; anti-tussive expectorant (asthmatic agents), such as, sodium chromoglycate, isoproterenol HCl; anti-viral and anti-cancer agents such as interferons (such as alpha-2 interferon for treatment of common colds), phenyl-p-guanidino benzoate, enviroxime, etc.; beta-adrenergic blocking agents, such as, propranolol HCl; blood factors, such as, factor VII, factor VIII; bone metabolism controlling agents, such as, vitamin $D_3$; bronchoisters, such as, clenbuterol HCl, bitolterol mesylate; cardiotonics such as digitalis; cardiovascular regulatory hormones, drugs and derivatives, such as, bradykin antagonists, atrial natriuretic peptide and derivatives, such as, hydrailsazine, angiotensin II antagonist, nitroglycerin, propranolol, clofilium rosylate; chemotherapeutic agents, such as, sulphathiazole, nitrofurazone; CNS-stimulants, such as, lidocaine, cocaine; corticosteroids, such as, lacicortone, hydrocortisone, fluocinolone acetonide, triamcinolone acetonide; enzymes, such as, lysozyme chloride, dextranase; gastrointestinal hormones and derivatives, such as, secretin, substance P; hypothalamus hormones and derivatives, such as, LHRH and analogues (such as naferelin, buserelin, zolidex), TRH (thyrotropin releasing hormone); hypotensives; local anaesthetics, such as, benzocaine; migraine treatment substances, such as, dihydroergot amine, ergometrine, ergotamine, pizotizin; pancreatic hormones and derivatives, such as, insulin (hexameric/dimeric/monomeric forms); parasympathomimetics, such as, nicotine, methacholine; parasympatholytics, such as, scopolamine, atropine, ipratropium; Parkinson's disease substances, such as, apomorphin; pituitary gland hormones and derivatives, such as, growth hormone (e.g. human), vasopressin and analogues (DDAVP, Lypressin); prostaglandins, such as, PGA and derivatives thereof, $PGE_1$ and derivatives thereof, $PGE_2$ and derivatives thereof, $PGF_1$ and derivatives thereof, dinoprost trometamol; protease inhibitors, such as, citrate, or $\alpha_1$-antitrypsin; sex-hormones, such as, ethinyloestradiol, levonorgestrel, FSH, LH, LTH, estradiol-17-beta, norethindrone; sympathomimetics, such as, phenylephrine, xylometazoline, tramazoline, dopamine, dobutamine; sleep-aids, such as granisetron and ramelteon, tranquilizers, such as, brotizolam, camazepam, chlorazepic acid, cloxazolam, delorazepam, estazolam, ethyl loflazepate, fludiazepam, flutazolam, halazepam, haloxazolam, ketazolam, laprazolam, lormetazepam, nimetazepam, nitrazepam, nordiazepam, oxazepam, pinazepam, prazepam, temazepam, tetrazepam, tofisopam; vaccines, such as, AIDS-vaccines, parainfluenza virus, polio, rhinovirus type 13, respiratory syncytial virus; vasoconstrictors, such as, phenylephrine HCl, tetrahydrozoline HCl, naphazoline nitrate, oxymetazoline HCl, tramazoline HCl; vasodilators, such as, papaverine HCl, Substance P, vasoactive intestinal peptide (VIP).

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

Certain exemplary formulations comprising alkoxy-polyethylene glycol also comprise one or more therapeutic agents selected from the group consisting of peptide drugs, such as, oxytocin, vasopressin (desmopressin), insulin, calcitonin, elcatonin, cyanocobalamin $B_{12}$, and glucagon-like protein-1 (GLP-1), and small organic molecules, such as, dinoprsoone, misoprostol, apomorphine, fentanyl, metoclopramide, butorphanol, and midazolam

C. Other Excipients

It is understood that the compositions of the invention, in addition to the alkoxy-polyethylene glycol and the therapeutic agent, can comprise a number of other excipients known to those skilled in the art, including absorption promoters, buffering agents, water absorbing polymers, alcohols, lipids, osmotic pressure controlling agents, pH-controlling agents, preservatives, propellants, surfactants, enzyme inhibitors, excipients for adjusting hydrophilic-lipophilic balance (HLB) and stabilizers.

Exemplary surfactants, include, for example nonoxynol, octoxynol, tweens, spans, sodium lauryl sulfate, and sorbitan monopalmitate. Exemplary absorption promoters include, for example, bile salts and derivatives thereof, fusidic acid and derivatives thereof, oleic acid, lecithin, lysolechitins, dodecanoyl phosphatidylcholine (DDPC), sucrose monododecanoate, n-dodecyl-β-D-maltopyranoside, pectin, chitosan, α-, β- and γ-cyclodextrins and derivatives thereof, pegylated caprylic-/capric glycerides and derivatives thereof, such as, Softigen and Labrasol. Exemplary water absorbing polymers include, for example, polyethylene glycols having an average molecular weight ranging from 200 to 7500, propylene glycol, or mixtures thereof, or single ethylene glycols such as tetraethylene glycol and pentaethylene glycol. Exemplary alcohols include, for example, ethanol, isopropyl alcohol. Exemplary lipids include, for example, vegetable oil, soybean oil, peanut oil, coconut oil, maize oil, olive oil, sunflower oil, monoglycerides, diglycerides, mono/diglycerides, mono/di/triglycerides. Exemplary osmotic pressure controlling agents include, for example, glycerol, dextrose, maltose, sucrose, mannitol, xylitol, various salts (for example, sodium chloride). Exemplary pH-controlling agents include, for example, buffers, acids (for example, nitric acid, phosphoric acid, or acetic acid). Exemplary preservatives include, for example, methyl paraoxybenzoate, phenyl ethyl alcohol or benzoic acid. Exemplary propellants, include, for example, butane or air displacement such as nitrogen. Excipients adjusting the HLB of the formulation include, for example, Tween 20, 25, 40, 45, 65, 85, Span 20-80, Brij 30-98, acacia. Exemplary enzyme inhibitors include, for example aprotinin and other peptidase inhibitors, diisopropylfluorophosphate (DFP), carbopol. Exemplary stabilizers include, for example, cyclodextrins.

Although it is understood that the alkoxy-polyethylene glycols described herein, for example, methoxy-polyethylene glycol, can solubilize poorly soluble therapeutic agents, under certain circumstances, it may be helpful to include additional compounds that enhance the solubility of the therapeutic agent. Examples of such solubilizers include, for example, alcohols and polyols, such as ethanol, isopropanol, butanol, benzyl alcohol, ethylene glycol, propylene glycol, butanediols and isomers thereof, glycerol, pentaerythritol, sorbitol, mannitol, transcutol, dimethyl isosorbide, polyethylene glycol, polypropylene glycol, pegylated-mono/di-caprylic/capric glycerides, polyvinylalcohol, hydroxypropyl methylcellulose and other cellulose derivatives, cyclodextrins (for example, α-, β-, or γ-cyclodextrins) and cyclodextrin derivatives; ethers of polyethylene glycols having an average molecular weight of about 200 to about 6000 or tetrahydrofurfuryl alcohol PEG ether (glycofurol, available commercially from BASF under the trade name Tetraglycol); surfactants, such as, sodium lauryl sulfate, oleic acid, linoleic acid, monoolein, lecithin, lysolecithin, deoxycholate, taurodeoxycholate, glycochenodeoxycholate, polyoxyethylene X-lauryl ether, where X is from 9 to 20, sodium tauro-24,25-dihydrofusidate, polyoxyethylene ether, polyoxyethylene sorbitan esters, p-t-octylphenoxypolyoxyethylene, N-lauryl-β-D-maltopyranoside, 1-dodecylazacycloheptane-2-azone; amides, such as, 2-pyrrolidone, 2-piperidone, caprolactam, N-alkylpyrrolidone, N-hydroxyalkylpyrrolidone, N-alkylpiperidone, N-alkylcaprolactam, dimethylacetamide, and polyvinylpyrrolidone; esters, such as, ethyl propionate, tributylcitrate, acetyl triethylcitrate, acetyl tributyl citrate, triethylcitrate, ethyl oleate, ethyl caprylate, ethyl butyrate, triacetin, propylene glycol monoacetate, propylene glycol diacetate, caprolactone and isomers thereof, valerolactone and isomers thereof, β-butyrolactone and isomers thereof; and other solubilizers known in the art, such as dimethyl acetamide, dimethyl isosorbide (Arlasolve DMI (ICI)), N-methylpyrrolidones (Pharmasolve (ISP)), monooctanoin, and diethylene glycol monoethyl ether (available from Gattefosse under the trade name Transcutol).

Preferred additional solubilizers include triacetin, triethylcitrate, ethyl oleate, ethyl caprylate, dimethylacetamide, N-methylpyrrolidone, N-hydroxyethylpyrrolidone, polyvinylpyrrolidone, hydroxypropyl methylcellulose, hydroxypropyl cyclodextrins, ethanol, polyethylene glycol 200-1000, PEG 300, PEG 400, Transcutol, and dimethyl isosorbide, sorbitol, glycerol, triacetin, glycofurol and propylene glycol. Typically, the solubilizer, if present, is present in an amount of from about 0.1% (w/v) to about 50% (w/v), from about 1% (w/v) to about 40% (w/v) or from about 2% (w/v) to about 25% (w/v). In addition, the liquid pharmaceutical composition can comprise water, for example, from about 2% (v/v) to about 99% (v/v), from about 10% (v/v) to about 95% (v/v), or from about 20% (v/v) to about 90% (v/v), of the liquid composition.

As discussed, the composition can comprise a preservative. In addition or in the alternative, the composition can be sterilized. Sterilization can be achieved by filter sterilization, autoclaving, exposure to ionizing radiation, for example, gamma radiation, UV irradiation, and chemical sterilization. In one embodiment, the sterile composition has a sterility assurance level of at least about $10^3$. The resulting liquid compositions preferably are stable at room temperature, such that less than 5%, 4%, 3%, 2% or 1% by weight of the therapeutic agent degrades after storage for 30 days, or more preferably 6 months, at 20° C.

In addition, the formulations may also include a sweetener or flavoring agent. Exemplary sweeteners or flavoring agents include, for example, acacia syrup, acesulfame potassium, anethole, anise oil, aromatic elixir, aspartame, benzaldehyde, benzaldehyde elixir, cyclodextrins, caraway, caraway oil, cardamom oil, cardamom seed, cardamom spirit, cardamom tincture, cherry juice, cherry syrup, cinnamon, cinnamon oil, cinnamon water, citric acid, citric acid syrup, clove oil, cocoa, cocoa syrup, coriander oil, dextrose, eriodictyol, eriodictyol fluid extract, eriodictyol syrup, aromatic, ethylacetate, ethyl vanillin, fennel oil, ginger, ginger fluid extract, ginger oleoresin, glucose, sugar, maltodextrin, glycerin, glycyrrhiza, glycyrrhiza elixir, glycyrrhiza extract, glycyrrhiza extract pure, glycyrrhiza fluid extract, glycyrrhiza syrup, honey, isoalcoholic elixir, lavender oil, lemon oil, lemon tincture, maltodextrin, maltose, mannitol, methyl salicylate, menthol, nutmeg oil, orange bitter, elixir, orange bitter, oil, orange flower oil, orange flower water, orange oil, orange peel, bitter,

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

orange peel sweet, tincture, orange spirit, orange syrup, peppermint, peppermint oil, peppermint spirit, peppermint water, phenylethyl alcohol, raspberry juice, raspberry syrup, rosemary oil, rose oil, rose water, saccharin, saccharin calcium, saccharin sodium, sarsaparilla syrup, sarsaparilla compound, sorbitol solution, spearmint, spearmint oil, sucrose, sucralose, syrup, thyme oil, tolu balsam, tolu balsam syrup, wintergreen oil, vanilla, vanilla tincture, vanillin, wild cherry syrup, xylitol, or combinations thereof.

In addition, the formulations optionally can contain a taste masking agents. Exemplary masking agents include, for example, cyclodextrins, cyclodextrin emulsions, cyclodextrin particles, cyclodextrin complexes, or combinations thereof.

The foregoing list of excipients and additives is by no means complete, and it is understood that a person of ordinary skill in the art can choose other excipients and additives from the GRAS (generally regarding as safe) list of chemicals used in pharmaceutical preparations and those that are currently allowed in topical and parenteral formulations.

Exemplary liquid compositions of the invention contain, for example, the active ingredient (for example, midazolam), 40% (v/v) to 70% (v/v) methoxy-polyethylene glycol (for example, mPEG 350), 0% (v/v) to 20% (v/v) polyethylene glycol (for example, PEG 400), 0% (v/v) to 10% (v/v) propylene glycol, and 0% (v/v) to 5% (v/v) ethanol. Other exemplary liquid compositions of the invention contain, for example, the active ingredient dissolved in 50% (v/v) to 70% (v/v) mPEG 350, 1% (v/v) to 4% (v/v) propylene glycol, and 1% (v/v) to 4% (v/v) ethanol.

It is understood that the choice and amounts of each of the therapeutic agents, alkoxy-polyethylene glycol and other excipients combined to produce the compositions of the invention will depend upon the ultimate use of the composition, and the intended therapy and mode of administration. When the liquid compositions ultimately are administered to a patient, the amount of a given excipient, unless the circumstances dictate otherwise, preferably is limited to a bioacceptable amount, which is readily determined by one of skill in the art. Furthermore, it is understood that the liquid compositions of the invention can be formulated using techniques known to those skilled in the art. A thorough discussion of formulations and the selection of pharmaceutically acceptable carriers, stabilizers, etc. can be found, for example, in *Remington's Pharmaceutical Sciences* (18th Ed.), Mack Publishing Company, Eaton, Pa.

Although the therapeutic agent and the alkoxy-polyethylene glycol are combined in the liquid formulations of the invention, they are not covalently linked to one another. In certain embodiments, the liquid formulations of the invention are free or are substantially free of chitosan. In certain embodiments, the compositions of the invention may be prepared in a powder form.

II Modes of Administration and Pharmacokinetics

The compositions of the invention are particularly useful in delivering one or more therapeutic agents to a mucosal membrane or the skin of a mammal, for example, a human. The mucosal membrane to which the pharmaceutical preparation of the invention is administered may be any mucosal membrane of the mammal to which the therapeutic agent is to be applied, for example, the nose (for example, via a nasal membrane), vagina, eye (for example, via an ocular membrane), ear (for example, via a tympanic membrane), mouth (for example, via the buccal membrane), lungs (for example, via the pulmonal membrane), or rectum (for example, via the rectal membrane). The compositions are particularly useful in delivering a therapeutic agent to the mucosa of the nose, mouth (buccal, gingual, sublingual or to the hard palate), or the vagina.

It is understand that the compositions of the invention are particularly useful in the intranasal delivery of a therapeutic agent. When the composition is applied to the nasal mucosa, the volume of the pharmaceutical composition applied typically is in the range of 1-1000 μL, preferably not more than 700 μL, more preferably 50-150 μL per nostril, and most preferably about 100 μL/nostril.

It is understood that when administered intranasally, the compositions are delivered via a spray device that produces a plume of spray droplets that contact the nasal mucosa. It is contemplated that the compositions can be delivered using commercially available spray devices available from, for example, Pfeiffer of America, Princeton, N.J.; Valois of America, Inc., Greenwich, Conn.; or Becton Dickinson, Franklin Lakes, N.J. Furthermore, these devices are easily operable by the patient or care giver, and leave little or no residual formulation in the device after use.

Such devices can be filled with single or multi-dose amounts of the desired formulation. The container holding the pharmaceutical composition and its sealing means are sterilizable. At least the parts of the device that are in contact with the pharmaceutical composition should be constructed and assembled in a configuration that can be sterilized. Exemplary delivery devices with one or more unit-dose(s) are described, for example, in U.S. Pat. Nos. 4,946,069; 5,307,953; 6,948,492; and 6,446,839. Individual devices can be packaged, sterilized and shipped; alternatively, entire shipping and storage packages can be sterilized at once, and the devices removed individually for dispensing, without affecting the sterility of the remaining units.

The mucosal epithelium in the nasal cavity is covered with many hair-like cilia that provide an important defense mechanism against inhaled dust, allergens and microorganisms. The normal half-time for non-absorbed substances administered to the nasal cavity is about 15 minutes due to the mucociliary clearance removing foreign particles and excess mucus toward the pharynx. For this reason it is preferred that the absorption occurs rapidly and preferably within 0.5 to 20 minutes. However, in the current invention due to bioadhesive properties of the invention, the preferred absorption may occur within 0.5 to 300 minutes (e.g., for vaccines and biologicals), preferably between 0.5 to 60 minutes (e.g., for large molecules) and more preferably between 0.5 and 20 minutes, for example, within 2, 3, 4, 5, 10, 15 or 20 minutes post administration. The composition can be formulated so that upon administration to a subject, for example, via intranasal administration to the subject, the therapeutic agent has a peak concentration ($T_{max}$) in the blood of the subject within 30, 25, 20, 15, 10 8, 5, 3 or 2 minutes after administration of the therapeutic agent.

In addition to administration to humans, the compositions of the invention can be used to deliver the therapeutic agent to an animal, for example: pets, for example, dogs, cats, rabbits, and guinea pigs; and farm animals, for example, horses, sheep, pigs, cattle, and chickens.

Throughout the description, where compositions are described as having, including, or comprising specific components, it is contemplated that compositions also consist essentially of, or consist of, the recited components. Similarly, where processes are described as having, including, or comprising specific process steps, the processes also consist essentially of, or consist of, the recited processing steps. Except where indicated otherwise, the order of steps or order for performing certain actions are immaterial so long as the

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

invention remains operable. Moreover, unless otherwise noted, two or more steps or actions may be conducted simultaneously.

## EXAMPLES

The invention is explained in more detail with reference to the following Examples, which are to be considered as illustrative and not to be construed so as to limit the scope of the invention as set forth in the appended claims.

### Example 1

#### Exemplary Lorazapam Containing Formulation

In this Example, 10 mg lorazepam is dissolved in 2 mL of mPEG 350 using ultrasound to obtain a solution containing 5 mg/mL of lorazepam. 50 μL of the resulting composition is administered into each nasal cavity of male New Zealand White rabbits held in a supine position during, and then one minute after application. An Eppendorf pipette is used for each application. After administration, blood samples then are harvested from a marginal ear vein at 0, 2, 5, 10, 15, 30 and 60 minutes, and the lorazepam concentration determined by high performance liquid chromatography (HPLC). The pharmacokinetics of lorazepam delivery via intranasal administration can then be compared with the pharmacokinetics of lorazepam delivery by intravenous administration. It is contemplated that the pharmacokinetics of the intranasally administered lorazepam will be comparable to those of the intravenously administered lorazepam.

### Example 2

#### Exemplary Midazolam Containing Formulation

In this Example, 10 mg of midazolam is dissolved in 2 mL of mPEG 350 using ultrasound to obtain a solution containing 5 mg/mL midazolam. 50 μL of the resulting composition is then administered into each nasal cavity of male New Zealand White rabbits, held in a supine position during, and then one minute after application. After administration, blood samples then are harvested from a marginal car vein at 0, 2, 5, 10, 15, 30 and 60 minutes, and the midazolam concentration determined by HPLC. The pharmacokinetics of midazolam delivery via intranasal administration can then be compared with the pharmacokinetics of midazolam delivery by intravenous administration. It is contemplated that the pharmacokinetics of the intranasally administered midazolam will be comparable to those of the intravenously administered midazolam.

### Example 3

#### Pharmacokinetics of Exemplary Midazolam Formulations

This Example describes a variety of formulations containing methoxy-polyethylene glycol that demonstrate comparable pharmacokinetic properties to a control formulation containing polyethylene glycol and propylene. In addition to having comparable pharmacokinetic properties, the methoxy-polyethylene glycol formulations had a lower viscosity than the control formulation.

Table 1 lists the composition of a first test formulation, Table 2 lists the composition of a second test formulation, and Table 3 lists the composition of a control formulation.

TABLE 1

Test Formulation 1 Containing 50 mg/mL Midazolam base

| Component | Percent of Final (% v/v) |
|---|---|
| mPEG 350 | 47 |
| PEG 400 | 18 |
| Propylene Glycol | 5 |
| Ethanol | 7 |
| Water | 21 |

TABLE 2

Test Formulation 2 Containing 50 mg/mL Midazolam base

| Component | Percent of Final (% v/v) |
|---|---|
| mPEG 350 | 47 |
| PEG 400 | 18 |
| Propylene Glycol | 10 |
| Polysorbate 80 | 0.1 |
| Water | 22 |

TABLE 3

Control Containing 50 mg/mL Midazolam base

| Component | Percent of Final (% v/v) |
|---|---|
| PEG 400 | 18 |
| Propylene Glycol | 78 |
| Butylatedhydoxytoluene | 0.01 |

Each of the test and control formulations contained 50 mg/mL midazolam. Once made, 5 mg of midazolam in 0.1 mL was delivered intranasally to the right nostril of each dog (3 dogs per set) for each formulation in a cross over manner. Blood was harvested from the dogs predose and at 0.03, 0.08, 0.16, 0.25, 0.5, 0.75, 1, 2, and 4 hours after administration, and the concentration of midazolam in the blood measured by HPLC. The pharmacokinetic properties are summarized in Table 4.

TABLE 4

Pharmacokinetic Properties

| Formulation | $T_{max}$ (hr) | $C_{max}$ (ng/mL) | $AUC_{last}$ (hr*ng/mL) | $AUC_{INF}$ (hr*ng/mL) |
|---|---|---|---|---|
| Test Formulation 1 | 0.11 ± 0.05 | 2220 ± 289 | 506 ± 94 | 508 ± 95 |
| Test Formulation 2 | 0.05 ± 0.03 | 1880 ± 682 | 399 ± 75 | 403 ± 76 |
| Control Formulation | 0.07 ± 0.03 | 2350 ± 796 | 506 ± 72 | 509 ± 71 |

In Table 4, Cmax refer to the maximum plasma concentration, $T_{max}$ refers to the time to reach $C_{max}$, $AUC_{last}$ refers to area under the concentration curve from time zero to the last measurable plasma concentration, and $AUC_{INF}$ refers to the area under the concentration curve from time zero to infinity.

The results demonstrate that the test formulations, when administered intranasally to the dogs, produced comparable pharmacokinetics to the control formulation. The test formulations, however, had a lower viscosity than the control formulations. Lower viscosity correlates with better spray pattern characteristics.

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

## Example 4

### Additional Exemplary Methoxy-Polyethylene Glycol Containing Formulations

This example describes the benefit of incorporating methoxy-polyethylene glycol into certain intranasal formulations. Table 5 describes a formulation containing methoxy-polyethylene glycol and PEG 400, Table 6 describes a formulation containing methoxy-polyethylene glycol without PEG 400, Table 7 describes a formulation containing methoxy-polyethylene glycol without PEG 400 (with reduced ethanol), and Table 8 describes a control formulation containing PEG 400 but no methoxy-polyethylene glycol.

TABLE 5

| Component | Viscosity (cP) | % (w/w) |
|---|---|---|
| Propylene glycol | 40 | 5 |
| PEG 400 | 80 | 18 |
| mPEG 350 | 29 | 47 |
| Ethanol | — | 6 |
| Water | 1 | 18 |
| Midazolam | — | 7 |

TABLE 6

| Component | Viscosity (cP) | % (w/w) |
|---|---|---|
| Propylene glycol | 40 | 2 |
| mPEG 350 | 29 | 64 |
| Ethanol | — | 5 |
| Water | 1 | 23 |
| Midazolam | — | 7 |

TABLE 7

| Component | 75 mg Midazolam/ dose (% w/w) | 50 mg Midazolam/ dose (% w/w) | 25 mg Midazolam/ dose (% w/w) |
|---|---|---|---|
| MPEG 350 | 64.8 | 64.8 | 64.8 |
| Propylene glycol | 2.0 | 2.0 | 2.0 |
| Ethanol | 2.5 | 2.5 | 2.5 |
| Water | 23.7 | 26.0 | 28.3 |
| Phenethyl Alcohol | 0.025 | 0.025 | 0.025 |
| Midazolam | 6.9 | 4.6 | 2.3 |

TABLE 8

Control Formulation (Without Methoxy-polyethylene Glycol)

| Component | Viscosity (cP) | % (w/w) |
|---|---|---|
| PEG 400 | 89 | 19 |
| Propylene Glycol | 40 | 76 |
| Butylatedhydroxytoluene | — | 0.01 |
| Midazolam | — | 5 |

The formulation of Table 5 was prepared by mixing the propylene glycol, PEG 400, mPEG 350, and ethanol. The midazolam was then added to the mixture, and then after the midazolam had dissolved following mixing the water was added to the formulation. The formulations in Tables 6 and 7 were prepared as follows. The midazolam was weighed in a container and the ethanol was added to wet the active ingredient. After mixing, about 65% of the mPEG 350 was added, and the resulting mixture mixed for 2 minutes. Thereafter, the



additional organic phase was added. The remaining 35% of the mPEG 350 was mixed with water, and the diluted mPEG 350 then was gradually added with mixing to the midazolam solution until a clear solution was produced. The viscosity of the resulting formulations and spray patterns were tested.

The viscosity of the resulting formulations was tested at 25° C. using a viscometer (Brookfield DV-II PRO). The viscosity of the control formulation without methoxy-polyethylene glycol (Table 8) was found to be about 42 cP, whereas the viscosity of the test formulation of Table 5 was found to be about 30 cP, and the viscosity of the test formulation of Table 6 was found to be about 23 cP. The reduced viscosity of the test formulations relative to the control formulation permitted the creation of more reproducible spray patterns.

The spray patterns produced by the two test formulations of Tables 5 and 6 were tested using a Proveris spray view instrument. The resulting parameters of the resulting spray patterns were found to be more reproducible as the viscosity of the formulation decreased.

In addition, 100 μL of placebo formulations (no midazolam) corresponding to the formulations set forth in Tables 7 and 8 were administered intranasally to three healthy test subjects using a commercially available spray device from Pfeiffer. The placebo formulation corresponding to Table 7 containing methoxy-polyethylene glycol had a less noticeable taste relative to the placebo formulation corresponding to Table 8.

These collective results demonstrate that mPEG 350 is a suitable excipient for nasal administration, for example, with midazolam.

## Example 5

### Sprayability of Methoxy-Polyethylene Glycol Containing Formulations

This Example demonstrates that methoxy-polyethylene glycol-based formulations produce superior spray flumes relative to polyethylene glycol. Solutions containing 100% methoxy-polyethylene glycol 350 (MPEG 350) from Sigma-Aldrich Chemie GmbH (St. Louis, Mo., USA) and 100% polyethylene glycol 300 (PEG 300) from Croda Chemicals Europe Ltd. (Goole, UK) were placed into Pfeiffer 20 mL bottles (Pfeiffer 34473) and attached to certain pumps from Valois or Pfeiffer (see Table 8). Each spray device was placed 25 cm under a sheet of absorbent paper and the sprayability was measured as the diameter across of the paper wetted by the resulting spray. The results are summarized in Table 9.

TABLE 9

| Pump Type | Formulation | Spray diameter (cm) |
|---|---|---|
| Pfeiffer 71514 | PEG 300 | 2.0-3.2 cm |
| Pfeiffer 71514 | mPEG 350 | 22-26 cm |
| Valois VP6/100 | PEG 300 | 5.0-7.5 cm |
| Valois VP6/100 | mPEG 350 | 15-21 cm |

The results show that there is a clear difference in the sprayability of mPEG 350 compared with PEG 300. The required spray angle is not achieved using PEG 300, whereas a clinically relevant spray-angle can be achieved using mPEG 350.

### INCORPORATION BY REFERENCE

The entire disclosure of each of the patent documents and scientific articles referred to herein is incorporated by reference for all purposes.

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

EQUIVALENTS

The invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. The foregoing embodiments are therefore to be considered in all respects illustrative rather than limiting on the invention described herein. Scope of the invention is thus indicated by the appended claims rather than by the foregoing description, and all changes that come within the meaning and range of equivalency of the claims are intended to be embraced therein.

What is claimed is:

1. A liquid pharmaceutical composition formulated for intranasal administration, comprising:

i) midazolam or a pharmaceutically salt thereof; and

ii) a methoxy-polyethylene glycol selected from the group consisting of methoxy-polyethylene glycol 350 and methoxy-polyethylene glycol 550.

2. The pharmaceutical composition of claim 1, further comprising propylene glycol.

3. The pharmaceutical composition of claim 2, further comprising water.

4. The pharmaceutical composition of claim 1, wherein the methoxy-polyethylene glycol is methoxy-polyethylene glycol 350.

5. The pharmaceutical composition of claim 3, wherein the methoxy-polyethylene glycol is methoxy-polyethylene glycol 350.

6. The pharmaceutical composition of claim 1, further comprising polyethylene glycol.

7. The pharmaceutical composition of claim 5, further comprising polyethylene glycol.

8. The pharmaceutical composition of claim 1, further comprising ethyl alcohol.

9. The pharmaceutical composition of claim 6, wherein the polyethylene glycol is polyethylene glycol 400.

10. The pharmaceutical composition of claim 7, wherein the polyethylene glycol is polyethylene glycol 400.

11. The pharmaceutical composition of claim 1, wherein the midazolam is present in a concentration from 0.001% (w/v) to 20% (w/v).

12. The pharmaceutical composition of claim 1, further comprising water.

13. The pharmaceutical composition of claim 10, wherein the midazolam is present in a concentration from 0.001% (w/v) to 20% (w/v).

14. The pharmaceutical composition of claim 9, wherein the methoxypolyethylene glycol is methoxy-polyethylene glycol 350.

15. A method of administering midazolam to a mammal, the method comprising administering a pharmaceutical composition to a mucosal surface of the mammal, the pharmaceutical composition comprising:

midazolam or a pharmaceutically acceptable salt thereof; and

a methoxy-polyethylene glycol selected from the group consisting of methoxy polyethylene glycol 350 and methoxy-polyethylene glycol 550.

16. The method of claim 15, wherein the mucosal surface is a nasal membrane, buccal membrane, pulmonal membrane, ocular membrane, or rectal membrane.

17. The method of claim 15, wherein the mucosal surface is a nasal membrane.

18. The method of claim 15, wherein the midazolam has a peak concentration ($T_{max}$) in the blood of the mammal within 30 minutes after administration of the midazolam.

19. The method of claim 15, wherein the midazolam has a peak concentration ($T_{max}$) in the blood of the mammal within 15 minutes after administration of the midazolam.

20. The method of claim 15, wherein the pharmaceutical composition is administered in a volume of 50 µl to 300 µl.

21. The method of claim 15, wherein the mammal is a human.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 08-17-2021

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1992

**Short Case Caption:** UCB, Inc. v. Cipla Limited

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,663 words.

☐ the filing has been prepared using a monospaced typeface and includes ___________ lines of text.

☐ the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 09/03/2026

Signature: /s/ Anil H. Patel

Name: Anil H. Patel